UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| CAPITOL RECORDS, LLC, *et al.*, | CASE NO. 09 CV 10101 (RA) |
| Plaintiffs, | |
| v. | |
| VIMEO, LLC d/b/a VIMEO.COM, *et al.*, | |
| Defendants. | |

---

| | |
|---|---|
| EMI BLACKWOOD MUSIC, INC., *et al.*, | CASE NO. 09 CV 10105 (RA) |
| Plaintiffs, | |
| v. | |
| VIMEO, LLC d/b/a VIMEO.COM, *et al.*, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE DMCA SAFE HARBOR** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ...................................................................................3

    A.    Vimeo's Business..................................................................................3

    B.    How Vimeo Works ..............................................................................4

    C.    Vimeo's Revenue .................................................................................4

    D.    Vimeo's Copyright Infringement Policy ...........................................5

    E.    Vimeo's DMCA Policy and Processes ...............................................6

    F.    Vimeo's Repeat-Infringer Policy .......................................................7

    G.    Plaintiffs ..............................................................................................8

    H.    Plaintiffs' Requests to Remove Content ............................................8

    I.    This Lawsuit, and Plaintiffs' Failure to Send Vimeo DMCA
        Notices Regarding the Videos-in-Suit ...............................................9

    J.    Vimeo's Receipt of Counter-Notifications in Response to Its
        Takedown of Videos at Plaintiffs' Request .......................................10

ARGUMENT ........................................................................................................10

I.    VIMEO MEETS THE DMCA'S THRESHOLD REQUIREMENTS .............................12

    A.    Vimeo Is a Service Provider ...............................................................12

    B.    Vimeo Has Registered a Designated Agent to Receive
        DMCA Notices and Has a Working DMCA Notification System .......13

    C.    Vimeo Has Adopted and Reasonably Implemented a
        Repeat-Infringer Policy.......................................................................14

    D.    Vimeo Does Not Interfere with Standard Technical Measures ...........14

II.    VIMEO IS ENTITLED TO SAFE HARBOR UNDER § 512(c)......................................15

    A.    Vimeo's Service Qualifies as "Storage at the Direction of a User" .....................16

        1.    Section 512(c) Applies to Services That Use Automated Processes to Facilitate User Access to Stored Material ............................16

        2.    Vimeo Stores and Streams Videos via Automated Processes Initiated by Users .......................................................................17

    B.    Vimeo Had No Knowledge of the Allegedly Infringing Material. ........................17

        1.    Vimeo Had No Actual Knowledge of the Videos-in-Suit .........................19

            a.    Plaintiffs Did Not Send Vimeo a DMCA Notice Regarding Any of the Videos-in-Suit ............................................19

            b.    The Schedules Attached to the Complaints Are Insufficient to Confer Knowledge of Infringement upon Vimeo   .............................................................................19

        2.    Vimeo Was Not Aware of Facts or Circumstances from Which the Specific, Allegedly Infringing Activity Was Apparent ......................20

    C.    In Any Event, Vimeo Responded Expeditiously to Remove the Allegedly Infringing Materials ................................................................................26

    D.    Vimeo Does Not Have the Right and Ability to Control the Allegedly Infringing Activity, and Does Not Receive a Financial Benefit Directly Attributable Thereto .....................................................................27

        1.    Vimeo Lacks the Right and Ability to Control the Allegedly Infringing Activity ...........................................................................27

        2.    Vimeo Receives No Financial Benefit Directly Attributable to Allegedly Infringing Activity. ..........................................................28

CONCLUSION.............................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)....................................................................................25

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011) ............................................................. *passim*

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004).................................12, 16, 19, 20, 21

*Costar Grp. Inc. v. Loopnet, Inc.*,
   164 F. Supp. 2d 688 (D. Md. 2001) .........................................................................16

*Hendrickson v. eBay, Inc.*,
   165 F. Supp. 2d 1082 (C.D. Cal. 2001) ...................................................................13

*Io Grp. Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) .................................................14, 16, 20, 27, 28

*Jara v. Initial Contract Servs., Inc.*,
   699 N.Y.S.2d 411 (N.Y. App. Div. 1999) ...............................................................13

*Leibovitz v. Paramount Pictures Corp.*,
   948 F. Supp. 1214 (S.D.N.Y. 1996)........................................................................26

*Lenz v. Universal Music Corp.*,
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) ..................................................................21

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986)..................................................................................25

*Obodai v. Demand Media, Inc.*,
   No. 11 Civ. 2503, 2012 WL 2189740 (S.D.N.Y. June 13, 2012)......................12, 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ................................................................................11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   No. CV 05-4753, 2009 WL 1334364 (C.D. Cal. May 12, 2009) .........................19

*Perfect 10, Inc. v. CCBill LLC*,
   340 F. Supp. 2d 1077 (C.D. Cal. 2004) .............................................14, 21, 22, 23

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............................................................15, 28

*Perfect 10, Inc. v. Visa Int'l Service Ass'n*,
   494 F.3d 788 (9th Cir. 2007) ..................................................................................28

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
  948 N.Y.S.2d 881 (N.Y. Sup. Ct. 2012) ............................................................11

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  667 F.3d 1022 (9th Cir. 2011) ..........................................................................18

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  620 F. Supp. 2d 1081 (C.D. Cal. 2008) .......................................................16, 17

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  665 F. Supp. 2d 1099 (C.D. Cal. 2009) .................................................18, 21, 26

*Viacom Int'l Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ........................................................................ *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
  718 F. Supp. 2d 514 (S.D.N.Y. 2010).................................................12, 14, 23

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012) ....................................................... *passim*

## Statutes

17 U.S.C. § 107........................................................................................................25

17 U.S.C. § 512(c) ...............................................................................12, 15-19, 26-29

17 U.S.C. § 512(i)............................................................................................. 12-15

17 U.S.C. § 512(j)....................................................................................................12

17 U.S.C. § 512(k)...................................................................................................12

17 U.S.C. § 512(m)...................................................................................................21

## Miscellaneous

Restatement (Second) of Agency § 228(2)..............................................................13

## PRELIMINARY STATEMENT

Vimeo now moves for summary judgment on the ground that it is entitled to safe harbor pursuant to the Digital Millennium Copyright Act ("DMCA").[1]

Congress enacted the DMCA in 1998 to limit the liability of online service providers that allow their users to upload content to their websites.  It recognized that service providers often lack control over what their users upload but, under existing copyright law, could nonetheless be subject to penalties based upon infringing user content.  The DMCA seeks to encourage the development of online services that feature user content while protecting copyright holders' rights.  It strikes this careful balance by assigning duties to each side.  The service provider must satisfy several statutory prerequisites and expeditiously remove content that a copyright holder identifies as infringing.  The copyright holder's obligation in this framework is relatively limited:  If it wishes allegedly infringing material to be removed, it must furnish the service provider with a takedown notice that complies with certain statutory requirements.  In assigning these duties, Congress recognized that it is the copyright holder that is best situated to identify content that infringes its copyrights.  Service providers that comply with the DMCA's requirements receive safe harbor from any liability for copyright infringement arising from user-supplied content.

Through its online service, Vimeo enables users to upload videos of their own creation and share them with others.  Started as a part-time project in 2004, Vimeo today has over 12 million registered users worldwide who collectively upload approximately 43,000 videos per day.  These users range from amateur and professional filmmakers to businesses, politicians, churches, and individuals who simply wish to upload their family videos.  Given the sheer volume of video content

---

[1]   For simplicity, both the Defendant corporate entities (Vimeo, LLC and Connected Ventures, LLC) and the Vimeo service (available through http://vimeo.com) are collectively referred to herein as "Vimeo" unless otherwise noted.

uploaded every day, Vimeo does not—and cannot—view every video uploaded by its users to attempt to determine whether it infringes a copyright or otherwise violates Vimeo's terms of service. Instead, Vimeo relies upon copyright holders to inform it if a user has uploaded an infringing video. This is exactly what Congress envisioned when it enacted the DMCA.

Plaintiffs, a group of music recording and publishing companies, have chosen to ignore the limited responsibility Congress assigned them—namely, to send Vimeo takedown notices if they wish to have allegedly infringing material removed from the website.  Instead, they have sued Vimeo for copyright infringement with respect to hundreds of user videos that were never the subject of a DMCA notice.  Plaintiffs have advanced a number of theories in support of their copyright claims, including the notion that service providers like Vimeo must affirmatively monitor all content uploaded by their users and remove supposedly infringing content before even being requested to so do.  But the courts—including recently the Second Circuit in *Viacom Int'l Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)—have repeatedly held that the DMCA does not require a service provider to do any such thing.

Vimeo has at all times complied with the DMCA's requirements.  Plaintiffs' assertion that they are entitled to copyright damages based upon allegedly infringing videos they have never previously identified simply cannot be reconciled with the DMCA's letter or spirit.  Having fulfilled all of the statutory requirements as demonstrated below, Vimeo is entitled to the DMCA's safe harbor protection and, as a result, this Court should enter judgment in favor of Vimeo on all of Plaintiffs' claims.

# FACTUAL BACKGROUND[2]

## A.    Vimeo's Business

Vimeo operates an online video-hosting and video-sharing website, located at
http://vimeo.com. (SUF ¶¶ 1, 6.)  Vimeo distinguishes itself from other video-sharing websites not
only by providing its members with the best tools and highest quality video technology available, but
also by focusing on the sharing of original user-generated content created by amateur and
professional artists (*Id.* ¶ 6, 15.)  Vimeo was created in 2004 by four young entrepreneurs who
imagined a place on the Internet where people could upload and share original videos.[3] (*Id.* ¶ 2.)  As
of April 2007, Vimeo had about 40,000 registered users.  (*Id.* ¶ 18.)  Starting in mid-2008, Vimeo
began to grow, and by the end of 2009, Vimeo had over 2.3 million registered users, with about
11,000 new videos being uploaded every day.  (*Id.*)  Today, Vimeo has approximately 12.3 million
registered users. (*Id.*)

The videos hosted on Vimeo are incredibly diverse:  They include personal home videos as
well as animation, documentaries, independent films, inspirational works, shorts, slow-motion films,
time-lapse videos, and split screen films, among many, many others.  (*Id.* ¶ 15.)  Videos range in
length from clips lasting a few seconds to full-length feature films posted by their creators.  (*Id.*)
Vimeo currently has registered users located in 49 different countries.  (*Id.*)  Vimeo is one of the top
130 most-visited websites in the world, and it has received numerous accolades.  (*Id.* ¶ 16.)

Vimeo users are as varied as their videos.  Accountholders include individuals, political
organizations (*e.g.*, the White House), news media (*e.g.*, *The New York Times*, CNN), educational

---

[2]    The undisputed facts are set forth more fully in the accompanying Statement of Undisputed Facts
Pursuant to Local Rule 56.1, dated September 7, 2012 ("SUF"), and the Declarations of Michael A.
Cheah, Dae Mellencamp, Andrew Pile, and Todd Anten, executed September 7, 2012.

[3]    At the time Vimeo was founded, video-sharing websites were in their infancy.

institutions (*e.g.*, Yale Law School), not-for-profits (*e.g.*, the Metropolitan Museum of Art, the New York City Ballet), entertainment conglomerates (*e.g.*, Viacom Entertainment and Music Group), music companies (*e.g.*, Warner Bros. Records); filmmakers (*e.g.*, director Jason Reitman), and musicians and bands (*e.g.*, Phish, Josh Groban, Van Halen, "Weird Al" Yankovic). (*Id.* ¶ 17.)

**B.     How Vimeo Works**

Any member of the public with access to the Internet can visit and watch a video on Vimeo for free. (*Id.* ¶¶ 7, 60.) To upload a video, however, users must register and create a Vimeo account by providing a user name, a password, and a valid e-mail address. (*Id.* ¶ 9.) Once registered, the user may upload a video by clicking on the "upload" button on Vimeo's "Video Upload" page, located at http://vimeo.com/upload. (*Id.* ¶ 10.) Vimeo's system then automatically, and without any human intervention, initiates the upload. (*Id.* ¶ 8.) The user has the option of providing a title, description, and "tags" (or keywords) for the video. (*Id.* ¶ 10.) After the user provides this information, the video is automatically "transcoded" (that is, converted into a format that most Internet browsers can accommodate) and made available for viewing on Vimeo, thereby completing the upload process. (*Id.* ¶ 13.) The video then can be viewed on Vimeo through a process known as "streaming" or, in some cases, can be downloaded to facilitate viewing. (*Id.* ¶ 14.)

Vimeo does not (and, as a practical matter, cannot) screen or review videos before they are uploaded. (*Id.* ¶¶ 11, 12.) On any given day, users upload approximately 43,000 new, unique videos on Vimeo. (*Id.* ¶ 18.) Vimeo's database currently numbers over ***31.7 million*** videos. (*Id.*)

**C.     Vimeo's Revenue**

Vimeo's revenue is derived primarily from two sources: subscription fees and advertising sales. (*Id.* ¶ 61.) In addition to offering free or "basic" accounts, Vimeo offers two subscription accounts: a "Vimeo Plus" subscription for $59.99/year and a "Vimeo PRO" subscription for

4

$199.00/year.  (*Id.* ¶ 62.)  All plans, including the basic membership, allow users to view and upload

videos.  (*Id.* ¶ 60.)  The subscription plans give users certain additional features, such as priority

uploading and the ability to upload an unlimited number of non-HD (high definition) videos per

week.  (*Id.* ¶ 62.)  The vast majority of Vimeo's revenues are derived from subscription fees.  (*Id.*

¶ 61.)  To a lesser extent, Vimeo generates revenue through advertisements on its website.  (*Id.*

¶ 63.)  Most of the advertising revenue comes from "display advertising."  This generally takes the

form of banner advertisements and custom promotions.  (*Id.*)  Vimeo's past and present advertisers

include Canon, Coca-Cola, Frito-Lay (for Tostitos®), Honda, Mercedes-Benz, Nike, Nikon, Nokia,

Proctor & Gamble (for Old Spice), Rolex, and The Sundance Channel.  (*Id.*)  A smaller portion of

Vimeo's advertising revenue comes from sponsored listings provided by Google under its AdSense

program.  (*Id.* ¶ 64.)

**D.**     **Vimeo's Copyright Infringement Policy**

Vimeo requires each user to agree to its terms of service agreement, available at

http://vimeo.com/terms ("Terms of Service"), when registering.  (*Id.* ¶ 21.)  The Terms of Service

prohibit, among other things, uploading videos that infringe the copyrights of third parties.  (*Id.*

¶¶ 20, 21.)  *See* http://vimeo.com/terms.   Vimeo also posts and enforces a set of community

guidelines ("Community Guidelines"), which are incorporated into the Terms of Service.  (SUF

¶¶ 20, 22.)  The Community Guidelines state that users may only upload videos that they have

created or played a role in creating and reiterate that the user must have all necessary rights

(including copyrights) to upload the video. (*Id.* ¶ 22.) *See* http://vimeo.com/guidelines.[4]  Users who

---

[4]     The prohibition of uploading videos that infringe the copyrights of third parties is reiterated on
the Upload page through which users upload their videos, located at http://vimeo.com/upload; on its
Copyright page, located at http://vimeo.com/dmca; and through employees' posts on the website and
individual communications with users.  (SUF ¶¶ 23-25.)

violate Vimeo's Terms of Service may have their videos removed and/or their Vimeo accounts terminated.  (SUF ¶¶ 26, 30.)

Vimeo enables users to report suspected violations of Vimeo's Terms of Service by "flagging" offending videos.  (*Id.* ¶ 29.)  Vimeo employees regularly review all flagged videos and remove any videos and terminate accounts that, in their judgment, do not comply with the Terms of Service.  (*Id.* ¶¶ 29, 30.)  Vimeo also employs a number of automated tools (referred to by Vimeo staff as moderator tools, or "Mod Tools") to help Vimeo staff identify and remove content that does not comport with Vimeo's Terms of Service.  (*Id.* ¶¶ 27, 28.)  For example, "Sweet Spot" is a tool that automatically searches for videos that are precisely the same length as a typical half-hour or hour-long television show without advertisements.  (*Id.* ¶ 28.)  Another tool, "Gainers," identifies the 200 videos that have generated the most views in the past 24 hours.  (*Id.*)  Once identified, these videos are manually reviewed by Vimeo staff on a regular basis to determine whether they violate the Terms of Service; if so, the videos are removed and, when appropriate, accounts are terminated. (*Id.* ¶ 30.)  As a result of these regular practices, many videos that may contain infringing content are routinely removed, and the corresponding accounts are terminated, in the absence of a DMCA notice.  (*Id.*)

E.      **Vimeo's DMCA Policy and Processes**

Vimeo has adopted policies and procedures for responding to complaints from copyright holders pursuant to the DMCA.  (*Id.* ¶¶ 31-38.)  Specifically, Vimeo:  (1) has appointed an agent for receiving notifications of claimed infringement; (2) publishes on its website the information needed to process a DMCA notice (*see* http://vimeo.com/dmca); and (3) informs complainants how and where to submit DMCA notices (providing multiple means of doing so).  (*Id.*)

Vimeo follows these steps upon receipt of a notice that could be construed as complaining about copyright infringement: (1) it reviews the notice to determine whether it contains the required information; (2) if the notice does not contain all of the required information, Vimeo requests the missing information from the complainant; (3) if the notice does contain the required information, Vimeo checks the identified video(s) to ensure it matches the description in the notice; and (4) where there is a match, Vimeo removes the video from its website and notifies both the complainant and the user who posted the infringing video.  (*Id.* ¶¶ 33-35.)

Vimeo uses technical measures to ensure that videos removed for DMCA reasons cannot be re-uploaded.  (*Id.* ¶ 45.)  Vimeo also processes any counter-notifications received from users pursuant to the DMCA.  (*Id.* ¶ 36.)  Vimeo does not actively prevent copyright owners from collecting information needed to issue DMCA takedown notices.  (*Id.* ¶ 38.)

**F.**      **Vimeo's Repeat-Infringer Policy**

Vimeo has adopted and implemented a policy for terminating the accounts of repeat infringers.  (*Id.* ¶¶ 39-49.)  Vimeo informs users of its repeat-infringer policy in a dedicated copyright page on its website.  (*Id.* ¶¶ 24, 40, 41.)  *See* http://vimeo.com/dmca.  Vimeo reiterates this policy in its Terms of Service, which informs users that uploading infringing videos is prohibited and that termination may result from any violation of the Terms of Service.  (SUF ¶¶ 21, 41.)  *See* http://vimeo.com/terms ("Vimeo may suspend, disable, or delete your account … if Vimeo determines that you have violated any provision of this Agreement.").

Vimeo employs a "three strikes" rule to determine who is a repeat infringer:  A user's account will be terminated if the user has been the subject of three separate DMCA notices.[5]  (SUF ¶ 40.)  Vimeo tracks the videos that have been removed because of DMCA notices in its "Purgatory" tool and displays the total number of removed videos on the user's "Rap Sheet" (an internal webpage that displays a user's history of activity on Vimeo).  (*Id.* ¶¶ 43-44.)  When Vimeo terminates a user's account, it removes ***all*** of that user's videos and permanently blocks the e-mail address associated with that account from establishing a new Vimeo account.  (*Id.* ¶¶ 44, 49.)  In addition, Vimeo staffers have the discretion to (and often do) terminate a user's account if, in the staff's judgment, other videos in the account appear to violate Vimeo's Terms of Service, even if the user has not received three "strikes" (*e.g.*, if the user has uploaded other videos that do not appear to be user-generated).  (*Id.* ¶¶ 47-48.)

## G.   Plaintiffs

Plaintiffs are music recording and publishing companies affiliated with the EMI Group Limited.  (*Id.* ¶ 4.)  A number of entities affiliated with Plaintiffs (*e.g.*, EMI Music Norway), and Plaintiffs' musicians and artists (*e.g.*, Coldplay, Katy Perry, Diane Birch, OK Go) appear to be Vimeo accountholders.  (*Id.* ¶¶ 54, 55.)

## H.   Plaintiffs' Requests to Remove Content

Vimeo has expeditiously processed every request to remove content that Plaintiffs have ever sent to it.  (*Id.* ¶¶ 50, 69.)  On or about December 11, 2008, Vimeo received a DMCA notice from EMI Music North America ("EMI Music"), alleging that certain videos containing "EMI Recordings" and "EMI Compositions" were accessible on Vimeo and demanding that they be

---

[5]   For the purposes of this policy, DMCA notices filed within three business days of each other are considered to be a single "strike," and multiple videos listed in a single DMCA notice are considered to be a single "strike."  (SUF ¶ 40.)

removed.  (*Id.* ¶ 51.)  EMI Music's letter attached two lists comprising approximately 170 Vimeo URLs, which EMI Music claimed included sound recordings and/or music compositions for which EMI Music owned the copyrights. (*Id.*)  Vimeo processed the notification and within three to four weeks had removed and removed each of the videos at the URLs identified in the lists, and notified EMI Music of the same.  (*Id.*)

On June 15, 2010 (six months after Plaintiffs filed their Complaints in these cases), Vimeo received six DMCA notices from EMI Music, identifying URLs of six videos on Vimeo that it alleged contained music that infringed EMI Music's copyrights.  (*Id.* ¶ 52.)  Vimeo reviewed and removed the videos at the URLs referenced therein on the same day it received notice, and so notified EMI Music.  (*Id.*)

On July 11, 2012, EMI Music again sent a DMCA notice to Vimeo.  Vimeo removed the video at the identified URL on the same day it received notice, and notified EMI Music.  (*Id.* ¶ 53.)

## I.   This Lawsuit, and Plaintiffs' Failure to Send Vimeo DMCA Notices Regarding the Videos-in-Suit

Plaintiffs commenced these actions on December 10, 2009.  Plaintiffs alleged that approximately 199 videos located at specified URLs on Vimeo's website infringed their copyrights (the "Videos-in-Suit").  (*Id.* ¶ 69.)  Plaintiffs listed these videos in "schedules" attached to the Complaints.  (*Id.*)  ***Critically, at no time prior to the commencement of this litigation did Plaintiffs send Vimeo a DMCA notice complaining of any of the allegedly infringing videos identified in the Complaints***.  (*Id.* ¶ 67.)  Although these schedules did not constitute valid notices under the DMCA, Vimeo nonetheless treated them as if they were DMCA notices and reviewed and removed the videos identified at the URLs on the schedules within a few weeks of receiving the Complaints.  (*Id.* ¶ 69.)

9

On May 9, 2012, Vimeo received proposed amendments to Plaintiffs' schedules of allegedly infringing works which contained what Plaintiffs alleged to be more than 1,000 additional infringing videos. (*Id.* ¶ 70.) Despite the fact that these schedules likewise did not constitute valid DMCA notices, Vimeo reviewed and removed the videos at the URLs referenced therein in less than 48 hours.[6] (*Id.*)

**J.     Vimeo's Receipt of Counter-Notifications in Response to Its Takedown of Videos at Plaintiffs' Request**

Vimeo has received a number of counter-notifications for videos it removed pursuant to Plaintiffs' allegations. For example, for at least three of the videos listed in Plaintiffs' proposed May 9, 2012 amended schedules, the accountholders submitted counter-notifications alleging that Plaintiffs' takedown demands were in error. (*Id.* ¶ 57.) Plaintiffs did not file suit against any of these accountholders, and two of the videos were restored (while the third counter-notification was withdrawn). (*Id.*)

## ARGUMENT

As an online service provider that respects the rights of copyright holders, Vimeo is shielded from all of Plaintiffs' copyright infringement claims by the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

Recognizing that online entities such as Vimeo would not be able to survive if they were exposed to liability for every claim of copyright infringement arising from material posted by third-

---

[6]     On May 21, 2012, Plaintiffs submitted a pre-motion letter to the Court seeking leave to amend their Complaints by adding these 1000+ videos to their original schedules. (SUF ¶ 71.) On May 31, 2012, the Court denied the request without prejudice, ruling that "[a]mending the pleading at this stage [15 months after the close of discovery] would, if granted, require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions." (*Id.*) Thus, the Videos-in-Suit consist of the 199 videos listed in the schedules attached to the original Complaints, none of which was the subject of a DMCA notice.

party users, Congress enacted a detailed and balanced framework that immunizes from copyright infringement liability online businesses that comply with the requirements of that framework. *See* 144 Cong. Rec. H7074-03, H7095 (1998) (statement of Rep. Goodlatte) ("[I]f America's service providers are subject to litigation for the acts of third parties at the drop of a hat, they will lack the incentive to provide quick and sufficient access to the Internet."); *Viacom*, 676 F.3d at 27 (stating that the DMCA safe harbors were "designed to 'clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks.'" (quoting S. Rep. No. 105-190, at 2)); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (noting that DMCA safe harbors limit online service providers' "'legal exposure for infringements that may occur in the course of their activities'" (citation omitted)).

Vimeo's qualification for DMCA safe harbor precludes any monetary liability for all forms of direct or secondary copyright infringement claims, including all of the claims Plaintiffs have asserted in this action—as the Second Circuit has recently confirmed. *See Viacom*, 676 F.3d at 41 ("[A] finding of safe harbor application necessarily protects a defendant from ***all*** affirmative claims for monetary relief." (emphasis added)); *see also Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 749 (S.D.N.Y. 2012) ("Because Photobucket is afforded the protection of the DMCA's 'safe harbor' provision, these secondary infringement claims are also dismissed."); S. Rep. No. 105-190, at 20 (1998) (reiterating that the DMCA safe harbors apply to claims of "direct, vicarious and contributory infringement"); H.R. Rep. No. 105–551, pt. 2, at 50 (1998) (same).

The DMCA even protects Vimeo from the Capitol Plaintiffs' common-law claims for infringement of sound recordings created prior to February 15, 1972 (which are not covered by the Copyright Act), as courts have held that the DMCA's safe harbor provisions apply to both pre- and post-1972 sound recordings. *See*, *e.g.*, *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d

11

627, 641-42 (S.D.N.Y. 2011) ("[T]he DMCA applies to sound recordings fixed prior to February 15, 1972."); *UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 948 N.Y.S.2d 881, 887 (N.Y. Sup. Ct. 2012) ("[T]he safe harbor provision codified by section 512(c)(1) of the DMCA is applicable to Pre-1972 Recordings.").

Thus, should the Court grant Vimeo's DMCA motion, it will dispose of the entire case.[7]

## I.   VIMEO MEETS THE DMCA'S THRESHOLD REQUIREMENTS

To be eligible for DMCA safe harbor, a party must meet the following threshold conditions: it must:  (1) qualify as a "service provider"; (2) have registered an agent to receive notifications of claimed infringement; (3) have adopted and reasonably implemented a repeat-infringer policy; and (4) not interfere with "standard technical measures" used by copyright owners to identify or protect their works.  *See* 17 U.S.C. §§ 512(k)(1)(B), (c)(2), (i); *Viacom*, 676 F.3d at 27.  Vimeo readily satisfies these requirements.

### A.   Vimeo Is a Service Provider

Vimeo is a "service provider" as defined by the DMCA because it provides online video hosting and sharing services.  (SUF ¶¶ 6-14.)  *See* 17 U.S.C. § 512(k)(1)(B) (defining a "service provider" as "a provider of online services or network access, or the operator of facilities therefor").  Courts have held that this broad definition encompasses websites like Vimeo that provide online services (in the form of hosting user-submitted material) to Internet users.  *See Obodai v. Demand Media, Inc.*, No. 11 Civ. 2503, 2012 WL 2189740, at *4 (S.D.N.Y. June 13, 2012) ("Because the defendant operates a website that permits users to post and share materials, it falls within the broad definition of a service provider under section 512(k)(1)(B)."); *see also*, *e.g.*, *Viacom Int'l Inc. v.*

---

[7]   As Plaintiffs do not allege that any of the Videos-in-Suit remains accessible on the Vimeo website, the provision of the DMCA authorizing injunctive relief, even when safe harbor from monetary liability is granted, is inapplicable.  *See* 17 U.S.C. § 512(j).

*YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010) ("YouTube is a service provider for

purposes of § 512(c)."); *Wolk*, 840 F. Supp. 2d at 744 (Photobucket); *Corbis Corp. v. Amazon.com,*

*Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004) (Amazon); *Hendrickson v. eBay, Inc.*, 165 F.

Supp. 2d 1082, 1088 (C.D. Cal. 2001) (eBay).[8]

### B.    Vimeo Has Registered a Designated Agent to Receive DMCA Notices and Has a Working DMCA Notification System

Vimeo formally registered with the Copyright Office a designated agent to receive notices of

claimed infringement more than seven years ago.  (SUF ¶ 31.)  Vimeo publishes on its website

detailed instructions explaining how to submit a notice to Vimeo pursuant to the DMCA on its

Copyright page (http://vimeo.com/dmca), which is part of its Terms of Service.  (*Id.* ¶ 22.)  *See*

http://vimeo.com/dmca.  Vimeo's working DMCA notification system includes policies and

procedures for responding to complaints from copyright holders pursuant to the requirements set

forth in the DMCA.  *See supra* § I.E-F.  If a notice is deficient, Vimeo follows up with the

complainant to request the additional information needed to process the notice.  (SUF ¶ 33.)  Vimeo

processes all intelligible DMCA notices it receives, confirming that they contain the required

information, comparing the video(s) complained of with the descriptions in the notice, expeditiously

removing any properly identified videos, tracking the processing of notices in "Purgatory," and

---

[8]    Plaintiffs may argue that Vimeo is not entitled to safe harbor because some of its employees have
uploaded personal videos to its website (including ten of the 199 Videos-in-Suit).  This argument,
which is rooted nowhere in the DMCA, is baseless.  Many Vimeo employees were users of the site
before they were hired and/or use the site in their personal capacity, and, in any event, none of this
changes the nature of Vimeo's business of hosting user-generated content—a business that makes it
eligible to seek safe harbor under the DMCA.  *See* Restatement (Second) of Agency § 228(2)
("Conduct of a servant is not within the scope of employment if it is different in kind from that
authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve
the master."); *Jara v. Initial Contract Servs., Inc.*, 699 N.Y.S.2d 411, 412 (N.Y. App. Div. 1999)
(corporate defendant not liable where its low-level supervisor was not acting within scope of his
employment when he committed alleged tort).

notifying both the complainant and the Vimeo user who posted the infringing video(s) of the actions taken.  (*Id.* ¶¶ 32-36, 39-44, 47-49.)  Vimeo also processes any counter-notifications received from users pursuant to the DMCA.  (*Id.* ¶ 36.)  In addition, Vimeo does not prevent copyright owners from collecting information needed to issue a DMCA notice.  (*Id.* ¶ 38.)

### C.   Vimeo Has Adopted and Reasonably Implemented a Repeat-Infringer Policy

Vimeo has "adopted and reasonably implemented, and informed subscribers and account holders … of a policy that provides for the termination in appropriate circumstances of subscribers and account holders … who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  Specifically, Vimeo publishes its repeat-infringer policy on its website (*see* http://vimeo.com/dmca), tracks DMCA notices it receives by accountholder, and terminates user accounts that receive three "strikes."  *See supra* § I.F. Vimeo also permanently blocks the e-mail address associated with a terminated account from establishing a new Vimeo account.  *See supra* § I.F; *see also Viacom*, 718 F. Supp. 2d at 527-28 (finding that a policy of terminating accounts that have received three DMCA notices is reasonable); *Perfect 10, Inc. v. CCBill LLC*, 340 F. Supp. 2d 1077, 1094 n.12 (C.D. Cal. 2004) (same), *aff'd in part*, 488 F.3d 1102, 1111 (9th Cir. 2007) ("A service provider reasonably implements its repeat infringer policy if it terminates users when 'appropriate.'"); *Io Grp. Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143-44 (N.D. Cal. 2008) (relying on similar facts to find that Veoh reasonably implemented its policy).  Vimeo has terminated thousands of accounts throughout its history, including accounts deemed to be repeat infringers pursuant to the DMCA. (SUF ¶¶ 30, 48.)

### D.   Vimeo Does Not Interfere with Standard Technical Measures

Vimeo accommodates and does not interfere with any "standard technical measures" used by copyright owners to identify or protect their works.  17 U.S.C. § 512(i)(1)(B).  The phrase "standard

technical measures" is defined in the statute to apply only to "technical measures that are used by copyright owners to identify or protect copyrighted works" and that "have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process," among other requirements.  17 U.S.C. § 512(i)(2)(A).  This required standard-setting process has never occurred, and thus, as a matter of law, there are currently no relevant "standard technical measures" with which Vimeo could have interfered.  *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1174 n.18 (C.D. Cal. 2002) ("It … appears to be an open question if ***any*** conduct or policy could interfere with 'standard technical measures.'").  In any event, there is no dispute that Vimeo does not interfere with any such measures.

Having satisfied the threshold conditions for eligibility, Vimeo is entitled to seek safe harbor under the DMCA.

## II.   VIMEO IS ENTITLED TO SAFE HARBOR UNDER § 512(c)

Under the applicable provision here, § 512(c), a service provider that stores allegedly infringing material on its system or network at the direction of users is entitled to safe harbor protection if the service provider:

(A)(i)    does not have actual knowledge that the material … is infringing;

   (ii)    in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

   (iii)   upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B)    does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C)    upon notification of claimed infringement [via a valid DMCA notice], responds expeditiously to remove, or disable access to, the material that is claimed to be infringing … .

17 U.S.C. § 512(c)(1)(A)-(C).  Vimeo satisfies all of these requirements and therefore is entitled to safe harbor.

A.    **Vimeo's Service Qualifies as "Storage at the Direction of a User"**

The safe harbor codified in § 512(c) applies to any claim for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider …."  17 U.S.C. § 512(c)(1).  Vimeo satisfies this criterion.

1.    **Section 512(c) Applies to Services That Use Automated Processes to Facilitate User Access to Stored Material**

Courts have held that a website (like Vimeo) that hosts user-generated videos and makes them more readily accessible to the public qualifies as a "service provider" engaging in "storage at the direction of a user" for the purposes of § 512(c).  *See Viacom*, 676 F.3d at 38-40 (affirming with respect to YouTube that the § 512(c) safe harbor applies to "the conversion (or 'transcoding') of videos into a standard display format, the playback of videos on 'watch' pages, and the 'related videos' function").  This is consistent with the prevailing judicial view that the § 512(c) safe harbor should not be strictly limited to entities that offer mere storage of material.  *E.g.*, *Io*, 586 F. Supp. 2d at 1147.  Rather, the statute covers all "software functions" that are "directed toward facilitating access to materials stored at the direction of users."  *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1088 (C.D. Cal. 2008) ("*UMG I*").  As a result, entities that make user-uploaded material more readily accessible have been accorded safe harbor protection.  *See*, *e.g.*, *Corbis*, 351 F. Supp. 2d at 1110-11 (granting summary judgment that Amazon was protected under § 512(c) for a service that enabled vendors to upload images onto Amazon's servers for display to users); *Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 701-02 (D. Md. 2001) (holding that

an online database of real estate listings and photographs compiled from user submissions and made accessible to users on request is protected by § 512(c)), *aff'd*, 373 F.3d 544 (4th Cir. 2004).[9]

### 2.   Vimeo Stores and Streams Videos via Automated Processes Initiated by Users

Vimeo employs a range of automated processes designed to facilitate user access to stored materials and thus qualifies for protection under § 512(c).  The replication, transmittal, and display of videos on Vimeo—the actions that are the subject of Plaintiffs' infringement claims—occur through the operation of automated computer processes in response to users' direction.  (SUF ¶¶ 8-14.) Likewise, the Videos-in-Suit were uploaded by Vimeo users and then subjected to the same automated processes.  (*Id.*)  The automated, user-directed nature of Vimeo's video-processing operations plainly qualifies for safe harbor under § 512(c).

### B.   Vimeo Had No Knowledge of the Allegedly Infringing Material

Having satisfied the threshold requirements for § 512 (c) safe harbor, Vimeo is shielded from liability as to the Videos-in-Suit unless Plaintiffs prove that Vimeo had knowledge of the infringements alleged in the Complaints and failed to expeditiously remove the allegedly infringing material from the Vimeo website.  Plaintiffs cannot satisfy this burden.

Courts applying § 512(c) have consistently held that to disqualify an otherwise-eligible service provider from safe-harbor protection, the plaintiff must come forward with evidence that the service provider (1) had knowledge of ***particular*** infringing material on its service, or (2) was aware of facts or circumstances from which the ***specific*** infringing activity was apparent—so-called "red

---

[9]   Vimeo also allows uploaders to make their videos available for "downloading"—that is, to enable a user to save a video to their computer for personal viewing.  (SUF ¶ 14.)  Courts recognize that this downloading function also fits within § 512(c)'s "storage" criterion as a method of facilitating viewing.  *See, e.g.*, *UMG I*, 620 F. Supp. 2d at 1092 (finding downloading function on video-sharing website to be "merely … [a] technically different means of accessing uploaded videos").

flag" knowledge. *See*, *e.g.*, *Viacom*, 676 F.3d at 30 ("[W]e are persuaded that the basic operation of § 512(c) requires knowledge or awareness of ***specific*** infringing activity." (emphasis added)); *id.* at 33 (general "estimates [of up to 80% of the material on YouTube being infringing] are insufficient, standing alone, to create a triable issue of fact as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular instances of infringement"); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1038 (9th Cir. 2011) ("the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual" or "red-flag" knowledge requirements).  Similarly, allegations of willful blindness must pertain to specific acts of infringement and not mere general awareness. *See Viacom*, 676 F.3d at 35 ("[W]e hold that the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of ***specific*** instances of infringement under the DMCA." (emphasis added)).

The law is clear that mere generalized knowledge of potentially or even likely infringing activity on one's website is insufficient to deny a service provider the § 512(c) safe harbor.  *See Viacom*, 676 F.3d at 30-31 (rejecting the "amorphous obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement").  Put another way, a service provider's generalized understanding that material—even a great deal of material—containing copyrighted content is stored on its system is not enough to establish awareness of specific infringing activity. *See*, *e.g.*, *Obodai*, 2012 WL 2189740, at *6 ("*Viacom* concluded that safe harbor might not apply if the defendant had knowledge that the specific works in dispute were infringing, not knowledge or suspicion of broader infringement."); *Capitol Records*, 821 F. Supp. 2d at 644 ("General awareness of rampant infringement is not enough to disqualify a service provider of protection."); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal.

2009) ("*UMG II*") (rejecting the argument that a service provider's awareness that it was "hosting user-contributed material capable of copyright protection" creates disqualifying knowledge).

Plaintiffs cannot demonstrate either actual or "red flag" knowledge on the part of Vimeo.

### 1.   Vimeo Had No Actual Knowledge of the Videos-in-Suit

#### a.   Plaintiffs Did Not Send Vimeo a DMCA Notice Regarding Any of the Videos-in-Suit

At no time prior to the commencement of this litigation did Plaintiffs send Vimeo a DMCA notice regarding *any* of the 199 allegedly infringing videos at the URLs referenced in the Complaints and at issue here.  Having successfully availed themselves of Vimeo's DMCA procedures both before and after the filing of this lawsuit, *see supra* § I.H, Plaintiffs obviously know how to request that allegedly infringing content be removed from Vimeo's website, and know that Vimeo takes such requests seriously and acts on them expeditiously.  Instead, Plaintiffs bypassed the DMCA altogether by filing suit without first providing Vimeo with notice and an opportunity to take down the material under the DMCA—precisely the scenario that Congress sought to avoid by enacting the DMCA notice requirements.  *See*, *e.g.*, *Corbis*, 351 F. Supp. 2d at 1107 ("[Plaintiff's] decision to forego the DMCA notice provisions … stripped it of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder.").

#### b.   The Schedules Attached to the Complaints Are Insufficient to Confer Knowledge of Infringement upon Vimeo

While Plaintiffs did annex a list of allegedly infringing videos to their Complaints, a complaint does not qualify as a valid DMCA notice.  *See* 17 U.S.C. § 512(c)(3) (setting forth specific notice requirements); *Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV 05-4753 AHM, 2009 WL 1334364, at *5 (C.D. Cal. May 12, 2009) (granting summary judgment to defendant, finding it "absurd" that "the complaint or any other pleading that contains sufficient identification of the

alleged infringement could count as a DMCA notification").  Plaintiffs thus have no evidence that Vimeo had actual knowledge of any of the 199 allegedly infringing Videos-in-Suit.  *See Viacom*, 676 F.3d at 31 ("[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement …."); *Corbis*, 351 F. Supp. 2d at 1107 (granting summary judgment of safe harbor protection and finding plaintiff's evidence of actual knowledge "wholly insufficient").  In any event, Vimeo treated the schedules as a DMCA notice and expeditiously removed the listed videos.

### 2.   Vimeo Was Not Aware of Facts or Circumstances from Which the Specific, Allegedly Infringing Activity Was Apparent

Nor can Plaintiffs demonstrate that Vimeo was "aware of facts or circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(1)(A)(ii).  A showing of such "red-flag" knowledge requires that:  (1) the service provider was subjectively aware of the facts or circumstances from which the infringing activity was apparent, and (2) under those facts and circumstances, the infringing activity would have been apparent to a reasonable person.  *See Viacom*, 676 F.3d at 31; *see also* S. Rep. No. 105-190, at 44 (1998) ("The 'red flag' test has both a subjective and an objective element. In determining whether the service provider was aware of a 'red flag,' the subjective awareness of the service provider of the facts or circumstances in question must be determined.  However, in deciding whether those facts or circumstances constitute a 'red flag'—in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances—an objective standard should be used."); H.R. Rep. No. 105–551, pt. 2, at 53 (same).

Section 512(c)(1)(A)(ii) is triggered only where "'the service provider deliberately proceeded in the face of ***blatant*** factors of which it was aware.'"  *Io*, 586 F. Supp. 2d at 1148 (emphasis added) (citation omitted); *accord Viacom*, 676 F.3d at 31 ("[T]he red flag provision turns on whether the

provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."); *Corbis*, 351 F. Supp. 2d at 1108 ("As articulated by Congress, apparent knowledge requires evidence that a service provider 'turned a blind eye to "red flags" of obvious infringement.'" (quoting H.R. Rep. No. 105–551, pt. 2, at 57 (1998))).  Under this standard, a service provider must remove material on its own—without receiving a valid DMCA takedown notice—only where the infringement would be "'apparent from even a brief and casual viewing.'"  *Capitol Records*, 821 F. Supp. 2d at 644 (citation omitted).

The "red flag" provision must also be viewed in the overall context of the statute.  In enacting the DMCA, Congress expressly provided that "a service provider need not monitor its service or affirmatively seek facts indicating infringing activity … in order to claim [the DMCA's] limitation on liability…."  S. Rep. No. 105-190, at 44; H.R. Rep. No. 105-551, pt. 2, at 53; *see* 17 U.S.C. § 512(m) (codifying same).  Courts have confirmed this important precept.  *See, e.g.*, *Viacom*, 676 F.3d at 35 ("DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider."); *CCBill*, 488 F.3d at 1113 ("The DMCA notification procedures place the burden of policing copyright infringement–identifying the potentially infringing material and adequately documenting infringement–squarely on the owners of the copyright."); *UMG II*, 665 F. Supp. 2d at 1112 ("[T]he DMCA does not place the burden of ferreting out infringement on the service provider.").  This means that the burden is on ***copyright owners*** to review each potential infringement, make a good faith determination regarding whether it is infringing (including considering the possibility of fair use), and submit a DMCA-compliant notice to the service provider.  *See Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1155-56 (N.D. Cal. 2008).[10]

---

[10]  Absent proper notice or other knowledge of infringement, service providers are under no obligation to respond in any fashion.  *See CCBill*, 488 F.3d at 1113.

21

In light of these principles, Vimeo may not be charged with knowledge based on facts or circumstances of which it was not subjectively aware but which it might have learned through increased monitoring of user activity.  *See*, *e.g.*, *Viacom*, 676 F.3d at 32 ("[N]o court has embraced the … proposition … that the red flag provision 'requires less specificity' than the actual knowledge provision."); *CCBill*, 488 F.3d at 1114 (rejecting argument that service provider received notice of apparent infringement from circumstances that raised "red flags" because certain hosted websites were named "illegal.net" and "stolencelebritypics.com").

Here, there is no evidence that Vimeo ***should have known*** that any of the Videos-in-Suit was present on the Vimeo website and was infringing.

***First***, there is no evidence that Vimeo knew these videos were even on its system at all. Vimeo's staff does not manually review or screen videos before they are uploaded to the website.[11] (SUF ¶ 8.)  Nor would this be possible without bringing the service to a grinding halt, as users upload approximately 43,000 unique videos on any given day.  (*Id.* ¶¶ 12, 18.)  Moreover, the videos uploaded to Vimeo are processed and stored automatically and without Vimeo's involvement.  (*Id.* ¶¶ 8, 11-14.)  Vimeo's staff also has not seen the vast majority of the videos on its service—this too would be physically impossible to accomplish, as Vimeo's database now contains more than 31.7 million videos.  (*Id.* ¶¶ 8, 12, 18.)

***Second***, even if Vimeo were somehow aware that any of the Videos-in-Suit was on its site, it could not reasonably determine whether it was infringing.  Service providers like Vimeo have no

---

[11]   Plaintiffs may point to a marketing PowerPoint presentation in an attempt to claim that Vimeo staff reviews every video uploaded to the site.  However, as every deponent asked has explained, this is not true.  Further, as Dae Mellencamp, Vimeo's president has explained, this was a draft presentation, created by a non-Vimeo employee, which was immediately corrected and never made public.  (SUF ¶ 8 (Deposition Transcript of Dae Mellencamp).)  Thus, there is no genuine dispute that Vimeo does not review every video upon upload.

way of knowing which copyright owners have rights in which works; which aspects of those works those rights holders have licensed to which third parties; which materials copyright owners or licensees have chosen to put on the Internet for promotional reasons; and what uses of a given work would be considered *de minimis* or fair uses under the Copyright Act.  (SUF ¶¶ 58-59.)  *See Viacom*, 718 F. Supp. 2d at 524 ("[T]he infringing works in suit may be a small fraction of millions of works posted by others on the service's platform, whose provider cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting.").

It is precisely this sort of investigation that the DMCA explicitly places on the shoulders of copyright holders, not service providers.  Congress thus made clear that "red flags" do not exist where the circumstances leave uncertain whether the material at issue is protected by copyright at all, whether a particular use of copyrighted material is licensed or, if unlicensed, whether the use of the material might be a fair use.  S. Rep. No. 105-190, at 48; H.R. Rep. No. 105-551, pt. 2, at 57-58; *see also Capitol Records*, 821 F. Supp. 2d at 644 ("[I]f investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'").

Here, Plaintiffs have maintained that infringement should have been obvious to Vimeo because the titles of some of the Videos-in-Suit contain the names of Plaintiffs' artists or songs.  This argument presupposes that Vimeo systemically reviews the titles of all 43,000 videos that are uploaded to the website each day, which it does not.  In any event, a video's mere title, however suggestive, does not confer "red flag" knowledge as a matter of law.  *See CCBill*, 488 F.3d at 1114 ("Because CWIE and CCBill provided services to 'illegal.net' and 'stolencelebritypics.com,' Perfect 10 argues that they must have been aware of apparent infringing activity.  We disagree.  When a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen'

may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen. We do not place the burden of determining whether photographs are actually illegal on a service provider.").  Indeed, notices that only identify a title of a work or an artist are not valid DMCA notices and do not impart guilty knowledge to the service provider.  *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 747 ("Notices that do not identify the specific location of the alleged infringement are not sufficient to confer 'actual knowledge' on the service provider."); *Capitol Records*, 821 F. Supp. 2d at 644 ("[N]otices … that do not substantially comply with the DMCA or that simply give representative lists of copyrighted works do not establish actual or 'red flag' knowledge of infringement.").

Setting aside the fact that the title of a video file is not remotely dispositive of infringement, Vimeo simply has no way of knowing whether the use in question is authorized.  Many recording artists, musicians, and bands have Vimeo accounts through which they post videos containing music. (SUF ¶¶ 17, 54-55, 57.)  Indeed, ***Plaintiffs' own artists*** have posted videos on Vimeo containing the very same songs that Plaintiffs have complained about.  (*Id.*)  *Compare* http://vimeo.com/8267567 (video uploaded by artist OK Go of musical composition "Here It Goes Again") *with* http://vimeo.com/4233013 (identified on Capitol Record's Schedule A as infringing the musical composition "Here It Goes Again" by OK Go).  In addition, Vimeo receives counter-notifications for videos that are the subject of DMCA notifications for the use of music, including videos removed at Plaintiffs' request.  (SUF ¶¶ 57, 58.)  As Plaintiffs' own Rule 30(b)(6) witnesses confirmed, one

cannot determine whether the use of a particular musical work is infringing simply by listening to it.[12]

Nor does the law require a service provider to assume that every instance of a particular work is infringing merely because the copyright holder has complained that one particular instance is infringing. *See Wolk*, 840 F. Supp. 2d at 747 ("Although [Plaintiff] advocates for a system where one notice of infringement would apply to all instances of that image appearing on the website, it would be irresponsible for Photobucket to assume infringement in the way the Plaintiff describes."); *Capitol Records*, 821 F. Supp. 2d at 642 ("Service providers must take down the specific infringing material identified in the notice but are not required to search for and take down other material that may infringe the identified copyrighted works.").

**Finally**, even if Vimeo could somehow be charged with knowledge that (1) the specific Videos-in-Suit were on Vimeo's system, and (2) they were uploaded by someone other than the copyright holder or other authorized individual, Vimeo still would not possess red flag knowledge because, given the nature of these videos, many of the uses may indeed be "fair uses." The fair-use doctrine allows limited use of copyrighted material without the permission of the rights holder. *See generally* 17 U.S.C. § 107; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). A fair use of a copyrighted work is not actionable, and therefore any work for which there is even a colorable claim of fair use cannot confer upon a service provider a unilateral removal obligation under the DMCA. *See* 17 U.S.C. § 107.[13] In fact, the Recording Industry Association of

---

[12]   SUF ¶ 56  (Deposition Transcript of Alasdair McMullen (cannot determine who owns copyright to sound recording just by listening to it) & Deposition Transcript of Michael Abitbol (cannot determine who owns copyright to music composition just by listening to it)).

[13]   This result is a natural extension of the fact that a service provider cannot lose its safe harbor protection simply because it might err in making what are often complex or difficult determinations. *See* S. Rep. No. 105-190, at 48; H.R. Rep. No. 105-551, pt. 2, at 57-58; *see also Maxtone-Graham v.* (*footnote continued*)

America, Inc. itself—of which Plaintiffs and/or their affiliates are members—has withdrawn DMCA

takedown requests to Vimeo after being notified that the videos in question were original user videos

with the allegedly infringing songs used as mere background music.  (SUF ¶ 54.)[14]

### C.    In Any Event, Vimeo Responded Expeditiously to Remove the Allegedly Infringing Materials

Even assuming Vimeo did possess actual or "red-flag" knowledge of the specific alleged

infringements—which it plainly did not—Vimeo expeditiously removed the allegedly infringing

materials upon receipt of the Complaints.  *See* 17 U.S.C. § 512(c)(1)(A)(iii).  As explained above,

while Plaintiffs' annexation of a list of allegedly infringing videos to their Complaints does not

qualify as a valid DMCA notice, Vimeo nevertheless expeditiously removed those videos from its

website.  *See supra* § I.H-I (Vimeo expeditiously removed all videos identified in Plaintiffs'

December 11, 2008, June 15, 2010 and July 11, 2012 take down notices; December 10, 2009 civil

complaint; and May 9, 2012 amended schedules).  Plaintiffs do not dispute that all of the Videos-in-

Suit have been removed.

---

*Burtchaell*, 803 F.2d 1253, 1254-55 (2d Cir. 1986) (referring to the question of fair use as "'the most
troublesome in the whole law of copyright'" (citation omitted)); *Leibovitz v. Paramount Pictures
Corp.*, 948 F. Supp. 1214, 1219 (S.D.N.Y. 1996) (describing a fair-use analysis as "a complex and
daunting task"), *aff'd*, 137 F.3d 109 (2d Cir. 1998).

[14]    Plaintiffs' complaints place particular emphasis on "lip dubs," which they define as "a video that
is comprised of footage of an individual (or individuals) 'lip synching' the entirety of a popular
musical composition."  *See, e.g.*, Complaint of EMI Blackwood Music, Inc. *et al.*, 09-CV-10105,
Doc. #1, ¶ 30.  But this "lip dubs" are no different for present purposes from any other type of video.
***First***, Vimeo is under no duty to police its website for copyright infringement—whether via "lip
dubs" or any other type of content.  ***Second***, it would not be possible for Vimeo, merely by watching
a "lip dub," to ***know*** that the music used in it:  (1) was not owned by the user; (2) was not licensed to
the user or otherwise authorized by the rights holder(s); (3) if unauthorized, would be objected to by
the rights holder(s); or (4) does not constitute a fair use of the work.

### D.    Vimeo Does Not Have the Right and Ability to Control the Allegedly Infringing Activity, and Does Not Receive a Financial Benefit Directly Attributable Thereto

Vimeo does not have the right and ability to control the alleged infringements at issue here, and in any event does not receive a financial benefit directly attributable thereto.  *See* 17 U.S.C. § 512(c)(1)(B).  "'***Both*** elements must be met for the safe harbor to be denied.'"  *Io*, 586 F. Supp. 2d at 1150 (emphasis added) (citation omitted).

### 1.    Vimeo Lacks the Right and Ability to Control the Allegedly Infringing Activity

The right and ability to control allegedly infringing activity focuses on a service provider's legal and practical control over the ***specific*** infringing activity at issue.  *See* 17 U.S.C. § 512(c)(1)(B) (referring to "***the*** infringing activity" (emphasis added)); *Io*, 586 F. Supp. 2d at 1151 ("[T]he plain language of section 512(c) indicates that the pertinent inquiry is not whether Veoh has the right and ability to control it[s] ***system***, but rather, whether it has the right and ability to control the ***infringing activity***.").  The mere ability of a service provider to remove content after it has been uploaded is insufficient as a matter of law to establish the right and ability to control the infringing activity required by § 512(c)(1)(B).  *See, e.g.*, *Viacom*, 676 F.3d at 38 ("[W]e conclude that the 'right and ability to control' infringing activity under § 512(c)(1)(B) 'requires something more than the ability to remove or block access to materials posted on a service provider's website.'" (citations omitted)); *Wolk*, 840 F. Supp. 2d at 748 ("'[T]he right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored on its system.'" (citation omitted)); *UMG II*, 665 F. Supp. 2d at 1112-13.  Indeed, to hold otherwise would eviscerate the DMCA's safe harbor protections by imposing liability on service providers for the very act of complying with the DMCA's provisions in taking down infringing content.  *Io*, 586 F. Supp. 2d at 1151; *see also Viacom*, 676 F.3d at 38 ("To

date, only one court has found that a service provider had the right and ability to control infringing

activity under § 512(c)(1)(B)," where the service provider utilized a monitoring program by which

applicant websites received detailed instructions regarding layout, appearance, and content, and then

*reviewed every website* prior to accepting the site in its service (referring to *Perfect 10, Inc. v.*

*Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1163-64 (C.D. Cal. 2002))).

Here, Vimeo cannot control, *ex ante*, what its users choose to post on the website.  (SUF

¶¶ 8, 12, 18.)  *See Io*, 586 F. Supp. 2d at 1153 (granting summary judgment after noting that "there is

no evidence that Veoh can control what content users choose to upload *before* it is uploaded"

(emphasis added)).  Nor does Vimeo pre-screen content prior to users' uploading of videos—an

impossible task in any event.  (SUF ¶¶ 8, 12.)  *See Io*, 586 F. Supp. 2d at 1153 (rejecting argument

that "Veoh should be required to prescreen every submission before it is published").

## 2.    Vimeo Receives No Financial Benefit Directly Attributable to Allegedly Infringing Activity

Because Vimeo lacks the right and ability to control the allegedly infringing activity, it is

unnecessary to demonstrate that it does not receive a financial benefit directly attributable to it.  *See*

*Perfect 10, Inc. v. Visa Int'l Service Ass'n*, 494 F.3d 788, 806 (9th Cir. 2007) (declining to address

issue of direct financial benefit because there was no right and ability to control); *Io*, 586 F. Supp. 2d

at 1150 (same); *see also Io*, 586 F. Supp. 2d at 1150 ("'*Both* elements must be met for the safe

harbor to be denied.'" (emphasis added) (citation omitted)).

Even if Vimeo had to make such a showing, it is clear that Vimeo does not receive a financial

benefit directly attributable to allegedly infringing activity.  The DMCA safe harbor provisions

protect service providers that derive revenue from sources other than infringement.  *See* S. Rep. No.

105-190, at 44 ("In general, a service provider conducting a legitimate business would not be

considered to receive a 'financial benefit directly attributable to the infringing activity' where the

infringer makes the same kind of payment as non-infringing users of the provider's service."); H.R. Rep. No. 105–551, pt. 2, at 54 (same). This approach is consistent with Congress' expressed desire for the financial benefit analysis to involve "a common-sense, fact-based approach, not a formalistic one." S. Rep. No. 105-190, at 44; H.R. Rep. No. 105–551, pt. 2, at 54.

Here, the vast majority of Vimeo's revenues are derived from subscription fees, which are the same regardless of the content (infringing or not) subscribers decide to upload. *See supra* § I.C.[15] Congress expressly kept such revenue within the safe harbor when it enacted the DMCA. *See* S. Rep. No. 105-190, at 44; H.R. Rep. No. 105–551, pt. 2, at 54; *see also Wolk*, 840 F. Supp. 2d at 748 ("[W]here there is no evidence in the record that the service provider 'attracted or retained subscriptions because of the infringement or lost subscriptions because of its eventual obstruction of the infringement,' no reasonable jury could conclude that the service provider received a direct financial benefit from providing access to the infringing material." (citation omitted)). Thus, Vimeo's membership fees are not directly attributable to allegedly infringing activity.

The remainder of Vimeo's revenues comes from advertising on the website. (SUF ¶¶ 63-64.) Like subscription fees, this advertising revenue does not depend on the type of user submission (infringing or not), and so it is not directly attributable to allegedly infringing activity. (*Id.* ¶ 65.) *See Capitol Records*, 821 F. Supp. 2d at 645 (finding no direct financial benefit despite, plaintiff's argument that "infringing activity on Defendants' sites acts as a draw and increases user traffic,"

---

[15]  Vimeo offers three levels of membership to its users:  a "Basic" membership that is free, a "Plus" membership that costs $59.95/year and a "PRO" membership that costs $199/year. Among other benefits, "Plus" members receive 5 gigabytes per week of storage space on Vimeo's servers, unlimited uploading of videos in HD (high-definition) format, and use of the site without viewing any banner advertisements. "PRO" members receive 50GB of high-definition upload space, priority uploading, advanced customization capabilities for the video player, access to advanced statistics regarding video performance, and the ability to create custom portfolios for users' own URL. (SUF ¶ 62.) Neither Plus nor PRO subscribers receive any special viewing privileges related to the content of the videos on the Vimeo.

because "the financial benefit must be ***attributable to the infringing activity***" (emphasis added)). Likewise, the amount of advertising revenue generated via Google's AdSense program is entirely unrelated to whether any music in the uploaded video that triggers the ad is or is not infringing.

## CONCLUSION

For all of the foregoing reasons, Vimeo respectfully requests that the Court grant its motion for summary judgment of entitlement to DMCA safe harbor.


Dated: September 7, 2012
       New York, New York

                                        Respectfully submitted,

                                        /s/ Robert L. Raskopf
                                        Robert L. Raskopf
                                        Jessica A. Rose
                                        Todd Anten
                                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        (212) 849-7000

                                        Rachel Herrick Kassabian (*pro hac vice*)
                                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                        555 Twin Dolphin Drive, 5th Floor
                                        Redwood Shores, CA 94065
                                        (650) 801-5000

                                               - and -

                                        Michael A. Cheah
                                        VIMEO, LLC
                                        555 West 18th Street
                                        New York, New York 10011
                                        (212) 314-7457

                                        *Attorneys for Defendants Vimeo, LLC and*
                                        *Connected Ventures, LLC*