UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; VIRGIN RECORDS AMERICA, INC., a California Corporation, | CASE NOS.    09 CV 10101 (RA)<br>                    09 CV 10105 (RA)<br><br>**MEMORANDUM OF LAW OF PLAINTIFFS (1) IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DEFENSE UNDER SECTION 512 OF THE DMCA, AND (2) IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

                            Plaintiffs,

v.

VIMEO, LLC d/b/a VIMEO.COM, a Delaware
Limited Liability Company; CONNECTED
VENTURES, LLC, a Delaware Limited
Liability Company, and DOES 1-20, inclusive,

                            Defendants.

EMI BLACKWOOD MUSIC, INC., a
Connecticut Corporation; EMI APRIL MUSIC,
INC., a Connecticut Corporation; EMI VIRGIN
MUSIC, INC., a New York Corporation;
COLGEMS-EMI MUSIC, INC., a Delaware
Corporation; EMI VIRGIN SONGS, INC., a
New York Corporation; EMI GOLD
HORIZON MUSIC CORP., a New York
Corporation; EMI U CATALOG, INC., a New
York Corporation; EMI UNART CATALOG
INC., a New York Corporation; JOBETE
MUSIC CO., INC., a Michigan Corporation;
and STONE DIAMOND MUSIC
CORPORATION, a Michigan Corporation,

                            Plaintiffs,

v.

VIMEO, LLC d/b/a VIMEO.COM, a Delaware
Limited Liability Company; CONNECTED
VENTURES, LLC, a Delaware Limited
Liability Company, and DOES 1-20, inclusive,

                            Defendants.

4907605.1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Introduction ...................................................................................................... 1

    A.    The Digital Millennium Copyright Act. ................................................ 1

    B.    The Parties ........................................................................................... 3

    C.    The Vimeo Website, System, And Service.............................................. 4

    D.    Vimeo Permits And Encourages The Infringing Use Of Music. ............ 6

I.    THE SAFE HARBOR DOES NOT APPLY TO INFRINGING AUDIOVISUAL WORKS CREATED AND UPLOADED BY VIMEO ITSELF........................................ 8

II.    VIMEO IS DISQUALIFIED FROM SAFE HARBOR BECAUSE OF ITS KNOWLEDGE OF AND WILLFUL BLINDNESS TO INFRINGEMENT. ................... 9

    A.    Vimeo Had Actual Or Red Flag Knowledge Of Specific Infringements. .............. 9

    B.    Vimeo Adopted A Policy Of Willful Blindness To Infringement Of Music........ 14

III.    VIMEO OBTAINS A "FINANCIAL BENEFIT" AND HAS THE "RIGHT AND ABILITY TO CONTROL" INFRINGEMENT.............................................. 18

    A.    Vimeo Receives A Direct Financial Benefit Attributable To Infringing Activity. ............................................................................................ 18

    B.    Vimeo Has The Right And Ability To Control Infringement.............................. 23

        1.    In Curating Its Website, Enforcing Content Restrictions, And Monitoring Content And Users, Vimeo Engages In The "Something More" Described By *Viacom*. ................................................. 24

        2.    Vimeo Controls Infringing Activity By Blatantly Inducing Its Users To Infringe Copyrighted Music. ............................................... 36

IV.    VIMEO DID NOT ADOPT, IMPLEMENT, AND COMMUNICATE AN EFFECTIVE REPEAT INFRINGER POLICY.............................................. 45

V.    VIMEO DOES NOT "EXPEDITIOUSLY REMOVE" INFRINGING WORKS. .......... 47

VI.    VIMEO PROVIDES FUNCTIONALITIES THAT ARE NOT STORAGE. ................. 48

VII.    THE DMCA DOES NOT APPLY TO PLAINTIFFS' PRE-1972 RECORDINGS. ....... 49

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A&M Records, Inc. v. Napster, Inc.,*
114 F. Supp. 2d 896 (N.D. Cal. 2000) .................................................................14

*A&M Records, Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) ................................................................... *passim*

*A&M Records, Inc. v. Napster, Inc.,*
No. C 99-05183 MHP, 2000 WL 573136 (N.D. Cal May 12, 2000) .....................46

*Agee v. Paramount Comm'cns, Inc.,*
59 F.3d 317 (2d Cir. 1995)...............................................................................6, 7

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.,*
239 F.3d 619 (4th Cir. 2001) ................................................................................3

*Arista Records, Inc. v. Flea World, Inc.,*
No. 03-2670 (JBS), 2006 WL 842883 (D.N.J. Mar. 31, 2006) .............................31

*Arista Records LLC v. Lime Group LLC,*
784 F. Supp. 2d 398 (S.D.N.Y. 2011)......................................................... *passim*

*Arista Records LLC v. Usenet.com, Inc.,*
633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................26, 36, 37, 39

*Capitol Records, Inc. v. MP3tunes, LLC,*
821 F. Supp. 2d 627 (S.D.N.Y. 2011).................................................................50

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
372 F.3d 471 (2d Cir. 2004)................................................................................49

*Columbia Pictures Indus., Inc. v. Aveco, Inc.,*
800 F.2d 59 (3d Cir. 1986)..................................................................................43

*Columbia Pictures Indus., Inc. v. Fung,*
No. CV 06-5578 SVW, 2009 WL 6355911 .................................................. *passim*

*Ellison v. Robertson,*
357 F.3d 1072 (9th Cir. 2004) .............................................................................19

*Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n,*
554 F.2d 1213 (1st Cir. 1977).............................................................................19

4907605.1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ........................................................................20

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F.2d 1159 (2d Cir. 1971)......................................................................19

*Hendrickson v. Amazon.com, Inc.*,
  298 F. Supp. 2d 914 (C.D. Cal. 2003) ..........................................................2

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ............................................................. *passim*

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*,
  146 F.3d 66 (2d Cir. 1998)..........................................................................17

*Io Group, Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) ...............................................24, 36

*Lee v. Bankers Trust Co.*,
  166 F.3d 540 (2d Cir. 1999)........................................................................50

*Louis Vuitton S.A. v. Lee*,
  875 F.2d 584 (7th Cir. 1989) ......................................................................17

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster I*"),
  545 U.S. 913 (2005).......................................................................... *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* (*Grokster II*),
  454 F. Supp. 2d 966 (C.D. Cal. 2006) ................................................ *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ......................................................49

*Newton v. Diamond*,
  204 F. Supp. 2d 1244 (C.D. Cal. 2002) ........................................................4

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (C.D. Cal. 2007)..................................................................18

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) .............................................. *passim*

4907605.1

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Perfect 10 v. Google, Inc.*,
  416 F. Supp. 2d 828 (C.D. Cal. 2006) ................................................................22

*Phillip Morris USA Inc. v. Liu*,
  489 F. Supp. 2d 1119 (C.D. Cal. 2007) .............................................................16

*Playboy Enterprises, Inc. v. Webbworld, Inc.*,
  991 F. Supp. 543 (N.D. Tex. 1997) ...................................................................25

*Playboy Enters., Inc. v. Webbworld, Inc.*,
  968 F. Supp. 1171 (N.D. Tex. 1997) .................................................................20

*Polygram Int'l Pub'g, Inc. v. Nevada/TIG, Inc.*,
  855 F. Supp. 1314 (D. Mass. 1994) ..................................................................19

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963) ........................................................................19, 28

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010) ....................................................................9, 15, 17

*Tur v. YouTube*,
  No. CV064436 FMC, 2007 WL 1893635 (C.D. Cal. June 20, 2007) ...................31

*UMG Recordings, Inc. v. Escape Media Group, Inc.*,
  948 N.Y.S.2d 881 (N.Y. Sup. Ct. 2012) ............................................................50

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  667 F.3d 1022 (9th Cir. 2011) ...............................................................8, 45, 49

*United States v. Nektalov*,
  461 F.3d 309 (2d Cir. 2006) ..............................................................................14

*United States v. Reyes*,
  302 F.3d 48 (2d Cir. 2002) ................................................................................14

*Viacom Int'l Inc. v. YouTube, Inc.*,
  718 F. Supp. 2d 514 (S.D.N.Y. 2010) ............................................................2, 46

*Viacom International, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ...................................................................... *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012)....................................................................23

**STATUTES**

17 U.S.C.
   § 301(c) ...............................................................................................................49
   § 512(i)(1)(A)...................................................................................................1, 45
   § 512(c) ........................................................................................................ *passim*
   § 512(n) ...............................................................................................................48

**OTHER AUTHORITIES**

H.R. Rep. No. 105-551, pt. 1 (1998)................................................................................2

H.R. Rep. No. 105-551, pt. 2 (1998).................................................1, 2, 23, 49, 50

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats: Reckoning the*
   *Future Business Plans of Copyright-Dependent Technology Entrepreneurs*, 50 Ariz.
   L. Rev. 577 (Summer 2008) ................................................................................13, 15

S. Rep. No. 105-190 (1998) ...............................................................................9, 46, 50

4907605.1

## Introduction

### A.      The Digital Millennium Copyright Act.

Congress designed the Digital Millennium Copyright Act ("DMCA") to "preserve[]

strong incentives for service providers and copyright owners to cooperate to detect and deal with

copyright infringements that take place in the digital networked environment."  H.R. Rep. No.

105-551, pt. 2, at 49 (1998).  Therefore, the DMCA requires that to qualify for safe harbor, a

service provider, such as Vimeo,[1] must first prove that it provides "***storage*** at the direction of a

user of material that resides on a system network ***controlled or operated*** by or for the service

provider," 17 U.S.C. § 512(c)(1) (emphasis added), and that it has informed users of and

implements an effective "repeat infringer" policy.  *Id.* § 512(i)(1)(A).  Vimeo also must prove

that it:

> "(A)  (i) does not have actual knowledge that the material or an activity using the
> material on the system or network is infringing; (ii) in the absence of such actual
> knowledge, is not aware of facts or circumstances from which infringing activity
> is apparent; or (iii) upon obtaining such knowledge or awareness, acts
> expeditiously to remove, or disable access to, the material;
>
> (B)  does not receive a financial benefit directly attributable to the infringing
> activity, in a case in which the service provider has the right and ability to control
> such activity; and
>
> (C)  upon notification of claimed infringement … responds expeditiously to
> remove, or disable access to, the material that is claimed to be infringing or to be
> the subject of infringing activity."  *Id.* § 512(c)(1).

*Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), made clear that a

service provider must prove ***each*** of the following to gain safe harbor:  (1) it does not have actual

(i.e., subjective) knowledge of specific infringing works; ***and*** (2) it does not have "red flag" (i.e.,

objective) knowledge of specific infringing works; ***and*** (3) it is not "willfully blind" to

---

[1]        Plaintiffs refer to the Defendants Vimeo, LLC and Collected Ventures, LLC and to the service, vimeo.com,
collectively as "Vimeo."

1

infringement; ***and*** (4) it does not have the right and ability to control infringing activity from which it receives a financial benefit (regardless of knowledge); ***and*** (5) it does not induce infringement; ***and*** (6) it expeditiously removes infringing works after being provided a "takedown" notice. Vimeo has the burden of proof on each element of this affirmative defense. H.R. Rep. No. 105-551, pt. 1, at 26 (1998) ("[A] defendant asserting [Section 512(c)] as an affirmative defense … bears the burden of establishing its entitlement."); *see Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914, 915 (C.D. Cal. 2003) ("[B]ecause Amazon is asserting an affirmative defense … it must establish all elements of the safe harbor rule under the DMCA.").

Vimeo bases its concept of DMCA "compliance" largely on the repeated contention that it need not do anything to remove infringing works, even when it knows of them unless it receives "the DMCA Takedown Notice." Confining the DMCA to a "notice and takedown" statute places the burden entirely on the copyright owner and ignores the remaining safe harbor requirements. That is not what the statute says, nor is it the construct reiterated in *Viacom*. In fact, Congress made clear that copyright owners need ***never*** provide takedown notices, an often futile process. H.R. Rep. No. 105-551, pt. 2, at 54 ("The Committee emphasizes that new Section 512 does not specifically mandate use of a notice and takedown procedure.").[2]

Nothing requires copyright owners to constantly search the Internet, find infringing works on service providers' (like Vimeo's) servers and indexes, serve takedown notices, and wait for the service provider to remove the infringing work at the specific URL located by the copyright owner (while leaving other copies of the same work or the same infringing music). Vimeo says this process can take three to four weeks (and Vimeo did not even fully comply). By

---

[2]    Even though YouTube responded to takedown notices, *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 519 (S.D.N.Y. 2010), that fact did not absolve it from liability, and indeed the Second Circuit ascribed no significance to it. *See Viacom*, 676 F.3d at 27 n.7.

2

then, the infringing work not only has been performed, but potentially has been distributed to

anonymous computers from which it "could be levered into the distribution within days or even

hours of millions of identical near-perfect … copies." *In re Aimster Copyright Litig.*, 334 F.3d

643, 646 (7th Cir. 2003).  Since other copies of the same infringing work either remain on the

service provider's server or can be replaced immediately, the copyright owner must repeat the

same cycle over and over, a process aptly characterized as a never-ending game of "whack-a-

mole."  This scenario has been replayed many times on the Vimeo website.

Vimeo all but ignores (or only discusses in a cursory manner) the other requirements for

safe harbor, which Vimeo fails on multiple counts:  Vimeo has actual and "red flag" knowledge

of infringing works on its system but refuses to remove them; it has constructed a system to

remain willfully blind to infringement; it has the right and ability to control infringing content

from which it financially benefits, it induces users to infringe music copyrights; and it fails to

communicate or properly implement a repeat infringer policy or expeditiously remove infringing

works.  Thus, Vimeo is far from the "innocent" service provider eligible for DMCA "immunity."

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) ("This immunity,

however, is not presumptive, but granted only to 'innocent' service providers…").  Accordingly,

Vimeo's motion for summary judgment should be denied, and Plaintiffs' motion for partial

summary judgment should be granted.

**B.    The Parties**

Plaintiffs are record companies (the "EMI Record Companies") and music publishing

companies (the "EMI Publishing Companies").  Plaintiffs' Statement of Undisputed Material

Facts ("SUF") 1, 4.  The EMI Record Companies' catalog includes sound recordings protected

under the Copyright Act, and other recordings "fixed" (i.e., first recorded) prior to February 15,

3

1972, and thus protected under state law.  SUF 2, 3.  All of the EMI Publishing Companies'

musical compositions are protected by the Copyright Act.[3]  SUF 5.

Vimeo is a big business, owned by the media conglomerate IAC/Interactive Corp.

Vimeo operates and controls the website located at www.vimeo.com, which has become one of

the most popular websites on the Internet.  SUF 9, 10.  The Vimeo website is a commercial,

entertainment destination whose business is based on attracting users by providing audiovisual

works to the public for viewing ("streaming") and copying ("downloading").  SUF 11.

### C.    The Vimeo Website, System, And Service

The Vimeo website is a "closed-end" system.  Vimeo enables members of the public (and

its employees) to upload content to its website.  SUF 12, 23.  Once uploaded, Vimeo copies the

videos to its own server, aggregates, and indexes its audiovisual content, places advertising with

that content, and then publicly performs (streams) and distributes (makes available for

download) that content on demand to anyone with Internet access.  SUF 12, 16.  During the

upload process, Vimeo enables users to assign titles or "tags" to the video (i.e., keywords

associated with the video), to place the video into a "category," and to add privacy restrictions

that limit access to the video.  SUF 13, 14, 25.  At the same time, Vimeo encourages its users and

employees to engage in a variety of interactive activities, such as posting "comments" about

uploaded videos, flagging videos as "likes," creating lists of "contacts" (other users with whom

they wish to connect), creating or joining "groups" (in which videos by group members are

uploaded to a central location), creating or subscribing to "channels" (specified categories of

videos), or creating "albums" (collections of videos).  SUF 18, 19, 22, 23.  All of this takes place

---

[3]         "Sound recordings and their underlying musical compositions are separate works with their own distinct
copyrights."  *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002).  "A musical composition
captures an artist's music in written form," while "[t]he sound recording is the sound produced by the performer's
rendition of the musical work."  *Id.* at 1250-51.

on or from Vimeo's "premises."

Vimeo exercises unique control over the content it provides on its website in a number of ways. It employs a "Community Team" or "Moderators," who work behind the scenes using a variety of tools to: (1) monitor and review the Vimeo website in order to promote content they deem desirable for the Vimeo "brand," and to demote or remove content they deem undesirable or in violation of Vimeo's content restrictions; (2) look for and recommend videos, including featuring them as "Obsessions" on Vimeo's home page or on "Vimeo HD" channels or as "Staff Picks;" (3) interact with users by uploading their own videos, "liking" user-uploaded videos, posting comments to videos, participating in community discussions and projects, providing instruction to users, and communicating directly, individually and collectively, to Vimeo users about permissible content. SUF 41-47, 50-55.

Vimeo also has created an internal website (known as "ModWorld") that contains more than 40 tools giving its employees the unprecedented ability to monitor and control the website *and* users' activities. SUF 123-125. Among other things, these tools enable employees to: access lists of popular videos ("Gainers") (SUF 135-136); review conduct of problematic users ("Thin Ice") (SUF 159-168); review the most recent user comments ("Comment Scanner") (SUF 173-177); view a list of users whose videos have been deleted ("[user] Purgatory") (SUF 183); add or edit video "categories" ("Categories") (SUF 181); search for usernames and review individual user conduct ("User Scanner," "User Search") (SUF 176, 177); view "flagged" videos and deleted videos, including those flagged and deleted by Vimeo itself ("Flagged" and "[video] Purgatory") (SUF 130-134); and use various "filters" and searches to view videos that are likely to be television shows or motion pictures (e.g., "Sweet Spot" and "Movie Search") (SUF 154-158) or otherwise prohibited or disfavored, which the Staff can then delete or hide ("bury") or

5

conversely prevent them from being flagged for deletion ("whitelist") (SUF 137-153).

**D.**     **Vimeo Permits And Encourages The Infringing Use Of Music.**

Vimeo ostensibly built and promoted its website as a place for "creative" content and "original" works.  SUF 29-31.  However, Vimeo's requirement that a video be "creative" and "original" is applied only to the *visual* component of its videos, not to the *audio (music)* component.  SUF 30, 35-38, 287.  By Vimeo's own estimate, *10%-20%* of the videos on its website contained unlicensed music.  SUF 56.  Vimeo's attitude towards infringing music can be summarized by its advice to users – *"go ahead and post it"; "we allow it"* – and its internal communications admitting that *"we ignore music and say legality doesn't matter."* [4]  SUF 38, 300, 302-305.  Vimeo has copied, performed, and distributed 199 of Plaintiffs' most valuable copyrighted sound recordings and musical compositions (many in multiple videos).[5]  SUF 6, 7, 395, 397, 402.  These include seminal recordings by The Beatles, Coldplay, Norah Jones, Nat King Cole, and The Beach Boys; and musical compositions created and/or popularized by Henry Mancini and The Jackson Five.[6]  SUF 63, 66, 69; *see* Schedules to Plaintiffs' Complaints. Videos containing Plaintiffs' copyrighted music have been viewed on the Vimeo website millions of times.  SUF 258, 260.  *Agee v. Paramount Comm'cns, Inc.*, 59 F.3d 317, 324 n.5 (2d

---

[4]      The evidence of Vimeo's conduct is overwhelming, frequently derived from Vimeo's own documents, testimony or website.  Only a small portion can be directly referenced in this brief.  Plaintiffs' Statement of Undisputed Facts ("SUF") cites incontrovertible evidence further supporting Plaintiffs' position.

[5]      These are the videos identified by Plaintiffs as "representative infringements" at the outset of this litigation in 2009.  After the close of discovery, during the approximately 12 months the actions were stayed, Vimeo continued to infringe Plaintiffs' works.  Plaintiffs have now identified more than 1,000 additional representative examples.  SUF 402; *see*, e.g.*, Berkley Decl., 23, 24, 28.  As Vimeo notes, at the conference with Judge Castel on May 31, 2012, Plaintiffs informed the Court that they wished to amend their complaints to add these infringements.  Motn. at 10 n.6.  Judge Castel ordered that any motion to amend be filed after the motions for summary judgment were decided.  *See* Dkt. 43.  The issues raised by the current motions are the same issues with respect to the new, additional infringements.

[6]      For purposes of these motions, Plaintiffs' ownership of their copyrighted works and their use by Vimeo on its website are not contested (and ultimately would easily be proven.)  Plaintiffs are providing screenshots identifying all infringements (*see*, *e.g.*, Frackman Decl., Ex. 13-27), and if the Court requests, Plaintiffs will provide a DVD with examples of all of the videos.

Cir. 1995) ("[P]roducers of movies, television shows, and commercials often obtain master use licenses from sound recording copyright owners that allow them to synchronize sound recordings with visual images, as well as to copy and distribute the audiovisual work.").

Except for *music*, Vimeo strictly controls, monitors, and curates (in its words) the audiovisual works it copies, performs, and distributes.  It prohibits – and uses its personnel and tools to review, monitor, and delete – all sorts of videos, including television programs, movies, and movie trailers, as well as "gameplay videos," "commercial" videos (such as product promotions or real estate tours), "sexually explicit" videos, and "fan vids," among others.  SUF 98-116.  It enforces its discretionary and subjective guidelines to eliminate content that is not "Vimeoesque."  SUF 141.  All in order to mold its website and control its image.  SUF 29, 30, 42.  Despite its pervasive involvement in and control of the content on its website, Vimeo does nothing to limit the infringing use of *music* on its website.  SUF 98, 115, 129, 131, 175, 193, 200, 201-211.

Vimeo's business model and service intentionally differs from, and Vimeo controls the content on its website far more pervasively than, other "user-generated content" websites.  SUF 29, 30, 42.  YouTube, Veoh, and other websites do not create and consistently upload their own infringing videos; do not expressly tell users it is permissible to use infringing music in their videos *and* instruct their users how to do so; do not have a team of employees monitoring to "curate" their content and a set of technological tools to accomplish that task; do not actively participate in the website "community" to define and delimit the content on their website; do not at their sole discretion delete and "bury" content that they believe does not reflect the image or brand they want to establish; and do not refuse to obtain licenses from music copyright owners or to deploy available technologies to filter copyrighted music.  As described below, Vimeo does all

7

4907605.1

of these things and more.  It does more than merely "store" videos at the request of its users.  It is a content provider, advising users that "[w]e want users who will contribute to Vimeo and our community, not just use our service to host their videos for free."  SUF 42.

Only Vimeo is in a position to stop the infringement of Plaintiffs' music.  Instead, Vimeo uses Plaintiffs' copyrighted music to attract users who are prohibited by other websites from uploading works with infringing music and to gain a competitive advantage by obtaining, for free, music that forms the lifeblood of Plaintiffs' businesses and that others must pay to use.  Plaintiffs do not challenge Vimeo's right to do business.  Rather, they want Vimeo to do so *legitimately*, as others do, and without infringing Plaintiffs' copyrights.  That can be accomplished easily; however, Vimeo refuses to do so.

## I.   THE SAFE HARBOR DOES NOT APPLY TO INFRINGING AUDIOVISUAL WORKS CREATED AND UPLOADED BY VIMEO ITSELF.

One of the critical ways in which Vimeo knows of specific infringements and differs from other websites is that Vimeo's employees and Staff themselves make audiovisual works that infringe Plaintiffs' music.  SUF 63-68, 71.  *Compare Viacom*, 676 F.3d at 28 (YouTube's "basic function" is merely to "permit[] users to 'upload' and view video clips free of charge"); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1035 (9th Cir. 2011) ("Veoh does not actively participate in or supervise file uploading…").  Vimeo admits that *ten* of the infringing videos on the schedules to the complaints in this action reside in the accounts of Vimeo employees (Motn. at 13 n.8), accessible from the user page of the Vimeo employee who uploaded them.  SUF 63.  Almost all bore a flag (or "badge") or other indication designating them as having been made by Vimeo employees.  SUF 64.

Section 512(c)'s safe harbor applies only to "storage at the direction of a *user*." 17 U.S.C. § 512(c)(1) (emphasis added).  Vimeo thus is wrong in claiming that safe harbor

extends to the infringing conduct of a service provider's employees, officers, and agents.  Motn. at 13 n.8.  Vimeo-made content is not "*user*-generated content" and does not meet the definition of Section 512(c).  The legislative history confirms that "information that resides on the system or network operated by or for the service provider *through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c).*"  S. Rep. No. 105-190, at 43 (1998) (emphasis added).  Nor can Vimeo avoid liability by claiming that it is not charged with the actions of its own paid personnel whose job responsibilities include creating videos.  SUF 43, 50, 54, 65.  *See Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCx), 2009 WL 6355911, at \*13 & n.21 (even unpaid moderators are agents of website).

## II.   VIMEO IS DISQUALIFIED FROM SAFE HARBOR BECAUSE OF ITS KNOWLEDGE OF AND WILLFUL BLINDNESS TO INFRINGEMENT.

There are *three* ways a service provider is charged with knowledge that disqualifies it from safe harbor:  *First*, actual "subjective" knowledge of infringement.  *Viacom*, 676 F.3d at 31.  *Second*, if it was "subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Id*.  This "red flag" knowledge "incorporates an objective standard" and thus "is not swallowed up by the actual knowledge provision…."  *Id*.  *Third*, "'willful blindness is tantamount to knowledge….'"  *Id*. at 34 (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109 (2d Cir. 2010)).  A service provider that has "made a 'deliberate effort to avoid guilty knowledge'" forfeits its safe harbor.  *Id*. (quoting *Aimster*, 334 F.3d at 650).

### A.   Vimeo Had Actual Or Red Flag Knowledge Of Specific Infringements.

Vimeo's claim that there is "no evidence that Vimeo knew these videos were even on its system at all" (Motn. at 22) is demonstrably false.  Vimeo employees not only made infringing videos, they instructed users how to incorporate unlicensed music, and reviewed and commented on videos they knew used unlicensed commercial music.  SUF 52-55, 61-66, 69-71, 75, 77.  All

9

(or nearly all) Vimeo employees are frequent users, who spend several hours a day on the Vimeo website, receiving links to various videos (including all videos from the many hundreds of channels, users, and groups that they may subscribe to) and otherwise crawling the website to review videos for a variety of reasons, including "just to see what's on there."   SUF 43-45, 47, 50, 52-55.

Of the 199 works listed in the schedules to Plaintiffs' complaints, as noted, *ten* were created and uploaded by employees.  SUF 63-66, 69.  Vimeo employees (prominently identified as Vimeo "Staff") commented on or "liked" at least *twenty-five* of the videos.  SUF 70, 340-349. Vimeo employees placed *two* infringing videos on channels created or "curated" by Vimeo (such as Vimeo's "Staff Picks" channel).  SUF 341-343.  All of these necessarily were directly viewed by Vimeo employees.  In addition, Vimeo employees "whitelisted" *twenty* infringing videos and "buried" *four* more, both acts which require review of the videos or of the users' accounts.  SUF 137-152.  At least *30* of the videos are identified as uploaded by subscribers to Vimeo's "Plus" service (a premium fee-based service), whose accounts and videos Vimeo states it reviews for compliance with its policies.[7]  SUF 178-179.

Vimeo does not even submit a single declaration from any Staff member refuting his or her actual knowledge.  Several examples illustrate just how disingenuous is Vimeo's claim that it lacked knowledge that infringing videos were on its own system:  (1) Vimeo selected as a "Staff Pick" a video set to a recording by Plaintiff Capitol Records artist Daft Punk (specifically identified in the video's description).  This video had been viewed 340,000 times, had more than 4,000 "likes," *and* was "whitelisted" by Vimeo Staff.  SUF 342.  (2) Vimeo selected as a "Staff

---

[7]       In addition, of the videos discovered after this lawsuit was filed, at least *7* additional videos were uploaded by Vimeo employees; at least *30* additional videos reflect "likes" or comments by Vimeo employees; more than *25* such videos were selected and featured by Vimeo Staff on Vimeo-curated channels, including both "Staff Picks" and the "Vimeo HD" Channel; and at least *70* additional videos have now been identified as "whitelisted," and at least *50* additional videos as "buried."  SUF 34, 66, 143, 151-152, 348.

Pick," and made multiple comments on, a video set to Blur's "Girls and Boys," whose uploaders advised Vimeo that they were "motivated" by Vimeo's own posted video set to and synchronized with commercial music.  SUF 343.  (3) Vimeo employees followed and regularly commented on dozens of videos set to commercial "pop songs" (known as the "Davey Dance Blog"), including videos incorporating recordings by The Beatles, David Bowie, and The Beastie Boys.  SUF 63 (d),(i), 66(e),(f),(g), 265, 335, 345.

While the foregoing is sufficient to establish Vimeo's ***actual*** knowledge of these videos, alternatively and at a minimum, Vimeo possesses "red flag" or constructive knowledge of these infringements, i.e., "subjective[] aware[ness] of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Viacom*, 676 F.3d at 31.  Vimeo was aware of many facts that provided it with red-flag knowledge.  Vimeo recognized the reality that music was integral to its videos.  As Vimeo's President admitted, "[t]he right soundtrack can make the difference between a good video and a great one."  SUF 59.  Here, the infringed musical works were well known, popular, and successful songs, and the artists were known to Vimeo and its employees (for example, The Beatles, Coldplay, and The Jackson Five).  SUF 63, 66, 69, 264.  Their use was apparent on the face of the videos and the webpages surrounding them, as several had Plaintiffs' names prominently displayed either in the video itself or in the video description or tags, and many videos included actual music "credits" with the name of the popular artist and/or song title.  SUF 80-85.  A number of the videos actually consisted solely of a visual of a vinyl record playing the music, including with the name and logo of one of the Plaintiffs ("Capitol") prominently displayed.  SUF 83.  For Vimeo to claim complete unawareness of infringement is ludicrous, as these are precisely the type of blatant facts that result in imputed knowledge of infringement.  *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v.*

4907605.1

*Grokster, Ltd. (Grokster II)*, 454 F. Supp. 2d 966, 987 (C.D. Cal. 2006) (popular "Top 40" songs "are almost invariably copyrighted").

Vimeo is a sophisticated, commercial Internet business that exploits copyrighted works. Its executives were familiar with or had been involved in the music industry.  SUF 73, 235-240. Its Staff made videos using infringing music and even instructed others how to do so.  SUF 63, 66, 69-71, 289-299.  Vimeo knows how to and does protect its own intellectual property.  SUF 74.  Vimeo requires its users to agree to a "worldwide, non-exclusive, royalty-free license and right to copy, transmit, distribute, publicly perform and display (through all media now known or hereafter created), and make derivative works from your video."  SUF 62, 74; *see also* Cheah Decl., ¶ 4 & Ex. 1.  Vimeo engages in the same activities with Plaintiffs' copyrighted music *without a license*.  Vimeo even opened its own "music store," in which for a fee it (ironically) *licensed* music to its users to be used in videos.  SUF 58.  Based on these facts, Vimeo's knowledge is "apparent."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 & n.5 (9th Cir. 2001) ("apparent" knowledge where "Napster executives have recording industry experience," "enforced intellectual property rights in other instances," "downloaded copyrighted songs from the system," and "promoted the site with screen shots listing infringing files.").

Vimeo knew *it* did not have licenses from music copyright owners for *its* commercial use of music.  SUF 72-79, 234-241, 285-288.  It never asked its users whether they had music licenses (despite the fact that the videos in suit were uploaded by individuals who did not claim to be licensees).[8]  SUF 88, 89, 93.  Vimeo Staff expressed the need for music licenses and knew

---

[8]      Vimeo claims that certain artists and EMI affiliates have Vimeo accounts.  These videos are not subject to this lawsuit.  *See* Motn. at 24.  In any event, as Vimeo knows, only the copyright owners – Plaintiffs – can permit the use of their music.  Rather than prove that Vimeo is unable to detect acts of infringement, the exact *opposite* is true; the existence of these accounts would mean that material uploaded by third parties clearly is *not* authorized. Vimeo knows that.  *See* SUF 85 (Vimeo Staff could determine if the owner of copyrighted music uploaded videos to Vimeo, because "[g]enerally it's under their name").  Indeed, the Second Circuit in *Viacom* ascribed no significance to a plaintiff's uploading of videos, even though YouTube pointedly argued that plaintiffs there "posted…a

that Plaintiffs do not permit their unlicensed music to be distributed over the Internet.  SUF 234-241.  Vimeo executives wrote as early as 2007 "copyright holders are expected to charge a revenue share of 20-50 percent for use of music," and they recognized that "big media companies might dispute our use of *copyrighted* music in our videos."  SUF 72, 79, 235, 237, 238.  When it provided a popular video to CBS for possible inclusion in a "60 Minutes" segment about Barry Diller (the CEO of Vimeo's parent), Vimeo questioned whether it should be used because the music was not licensed and suggested "if you want me to make a version that does not have copyrighted music in it, I will do that for you."  SUF 77.  Vimeo even directly lied to a user, telling him that Vimeo "pay[s] royalties on any music used on Vimeo."  SUF 304.

Finally, Vimeo's argument that it must be able to answer "which copyright owners have rights," "which aspects of those works [are] licensed to third parties," and "what uses" would "be considered *de minimis* or fair uses" is meritless.  Motn. at 23.  Vimeo's own employees knew they were using and sanctioning unauthorized uses of music, as evidenced, for example, by a canned response to users regarding the use of copyright music that "adding a third party's copyrighted content to a video generally … constitutes copyright infringement."  SUF 78.  In any event, Vimeo does not identify any licensed music or any instance of alleged fair use, and these are affirmative defenses, not issues on this motion.  *See Napster*, 239 F.3d at 1015-17 (rejecting fair use defense on the merits).  If a service "provider could" simply "claim … the possibility that some files might be fair use" or simply claim doubt as to the copyright or licensing status of a work, then "infringement can never be 'apparent' as to any file," making the knowledge provision of the DMCA a nullity.  Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats:  Reckoning the Future Business Plans of Copyright-Dependent Technology*

---

'boatload' of videos" to the site.  Br. of YouTube, Inc., *Viacom Int'l, Inc. v. YouTube, Inc.*, Nos. 10-3270-cv, 10-3342-cv, 2011 WL 1356930, at *2 (2d Cir. Mar. 31, 2011); *see A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 918 (N.D. Cal. 2000) (some prominent artists, for example Metallica, permitted their concerts to be recorded).

*Entrepreneurs*, 50 Ariz. L. Rev. 577, 598 (Summer 2008); *see A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 918 (N.D. Cal. 2000) (rejecting claim that chain of title issues were complex); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1169 (C.D. Cal. 2002) (rejecting argument that defendant "would not necessarily know Perfect 10's copyrights were infringed because they might be licensed").

### B.     Vimeo Adopted A Policy Of Willful Blindness To Infringement Of Music.

Unlike "actual" or "red flag" knowledge, by definition "willful blindness" resulted in Vimeo ***not*** necessarily viewing infringing videos (i.e., it was "blind" to them). Willful blindness is equivalent to or "'tantamount to knowledge,'" i.e., it "***demonstrate[s]*** knowledge or awareness of specific instances of infringement." *Viacom*, 676 F.3d at 35 (emphasis added). Because the intent and result of willful blindness is to avoid learning of specific acts of wrongdoing, the requisite knowledge is imputed to those who "made a 'deliberate effort to avoid guilty knowledge.'" *Id.*; *see Aimster*, 334 F.3d at 650 ("Willful blindness is knowledge, in copyright law…."); *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002) ("[O]ur precedents establish that the [willful blindness] doctrine may be invoked to prove defendant had *knowledge* of the [illegal acts].") (emphasis in original). That is why and how willful blindness differs from red flag knowledge.

This "hardly novel principle" (*Viacom*, 676 F.3d at 35) is consistent with the rationale that holding a service provider liable for its willful blindness is a "practical necessity, given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts he believes to be true." *Reyes*, 302 F.3d at 54. In other words, a service provider cannot simply say, "I didn't see it" and evade liability. *See United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) (the "rationale" for the willful blindness doctrine is "that a defendant's affirmative efforts to see no evil and hear no evil do not magically invest him

14

with the ability to do no evil").[9]

*Aimster*, cited in *Viacom*, illustrates the application of the willful blindness principle in the context of the Internet.  The defendant claimed to lack "know[ledge of] what songs were being copied by users of his system."  That claim literally was true because of Aimster's self-imposed blindness.  334 F.3d at 650.  Nevertheless, the Court held that as a result of "a deliberate effort to avoid guilty knowledge," the defendant was liable for ***all*** infringements on its website.

*Id.  Viacom* reiterated this principle, quoting from its recent decision in *eBay*, 600 F.3d at 109:

> "[a] service provider is not … permitted willful blindness.  When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself ***from learning of the particular infringing transaction*** by looking the other way."

*Viacom*, 676 F.3d at 35 (emphasis added).

Just the opposite of eBay, Vimeo cultivated an environment where it encouraged infringement of ***music*** by its employees and its users and then looked away from the same infringing conduct.  Vimeo's internal communications clearly reflect its policy to simultaneously invite infringement specifically of music, stating, "***we allow it***," and then ignoring these invited infringements, stating, "***we ignore it***" and "***legality doesn't matter when it comes to the uploading rules***…."  SUF 35, 36, 38, 86, 91.  Vimeo succinctly and publicly espoused that its policy on the use of copyrighted music is "***Don't ask don't tell*** **;)** [wink]."  *See* SUF 308 ( "We can't officially tell you that using copyright music is okay.  ***But....***") (emphasis added).  Vimeo's "blind eye" to music infringement was obvious to its users: "it does seem odd that Vimeo repeatedly turns a ***blind eye*** to the many videos on their site that use copyrighted music without permission."  SUF 92 (emphasis added); 202 ("***From day one*** at Vimeo, I've been amazed that

---

[9]       Similarly, the DMCA – and language referring to a lack of "monitoring" obligation – "does not abrogate" the willful blindness doctrine.  *Viacom*, 676 F.3d at 35; *see* Ginsburg, 50 Ariz. L. Rev. at 598 ("[Section] 512(m)'s dispensation of service providers from 'affirmatively seeking facts indicating infringing activity,' should not entitle the service provider to remain militantly ignorant.").  Otherwise, willful blindness never could exist but would be swallowed up by the refusal to monitor.

Vimeo has no restrictions about copyrighted music being used here illegally.  It is a sword of Damocles above their head, legally, at least in my country, but more importantly, it is an insult to the musicians who created the original music.") (emphasis added).

Vimeo effectuated its policy of willful blindness to music infringement into effect by attempting to shield itself from learning of infringement of music on its website.  ***First***, Vimeo refused to use its ***existing features*** that would reveal infringement of music.  Vimeo used all its resources to determine whether a video was "original" in all respects ***other than music***.  SUF 94, 95, 98-116, 123-129.  Even though Vimeo employees recognized that they had "back-end mechanisms that allow us to search through everything," (SUF 120, 123) Vimeo refused to use its many existing "ModWorld" tools (and so-called "filters") to at least limit infringement of music.  SUF 123-129.  Among others, one tool allowed users and Staff to "flag" for removal many different types of unlawful (and/or simply undesired) videos, yet it purposefully did not include copyrighted music as a category subject to being flagged.  SUF 130-134.  Vimeo developed, and partially premiered, a "Featured Music" function which would have allowed users to provide credits to artists, but Vimeo then withdrew and never fully implemented the feature admitting that it "run[s] into copyright issues."  SUF 96.  *See Phillip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007) (defendant "willfully blinded himself to facts that would put him on notice" of infringement because he "failed to keep the records he would otherwise normally keep").  Vimeo did not employ keyword and video-duration searches to identify unlawful postings, as it did for movies and television programs (as in its "Movie Search" or "Sweet Spot" tools).  SUF 154-158.  It developed a "Thin Ice" notification system to communicate with users regarding suspected "unoriginal" or otherwise disallowed content, but refrained from using it in the same way for copyrighted music.  SUF 159-168.

16

*Second*, in stark contrast to eBay, which was found *not* to be willfully blind to infringement on its website, Vimeo refused to do what eBay did.  eBay instituted a vast array of "anti-counterfeiting measures" including spending $20 million a year on tools to promote safety on its website, employing 200 employees who focused exclusively on combating infringement, creating a "fraud engine" to "ferret[] out" illegal and counterfeit listings, using key word searches to identify infringement, and implementing filters to screen for infringement.  *eBay*, 600 F.3d at 98-100.  Vimeo avoided all of these measures; it did not spend any money or dedicate any employees to "ferret out" music infringement (SUF 35-38); it did not instruct its employees to focus on music infringement, but rather to look away (SUF 86-95); it refused various filtering technologies that were offered to it and that were used by other websites to screen for music infringement (even as it deployed its own filters for other purposes) (SUF 217-233); and it did not promulgate specific prohibitions on infringing music (SUF 30-32, 36, 37, 39, 203, 204).  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*, 146 F.3d 66, 70 n.2 (2d Cir. 1998) ("[I]ndustry custom is relevant to determining whether Hilfiger engaged in willful blindness by refusing to conduct a more comprehensive search….").

Consistent with its policy to "ignore music," Vimeo looked away from infringement of music, even when users specifically queried whether the use of commercial music was acceptable.  SUF 203 ("I've tried searching around the community guidelines, the help section, and the forums, but I haven't found a solid answer on whether commercial music IS or ISN'T acceptable (the content guidelines don't touch on audio)").  *See also* SUF 88, 89, 93, 94, 303, 306, 308, 309.  It responded internally to other communications concerning infringement of music with, "nobody likes a tattle tale" and "ignoring but sharing."  SUF No. 90, 91.  *See Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) (willful blindness found where defendant

"was obligated at the very least to ask her supplier whether the items he was selling were …

counterfeit").  Had Vimeo not intentionally "looked away" and constructed a system and

procedure to remain blind to infringement of music that resided on its website, it readily would

have observed the infringing nature of the *specific* videos at issue.  Indeed, for all of the videos

referenced in the schedules to Plaintiffs' complaints, there was no claim or indication that the

music was licensed, and nearly all included the names of artists and/or song titles and/or record

companies which appeared either in the title, description, or tags of the videos, or in posted

comments.  SUF 80-85.

## III.  VIMEO OBTAINS A "FINANCIAL BENEFIT" AND HAS THE "RIGHT AND ABILITY TO CONTROL" INFRINGEMENT.

The DMCA precludes a service provider from safe harbor where it "receive[s] a financial

benefit directly attributable to the infringing activity, in a case in which the service provider has

the right and ability to control such activity…."  17 U.S.C. § 521(c)(1)(B).  Both elements of

"direct financial benefit" and "right and ability to control" exist here.

### A.    Vimeo Receives A Direct Financial Benefit Attributable To Infringing Activity.

Vimeo obtains a financial benefit directly attributable to infringement in at least four

ways:  (1) infringement "draws" users to its website and increases the website's value; (2) it

contributes to advertising and other revenue, including advertising placed on the same page as an

infringing work; (3) it saves the expense of paying for the music (unlike its competitors do); and

(4) it was used to solicit paying "Premium Members."  Any one of these suffices.

Financial benefit is defined by the common law.  *See Perfect 10, Inc. v. CCBill LLC*,

488 F.3d 1102, 1117 (C.D. Cal. 2007).  The exact amount of the benefit is a damage issue and

need not be quantified nor quantifiable.  *Fung*, 2009 WL 6355911, at *15-*16 & nn.25, 27

4907605.1

("[T]he present Motion involves *liability* not *damages*, so such detail is unnecessary"); finding financial benefit even though "Defendants assert that 'there is no detail, no dollar amounts'") (emphasis in original).  A direct financial benefit exists if the infringing content is "miniscule" compared to the overall available content and "regardless of how *substantial* the benefit is in proportion to a defendant's profits."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis in original); *Polygram Int'l Pub'g, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1333 (D. Mass. 1994) (financial benefit where copyrighted songs were played "by only 'four' of the 2,000 exhibitors, which occupied only .002% of the total exhibition space").  Even without ***any*** current revenue, "increases in userbase" and the potential for future revenue constitute a direct financial benefit.  *Napster*, 239 F.3d at 1023; *see Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) ("The financial benefit need not be tied directly to sales of the infringing goods").

1.      **Infringing Music Is A Draw:**  For over a century, in contexts ranging from dancehalls to community concerts to racetracks to the Internet, courts have recognized that performing or making infringing music available is a "draw" that provides a financial benefit. *See, e.g.*, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) ("[T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band … whose activities provide the property with a source of customers and enhanced income."); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir. 1971) (supervisor of community concerts derived "financial benefit from the actions of the primary infringers" performing infringing music); *Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n*, 554 F.2d 1213, 1214 (1st Cir. 1977) (racetrack derived financial benefit from playing infringing

19

music while patrons were not "absorbed in watching the races").  In *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996), the Court relied on this history to find a financial benefit from the sale of infringing recordings:

> Our conclusion is fortified by the continuing line of cases, starting with the dance hall cases, imposing vicarious liability on the operator of a business where infringing performances enhance the attractiveness of the venue to potential customers…. In this case, the sale of pirated recordings at the Cherry Auction swap meet is a "draw" for customers, as was the performance of pirated music in the dance hall cases and their progeny.

Courts have applied this principle to the Internet.  *See, e.g.*, *Napster*, 239 F.3d at 1023 (infringing music was a "draw" that "'enhance[s] the attractiveness of the venue'"); *Cybernet*, 213 F. Supp. 2d at 1171 ("Cybernet benefits from the draw posed by the existence of [plaintiff's] works provided at a cost far below that provided by the copyright owner."); *Playboy Enters., Inc. v. Webbworld, Inc.*, 968 F. Supp. 1171, 1177 (N.D. Tex. 1997) (infringing photographs "enhanced the attractiveness of the [defendant's] website to potential customers").

Music constitutes an integral part of Vimeo's audiovisual works.  Vimeo's Staff Blog stated, "You know it, I know it, and our ears know it:  Videos and music go great together."  SUF 60.  Vimeo's online tutorials directed to users opine that "[m]usic does a great job setting the mood you want for your video."  SUF 271.  *See* pp. 38-40 (infringing "Lip Dubs" attract users).  Vimeo has now launched a "Music Store" to license music and provide a tool designed to add musical tracks to videos (called "The Enhancer").  SUF 58, 59.  *Compare Lime Group*, 784 F. Supp. 2d at 435 (Limewire "possesses a direct financial interest in users' infringing activity" as shown by a plan to (1) attract infringing music users and then (2) turn some of them "into customers of LW's online music store, which would sell authorized music.").  A Vimeo "Public Relations Proposal" highlighted infringing videos as "Vimeo's greatest commodity."  SUF 265.  Vimeo capitalized on infringement by using many of Plaintiffs' most popular music.  According

20

to the partial records produced by Vimeo over two years ago (as of June 2010), the infringing

videos referenced in the schedules to Plaintiffs' complaints conservatively had been viewed over

950,000 times, and several individual videos had been viewed tens of thousands of times or

more.[10]  SUF 258.  The average and median number of views for these videos far exceeded those

for Vimeo's other available videos.  SUF 258, 259.

Vimeo also recognized that permitting infringing music differentiated it from competing

websites.  As one of Vimeo's former general managers commented specifically on a video

infringing a Plaintiff's copyright, "[W]atching [the infringing video] made clear how different

Vimeo will always be from YouTube."  SUF 264.  As a result, Vimeo benefitted by users

migrating to Vimeo from a number of other websites because of its permissive policy on the use

of copyrighted music.  SUF 274 (*E.g.,* "Thousands of people upload videos they've made with

clips from movies and TV shows, put to popular music…. YouTube has recently started pulling

the plug.  What about Vimeo?  Could we post our videos here?";  "I set [a video] to music … and

uploaded it to uTube and Veoh and Photobucket.  It was instantly rejected by their software for

copyright infringement…. Vimeo allowed it…. I am trying to find a place where I can upload

such videos…."; "I've had a problem placing [videos] on Facebook because I use music from my

MP3 library").  *See Lime Group*, 784 F. Supp. 2d at 435 (Limewire users "are drawn to

LimeWire because the program permits infringement").

Users even informed Vimeo they were attracted to its website in order to be permitted to

upload videos containing Plaintiff ***EMI's*** music that was prohibited by other websites.  "Vimeo

offers a platform which allows me to upload my work without copyright issues and conflicts

which I run into with YouTube many times."  SUF 274.  "The YouTube version of this music

---

[10]  The works added in the proposed amended schedules add over 2 million additional views by June 2010.  SUF
260.

4907605.1

video is blocked by EMI and WMG, so I hope Vimeo remains a more tolerant environment for music and animation lovers."  "[This video] was originally made for YouTube but since yet doesn't allow EMI music in videos I couldn't upload it."  SUF 275.

2.      **Advertising And Other Revenue:**  Vimeo admits it receives a financial benefit by selling advertising.  *See* Motn. at 29; SUF 242.  Many of these advertisements appear on the same page as videos infringing Plaintiffs' music, including advertisements for those identified by Vimeo as its key advertisers.  SUF 246-247.  Vimeo financially benefits from advertising in several ways:  First, it is paid by the advertiser based on the number of times an ad is displayed (a specific sum per 1000 "impressions").  SUF 242, 244, 251-252.  Second, Google "serves advertisements that are displayed" on Vimeo and targeted to the music.  Google pays Vimeo on a "per click" basis, making Vimeo's "financial benefit direct."  *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 857 (C.D. Cal. 2006); SUF 243-251.  Third, Vimeo entered into sponsorship agreements with advertisers, for example Carmex ***lip*** balm, to place advertisements on Vimeo's "***Lip*** Dub Stars" channel, which featured videos that infringed music.  SUF 253-257.  *See Fung*, 2009 WL 6355911, at *14 (financial benefit where defendant "solicited advertisement on the basis of the availability of works on his website"); *Google,* 416 F. Supp. 2d at 857 (financial benefit attributable to infringing content because "***any increase*** in [defendant's] web traffic leads to increased advertising revenue, brand awareness, and market clout") (emphasis added).

3.      **Saving Expense:**  A former Vimeo executive admitted that "if we were going to license music for use on the site," as others do, "we would have to pay for it."  SUF 234, 236.  Vimeo recognized that this savings is significant:  "copyright holders are expected to charge a revenue share of 20-50% for use of music" (SUF 237), and includes money that would have been spent to legitimately license music.  SUF 235 (budget estimate "[d]oes not include (any) outsized

22

content license fees for Music Copyrights, etc.").  *See Cybernet*, 213 F. Supp. 2d at 1171

(defendant benefits because "works [are] provided at a cost far below that provided by the

copyright owner"); *Grokster II*, 454 F. Supp. 2d at 989 ("Of course, it helped [defendant's]

profitability that it did not incur any costs to obtain the content that was used to attract users.").

   **4.**  **Premium Memberships:** Vimeo solicited "Premium Members" from web pages

that contain Plaintiffs' music.  SUF 282.  "Premium Members" paid a fee for ***additional benefits***

including to be able to download an unlimited number of infringing works.[11]  SUF 280-281; *see*

Motn. at 29 n.15; *see also* H.R. Rep. No. 105-551, pt. 2, at 54 (financial benefit "include[s] any

such fees where the value of the service lies in providing access to infringing material"); *Lime*

*Group*, 784 F. Supp. 2d at 435 (infringing content attracted users, some of whom purchased

premium "LimeWire Pro" software).

   **B.**  <u>**Vimeo Has The Right And Ability To Control Infringement.**</u>

   The right and ability to control infringement can be demonstrated in two different ways:

(1)  a monitoring program that, for example, includes detailed instruction on issues of layout,

appearance, and content, forbidding certain types of content, and refusing access to users who

fail to comply with instructions; or (2) inducement to infringe which "'premises liability on

purposeful, culpable expression and conduct.'"  *Viacom*, 676 F.3d at 38.  "Both of these

examples involve a service provider exerting substantial influence on the activities of users

without necessarily – or even frequently – acquiring knowledge of ***specific infringing activity***."

*Id.* (emphasis added).  Both occur here.

---

[11]  For that reason, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012), is inapposite. Not only did the defendant there provide a vastly different service, but there was no evidence that users paid a different price for different services (nor, of course, any of the other financial benefits discussed herein).

4907605.1

      **1.**      **In Curating Its Website, Enforcing Content Restrictions, And Monitoring Content And Users, Vimeo Engages In The "Something More" Described By *Viacom*.**

Vimeo begins its argument by opining that the "right and ability to control … focuses on the service provider's legal and practical control over *specific* infringing activity."  Motn. at 27 (emphasis in original).  That misstates the law, is not to be found in the DMCA, and flatly contradicts *Viacom*, which held that the "right and ability to control" "does ***not*** include a ***specific*** knowledge requirement."  *Viacom*, 676 F.3d at 38 (emphases added); *see id.* at 36 ("[T]he District Court erred by importing a specific knowledge requirement into the control and benefit provision….").[12]

The remainder of Vimeo's brief argument is dedicated largely to its claim that "something more" than the ability to remove content (which Vimeo admits it possesses) is required.  Motn. at 27.  But in a myriad of ways that Vimeo omits from its brief, Vimeo constantly exercises and has the ability to exercise (whether it exercises it or not) "much more" to aggressively control its website content.  Unique among other websites, Vimeo participates with its users and exercises review and control in order to "curate" the content on its website in furtherance of its goal to develop its image and brand, mold a unique site, attract and retain users, and distinguish itself from others ("maybe our slogan should be 'Not YouTube'").  SUF 29.  Vimeo candidly admitted:  "***We are just straight controlling our website***."  SUF 102.  In a more colorful but equally accurate admission, Vimeo Staff stated "hardline Vimeo ***editorial fascism*** is important to keeping our website from becoming a trashpile" (emphasis added).  SUF 103.  And yet, Vimeo refuses to exercise this control to limit the infringement of music.

*Viacom* provided a road map for one way to show the requisite "'something more.'"  676

---

[12]     Vimeo cites *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) as support for this erroneous proposition, but does not cite *Viacom*, which reversed the District Court on this issue.

24

F.3d at 38.  The right and ability to control exists "where the service provider instituted a monitoring program by which user websites received 'detailed instructions regarding issues of layout, appearance and content.'  The service provider also forbade certain types of content and refused access to users who failed to comply with its instructions."  *Id.* (quoting *Cybernet*, 213 F. Supp. 2d at 1173).  Here, Vimeo has an extensive and pervasive "monitoring program," has provided detailed instructions regarding content of its users, forbids certain types of content, and refuses access to users who fail to comply with its instructions.  SUF 30-40, 98-116, 123-200.

The right and ability to control does not require the ability to eliminate infringement, only to "limit" it.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster I*"), 545 U.S. 913, 930 (2005) ("[One] infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it….").  That Vimeo easily can do.  SUF 86-97, 201-211, 217-233.  A service provider need only have the ability to control, even if it chooses not to exercise it. *See, e.g.*, *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 554 (N.D. Tex. 1997) ("Courts … have focused not on an actual exercise of control but rather on the 'right and ability to control….'")  No service provider – not YouTube and not Cybernet – had both the ability to and exercised anywhere near the control Vimeo could and did exercise selectively and subjectively, while refusing to exercise it for one specific and discrete area, *music*.

(a)     **Enforcement Of Content Restrictions:**  In *Cybernet*, a primary means by which the website exercised control was by enforcing a set of extensive "General Policies."  These policies not only forbade illegal and infringing content, but also any "activities that, which in the sole and absolute discretion of Adult Check [i.e., Cybernet] may be or are harmful to its reputation, image, [and] goodwill…."  213 F. Supp. 2d at 1159.  Cybernet's policies also restricted site content and format, requiring that the sites "contain unique, quality, and adequate

25

content," and are not "[t]emplated."  *Id.* at 1160.

Just like Cybernet, Vimeo promulgates, publicizes, and enforces a set of content restrictions, including (but not limited to) in its "Community Guidelines." [13]  SUF 32-34; Cheah Decl., ¶¶ 13 (describing limitations on videos that may be uploaded); Pile Decl., ¶ 24 ("Vimeo removes videos that violate its Terms of Service to set an example for users").  It requires that its users provide what it determines is "original" content (except, of course, for music), removes duplicative content, telling its users, "[u]nlike some other video sites, we enforce this ['original content'] policy very strictly."  SUF 30, 34-36, 88, 94-95.  Just like *Cybernet*, Vimeo's guidelines prohibit specified content but were enforced in the sole discretion of the service provider and were not enforced as to certain copyrighted works (in *Cybernet*, plaintiff's photographs; here, music).  213 F. Supp. at 1162.  SUF 35-37, 86-87, 89, 94, 95, 98.  Just like Cybernet, Vimeo also sets "loose and subjective" guidelines (*id.* at 1160), which, in Vimeo's words, are "[o]ne of the major aspects that sets Vimeo apart from other video-sharing websites." SUF 34, 105, 115.  Thus, Vimeo has (as its founder puts it) "a long list of things we would reject."  SUF 32, 33, 39, 99.  Just like Cybernet, Vimeo acknowledges that it has the contractual right to control infringement.  Motn. at 5.

The most prominent of Vimeo's content restrictions is its requirement that ***all*** videos uploaded be ones "you have created yourself or participated closely in the creation of."  SUF 31-

---

[13]     The fact that Vimeo's Terms of Service warned against infringement (albeit not mentioning music) is of no help to it, just as it was no defense in *Cybernet*, 213 F. Supp. at 1160.  For decades, infringers have attempted unsuccessfully to hide behind similar words that pay "lip service" to rights but go unenforced.  *Usenet.com*, 633 F. Supp. 2d at 153 n.20; *see also Lime Group*, 784 F. Supp. 2d at 431 (warning users about infringing does not prevent imposition of inducement liability where "there is 'no evidence that [defendant] made an effort to filter copyrighted material from users' downloads or otherwise impede the sharing of copyrighted files'"); *Grokster II*, 454 F. Supp. 2d at 980 (terms prohibiting copyright infringement were irrelevant because "aside from admonishments to users, [Defendant] did not believe it had any responsibility to prevent use of its software for infringement"); *Viacom*, 676 F.3d at 28.  In fact, it was only after this lawsuit was filed that Vimeo added a vague parenthetical reference to "copyrights, etc." in its Content Restrictions, and at no time has it specified (unlike other websites) that use of third-party copyrighted music is not permitted for the simple reason that it is permitted.

33, 34, 94, 98, 362.  Vimeo hence undertakes effort to be "free of unoriginal material."  SUF 34.  However, Vimeo self-defines the terms "created yourself" and "original" to *exclude copied music.*  SUF 35-36.  (*E.g.,* "[F]or something to qualify as a creative or original video, we wouldn't stipulate one or the other using or not using music.";  "[Q:]  If a user creates a video that's not a TV show, it's not a movie trailer, it's not ripped from elsewhere on the web but the video uses music that the user did not create … does that fall within the [prohibition]?  [A:]  I don't think that it does.").  Vimeo communicates this content policy directly to its users.  SUF 303, 303 ("You can use the music, there are ton's [sic] of videos on here with music.";  "[Q]: hey guys, I see all the time at Vimeo videos [using] music that is copyrighted. Is there any problem with this?" [A]: "*we allow it*.").  *See also*, *e.g.*, SUF 86, 306, 308-311, 314.

      Vimeo's other published content restrictions likewise reflect its control and limitations on acceptable content, but not on the use of copyrighted *music*.  Vimeo enforces prohibitions on video games, commercials, infomercials, "real estate home tours," "fan vids," "compilations of scenes from TV or movies," "sexually illicit[sic] material or porn" (though "non-sexual nudity is o.k."), or "*anything else* you found on the web that you did not create yourself" (i.e., someone else's original videos), but permits copyrighted *music*.  SUF 108, 115, 32-33, 35-36, 38, 303.  Vimeo pursues such an aggressive policy of deletion because, in its view, "[w]hat we most need to avoid is the brand being diluted."  Ex. 124.  Vimeo Staff had a "specific idea of what type of video we wanted and anything that was not that was to be removed."  SUF 99.

      Vimeo also has enforced a loose set of *unpublished*, discretionary internal guidelines, deleting whatever videos it desired.  SUF 105, 140 ("[I]f I encountered a clip that seemed like it should not be on Vimeo, I removed it.").  *See Cybernet*, 213 F. Supp. 2d at 1159 (website deleted content at its "sole and absolute discretion").  Vimeo also will "bury" videos it believes "not

27

Vimeoesque" (*e.g.,* "Xtreme sports, sexy vids, political vids, anything that is allowed on the site, but not something we'd like to promote") and notifies individual users that it is not "interested" in hosting their content and that they must remove their videos.  SUF 116, 140.  None of these restrictions applies to videos containing copyrighted *music*, which Vimeo perceives as content that enhances and distinguishes its brand and public image.  SUF 30, 35-38, 59, 263-270.

(b)  **Implementation Of A Monitoring Program:**  The existence and implementation of a "monitoring program" to ensure compliance with content or format restrictions also is probative evidence of the right and ability to control.  *See Viacom*, 676 F.3d at 38.  The rationale for this rule is that where a defendant has the power to police its premises, the law should "encourage it to do so, thus placing responsibility where it can and should be effectively exercised."  *Shapiro, Bernstein*, 316 F.2d at 309; *see Cybernet*, 213 F. Supp. 2d at 1177-78 ("[O]nline service providers are meant to have *strong* incentives to work with copyright holders. The possible loss of the safe harbor provides that incentive….") (emphasis in original).

A full-time "Staff" (or Moderators) has the responsibility for Vimeo's monitoring program in ways and to an extent not present in other websites.  SUF 34, 41, 46, 119, 123.  Its Staff "employs various tools to help identify and remove videos that violate its Terms of Service (which incorporate its content restrictions) and terminate such accounts in appropriate circumstances," none of which applies to *music*.  SUF 89, 94-95.  Cheah Decl., ¶¶ 13-15; Pile Decl., ¶¶ 23-29.  This monitoring takes shape in various ways:

*First*, Vimeo Staff spend several hours each day watching videos, scanning through lists of videos or video "tags" or searching and reviewing uploaded content, and manually locating and identifying content to be deleted, all while ignoring *music*.  SUF 38, 109-115, 123-200.  One Vimeo internal document stated that Vimeo "literally reviews every video that is uploaded,"

which was certainly true as late as 2007.  SUF 107, 108 ("I used to be able to look thru the entire

list of uploads for a day!").  Vimeo Staff review every video that has been "flagged" by users, or

(frequently) by Vimeo employees themselves.  Upon finding a problematic video, they review

other videos uploaded by the same user.  SUF 130-134.  But Vimeo does not allow any way for

users or Staff to "flag" videos for copyrighted *music*.   SUF 130-132.

   Vimeo Staff also subscribe to "groups" (collections of users with a shared interest), to

"channels" (collections of particular types of videos), or to individual users, and regularly review

videos that are sent directly to them as a result of these subscriptions, and in their words, "we just

filter through it…."  SUF 120.  Vimeo Staff also subscribe to "keywords" and perform

"keyword" searches (for example, on the names of video games and movies) and subscribe to

"tags" (words submitted to describe a user's video).  SUF 113 (*E.g.*, "Julia used to subscribe to

this an[sic] a few other problem tags"; "I would say gamer video tags are useful to browse.").

But they don't do any of this for *music*.  SUF 207-211.  Additionally, as a matter of policy

Vimeo will contact users on a special notification form to confirm that a video is "original"

(other than the *music*); however, employees who encounter a video containing music make no

corresponding effort.  SUF 159-168, 208 ("Q: [W]hat do you do to determine whether a video

that uses copyrighted music without a license violates the guidelines?... A: I myself do not ask or

try to determine that.").

   Moreover, Vimeo admits that "[e]ven in the absence of a DMCA takedown notice,

certain Vimeo employees – those with 'Moderator' status – have the ability to, and regularly do,

remove videos and terminate user accounts."  Pile Decl., ¶ 27.  Although its monitoring process

reveals the use of copyrighted music (Verdugo Depo., 77:9-16: "Q: Have you seen videos that

use music that is popular, commercially recorded music?  A: Yes."), Vimeo will not use its eyes,

4907605.1

ears, and tools to locate and remove videos containing copyrighted music without a specific DMCA notice.  SUF 75, 89, 93, 94, 205-209, 312.  In fact, unlike other videos that are deleted, Vimeo employees will permit videos containing copyrighted music to remain *even when* they view them.  SUF 75, 89, 94 (*E.g.*, Whitman Depo., 124:17-25: "Q: When you come across a video that uses copyrighted music, do you do anything?  A: Not necessarily.").  Indeed, there is not a single instance of a Vimeo Moderator *ever* having removed a video on his or her own initiative just because the music in it was infringing.

*Second*, to maximize the control over its website, Vimeo created and deployed to its Staff approximately 40 different technologies and tools known as "ModWorld," designed specifically to monitor the website and its users.  SUF 123, 124.  These tools are unique to Vimeo and are available only to Vimeo Staff.  SUF 124.  Among other things, "ModWorld" includes tools that allow moderators to access, and take action with respect to, a list of newly-popular videos ("Gainers"), to view "filters" that identify content not conforming to Vimeo's guidelines (which can then be deleted), to add or edit video "categories" ("Categories"), and to quickly locate and view "flagged" videos and deleted videos ("Flagged" and "[video] Purgatory").  SUF 126, 130-184.  Vimeo's tools specifically are designed to locate commercial television programs and movies ("Sweet Spot" and "Movie Search").  SUF 154-158.  Vimeo Staff use these tools on a daily basis to delete content.  SUF 125-128 ("I checked gainers 5 days a week (generally once a day in the morning).").  Using these tools, Vimeo Staff deleted thousands of videos.  SUF 115.  These tools never were used to locate or delete videos containing infringing music, and Vimeo never created or adapted a moderator tool to search for or locate videos containing infringing music.  SUF 129.

*Third*, Vimeo at one time created two "automated" filters to collect and identify content

that was likely to violate its guidelines:  AKULA and RoboCop.  AKULA was a "suspicious video alert tool" that allowed Vimeo employees to "set … a filter" with one of several characteristics, for example, videos whose titles or descriptions contained the titles of popular television shows, and videos whose titles matched conventions for naming and numbering television episodes.  SUF 187-192.  RoboCop was "a system that runs many simple tests on a video to decide if its suspicious or not [by] using anything we know about a video."  SUF 194.  Vimeo knew the implications of this tool, leading one Staff member to remark, "Is there a way to flag this email [about RoboCop] for future subpoenas?.... Thank you Andrew [Pile] for developing this MONITORING software."  SUF 194-199.  Vimeo also had the ability but refused to implement music filtering technologies that were used successfully by other service providers.  *See infra*, at 43-44.

In light of the foregoing, Vimeo's assertion that it does not and cannot pre-screen all content uploaded to its website (despite that employees who monitored uploaded videos, or were instructed to monitor "videos coming into the site") is a red herring.  SUF 106-108.  Such a rule would render the "control" test dependent on the size of the defendant, immunizing those websites with the most infringement.  The argument that a site is "too large to police … makes no sense" because "Defendants alone control the size of their market."  *Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670 (JBS), 2006 WL 842883, at *11 (D.N.J. Mar. 31, 2006).  *Viacom* never required (or even mentioned) that all material must be pre-screened to evidence the right and ability to control.  Although YouTube is larger than Vimeo by an order of magnitude, *Viacom* did not hold that YouTube lacked the right and ability to control, because of its inability to pre-screen its videos.  *See Tur v. YouTube*, No. CV064436 FMC, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) (YouTube's claim that it "does not have the technical capabilities

needed to detect and prescreen allegedly infringing videotapes" was not dispositive because "[t]here is clearly a significant amount of maintenance and management that YouTube exerts").[14]

   **(c)     Vimeo's Promotion And Demotion Of Content:**  While Cybernet enforced its guidelines to ensure that its network was attractive and diverse, Vimeo went further by proactively promoting "Vimeoesque" videos deemed to be consistent with the site's image, while simultaneously "burying" videos that it believed were not.  SUF 53, 117-118, 140-142, 236, 327-328.  Vimeo Staff actively look for videos that are "cool" to feature them.  SUF 50. They create and moderate their own highly popular "channels" to highlight notable videos in various categories, including a "Staff Picks" channel which collects and features their favorite videos, which are promoted via the Vimeo home page and are sent to the "in boxes" of users. SUF 50, 53.  Vimeo Staff encourage users to create certain types of videos by overseeing "Vimeo projects" in order "to get the community taking more videos."  SUF 54.

   Vimeo also controls its content by conveying to users those videos and types of videos it "likes."  Vimeo Staff  have designated thousands of videos as "likes," all of which appear on that Staff Member's personal webpage accessible to all users.   SUF 19, 47, 52.  Vimeo Staff blog and write about videos they like.  SUF 50.  They regularly leave positive comments and feedback on videos.  As one "Community Manager" instructed:  "Leave comments, give likes! Receiving a like or a comment from a staff member is a huge deal to our users."  SUF 50, 340-348.  *See also infra*, at 36-45 (addressing Plaintiffs' inducement of infringement).

   At its discretion, Vimeo also selects videos (and entire user accounts) that it deems as

---

[14]       Contrary to Vimeo's assertion, pre-screening of *all* content was not done in *Cybernet*.  The Cybernet member websites had over 20 million images available (213 F. Supp. 2d at 1158), and Cybernet had checkers who took an initial look at the site (not all the images on the site) and thereafter conducted "spot checks" (*id.* at 1164). New images were made available by the individual webmasters, who were not under Cybernet's control and who were responsible for providing content, including infringing content.  *Id.* at 1160.  The infringing images in Cybernet were not even on Cybernet's servers (*id.* at 1173), as they are on Vimeo's, and Cybernet did not have the sophisticated monitoring tools used by Vimeo and that could have been used to limit infringement, or the availability of numerous filtering or content identification technologies.

"desirable" by designating them as "whitelisted," in which case the video (or *all* videos uploaded

by that user in the future) cannot be "flagged" and effectively becomes immune from removal

*for any reason*.  SUF 140-150.  At the same time, Vimeo selects videos to demote or "bury"

(hide within the website) videos that are not in violation of Vimeo's content restrictions but

nevertheless Vimeo deems undesirable.  SUF 137-143 (videos subject to burying are those "okay

by the guidelines but not exemplary," such as "trashy vids" and those "we don't like").  Vimeo

Staff also "auto-bury" the entire accounts of certain users (including future videos) so they, too,

are hidden.  SUF 144.

Among the videos that have been "liked," designated "Staff Picks," favorably

commented on by Vimeo, "whitelisted" or otherwise promoted by Vimeo are many videos

containing Plaintiffs' copyrighted music.  SUF 151-153.  Vimeo not only refused to remove

these videos and their own infringing videos, even though its Staff could have done so

immediately (SUF 94, 115, 134), but by its conduct increased their viewership and visibility

within the Vimeo website.  SUF 67-68.

    **(d)**    **Instructing And Communicating With Users:**  Unlike its competitors, and

again above and beyond any activity engaged in by Cybernet, Vimeo Staff are by design highly

visible and active, since "[h]aving the staff active in the community is one of our big draws."

SUF 41, 50.  Vimeo Staff monitor, communicate with, and provide guidance to its *users* with

respect to content.  SUF 50, 104, 119-121.  Vimeo Staff receive and respond to communications

from users requesting instruction and technical advice specifically on the use of unlicensed

music, including encouraging the use of copyrighted music.[15]  SUF 304-305, 325, 350.  *See*

---

[15]    Vimeo's claim that the right and ability to control requires that it control the activities of the user *before*
content is uploaded is absurd.  *See* Motn. at 28.  As Vimeo recognizes, that is an "impossible task" for any website,
and thus such a rule would eviscerate the DMCA's protections.  *Id; see Napster*, 239 F.3d at 1024 (Napster liable
even though it could not control the user's personal activities because "[t]he file name indices … are within the

*Grokster I*, 545 U.S. at 938 (inducement exists where site "respond[s] affirmatively to [users'] requests").  For example, one moderator responded to a user query about copyrighted music: "The Official Answer I must give you is … [that] adding a third party's copyrighted content to a video generally (but not always constitutes copyright infringement…. ***Off the record answer: Go ahead and post it.  I don't think you'll have anything to worry about***."  SUF 305.  Another stated "We can't officially tell you that using copyright[sic] music is okay.  ***But***…."  SUF 308. *See also* SUF 300 ("You can use the music, there are ton's [sic] of videos on here with music.").

Vimeo also aggressively polices, weeds out, or bans ***users*** who they decide do not make a positive contribution to the Vimeo community and its image.  SUF 42, 98-105, 116, 123, 174. Vimeo seeks to eliminate people who "make Vimeo not rad," and "want[s] users who will contribute to Vimeo and our community, not just use our service to host their videos for free." SUF 42, 174.  Vimeo Staff (using a tool called "User Scanner") review lists of activities of new Vimeo account holders.  SUF 176-177.  Vimeo Staff also review (using the "Comment Scanner") a scrolling list of comments made by Vimeo users to locate users who post advertisements or spam, use profanity, or otherwise act as a "troll" (i.e., someone who criticizes videos without doing so constructively).  SUF 173-175.  Other tools allow Vimeo Staff to review the conduct of specific users ("Thin Ice"), to view a list of users who uploaded more than a preset number of videos that day ("User Binge"), and to view a list of users whose videos have been deleted ("[user] Purgatory").  SUF 159-168, 180, 183.  Additionally, all Vimeo users possesses a "rap sheet," which is reviewed by Vimeo to obtain a complete history of that user's activities on the Vimeo Website.  SUF 185, 186.

---

'premises' that Napster has the ability to police").  Vimeo users are no more and no less capable of being controlled than are YouTube users (or Cybernet webmasters).  Yet, *Viacom* never stated that control over what users do on their own computers is required for the ability to exercise control.

(e)      **Gameplay Videos:  An Illustration Of Vimeo's Right And Ability To**

**Control:**  Vimeo used its various tools and practices when it prohibited uploads of popular

"gameplay" videos in mid-2008.  ("Gameplay" videos are where users film themselves playing

through a videogame.)  SUF 212-216.  Vimeo widely announced and publicized this restriction

on gameplay videos, including by posting it in the "Staff Blog," adding a specific video

gameplay prohibition to its content restrictions, and communicating the prohibition in extensive

message board postings on its website, and setting a deadline for deletion of gameplay videos.

*Id.* As part of this aggressive campaign, Vimeo simultaneously purged existing gameplay videos,

created a specific "flag" and instructed users to "flag" gameplay videos which Vimeo then

deleted.  Vimeo employees themselves located and deleted gameplay videos, for example, by

searching for titles of games, searching for commonly used keywords, searching for and

subscribing to particular "tags" assigned to videos, and using the "ModWorld" tools to locate

such videos.  SUF 113, 130, 161, 212-216.

When Vimeo located a gameplay video, it deleted not just the individual video but at

times entire user accounts, notifying these users that their account had been removed for

"[u]ploading game walk-throughs, game strategy videos, depictions of player vs player battles,

raids, or other videos that  simply depict individuals playing a video game."  SUF 212-215.  As a

result, Vimeo "was constantly deleting gaming videos" and in a few months, Vimeo had "deleted

thousands [of gameplay videos] and … will continue to delete them."  SUF 115; Cheah Decl.,

¶¶ 15-16.

Vimeo could have done the same for infringing music, but elected not to.  The stark

contrast between Vimeo's approach to gameplay videos and copyrighted music is graphically

illustrated by one instance.  Vimeo deleted a user's account because a video bore the caption "no

35

copyright infringement intended," believing that the video contained gameplay footage. However, when Vimeo learned that the video actually was a user-created video using computer graphics (that Vimeo did allow) and that the "copyright infringement" caption referred only to the infringing *music* incorporated in the video, Vimeo *reinstated* the user's account and placed the video (and its infringing music) back on its website: "I'm reinstating this guy because the 'no copyright infringement intended' he was talking about had to do with the music." SUF 215.

In light of Vimeo's extensive control and its deliberate decision not to extend that control to music, Vimeo's claim that it cannot practicably control infringing activity doesn't withstand scrutiny *Napster,* 239 F.3d at 1023 ("the reserved right to police must be exercised to its fullest extent."). *Compare Io*, 586 F. Supp. 2d at 1153 ("Perhaps most importantly, there is no indication that Veoh has failed to police its system to the fullest extent permitted by its architecture."). If a service provider has the right and ability to control (i.e., limit) infringement on its own website and chooses not to exercise it, much less does so selectively, it no longer is the "passive service provider" meriting DMCA safe harbor. *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148-49 (S.D.N.Y. 2009) ( "Defendants took active steps, including both automated filtering and human review, to remove access to certain categories of content," yet did not do so for digital music files).

## 2. Vimeo Controls Infringing Activity By Blatantly Inducing Its Users To Infringe Copyrighted Music.

*Viacom* explained that inducing users to infringe "involve[s] a service provider exerting substantial influence on the activities of users" and "might *also* rise to the level of control under § 512(c)(1)(B)." 676 F. 3d at 38 (emphasis added). Courts have recognized that inducement to infringe is incompatible with safe harbor protection. *Fung*, 2009 WL 6355911, at *18 ("Inducement liability is based on active bad faith conduct aimed at promoting infringement; the

36

statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business."); *Usenet.com*, 633 F. Supp. 2d at 132-33 (defendant who "encouraged or fostered such infringement … would be ineligible for the DMCA's safe harbor provisions").  A defendant induces infringement if it "(1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement."  *Lime Group*, 784 F. Supp. 2d at 425 (citing *Grokster I*, 545 U.S. at 937); *see Viacom*, 676 F.3d at 38.  Inducement liability may be shown by "clear expression *or* other affirmative steps taken to foster infringement."  *Grokster I*, 545 U.S. at 918 (emphasis added); *see Lime Group*, 784 F. Supp. 2d at 425 (similar).

Inducement does not require knowledge of specific infringements (*Viacom*, 676 F.3d at 38), and "[i]mportantly, liability may attach even if the defendant does not induce specific acts of infringement."  *Fung*, 2009 WL 6355911, at *10; *see Grokster II*, 454 F. Supp. 2d at 966 (similar).  For that reason, inducement does not require that a service provider monitor its website (*see Fung*, 2009 WL 6355911, at *18), although Vimeo does so extensively; and inducement liability attaches even to "the distributor of a product capable of both lawful and unlawful use[s]."  *Grokster I*, 545 U.S. at 918.  Once a service provider has induced infringement, it is liable for all acts of infringement on its website.  *Id.* at 936-37 ("[O]ne who distributes a device with the object of promoting its use to infringe copyright … is liable for the resulting acts of infringement by third parties.").

The "classic instance of inducement" is a statement that "broadcasts a message designed to stimulate others to commit violations."  *Id.* at 937.  Vimeo engaged in that conduct repeatedly.  However, sending a message to users is "'not [the] exclusive' way of proving inducement liability" (*Lime Group*, 784 F. Supp. 2d at 425), and "[a]n unlawful objective to promote

37

infringement can be shown by a variety of means." *Fung*, 2009 WL 6355911, at *10.  These

include "[e]vidence of 'active steps … taken to encourage direct infringement,' *such as*

advertising an infringing use *or* instructing how to engage in an infringing use that show an

affirmative intent that the product be used to infringe." *Grokster I*, 545 U.S. at 938 (emphases

added).  Vimeo's inducement by "words and deeds" is pervasive:

>   (a)    **Vimeo Induces Infringement By Example:**  The most stark, but not the only,

evidence of Vimeo's inducement is its own infringing conduct, publicized and touted to its users.

Unlike other websites, Vimeo leads and teaches by example.  Vimeo's founder, its head of

technology, its head of the "Community Team," and the president and founder of Connected

Ventures all made and uploaded works containing infringing music.  These infringing works

identify "Vimeo Staff" and are made available to all Vimeo users.  SUF 289-299.  Vimeo

employees and Staff (again identified as such) also have appeared in infringing videos,

commented favorably on infringing videos, "liked' infringing videos, designated infringing

videos as "favorites," and "embedded" videos with commercial music.  SUF 331, 333-339, 340-

349.  Vimeo even created an in-house "Vimeo Street Team," a group of individuals whose role

"to engage with the community" included creating (infringing) content.  SUF 336, 337.

>   (b)    **Vimeo Induces Infringement By Creating, Uploading, And Promoting As Its**

**Signature Invention, "Lip Dubs," Which Invariably Infringe Music Copyrights:**  One of the

early "creations" by Vimeo's founder was a video format in which he "lip synched" to a

commercial, copyrighted recording, synchronized the recording into the video during editing,

and uploaded the video, making it available to every Vimeo user.  SUF 315.  He named this "a

lip dub," and it was promoted as the "signature" Vimeo video genre, something that "put us

[Vimeo] on the map."  SUF 315-317, 322-325.  As Vimeo and its users know, these popular lip

dub videos, by **definition,** copy and incorporate copyrighted music without consent or license. SUF 319-321 (If Vimeo "suddenly started to ban videos with copyrighted music, like lipdubs, then I would be pissed but I would have to realize it's their final decision.")  That also is apparent from Vimeo's instructions **on its home page** on how to create lip dubs.  SUF 317, 326 ("Like a music video.  Shoot yourself mouthing along to a song then synch it with a high quality copy of the song in an editing program.").

Lip dubs were heavily promoted.  Vimeo provided a "Lip Dub Stars" channel, labeling it a channel "we like" and securing commercial sponsorship for it.  SUF 328, 253-257.  Lip dubs were featured as a "Vimeo Obsession" on Vimeo's home page.  SUF 266, 326.  "Lip dub" became one of the top seven key words that drew visitors to Vimeo (SUF 330), and appeared (in several variants) in an internal chart of top "searches per day" on the Vimeo Website (SUF 261, 262).  *Compare Grokster II*, 454 F. Supp. 2d at 987 (inducement where defendants' interface contained a search category designated "Top 40," for "[s]uch songs are almost invariably copyrighted").  Vimeo capitalized on the popularity of this infringing video genre by adding "lip dub" as a hidden "keyword metatag" to the programming code of a substantial portion of Vimeo's web pages, a "sign that Defendants pursued infringement-minded users."  *Usenet.com*, 633 F. Supp. 2d at 152; *see also Fung*, 2009 WL 6355911, at *12 (inducement where "key terms … were meta tags embedded in the websites for reference by search engines").

In the description of the original lip dub video Vimeo's founder exhorted users, "why don't YOU make one??"  SUF 315.  Following his direction, hundreds (and likely thousands) of lip dub videos were uploaded to the Vimeo website, including those infringing Plaintiffs' copyrights.  SUF 316.  One of the most popular videos ever made was a lengthy lip dub using copyrighted music created by and featuring the **entire Vimeo Staff** during a company party at

39

Vimeo's offices.  SUF 322.  As users figured out, if Vimeo not only permitted but itself used copyrighted music, and instructed how to do so, users could do likewise with impunity.  "We saw [the] lip-dub flagpole sitter … and got pretty motivated to do our own office video and serve the kids from Connected Ventures."  SUF 343.  The infringing video made by the user was viewed more than 7,500 times, publicly complimented by Vimeo Staff ("Nice execution"), and selected as a Vimeo Staff pick.  Lip dubs exemplified to users what Vimeo stood for:  the creation of a website of audiovisual works where the *visual* portion was original, but the ***audio (music)*** portion could freely copy copyrighted music.

      **(c)**      **Vimeo Induced Infringement By Devising And Inviting Participation In Projects That Necessarily Infringed Music:**  Vimeo actively participated, encouraged, and induced participation by its users in projects specifically designed to infringe music.  SUF 333-339.  These *collaborative* projects also taught that it was okay to infringe music.  One such project was to create a series of videos containing the *entirety* of The Beatles' "Sergeant Pepper" album (owned by one of Plaintiffs).  SUF 333.  A Staff member volunteered to contribute "With a Little Help From My Friends."  SUF 333.  Another collaborative project promoted by Vimeo used The Beatles' "All Together Now" and also included a contribution by a Vimeo Staff member, who wrote "Thanks for letting me be a part of it."  SUF 334.

      **(d)**      **Vimeo Induced Infringement In Communications With Its Users:**  In its communications with users, both by e-mail and in its online forums, Vimeo sent the clear message that it was all right to create or post infringing content even though it constituted copyright infringement.  Thus, Vimeo employees told users that the use of infringing music is "not a big deal."  SUF 311.  A Staff member advised in Vimeo's public "forum," "You can use music, there are ton's [sic] of videos on here with music."  SUF 300.  Another Vimeo Staff

40

member responded to whether a video containing "copyrighted music" could be uploaded, with an "off the record" answer, which was "***Go ahead and post it***.  I don't think you have anything to worry about."  SUF 305.  Not only did Vimeo advise users that it was permissible to copy unlicensed music, it went so far as to assuage a user's expressed concern over using copyrighted music by ***falsely*** telling her that "[w]e [Vimeo] do pay royalties on any music played on Vimeo." The user then proceeded to upload a video containing one of Plaintiffs' copyrighted works.  SUF 304.

      **(e)**     **Vimeo Induced Infringement By Providing And Volunteering Instruction And Assistance To Users To Infringe:**  In addition to encouraging users to infringe ***music***, Vimeo provided technical advice specifically on how to infringe ***music*** and "respond[ed] affirmatively to requests for help in" doing so.  *Grokster I*, 545 U.S. at 938.  Vimeo instructed users how to synchronize pre-recorded, commercial music into their videos.  (*E.g.,* "Unless you have a clap board to synch audio and the visual, it's usually just trial and error.  You have to get the song pretty close to start, and then just move the audio track back and forth until you get it close … good luck".  Or elsewhere: "Bring the music into iTunes, then convert the song into AIFF, then import that file into FCP and you will be golden.")  SUF 350.  These instructions were public and to ***all*** users.  SUF 350-355.  *See Fung*, 2009 WL 6355911, at *13 (inducement found where defendants gave users technical assistance, such as "instructions regarding DVD ripping and conversion").

      Vimeo also instructed users how to "tag" their works using as examples well-known music artists.  SUF 84.  ("Good idea.  For now just tag the clip with music:the Beatles or music:Beck or whatever.")  *See Grokster II*, 454 F. Supp. 2d at 987 (technical assistance "demonstrated an intent to encourage use of its technology for infringement"); *Fung*, 2009 WL

41

6355911, at *13.  Vimeo provided links to its "Video School" lessons directly from pages with infringing videos, such as for a video titled "Helter Skelter" using the well-known Beatles' recording, offering to teach users "how you can make videos like this one!", and these lessons provided instructions on incorporating commercial music directly from a user's iTunes library. SUF 206, 350-355.  ("Once you've found the piece of music or sound effect that you're looking for, drag it into the [video's] timeline.")

       **(f)**       **Vimeo's Internal Communications Evidence Intent To Induce Infringement:**
Numerous "unequivocal indications of unlawful purpose in [defendants'] internal communications" reveal Vimeo's awareness of, acquiescence in, and inducement to infringe [example].  *Grokster I*, 545 U.S. at 938.  After receiving correspondence from Plaintiffs in December 2008 (referring in part to videos uploaded by Vimeo Staff), Vimeo employees mocked Plaintiffs while acknowledging that their own conduct was unlawful.  SUF 356-361 ("Who wants to start the felons group, where we just film shitty covers of these songs and write 'fuck EMI' at the end?").  *Compare Fung*, 2009 WL 6355911, at *5 (statement that "'they [copyright owners] accuse us for[sic] thieves and they r[sic] right'" is probative of intent to induce infringement); *see also* Pile Depo., Ex. 330, 151:23-152:19 (referring to EMI as "fucking goofballs"); Verdugo Ex. 200 (Whitman: "EMI is the culprit").

       **(g)**       **Vimeo Hampered Copyright Owners From Enforcing Their Rights:**  Vimeo made it more difficult or impossible for copyright owners to locate specific videos on its server. Vimeo allowed users to designate videos as "private," which then only could be viewed by those to whom the uploader supplied a password or designated as a "contact" (at least a thousand people could be so designated) and by Vimeo Staff (who never deleted any such videos despite their infringing content).  SUF 25-28, 311, 399.  That constitutes an infringing public

42

performance, *see, e.g.*, *Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 800 F.2d 59, 62 (3d Cir.

1986), but copyright owners could never locate these videos.  *See Grokster II*, 454 F. Supp. 2d

at 988 (defendant "deployed encryption technology so Plaintiffs could not see what files were

being transferred"); *see also Aimster*, 354 F.3d at 650-51 (similar).  Vimeo prided itself on

offering this option not offered by other websites.   SUF 27. More than ***9.5 percent*** of Vimeo

videos in 2010 were "private," among them videos infringing Plaintiffs' copyrights.  SUF 26.

The head of Vimeo's Community Team answered the telling question "I was wondering if it's

possible to legally use copyrighted music if it's a private invite channel?" with the response:

"Technically no, but I'm sure the FBI won't be busting down your door anytime soon.  There are

too many people doing it for it to be enforced unless it's being used for commercial purposes,

than it becomes more of an issue."  SUF 307.  (Ironically, ***Vimeo*** was using the videos for

commercial purposes.)

> **(h)     Vimeo Refused To Employ Filtering Technologies That Limit Infringement:**

The failure to "attempt[] to develop filtering tools or other mechanisms to diminish the infringing

activity [from] using [defendants'] software … underscores [the website's] intentional

facilitation of their users' infringement."  *Grokster I*, 545 U.S. at 940; *see Lime Group*,

784 F. Supp. 2d 398 ("Failure to utilize existing technology to create meaningful barriers against

infringement is a ***strong indicator*** of intent to foster infringement.") (emphasis added).  On a

daily basis, Vimeo employees "[r]eview filters for videos that violate our Community

Guidelines."  SUF 126, 127, 187-200.  Vimeo employees joked that they would be "indicted" or

"subpoena[ed]" for e-mails discussing Vimeo's use of "filtering software" or "monitoring

software."  SUF 198, 199.  Nevertheless, Vimeo rejected the use of available filtering methods

designed to limit infringement of ***music***.  SUF 217-233.

"[T]echnological barriers … available to diminish infringement [include] hash-based filtering, acoustic fingerprinting, filtering based on other digital metadata, and aggressive user education." *Lime Group*, 784 F. Supp. 2d at 429.  Many were feasible here:  (1) Hash-based filtering uses a so-called "hash value" calculated by examining the digital contents of a file, which can then be checked against a table of values for videos to be blocked.  SUF 217.

(2) Acoustic fingerprinting involves analyzing digital files for distinctive "fingerprints" of copyrighted music and checking these against a reference database.  It, too, was available to Vimeo to limit infringement.  SUF 217-229.  In fact, the Court in *Grokster II* referred to the defendants' refusal, ***in 2006***, to implement acoustic filtering technologies offered by Audible Magic and SnoCap as evidence of inducement to infringe.  454 F. Supp. 2d at 982.  Vimeo was approached by the very same providers and rejected their technology.  SUF 223-228.  Vimeo also rejected an invitation to use filtering methodology to identify music ("Audio ID" and "Content ID") developed by Google and implemented by YouTube.  SUF 229.  Vimeo's own expert agreed that "content fingerprinting" would be a "promising way" to limit infringement of music currently existing on the Vimeo website.  SUF 221. "[S]elective filtering demonstrates knowledge of infringement-mitigating techniques[,] and the company's intentional decision not to employ any such technologies"" is strong evidence of inducement.  *Lime Group*, 784 F. Supp. 2d at 430.  (3) Vimeo also "could have used a keyword-based filter to block unauthorized recordings…."  *Id.*  Again, even though it did precisely that for other content (such as television programs and movies), it refused to take this simple measure to limit infringement of music.  SUF 154-158. (4) Finally, Vimeo's only "aggressive user education" was education to infringe.

44

(i)     **Vimeo Sought To Attract Users From Other Websites:**  Part of Vimeo's business plan was to attract users from competing websites to its unique website.  SUF 274-276. Unlike Vimeo, these other websites either licensed or blocked infringing music.[16]  SUF 218, 237, 238.  Not only did Vimeo make it clear that it would not remove infringing music (unless a copyright owner happened to send a DMCA notice), it welcomed users who were not allowed to upload videos with infringing music to other websites.  SUF 274-276.

As summarized elsewhere, Vimeo did all of the foregoing while it knew of the use and importance of music, and that it did not have the required licenses to use music.  Nevertheless, it created a refuge for infringing music, promoted infringing music and projects, instructed users how to infringe, promoted and earned advertising revenue from an infringing channel of "lip dubs" which invariably contained copyrighted music, sent and received communications that condoned and revealed that Vimeo users were infringing copyrights, allowed users to conceal infringing music by making them "private," and refused to filter infringing music while affirmatively filtering other content.  *See Grokster II*, 454 F. Supp. 2d at 992 (summary judgment where "evidence of StreamCast's objective of promoting infringement is overwhelming").

## IV.    VIMEO DID NOT ADOPT, IMPLEMENT, AND COMMUNICATE AN EFFECTIVE REPEAT INFRINGER POLICY.

A service provider cannot claim safe harbor unless it has adopted ***and*** reasonably implemented a policy to terminate "repeat infringers," ***and*** has so informed its subscribers and account holders.  17 U.S.C. § 512(i)(1)(A).  The implementation of an effective repeat infringer policy is critical to "maintain the 'strong incentives' for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers, at the

---

[16]     On the other hand, Veoh adopted filtering technology, removed ***all*** copies of infringing works, prevented other copies from being uploaded, and went back and cleansed its entire database of infringing music. *See UMG Recordings*, 667 F.3d at 1028.  YouTube also initially did not license or filter copyrighted works.  That changed.

very least." *Cybernet*, 213 F. Supp. 2d at 1178.  Accordingly, a service provider must make clear that persons who "repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know there is a realistic threat of losing that access."  S. Rep. No. 105-190, at 52.  That did not happen here.

    ***First***, Vimeo claims ***now*** to use a "three strikes" repeat infringer policy, i.e., that an account will be terminated if a user has been the subject of three separate DMCA notices.  Under this "policy," DMCA notices sent within three business days of each other are treated as a single notice, and multiple infringing works identified in one DMCA notice are considered a single "strike."  SUF 383.  This policy would have permitted a user to be subject to a notice on day one and have his infringing works removed, then all of the same works re-posted on day two and have all of them removed, and then all of the same works re-posted on day three and as a result incur only one strike.  SUF 384.  *Compare Viacom*, 718 F. Supp. 2d at 527 (YouTube's policy was that a user received only one strike for multiple notices received within a two-hour period).

    ***Second***, there is no evidence that Vimeo adopted ***any*** repeat infringer policy prior to 2008.  SUF 370-376.  Employees ostensibly charged with overseeing DMCA matters between 2007 and 2009 testified they were not aware that Vimeo had ***any*** repeat infringer policy at all and could not describe a list of users who had been banned as repeat infringers.  SUF 370-374.  Only in October 2008, did Vimeo implement its so-called "Purgatory" database, which was used to track videos removed pursuant to infringement notifications.  SUF 378-380.  There appears to be no tracking of such notices before then, and the first "Purgatory" removal for copyright reasons was not until October 19, 2008.  SUF 378-380.  Thus, all infringements pertaining to videos uploaded prior to October 19, 2008 cannot be subject to safe harbor.  *See A&M Records, Inc. v. Napster, Inc.*, No. C 99-05183 MHP, 2000 WL 573136, at *9 (N.D. Cal May 12, 2000)

(Napster ineligible for safe harbor where, inter alia, it had not adopted a repeat infringer policy until after some of the infringements sued on).

*Third*, the fact that Vimeo officers and employees are themselves repeat infringers is the most obvious evidence of the failure to enforce a repeat infringer policy, even after one ostensibly existed.  SUF 385.  In addition, a comparison of the database with several takedown notices sent to (and purportedly acted on by) Vimeo shows that many URLs listed in the notices are not even reflected in the database as "strikes."  SUF 386.  Finally, users who have accrued three strikes according to Vimeo's own policies and records have been permitted to stay active on the Vimeo website.  SUF 386-388.

*Fourth*, until 2011, there is no evidence that Vimeo *communicated* any specific repeat infringer policy to its subscribers and account holders.  SUF 375, 376, 382, 383.

*Fifth*, Vimeo does not apply robust measures to insure that terminated users do not create new accounts and continue uploading infringing videos.  SUF 393.  Rather than block the IP addresses of terminated users, Vimeo blocks only the specific e-mail address used to the create the account.  SUF 393.  Thus, most terminated users easily can create new accounts simply by using a different e-mail address.  SUF 393.  Multiple infringers whose videos have been removed on three separate occasions still remain active on the Vimeo website.  SUF 387; *See Grokster II*, 454 F. Supp. 2d at 992 ("[B]locking users was not very effective because a user could simply create a new user-name to re-enter the network under a different identity.").[17]

## V.    VIMEO DOES NOT "EXPEDITIOUSLY REMOVE" INFRINGING WORKS.

Vimeo must also "*expeditiously*" remove infringing works.  17 U.S.C. § 512(c)(1)(A)(iii) (emphasis added).  Contrary to Vimeo's implication, expeditious removal is required not only for

---

[17]     The only "repeat infringer policy" that was challenged and deemed sufficient in *Viacom* was YouTube's refusal to provide access to its content identification tools made available to other third-party "partners."  676 F.3d at 40-41.  That is not the issue here, as Vimeo makes no such tools available to third parties at all.  SUF 232.

works subject to DMCA notice, but to all works of which it has knowledge from any source.  *See Viacom*, 676 F.3d at 27-28 ("[A]ctual knowledge of infringing material, [red flag knowledge], *or* receipt of a takedown notice *will each* trigger an obligation to expeditiously remove the infringing material.") (emphases added).  Vimeo fails this requirement in at least three ways:

*First*, as discussed above, Vimeo's own employees uploaded works containing Plaintiffs' music.  Those works remained on the Vimeo website for months or years. SUF 63-68, 398. *Second*, Vimeo's claim that "all the Videos-in-Suit have been removed" is wrong.  Motn. at 26. Many videos purportedly deleted by Vimeo, specifically, every video that was added to an active Vimeo "group," is available and *still can be downloaded* from the Vimeo website.  SUF 403. *Third*, Vimeo acknowledges that for "a few weeks" it did not remove the videos subject to Plaintiffs' initial 2008 letter.  Motn. at 9; SUF 396, 400.  This is hardly expeditious when Vimeo had the ability to delete these videos immediately.

## VI.   VIMEO PROVIDES FUNCTIONALITIES THAT ARE NOT STORAGE.

Section 512(c) safe harbor is available only when "infringement occurs 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.'"  *Viacom*, 676 F.3d at 38.  To qualify for safe harbor, each functionality is evaluated separately to determine if it fits within the defined characteristics. *See* 17 U.S.C. § 512(n).  Although eligible service providers are not limited strictly to "electronic storage lockers," providing some storage function does not itself immunize everything a service provider does thereafter.  *Viacom*, 676 F.3d at 40 (raising the issue whether licensing videos to third parties was "storage").

In addition to streaming copies of user-uploaded audiovisual works, Vimeo enables its users to download these works, thereby distributing the videos to be copied onto *anonymous*

48

***users' computers***.  SUF 16.  This functionality is not necessary to provide the "access" to

uploaded videos that is already accomplished by streaming.[18]  *Compare Viacom*, 676 F.3d at 28

("The basic function of the YouTube website permits users to 'upload' and view video clips free

of charge.")  Once downloaded, the works are now on a network ***not*** controlled or operated by

***the service provider,*** and "users [can] obtain 'perfect copies' of Plaintiffs' work," since "an

entire universe of copyrighted content has been, and can continue to be, made available for

unending infringement outside [Vimeo]."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007).  This is not the "storage at the direction of a user"

envisioned by Congress.  H.R. Rep. No. 105-551, pt. 2, at 53 ("providing server space for a

user's website …, for a chatroom, or other forum in which material may be posted at the

direction of user.")

## VII.    THE DMCA DOES NOT APPLY TO PLAINTIFFS' PRE-1972 RECORDINGS.

The Plaintiff recording companies' claims for unfair competition, common law copyright

infringement, and misappropriation stem from the unauthorized use of twenty sound recordings

first "fixed" (i.e., recorded) before February 15, 1972, when sound recordings first were

accorded federal copyright protection.  These pre-1972 sound recordings are protected under

state law.  17 U.S.C. § 301(c); *see, e.g.*, *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d

471, 477 (2d Cir. 2004).  No DMCA safe harbor applies to these recordings because, "[w]ith

respect [pre-1972] sound recordings," the Copyright Act broadly prohibits limiting "any rights or

remedies under the common law or statutes of any State," which "shall not be annulled or limited

by this title until February 15, 2067."  17 U.S.C. § 301(c).  Appending the DMCA to pre-1972

recordings would significantly "limit the remedies" otherwise available under state law.  *See*

---

[18]     Although the Ninth Circuit in *UMG* did state in passing that downloading occurred "'by reason of the storage at the direction of a user'" (667 F.3d at 1031), the Court did not explicitly address the argument made here.

H.R. Rep. No. 105-551, pt. 2, at 50; S. Rep. No. 105-190, at 41 (characterizing Section 512 as creating "Limitations on liability").

Plaintiffs are aware that two courts have held to the contrary as a matter "of first impression." *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 640 (S.D.N.Y. 2011); *see UMG Recordings, Inc. v. Escape Media Group, Inc.*, 948 N.Y.S.2d 881, 887 (N.Y. Sup. Ct. 2012) (Both cases remain pending, one in district court -- *MP3tunes* -- and the other in an appellate court -- *Escape Media*).  However, because "the plain meaning of a statute controls its interpretation," Plaintiffs submit that the plain language of the Copyright Act controls and, therefore, the better reasoned analysis is that the DMCA does not apply to pre-1972 recordings. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).

## <u>Conclusion</u>

Plaintiffs respectfully submit that Vimeo's motion for partial summary judgment should be denied and Plaintiffs' motion for partial summary judgment should be granted.


DATED:  October 12, 2012              MITCHELL SILBERBERG & KNUPP LLP
        New York, New York

                                      By: /s/ Russell J. Frackman
                                          Russell J. Frackman (*pro hac vice*)
                                          Marc E. Mayer (*pro hac vice*)
                                          11377 West Olympic Boulevard
                                          Los Angeles, California 90064-1683
                                          Telephone: (310) 312-2000

                                          Christine Lepera (ctl@msk.com)
                                          12 East 49th Street, 30th Floor
                                          New York, New York 10017
                                          Telephone: (212) 509-3900
                                          *Attorneys for Plaintiffs*

4907605.1