UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, *et al.*, | CASE NO. 09 CV 10101 (RA) |
| Plaintiffs, | |
| v. | |
| VIMEO, LLC d/b/a VIMEO.COM, *et al.*, | |
| Defendants. | |
| EMI BLACKWOOD MUSIC, INC., *et al.*, | CASE NO. 09 CV 10105 (RA) |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE DMCA SAFE HARBOR** |
| VIMEO, LLC d/b/a VIMEO.COM, *et al.*, | |
| Defendants. | |

04070.61750/5043338.17

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ............................................................................................................2

I.   VIMEO IS NOT DISQUALIFIED FROM SEEKING SAFE HARBOR
     BECAUSE SOME OF ITS EMPLOYEES ARE ALSO VIMEO USERS........................2

II.  AS PLAINTIFFS LARGELY CONCEDE, VIMEO MEETS THE DMCA'S
     THRESHOLD REQUIREMENTS.....................................................................3

     A.   Plaintiffs Do Not Meaningfully Dispute that Vimeo Is a Service Provider,
          Has Registered a Designated Agent to Receive DMCA Notices, Has a
          Working DMCA Notification System, and Does Not Circumvent Standard
          Technical Measures. ...................................................................3

     B.   Plaintiffs Concede that Vimeo Has Had a Repeat-Infringer Policy Since at
          Least 2008, and Its Attacks on that Policy Do Not Pass Muster. ...........5

          1.   Vimeo's "Three Strikes" Policy Is Reasonable. ..........................5

          2.   Vimeo's Pre-2008 Repeat-Infringer Policy Was Also Reasonable
               and, in Any Event, Is Irrelevant. .........................................7

          3.   Vimeo Enforces Its Repeat-Infringer Policy...............................8

          4.   Vimeo Communicates Its Repeat-Infringer Policy to Its Users........9

          5.   Vimeo Is Not Required to Block IP Addresses of Terminated
               Accounts for Its Repeat-Infringer Policy to Be Reasonable............10

III. PLAINTIFFS HAVE FAILED TO REBUT VIMEO'S SHOWING THAT IT IS
     ENTITLED TO SAFE HARBOR UNDER § 512(c). ...........................................11

     A.   Plaintiffs Largely Do Not Dispute that Vimeo's Service Qualifies as
          "Storage at the Direction of a User." .............................................11

     B.   Plaintiffs' Claimed Evidence of Knowledge Regarding the Videos-in-Suit
          Falls Woefully Short. ..............................................................12

          1.   Vimeo Had No Actual Knowledge of the Videos-in-Suit. ..............13

          2.   Vimeo Was Not Aware of Facts or Circumstances from which
               Specific Allegedly Infringing Activity Was Apparent. ...............14

          3.   Vimeo Was Not "Willfully Blind" to the Videos-in-Suit................18

C.      Plaintiffs Dispute the Expeditiousness of the Removals of Only 12 of the
        199 Videos-in-Suit and Concede the Remainder....................................................19

D.      Plaintiffs Have Failed to Show that Vimeo Has the Right and Ability to
        Control the Allegedly Infringing Activity or Receives a Financial Benefit
        Directly Attributable Thereto...............................................................................20

        1.      Plaintiffs Present No Evidence Disputing that Vimeo Lacks the
                Right and Ability to Control the Allegedly Infringing Activity. ...............20

        2.      Vimeo's Post-Upload Monitoring Activities To Address Policy
                Violations Such As Copyright Infringement On Its Website Do
                Not Meet The Cybernet Standard For Control. ........................................21

        3.      The Court Need Not Even Reach This Question, But If It Does,
                Plaintiffs Fail to Rebut Vimeo's Showing that It Receives No
                Financial Benefit Directly Attributable to Allegedly Infringing
                Activity. ...................................................................................................31

CONCLUSION.............................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. N.L.R.B.*,
  253 F.3d 19 (D.C. Cir. 2001) ................................................................................30

*Arista Records LLC v. Lime Group LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ..................................................................33

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..............................................................................................17

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d  627 (S.D.N.Y. 2011) ........................................2, 3, 14, 15, 16, 31

*Columbia Pictures Indus., Inc. v. Fung*,
  No. 06-CV-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ...............19, 27, 32

*Corbis Corp. v. Amazon.com, Inc.*,
  351 F. Supp. 2d 1090 (W.D. Wash. 2004) ...................................... 6, 9, 10, 13, 19

*Hendrickson v. eBay, Inc.*,
  165 F. Supp. 2d 1082 (C.D. Cal. 2001) ................................................................23

*Higgins v. Detroit Educ. Television Found.*,
  4 F. Supp. 2d 701 (E.D. Mich. 1998)..............................................................28, 31

*Io Group, Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) ....................................................... passim

*Jara v. Initial Contract Servs., Inc.*,
  699 N.Y.S.2d 411 (N.Y. App. Div. 1999) ...............................................................3

*Kramer v. Thomas*,
  No. 05-CV-8381, 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006) ..........................16

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008)...................................................................16

*Lenz v. Universal Music Corp.*,
  572 F. Supp. 2d 1150 (N.D. Cal. 2008) ....................................................16, 17, 28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster Remand*"),
  454 F. Supp. 2d 966 (C.D. Cal. 2006) ....................................................11, 29, 32

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 939 ...............................................................21, 25, 26, 27, 29, 32

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ....................................20, 21, 22, 24, 32

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
   488 F.3d 1102 (9th Cir. 2007) ...................................................................................20

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   No. 05-CV-4753, 2009 WL 1334364 (C.D. Cal. May 12, 2009) .....................................14, 19

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146 (9th Cir. 2007) ...................................................................................31

*Perfect 10, Inc. v. CCBill LLC,*
   488 F.3d 1102 (9th Cir. 2007) ................................................................................ 7, 17

*Salinger v. Random House, Inc.,*
   811 F.2d 90 (2d Cir. 1987) ........................................................................................17

*UMG Recordings, Inc. v. Veoh Networks, Inc.*
   665 F. Supp. 2d at 1099 (C.D Cal. 2009) .........................................................18, 19, 23

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
   667 F.3d 1022 (9th Cir. 2011) .......................................................................11, 12, 14, 16

*UMG Recordings, Inc. v. Veoh Networks, Inc*
   620 F. Supp. 2d 1081 (C.D. Cal. 2008) ......................................................................11

*Viacom Int'l, Inc. v. YouTube, Inc.,*
   718 F. Supp. 2d at 524 ..................................................................5, 16, 17, 32, 33

*Viacom Int'l, Inc. v. YouTube, Inc.,*
   676 F.3d 19 (2d Cir. 2012) ................................................................................ *passim*

*Warren v. Prejean,*
   301 F.3d 893 (8th Cir. 2002) ...................................................................................30

*Wolk v. Kodak Imaging Network, Inc.,*
   840 F. Supp. 2d 724 (S.D.N.Y. 2012)......................................4, 8, 22, 24, 27, 31, 33

## Statutes

17 U.S.C. § 107............................................................................................................17, 31

17 U.S.C. § 512(c) ....................................................................................................11, 12, 32

17 U.S.C. § 512(c)(1)(A) ...............................................................................................18

17 U.S.C. § 512(c)(1)(A)(i) ...........................................................................................14

17 U.S.C. § 512(c)(1)(B) ...............................................................................................21

17 U.S.C. § 512(c)(3)......................................................................................................14

17 U.S.C. § 512(i) ..........................................................................................................9

17 U.S.C. § 512(i)(1)(A).............................................................................................5, 9

17 U.S.C. § 512(k)(1)(B) ...........................................................................................................3

17 U.S.C. § 512(c)(1) ...............................................................................................11, 12, 13

15 U.S.C. § 512(m).........................................................................................................18, 27

## PRELIMINARY STATEMENT

This case is about 199 allegedly infringing videos.  Plaintiffs do not dispute that they elected not to send Vimeo a DMCA notice regarding any of these Videos-in-Suit[1]—not one.  Sending DMCA notices, Plaintiffs claim, is **not their problem**.  Having intentionally flouted Congress's mandate that copyright holders cooperate in the DMCA notice-and-takedown process, Plaintiffs now bear the formidable burden of demonstrating that, despite no notice from Plaintiffs, Vimeo somehow "knew" that each of these 199 videos infringed their copyrights and that Vimeo failed to remove the videos expeditiously after obtaining such "knowledge."  Plaintiffs do not come close to proving either point.  **First**, rather than demonstrating knowledge of infringement, Plaintiffs simply point to evidence that Vimeo knew (or might have known) that some of the videos contained music.  That, of course, proves nothing, as the inclusion of music in a video does not equate to *per se* infringement. **Second**, Plaintiffs do not dispute that Vimeo removed all 199 of the videos listed by URL in the complaint within two weeks of learning of them.  That is expeditious by any standard.

Plaintiffs' challenge to Vimeo's repeat-infringer policy—the only threshold requirement Plaintiffs dispute—fares no better.  Plaintiffs point to no material deficiencies in Vimeo's process. Instead, they quibble with the finer points of the policy, such as how many hours should pass before Vimeo may no longer treat two DMCA notices as a single strike.  Such petty gripes are immaterial. Vimeo's implementation need only be reasonable; it need not be perfect, nor need it meet Plaintiffs' litigation specifications.

---

[1]  Vimeo respectfully refers the Court to its opening brief for all defined terms.  In addition, Vimeo uses the following abbreviations in this brief: Response of Plaintiffs to Vimeo's Statement of Undisputed Facts ("RSUF"); Plaintiffs' Statement of Undisputed Facts ("Pl. SUF"); Vimeo's Statement of Undisputed Facts ("SUF"); and Vimeo's Supplemental Statement of Undisputed Facts ("SSUF").

And finally, Plaintiffs do not dispute that the decision to upload a video rests entirely with a user and Vimeo does not review videos before they are uploaded.  Vimeo thus does not have the right or ability to control the infringing activity.  Vimeo's episodic post-upload monitoring does not satisfy this test, and Plaintiffs' attempts to have this Court punish Vimeo for its voluntary activities to limit infringing content should be rejected out of hand.

## ARGUMENT

## I.   VIMEO IS NOT DISQUALIFIED FROM SEEKING SAFE HARBOR BECAUSE SOME OF ITS EMPLOYEES ARE ALSO VIMEO USERS.

At the outset, Plaintiffs claim that Vimeo may not even attempt to seek DMCA safe harbor protection because some employees of Connected Ventures or Vimeo uploaded personal videos—a total of 10 out of the 199 Videos-in-Suit—that allegedly infringed Plaintiffs' copyrights.  Plaintiffs are wrong.

*First*, Plaintiffs' argument finds no support in the DMCA.  Plaintiffs do not dispute that Vimeo is a "service provider" under the DMCA.  (*See* Section II.A, *infra*.)  Nothing in the DMCA remotely suggests that a service provider loses its entire safe harbor protection simply because some of its employees uploaded allegedly infringing materials to the service.  At most, even assuming such activity could somehow be imputed to Vimeo, the safe harbor would cease to apply only as to those ten specific videos—***not*** the remaining 189 Videos-in-Suit.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34 (2d Cir. 2012) (examining YouTube's satisfaction of the DMCA safe harbor requirements with respect to "***specific*** instances of infringement") (emphasis added).

*Second*, Vimeo cannot be held liable for the ten videos uploaded by employees.  A number of those videos were uploaded by employees ***before*** they started working for Vimeo (SSUF ¶¶ 30, 56), and Plaintiffs have not demonstrated that the remaining videos were uploaded in the course of the employees' employment (SSUF ¶¶ 30, 47, 56).  *See Capitol Records, Inc. v. MP3tunes, LLC*, 821

F. Supp. 2d 627, 649 (S.D.N.Y. 2011) (denying EMI's motion for summary judgment against employer in part because "it is not clear that [the employer's executives and employees] downloaded those songs during the course of their employment").  Indeed, to the extent any employee-uploaded videos were infringing, they could not have been uploaded within the scope of employment because Vimeo prohibits the posting of infringing content.[2]   (SSUF ¶ 3.)  Consequently, the ten videos are subject to the same DMCA notice-and-takedown process as any other user-generated content.  *See Capitol Records*, 821 F. Supp. 2d at 649.

## II.     AS PLAINTIFFS LARGELY CONCEDE, VIMEO MEETS THE DMCA'S THRESHOLD REQUIREMENTS.

### A.     Plaintiffs Do Not Meaningfully Dispute that Vimeo Is a Service Provider, Has Registered a Designated Agent to Receive DMCA Notices, Has a Working DMCA Notification System, and Does Not Circumvent Standard Technical Measures.

Plaintiffs concede that Vimeo (1) is a service provider under § 512(k)(1)(B);[3] (2) has a designated agent to receive DMCA notices (*see* RSUF ¶ 31); and (3) has a working DMCA notification system (*see* RSUF ¶¶ 32-37).  This last concession is of great moment.  The notice-and-takedown system is the cornerstone of the DMCA, devised expressly for the purpose of effectuating expeditious and inexpensive removals of infringing materials—a process that Plaintiffs deliberately ignored in order to file lawsuits.

And although Plaintiffs do not squarely assert that Vimeo circumvents "standard technical measures" used by copyright owners to identify or protect their works, they suggest that Vimeo

---

[2] *See* Restatement (Second) of Agency § 228(2) ("Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."); *Jara v. Initial Contract Servs., Inc.*, 699 N.Y.S.2d 411, 412 (N.Y. App. Div. 1999) (corporate defendant not liable where low-level supervisor was not acting within scope of employment when he committed alleged tort).

[3]  (*See* Pl. Br. at 1 ("[T]o qualify for safe harbor, a service provider, ***such as Vimeo*** …." (emphasis added).)

interferes with standard technical measures by allowing users to designate their videos "private." (*See* RSUF ¶ 38.)  This argument fails.  ***First***, as explained in Vimeo's opening brief, the standard-setting process that Congress envisioned to give meaning to the term "standard technical measures" never happened.  As a result, there is no industry consensus as to any such measures—let alone a consensus that allowing users to make personal content "private" interferes with such measures.[4] (*See* Br. at 14-15.)  ***Second***, there is nothing nefarious about a privacy feature, which allows users to keep their personal content (such as family videos) private.[5]  (SSUF ¶ 50). And when a user does makes a video private, it is the ***user*** who is acting, not Vimeo.  *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 745 (S.D.N.Y. 2012) (rejecting argument that Photobucket's editing tools interfered with "standard technical measures" because it permitted users to remove copyright owners' watermarks).  ***Third***, there is no evidence that Plaintiffs had any trouble identifying any infringing content as a result of Vimeo's privacy feature.

In sum, no genuine dispute of material fact exists as to Vimeo's satisfaction of the DMCA's threshold requirements.  (*See* Br. at 13-14.)

---

[4]   Plaintiffs seek to disqualify Vimeo from safe harbor on the ground that Vimeo allowed users to designate videos as "private."  (Pl. Br. at 42-43.)  Plaintiffs point to no supporting authority for this argument; nor could Vimeo locate any.  *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) (stating that the provider of an encrypted service is not *ipso facto* an indirect infringer "merely because encryption, like secrecy generally, facilitates unlawful transactions…. Encryption fosters privacy, and privacy is a social benefit though also a source of social costs.").  In addition, videos designated as "private" do not qualify as public performances because they are not displayed to "'a substantial number of persons outside of a normal circle of a family and its social acquaintances.'"  *See id.* at 62 (quoting 17 U.S.C. § 101).  Should this case proceed to the liability phase, Vimeo will demonstrate that Plaintiffs' public performance claims based on the private video designation fail.

[5]   ***Plaintiffs*** themselves have repeatedly posted videos on Vimeo that they designated as "private." (SSUF ¶ 44.)

**B.    Plaintiffs Concede that Vimeo Has Had a Repeat-Infringer Policy Since at Least 2008, and Its Attacks on that Policy Do Not Pass Muster.**

As explained in Vimeo's moving papers, Vimeo has adopted, reasonably implemented, and informed its account holders of "a policy that provides for . . . termination in appropriate circumstances" of user accounts apparently associated with repeated acts of copyright infringement. 17 U.S.C. § 512(i)(1)(A)(2010).  Plaintiffs concede many of these points, including that:

- Vimeo has had a repeat-infringer policy since (at least) 2008.  (RSUF ¶ 40.)

- Upon receiving a valid DMCA notice, Vimeo reviews other videos in the account to determine whether the user has violated Vimeo's Terms of Service; if so, Vimeo may terminate the account regardless of the number of "strikes."  (RSUF ¶ 47.)

- Vimeo has terminated thousands of user accounts, including those of repeat infringers under its DMCA policy as well as those of users who upload content that they did not create.  (RSUF ¶¶ 30, 48.)

- User email addresses associated with terminated accounts cannot be used to reopen an account with the same email address. (RSUF ¶ 49.)

These facts plainly satisfy the repeat-infringer policy threshold requirement.  Nevertheless, in an effort to manufacture a dispute where none exists, Plaintiffs present a number of trifling criticisms of Vimeo's policy and its implementation.  None creates a material issue of fact.

**1.    *Vimeo's "Three Strikes" Policy Is Reasonable.***

Vimeo employs a "three strikes" policy that is essentially identical to the "three strikes" policy adopted by YouTube. (SUF ¶ 40),  *See Viacom*, 718 F. Supp. 2d at 527-28 (finding on summary judgment that YouTube's "three strikes" repeat-infringer policy was reasonable), *aff'd in part and vacated in part on other grounds*, 676 F.3d 19 (2d Cir. 2012).  Plaintiffs do not contend that Vimeo's "three strikes" policy is ***per se un***reasonable.  Instead, they complain that Vimeo's treatment of DMCA notices sent within three business days of each other as a single "strike" hypothetically permits a user to re-post the same infringing work three days in a row but incur only a single strike.  (Pl. Br. at 46.)  This objection has no basis in fact:  Plaintiffs produce no evidence of

this situation ever having occurred and, as explained below, there is no reason to expect that it would ever occur.

*First*, as Plaintiffs concede, after a video has been removed by Vimeo in response to a DMCA notice, Vimeo blocks *all* users from re-uploading the same video file for that removed video. (*See* RSUF ¶ 21.)  *Second*, Vimeo staff manually review each potential repeat-infringer case and have the discretion to terminate an account as a repeat infringer in cases where there are fewer than three strikes but the user has demonstrated a willful violation of Vimeo's Terms of Service.  (*See* RSUF ¶ 47; SSUF ¶¶ 6, 11-13.)  Vimeo staff will generally determine that a user who has attempted to upload substantially the same infringing material following a DMCA takedown has willfully violated the Terms of Service.  (SSUF ¶¶ 12-13.)  In such cases, Vimeo will delete the user's account even though the user has not yet accumulated three "strikes"—with or without the "three day" rule.

That Plaintiffs might prefer a different set of rules is irrelevant.  Vimeo's repeat-infringer policy need not be perfect—it need only be reasonable.  *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1103 (W.D. Wash. 2004) ("An infringement policy need not be perfect; it need only be reasonably implemented."); *see also*, *e.g.*, *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1144 (N.D. Cal. 2008) ("[T]he DMCA requires reasonable, not perfect, policies …." (citation omitted)).  Here, Vimeo has made a good-faith policy decision to treat DMCA notices received within a short period of time as a single "strike" because, like the "three strikes" rule itself, it gives users an opportunity to reform their behavior.  (SSUF ¶ 5.)  This policy, when combined with Vimeo's practice of manually reviewing accounts with prior DMCA claims (SSUF ¶ 6), is at the very least a reasonable one.

### 2. ***Vimeo's Pre-2008 Repeat-Infringer Policy Was Also Reasonable and, in Any Event, Is Irrelevant.***

Plaintiffs next argue, incorrectly, that Vimeo presented no evidence that it had ***any*** repeat-infringer policy prior to 2008.  (Pl. Br. at 46.)  Specifically, Plaintiffs claim that because Vimeo implemented a new technology for tracking repeat infringers in October 2008 (called "Purgatory"), Vimeo failed to track repeat infringers before that date.  (*Id.*)  Plaintiffs conveniently ignore the undisputed facts demonstrating that Vimeo did terminate repeat infringers before Purgatory was launched, albeit using different methods.

As the declaration of Michael Cheah explains, prior to 2008, user accounts were often terminated upon the receipt of the first DMCA notice and, as Vimeo changed its policies to give users a chance to reform, it would identify repeat infringers by reviewing DMCA email records or recalling the names of users from any prior DMCA takedown notices.  (SUF ¶ 46; SSUF ¶ 5.)  This process was reasonable given the volume of content on the Vimeo website at the time and the number of DMCA notices that Vimeo regularly received:  up to and through 2008, Vimeo received on average no more than five DMCA notices per ***month***.  (RSUF  ¶ 37.)  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1110-11 (9th Cir. 2007) (holding that DMCA log that recorded "most," but not all, relevant information to track repeat infringers was sufficient to establish reasonable implementation of repeat-infringer policy).  Plaintiffs' suggestion that Vimeo did not terminate ***any*** accounts as repeat infringers prior to the creation of the Purgatory database is simply wrong.  (SUF ¶¶ 46-48; SSUF ¶ 8)  In fact, Vimeo regularly terminated repeat infringers prior to October 2008.  (SSUF ¶ 8.)  Tellingly, Plaintiffs do not identify any Vimeo user accounts that should have been terminated, but were not, as a result of Vimeo's purportedly inadequate pre-2008 DMCA processing.

In any event, Vimeo's manner of tracking repeat infringers before 2008 is irrelevant. Plaintiffs never sent a valid DMCA notice for any of the Videos-in-Suit. Even if one treats the Complaints as DMCA notices (which Vimeo did), the relevant date for determining Vimeo's repeat-infringer compliance is December 10, 2009—over a year after Vimeo implemented the Purgatory system. *See generally Wolk*, 840 F. Supp. 2d at 744 (evaluating defendant's DMCA compliance, including sufficiency of repeat-infringer policy, from the date defendant received intelligible takedown notices).

### 3.     *Vimeo Enforces Its Repeat-Infringer Policy.*

Plaintiffs argue that Vimeo's policy was poorly implemented because five user accounts had three "strikes" but were not terminated. Plaintiffs are wrong. *First*, each of these five user accounts was terminated—just not at the time of the third DMCA notice. (SSUF ¶ 10.) *Second*, that Plaintiffs can identify only five accounts (among millions of active and thousands of deleted accounts) that they contend should have been terminated earlier hardly demonstrates that Vimeo's overall process was unreasonable. Vimeo has terminated many accounts pursuant to its repeat-infringer policy. (SUF ¶¶ 46-48; SSUF ¶¶ 8-10.) In fact, Vimeo has terminated many accounts that received fewer than three strikes or indeed that never received any DMCA notices. (SUF ¶ 47; SSUF ¶ 11). The reasonableness of Vimeo's repeat-infringer policy is validated by the fact that it terminated 89 user accounts as repeat infringers between November 2008 (when the Purgatory database was implemented) and December 2009 (when Plaintiffs filed the instant actions). (SSUF ¶ 9; SUF ¶ 48.) Moreover, the record is undisputed that Vimeo regularly terminated the accounts of

repeat infringers prior to November 2008.  (SSUF ¶ 8.)  That a total of five accounts may have slipped through the cracks does not demonstrate a failure to enforce that policy.[6]

### 4. *Vimeo Communicates Its Repeat-Infringer Policy to Its Users.*

Plaintiffs contend that "until 2011, there is no evidence that Vimeo communicated any specific repeat infringer policy to its subscribers and account holders."  (Pl. Br. at 47.)  This contention is not supported by the record.

The DMCA requires only that Vimeo "inform[] subscribers and account holders of … a policy that provides for the termination [of the account] in appropriate circumstances."  17 U.S.C. § 512(i)(1)(A)(2010).  "The statute does not suggest what criteria should be considered by a service provider much less require the service provider to reveal its decision-making criteria to the user."  *Corbis*, 351 F. Supp. 2d at 1100-01  Rather, Vimeo need only "convey to users that 'those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others . . . know that there is a realistic threat of losing that access.'"  *Id.* at 1101 (citation omitted) (defendant's policy satisfied § 512(i) even though it did "not use the term 'repeat infringer' or precisely track the language of the DMCA").

Vimeo has always met this requirement.  Beginning in 2006, Vimeo informed users that it had the discretion to remove *all* content that violated its Terms of Service (which itself barred the uploading of videos that infringe copyright).  This necessarily includes both specific videos and

---

[6]  Plaintiffs assert in conclusory fashion that "Vimeo officers and employees are themselves repeat infringers."  (Pl. Br. at 47.)  But Plaintiffs adduce no *evidence* that any of these users is a "repeat infringer."  For example, most of the users listed in Plaintiffs' SUF posted just a single video.  (Pl. SUF at ¶¶ 63a, e, f, g, j; 66a, b, c.)  In fact, Plaintiffs identify only *two* individuals who it claims are "repeat" infringers:  David Fishel (who worked for CollegeHumor.com and not Vimeo) and Julia Heffernan (who was an intern).  (SSUF ¶¶ 48, 56.)  Further, no "officers" or "employees" of Vimeo received three "strikes."  (SSUF ¶ 7.)  Indeed, for each of the videos listed in Pl. SUF 63 and 66, Vimeo never received a valid DMCA takedown notice at all.  (SUF ¶ 66,70.)

entire accounts, which, of course, are simply collections of content.  (SSUF ¶ 11.)  Not intoning the magic words "repeat infringer" is of no import.  *See Corbis*, 351 F. Supp. 2d at 1100-02.  In May 2008, when Vimeo revised its Terms of Service, it expressly informed users that Vimeo "will terminate rights of subscribers and account holders in appropriate circumstances if they are determined to be repeat infringers"—essentially verbatim language from the DMCA.  (SSUF ¶ 11.)  Materially identical language has since remained in Vimeo's Terms of Service, including in December 2008 (when Plaintiffs sent Vimeo their first DMCA notice) and December 2009 (when Plaintiffs filed their Complaints).  (SSUF ¶ 11.)  Thus, Vimeo has always adequately conveyed to users the risk of account termination in appropriate circumstances.

     **5.**     ***Vimeo Is Not Required to Block IP Addresses of Terminated Accounts for Its Repeat-Infringer Policy to Be Reasonable.***

Finally, Plaintiffs complain that Vimeo's practice of blocking e-mail addresses, rather than IP addresses, of terminated accounts from being used to create new accounts is insufficient because a terminated user could create a new account using a different e-mail address.  (Pl. Br. at 47.)  Plaintiffs' attempt to impose such a requirement on video-sharing websites is baseless.

***First***, this argument has been rejected in essentially identical circumstances.  Specifically, in *Io*, the court held that blocking of IP addresses was not required because while "IP addresses identify a particular computer connected to the Internet, they do not distinguish between users (e.g., family members) who may share the same computer."  586 F. Supp. 2d at 1143-45; *see also Corbis*, 351 F. Supp. 2d at 1103-04 ("The mere fact that" a repeat infringer may reappear "under a different user name and identity does not, by itself, create a legitimate question of fact regarding the procedural implementation of Amazon's termination policy.").  Indeed, it would be unreasonable (and ineffective) to block IP addresses given that many people use public networks—such as those

available in schools, libraries, public WiFi hotspots, coffee shops, etc.—to access the Internet—and

those IP addresses are dynamically created when users access the network.  (SSUF ¶¶ 31-32.)[7]

      *Second*, Plaintiffs have adduced no evidence that any user whose account was terminated as

a repeat infringer ever established a new account under a different email address under false

pretenses.  As the *Io* court recognized, "the hypothetical possibility that a rogue user might reappear

under a different user name and identity does not raise a genuine fact issue as to the implementation

of Veoh's policy."  *Id.* at 1144; *see also id.* at 1144-45 ("Io has presented no evidence that a repeat

infringer has, in fact, established a new account under false pretenses, much less that Veoh has

intentionally allowed that to happen.").

## III. PLAINTIFFS HAVE FAILED TO REBUT VIMEO'S SHOWING THAT IT IS ENTITLED TO SAFE HARBOR UNDER § 512(c).

### A. Plaintiffs Largely Do Not Dispute that Vimeo's Service Qualifies as "Storage at the Direction of a User."

      Plaintiffs' attempt to contest that Vimeo's service qualifies as "storage at the direction of a

user" pursuant to § 512(c)(1) (*see* Br. at 16-17) is limited to the unsupported notion that because

Vimeo permits users to view videos through not only streaming but also downloading, it is somehow

disqualified from safe harbor protection.  This argument has no merit.

      In *UMG Recordings, Inc. v. Veoh Networks, Inc.*, the court expressly held that "'streaming'

and downloading merely are two technically different means of accessing uploaded videos."  620 F.

Supp. 2d 1081, 1092 (C.D. Cal. 2008) ("*UMG I*").  The *UMG I* court thus concluded that Veoh's

downloading services qualified as "storage" under the DMCA.  *Id.*  On appeal, UMG limited its

---

[7]  Plaintiffs' citation to the *Grokster* case on remand from the Supreme Court is highly misleading. That court was referring to the blocking of "usernames" only, not e-mail addresses, and the court certainly did not say that a service provider must block IP addresses of repeat infringers to qualify for "safe harbor."  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 992 (C.D. Cal. 2006) ("*Grokster Remand*").

arguments on the issue of "storage" solely to whether a downloading function was a form of "storage at the direction of a user." *See* Brief for Appellant at 33-53, *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (2011) (No. 09-56777) (providing 20 pages of argument as to why Veoh's "downloading" technology was not "storage at the direction of a user"); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1031 (9th Cir. 2011) (describing UMG's position as "downloading of videos fall[s] outside § 512(c)"). The Ninth Circuit rejected UMG's position, holding that streaming and downloading are "access-facilitating processes," ***both*** of which constitute "storage" under the DMCA. *Shelter Capital*, 667 F.3d at 1031.

The same reasoning applies here. In an attempt to distinguish between streaming and downloading, Plaintiffs argue that "once downloaded, the works are now on a network not controlled or operated by the service provider." (Pl. Br. at 49.) But that is true whenever anyone elects to download content from the Internet; were Plaintiffs correct, no service provider could ever obtain safe harbor protection given the possibility of user downloads. What occurs after a video is downloaded by a user does not change the fact that the allegedly infringing content was, prior to download, "stor[ed] at the direction of a user" on the service provider's "system or network." 17 U.S.C. § 512(c)(1) (2010). Thus, Vimeo's downloading function is merely another way for viewers to do exactly what they may accomplish by streaming: access videos – and it does not operate to take Vimeo out of the safe harbor.

### B. Plaintiffs' Claimed Evidence of Knowledge Regarding the Videos-in-Suit Falls Woefully Short.

Plaintiffs have failed to proffer any evidence demonstrating that Vimeo knew or should have known that the Videos-in-Suit were infringing. *See Viacom*, 676 F.3d at 30-32. Instead, Plaintiffs merely argue that Vimeo had actual knowledge that some of the Videos-in-Suit were on its website. That is not enough: Plaintiffs must demonstrate that Vimeo knew not just of the videos' ***existence***

but also that they were ***obviously infringing***.  *See id.* at 31 ("[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."); *Corbis*, 351 F. Supp. 2d at 1108 (test is whether defendant "actually knew that specific … vendors were selling items that infringed [the plaintiff's] copyrights," while "apparent knowledge requires evidence that a service provider 'turned a blind eye to "red flags" of obvious infringement.'" (quoting H.R. Rep. No. 105–551, pt. 2, at 42 (1998))).  As for "red flag" knowledge, Plaintiffs point only to evidence that Vimeo knew that, as a general matter, music has value and can be licensed for inclusion in videos.  This is a far cry from demonstrating red flag knowledge of specific instances of infringement.

Plaintiffs also incorrectly claim that proof of willful blindness represents a third, wholly separate means of establishing knowledge under the DMCA.  (*See* Pl. Br. at 9, 14.)  Instead, evidence of willful blindness may be used to establish either actual or red flag knowledge and in either case must be established on a video-by-video basis.  As the Second Circuit has clearly stated, "[t]he willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness ***of specific instances of infringement under § 512(c)(1)(A)***."  *Viacom*, 676 F.3d at 41 (emphasis added).

### 1.    ***Vimeo Had No Actual Knowledge of the Videos-in-Suit.***

The record contains no evidence that Vimeo had actual knowledge that of the Videos-in-Suit, much less that they were infringing.

***First***, Plaintiffs do not dispute that they did not send Vimeo a valid DMCA notice identifying any of the 199 allegedly infringing videos at the URLs referenced in the Complaints (*see* RSUF ¶ 67), nor could they.  By ignoring the established DMCA notice procedure, Plaintiffs missed their opportunity to confer actual knowledge on Vimeo.  *See*, *e.g.*, *Corbis*, 351 F. Supp. 2d at 1107

("[Plaintiff's] decision to forego the DMCA notice provisions . . . stripped it of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder."). Rather than avail themselves of the DMCA procedure Congress put in place, which would have resulted in Vimeo's removal of the allegedly infringing videos, Plaintiffs preferred to gather fodder for their lawsuits.

*Second*, Plaintiffs do not dispute that the schedules of allegedly infringing videos annexed to the Complaints do not qualify as valid DMCA notices or give rise to actual notice of infringement. (SUF ¶ 67.) *See* 17 U.S.C. § 512(c)(3) (setting forth specific notice requirements); *Perfect 10, Inc. v. Amazon.com, Inc.*, No. 05-CV-4753, 2009 WL 1334364, at *5 (C.D. Cal. May 12, 2009) (granting summary judgment to defendant and finding it "absurd" that "the complaint or any other pleading that contains sufficient identification of the alleged infringement could count as a DMCA notification"); *Capitol Records*, 821 F. Supp. 2d at 644 ("[N]otices by EMI or third parties that do not substantially comply with the DMCA or that simply give representative lists of copyrighted works do not establish actual or 'red flag' knowledge of infringement.").

*Third*, Plaintiffs have failed to present any evidence even arguably demonstrating that Vimeo actually believed any of the Videos-in-Suit were infringing. *See Shelter Capital*, 667 F.3d at 1038 (holding that "merely hosting a category of copyrightable content, such as music videos," is insufficient to demonstrate actual knowledge under § 512(c)(1)(A)(i)). On this record, no reasonable juror could conclude that Vimeo had actual knowledge that the Videos-in-Suit were infringing.

**2.**   ***Vimeo Was Not Aware of Facts or Circumstances from which Specific Allegedly Infringing Activity Was Apparent.***

Plaintiffs' argument that Vimeo had "red flag" knowledge of the Videos-in-Suit (Pl. Br. at 11-14) is similarly devoid of evidentiary support.   As an initial matter, Plaintiffs cite ***no evidence***

*whatsoever* that Vimeo was aware that 144 of the 199 Videos-in-Suit even *existed* on the site prior to receiving the Complaints.  As to these videos, there is not even a flagpole, much less a red flag.

As to the remaining 55 Videos-in-Suit, Plaintiffs have not presented any evidence that even arguably would have made the alleged infringement "objectively obvious" to a reasonable person. *Viacom*, 676 F.3d at 31; *see also Io*, 586 F. Supp. 2d at 1148 (alleged infringement must be "blatant"); *Capitol Records*, 821 F. Supp. 2d at 644 (alleged infringement must be "apparent from even a brief and casual viewing" to qualify as a red flag)." Plaintiffs arguments that Vimeo had knowledge that the remaining 55 videos were infringing fall flat as to *all* of these videos for the following reasons:

- **Employee uploads, comments, "likes" and "staff picks"**:  Plaintiffs allege that Vimeo had knowledge of 30 of the 55 videos because Vimeo employees uploaded, commented on, "liked" or selected the video as a "staff pick."  (Pl. Br. at 10-11).  However, 10 of these 30 videos were uploaded, commented on, or "liked" by Vimeo employees *prior to their employment with the company* and therefore cannot be used to impute "knowledge" to Vimeo.  *See supra* at n 2. In any event, even if employees uploaded, commented on, or "liked" the videos on dates when they were employed by Vimeo, such acts in no way confer *per se* knowledge of infringement on Vimeo for the reasons discussed below (*i.e.*, use of commercial music in video is perfectly legal in a number of circumstances).[8]

- **Plus accounts**:  Plaintiffs contend that Vimeo had knowledge of 30 of the 55 videos simply because those videos were uploaded by Plus users.  (Pl. Br. at 10.)  This argument fails.  Contrary to Plaintiffs' suggestion, Vimeo does not review *all* videos in *all* Plus accounts.  The cited evidence proves only that Vimeo has a Mod Tool that could have been used to identify and review Plus accounts.  (Frackman Decl. Ex. 21.)  But Vimeo did not in fact do that.  As set forth in the Supplemental Declaration of Andrew Pile, this tool was not used to review Plus accounts and, indeed, such a feat would not be feasible given that Plus members' videos account for nearly 40% of the videos uploaded to Vimeo.  (SSUF ¶¶ 37, 43.)

---

[8]   Moreover, the fact that a large number of users viewed and/or "liked" a video is simply not an indication (one way or the other) that the video is infringing.  (Pl. Br. at 10.)  Nor do general statements by Vimeo that music can enhance a video demonstrate knowledge that the particular Videos-in-Suit are infringing.  (*Id.* at 11.)

- **Whitelisting and burying**: Plaintiffs allege that Vimeo had knowledge of 20 of the 55 videos simply because they were "whitelisted" or "buried." (Pl. Br. at 10.) This too is irrelevant to red flag knowledge because, as Plaintiffs acknowledge (Pl. SUF  149), the mere act of "whitelisting" or "burying" a video does not require Vimeo staff to watch the video. (SSUF ¶¶ 21-23, 25.) Furthermore, as explained below, mere awareness that a video contains commercially-produced music does not equate to awareness that the video is obviously infringing.

Even if the evidence demonstrated that Vimeo was aware that any of these 55 videos was present on the site (which it does not), Plaintiffs have not shown that Vimeo knew that they were *infringing*. Plaintiffs argue that because Vimeo hosted videos with commercially-produced music and knew that music is often licensed rather than free, Vimeo *must* have known these videos were infringing. But the use of commercially produced music in a video simply does not constitute *per se* copyright infringement. To the contrary, as courts have repeatedly acknowledged, there are a number of ways that copyrighted materials (including commercially produced music) can be used in user-generated videos in an entirely lawful manner—such as when the material in question is used with the permission of the rights holder or in a manner that constitutes fair use. *See Shelter Capital*, 667 F.3d at 1036 ("[C]ontrary to UMG's contentions, there are many music videos that could in fact legally appear on Veoh."); *Lennon v. Premise Media Corp.*, 556 F. Supp. 310, 328 (S.D.N.Y. 2008); *see also Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1154-56 (N.D. Cal. 2008); *Kramer v. Thomas*, No. 05-CV-8381, 2006 WL 4729242, at *11 (C.D. Cal. Sept. 28, 2006).

The DMCA is clear that the burden "to determine whether [a song] was still protected by copyright or was in the public domain … whether the use was licensed; and … whether it was permitted under the fair use doctrine" may not be placed on service providers. S. Rep. No. 105-190, at 48 (1998); *see Viacom*, 718 F. Supp. 2d at 524 (observing that service providers "cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting"); *Capitol*

*Records*, 821 F. Supp. 2d at 644 ("[I]f investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'").[9]  Indeed, when a copyright holder submits a DMCA notice, it must consider fair use in certifying that the content is not authorized.  *See Lenz*, 572 F. Supp. 2d at 1156.

Likewise, a textual description of the music used in a video is insufficient to confer knowledge of infringement on a service provider.  *See CCBill*, 488 F.3d at 1114 (rejecting the argument that a service provider had "red flag" knowledge of apparent infringement because certain hosted websites were named "illegal.net" and "stolencelebritypics.com"); *see also Viacom*, 718 F. Supp. 2d at 528-29 (noting that a DMCA complaint may not provide a "merely generic description ('all works by Gershwin') without also giving the works' locations at the site").[10]

---

[9]   As one example of how music can appear in a video on Vimeo without infringing copyrights, EMI's Schedule A identifies a video at the URL http://www.vimeo.com/130432 as infringing EMI's copyright in the sound recording of "Unwritten" by the artist Natasha Bedingfield.  This is a 3 minute, 30 second home video of two friends preparing to travel to the Dominican Republic.  About halfway through the video, one of the friends, for comedic effect, playfully mouths the words to a snippet of "Unwritten" while on an airplane.  Such a use is arguably (indeed, highly likely) to be fair under 17 U.S.C. § 107—(1) it is transformative and devoid of any commercial purpose, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); (2) the song had been published, *see Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2d Cir. 1987); (3) only a portion of the work was used; and (4) such a use could have no conceivable impact on the potential market for or value of the work, *see Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 709-10 (E.D. Mich. 1998) (granting summary judgment on fair use to defendants, finding no effect on potential market where portion of song was used as background music for television program).  Given the complicated, case-by-case nature of fair use inquiries and given that every use of music on Vimeo is accompanied by a separate visual image that transforms and adds to the use of the music, such uses certainly cannot be deemed "objectively obvious" instances of infringement.  *See Viacom*, 676 F.3d at 31.

[10]   That Vimeo protects its own intellectual property (Pl. Br. at 12) does not demonstrate that Vimeo knew or should have known that **Plaintiffs'** copyrights were allegedly being infringed by the Videos-in-Suit.  Nor are Vimeo's statements to users concerning fair use relevant.  Vimeo's practice was to address user inquiries concerning the use of third-party copyrighted content in videos with the conservative response that adding a "third party's copyrighted content to a video generally (but not always) constitutes copyright infringement" (*Id.* at 13); the purpose and effect of this statement is to bespeak caution about uploading videos with third party content—something Plaintiffs should applaud.  (SSUF ¶ 1.)

3.     *Vimeo Was Not "Willfully Blind" to the Videos-in-Suit.*

For many of the same reasons, Plaintiffs have failed to raise a genuine issue of material fact as to whether Vimeo was willfully blind to the allegedly infringing nature of the Videos-in-Suit so as to demonstrate actual or red flag knowledge. It bears repeating that "[t]he willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances* of infringement under § 512(c)(1)(A)." *Viacom*, 676 F.3d at 41 (emphasis added). Thus, Plaintiffs must demonstrate that Vimeo was willfully blind to the *Videos-in-Suit*.

Here, there simply is no evidence that Vimeo made a "'deliberate effort to avoid guilty knowledge'" of the Videos-in-Suit. *Id.* To the contrary, the undisputed facts show that upon receiving Plaintiffs' Complaints (and thus first becoming aware of the allegedly infringing nature of the Videos-in-Suit), Vimeo expeditiously removed the videos from the site *even though the Complaints did not constitute valid notices under the DMCA*. (SUF ¶ 66-69.) This alone is sufficient to defeat Plaintiffs' allegations of willful blindness.

Plaintiffs' argument that Vimeo "effectuated its policy of willful blindness" by "refusing to use its existing features" to affirmatively search for videos on the site containing commercial music is unavailing. (Pl. Br. at 16.) Again, the sole inquiry is whether Vimeo was willfully blind to the specific 199 Videos-in-Suit, not whether Vimeo had general awareness that infringing material may exist on the site. The DMCA makes clear that a service provider need not "monitor[] its service or affirmatively seek[] facts indicating infringing activity." 15 U.S.C. § 512(m) (2010); *Viacom*, 676 F.3d at 35 ("DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider.").[11] Consequently, a service provider is not required by the DMCA to bear the

---

[11]  *See also* CCBill, 488 F.3d at 1113 ("The DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately

(*footnote continued*)

burden and expense of implementing filtering technology to affirmatively block allegedly infringing uses of music in videos. *See, e.g.*, *UMG II*, 665 F. Supp. 2d at 1116-18; *cf. also Columbia Pictures Indus., Inc. v. Fung*, No. 06-CV-5578, 2009 WL 6355911, at *14 n.24 (C.D. Cal. Dec. 21, 2009).

In sum, Plaintiffs have not come close to demonstrating willful blindness.

### C.   Plaintiffs Dispute the Expeditiousness of the Removals of Only 12 of the 199 Videos-in-Suit and Concede the Remainder.

As discussed in Vimeo's moving papers, Vimeo removed the 199 Videos-in-Suit within two weeks of receiving the only notification Plaintiffs ever provided for those URLs—the Complaints themselves.  (*See* Br. at 9.)  The Vimeo's dispatch in this regard cannot seriously be questioned.

Plaintiffs nevertheless assert that 12 of the 199 Videos-in-Suit were not expeditiously removed from Vimeo's website because they could be downloaded at the time Plaintiffs served the instant motion. (Pl. Br. at 47-48.)  Plaintiffs are wrong for several reasons.

*First*, Plaintiffs forget that the Complaints do not function as valid DMCA notices and that Vimeo thus had no legal obligation to remove ***any*** of the Videos-in-Suit from the site.  *See Perfect 10, Inc. v. Amazon.com*, 2009 WL 1334364, at *5 (finding it "absurd" that "the complaint or any other pleading that contains sufficient identification of the alleged infringement could count as a DMCA notification"); *Corbis*, 351 F. Supp. 2d at 1107.  Whether or how quickly Vimeo removed the Videos-in-Suit is simply irrelevant.

*Second*, Vimeo did expeditiously remove all of the Videos-in-Suit from the site at the time the Complaints were received.  However, more than two years later, in or around July 2012, an error

---

documenting infringement—squarely on the owners of the copyright."); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1112 (C.D. Cal. 2009)("UMG II") ("[T]he DMCA does not place the burden of ferreting out infringement on the service provider."); S. Rep. No. 105-190, at 44; H.R. Rep. No. 105-551, pt. 2, at 53 ("[A] service provider need not monitor its service or affirmatively seek facts indicating infringing activity … in order to claim [the DMCA's] limitation on liability …."); 17 U.S.C. § 512(m) (codifying same).

introduced during routine site maintenance inadvertently caused the downloading function for these videos, at these particular URLs only, to be reactivated.  (SSUF ¶ 16.)  Upon learning of the problem (via Plaintiffs' motion papers), Vimeo promptly fixed the bug; since then, the videos are no longer available for download.  (*Id*. ¶¶ 17-18.)  Notably, in the approximately three months after the downloading function was inadvertently reactivated, ***not one*** of these videos was downloaded by anyone other than persons who, based upon the timing and IP addresses, appear to be connected to Plaintiffs and their counsel.  (*Id*. ¶ 19.)[12]

### D.  Plaintiffs Have Failed to Show that Vimeo Has the Right and Ability to Control the Allegedly Infringing Activity or Receives a Financial Benefit Directly Attributable Thereto.

Plaintiffs have compiled a proverbial laundry list of reasons why they believe Vimeo does not meet the "right and ability to control" or "direct financial benefit" elements of the safe harbor test.  None of Plaintiffs' grounds creates a triable issue—either individually or collectively.  Because "'[b]oth elements must be met for the safe harbor to be denied,'" *Io*, 586 F. Supp. 2d at 1150, and Plaintiffs meet neither, summary judgment should be granted to Vimeo.

### 1.  *Plaintiffs Present No Evidence Disputing that Vimeo Lacks the Right and Ability to Control the Allegedly Infringing Activity.*

The Second Circuit has held that the right and ability to control is present when "a service provider exert[s] substantial influence on the activities of users."  *Viacom*, 676 F.3d at 38.  The *Viacom* court suggested, in *dicta*, two situations that may satisfy this test.  ***First***, as shown in *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* such control may exist where a service provider "instituted a

---

[12]   Plaintiffs also claim that Vimeo did not expeditiously remove the videos identified in its December 11, 2008 letter because it took "a few weeks" to complete the removal.  (SUF ¶ 51.)  This argument is not only incorrect (*see* S. Rep. No. 105-190, at 44 ("Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action."); H.R. Rep. No. 105–551, pt. 2, at 53-54 (same)), but also irrelevant because none of videos at the URLs listed in the letter is at issue in this case.  *See* Br. at 8-9.

monitoring program by which user websites received 'detailed instructions regard[ing] issues of layout, appearance, and content'" as well as "forbade certain types of content and refused access to users who failed to comply with its instructions." *Id.* (quoting 213 F. Supp. 2d 1146, 1173 (C.D. Cal. 2002)).  The court cautioned, however, that the *Cybernet* decision is the only one to date finding the requisite right and ability to control.  *Id.* **Second**, the *Viacom* court stated that "inducement of copyright infringement under [*Grokster*] … **might** also rise to the level of control under § 512(c)(1)(B)." *Id.* (emphasis added).  The *Grokster* case involved overwhelming evidence of the facilitation of massive copyright infringement by file-sharing services.  *See Grokster*, 545 U.S. at 923-24.  There, the Supreme Court held that purposeful inducement is shown by "clear expression or other affirmative steps taken to foster infringement."  *Id*. at 919.  As demonstrated below, while Plaintiffs argue both standards, they meet neither.

> **2.**      ***Vimeo's Post-Upload Monitoring Activities To Address Policy Violations Such As Copyright Infringement On Its Website Do Not Meet The Cybernet Standard For Control.***

Plaintiffs fail to demonstrate that Vimeo exercises the right and ability to control that was present in *Cybernet*.  In that case, the service provider exercised plenary control over what its users may do by instituting a monitoring program under which applicant websites received "detailed instructions regard[ing] issues of layout, appearance, and content." *Cybernet*, 213 F. Supp. 2d at 1173.  Cybernet also reviewed every website prior to accepting the site in its service, provided extensive advice, prohibited the proliferation of identical content, and refused access to users who failed to comply with its detailed instructions.  *Id.* at 1164, 1173, 1181-82.  Though agreeing "that closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme," the court found that Cybernet's extensive control of nearly all facets of its site demonstrated the "something more" required to establish a right and ability to control.  *See id.* at 1181-82.

Vimeo exercises nowhere near this level of control over its users.  Plaintiffs suggest that Vimeo's practice of voluntarily removing videos that violate its Terms of Service or Community Guidelines somehow constitutes the type of control that negates safe harbor protection.  (*See* Pl. Br. at 24-36.)  But all of Plaintiffs' evidence, discussed below, concerns Vimeo's control of its site—***not*** control of infringing activity by its users—and thus is irrelevant.[13]  Moreover, Plaintiffs' entire premise—that this Court should punish Vimeo for proactively eradicating allegedly infringing content from its system by depriving Vimeo of the very safe harbor it is striving to obtain—finds no support in logic or law.  "[T]hat [the service provider] has taken steps to reduce, not foster, the incidence of copyright infringement on its website," is considered evidence that the service provider does ***not*** have the practical ability to control the infringing activity.  *See Io*, 586 F. Supp. 2d at 1153-54.  Vimeo addresses each of Plaintiffs' arguments in turn.

***First***, Plaintiffs fault Vimeo for having Terms of Service that require user content to be original (*i.e.*, not ripped, copied or infringing, such as "anything [] you found on the web that you did not create yourself") (SUF ¶¶ 20-23), and that prohibit pornography, inciting violence, and other inappropriate content.  This argument borders on the absurd.  Virtually all service providers have terms of service—it is not a safe harbor disqualifier, nor should it be, for obvious reasons.  Terms of service that forbid content that is generally deemed inappropriate bear no resemblance to the detailed content instructions and rigorous compliance regime found in *Cybernet*, upon which Plaintiffs rely so heavily.  (Pl. Br. at 25-27.)  Stated another way, it wasn't Cybernet's rules that doomed its safe harbor qualification—it was the fact that Cybernet enforced those rules at the pre-publishing stage

---

[13]   Contrary to Plaintiffs' assertion (Pl. Br. at 24), the *Viacom* court did not hold that the right and ability to ***generally*** control a system was sufficient.  Rather, the Second Circuit held that the right and ability to control does not require ***knowledge*** of the specific infringing activity—but it does "'require[] something more than the ability to remove or block access to materials posted on a service provider's website.'"  *Viacom*, 676 F.3d at 38; *see also id*. at 26, 36.

by, essentially, acting as a gatekeeper.  *See Cybernet*, 213 F. Supp. 2d at 1173 (finding a right and ability to control based upon the fact that "Cybernet has refused to allow sites to use its system until they comply with its dictates"); *accord Wolk*, 840 F. Supp. 2d at 748 ("[S]uch a right and ability to control must take the form of prescreening content, rendering extensive advice to users regarding content and editing user content.").  Vimeo does nothing of this sort.

   **Second**, Plaintiffs urge that Vimeo's post-upload removal of videos it discovers that violate its Terms of Service, which Vimeo accomplishes in part by monitoring its site for suspect content, is also a safe harbor disqualifier.  Thus, in one breath Plaintiffs complain that Vimeo is not doing **enough** to combat copyright infringement, while in the next they argue that Vimeo should be penalized for doing **too much**.  Plaintiffs' "heads I win, tails you lose" gambit should be rejected.  *See, e.g.*, *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) ("The legislative history shows that Congress did not intend for companies … to be penalized when they engage in voluntary efforts to combat piracy over the Internet.").  Thus, the right and ability to affirmatively filter for or otherwise monitor potentially infringing content does not render service providers ineligible for safe harbor.[14]  *See UMG II*, 665 F. Supp. 2d at 1113 ("Veoh's 'right and ability' to implement filtering software, … cannot be the basis for concluding that Veoh is not eligible for the section 512(c) safe harbor.").

---

[14]   By way of example, Plaintiffs posit that Vimeo's policing of its system for gameplay videos, which are forbidden by its Terms of Service, confirms that Vimeo could likewise police for infringing musical content.  Plaintiffs are **factually** incorrect because the copyright problems with gameplay videos, where the videographer is literally filming a video game as he or she plays it, are facially obvious, unlike videos that allegedly infringe due to the inclusion of music.  Plaintiffs are **legally** incorrect because policing is not required under the DMCA.  *See*, *e.g.*, *Viacom*, 676 F.3d at 35 ("DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider.").

Likewise, Plaintiffs' contention that Vimeo should qualify for safe harbor protection only if it steps up its monitoring activities to the point of hiring hundreds of people to prescreen every one of the tens of thousands of videos uploaded by users every day, has also been rejected time and again by the courts. *See*, *e.g.*, *Io*, 586 F. Supp. 2d at 1153 (rejecting argument that "Veoh should be required to prescreen every submission before it is published"); *id.* at 1154 (rejecting argument that if a service provider "cannot prevent infringement on its site given the current volume of its business, then [the service provider] should be required to either hire more employees or to decrease its operations and limit its business to a manageable number of users (whatever that number might be)," which the court described as a "not-so-subtle suggestion . . . that, if [the service provider] cannot prevent infringement from ever occurring, then it should not be allowed to exist"); *Wolk*, 2011 WL 940056, at *6 ("Plaintiff has not pointed to any feasible method by which Photobucket can prescreen its content.").

*Third*, Plaintiffs urge that Vimeo's "channel," "Likes" and "Staff Picks" features somehow confer the requisite control. (Pl. Br. at 32-33.) Plaintiffs cite no authority for this odd proposition. Highlighting or commending a particular video in no way modifies its content. And while Plaintiffs cry foul that Vimeo permits users to create video channels such as "Lip Dub Stars" (Pl. Br. at 32, 39), they are dwarfed by the thousands of other channels present on the website. (*See infra* n.16.) More fundamentally, Vimeo has already demonstrated that it does not come close to reviewing every video uploaded to the website or engage in anything approaching comprehensive content curation. (Br. at 22 & n.11.) In fact, Vimeo's limited content monitoring and curation are miniscule compared to the staggering volume of user-uploaded material on the website. (SSUF ¶¶ 33-35). Thus, Vimeo's actions in this regard simply do not rise to the level of pervasive control present in *Cybernet*.

*Fourth*, Plaintiffs claim that Vimeo's practice of interacting with its users, such as answering user questions and tracking Terms of Service violators, is also fatal to its claim for safe harbor. (Pl. Br. at 33-34.) Strange as it may seem, Plaintiffs even go so far as to assert that Vimeo's current system for tracking repeat infringers under the DMCA, via user Rap Sheets and the Purgatory database, is disqualifying evidence of the right and ability to control. (Pl. Br. at 34.) These arguments, too, are devoid of any legal support—and nonsensical. A service provider's enforcement of its DMCA and other policies cannot simultaneously work to deprive it of the safe harbor it seeks. *See Viacom*, 676 F.3d at 38 (the right and ability to control "'requires something more than the ability to remove or block access to materials posted on a service provider's website").

At bottom, the undisputed evidence confirms that Vimeo cannot control, *ex ante*, what its users choose to post on the website. *See Io*, 586 F. Supp. 2d at 1153 (granting summary judgment after noting that "there is no evidence that Veoh can control what content users choose to upload *before* it is uploaded") (emphasis added). And none of the features or activities described above remotely constitutes the "something more" required to possess a right and ability to control specific allegedly infringing activity.

Plaintiffs also fail to demonstrate that Vimeo exercises a right and ability to control stemming from purposeful inducement of infringement under *Grokster*. Plaintiffs first suggest that *Viacom* held that an inducement claim under *Grokster* is a unique basis for imposing secondary liability for copyright infringement that is outside the DMCA safe harbor. (Pl. Br. at 36-37.) *Viacom* held no such thing. Instead, the *Viacom* court confirmed Congress's clear statement of legislative intent that DMCA safe harbor protection would extend to *all* forms of secondary infringement liability, including the inducement sub-species of contributory copyright infringement. *See Grokster*, 545 U.S. at 930 ("One infringes contributorily by intentionally inducing or

encouraging direct infringement."); S. Rep. No. 105-190, at 20 (reiterating that the DMCA safe harbors apply to claims of "direct, vicarious and contributory infringement"); H.R. Rep. No. 105–551, pt. 2, at 50 (same). Indeed, elsewhere in its decision, the Second Circuit confirmed that "a finding of safe harbor application necessarily protects a defendant from ***all*** affirmative claims for monetary relief," which of course would include inducement claims. *Viacom*, 676 F.3d at 41 (emphasis added). The *Viacom* court merely noted that purposeful inducement of infringement à la *Grokster* might under certain circumstances satisfy the right and ability to control element of the DMCA. *See id.* at 38. That is the extent of *Grokster*'s relevance here.

In *Grokster*, the Supreme Court was confronted with operators of file-sharing services who facilitated copyright infringement on a massive scale. *See* 545 U.S. at 923-24 (noting the "staggering" scope of "billions" of probable copyright infringements). Unlike this case, *Grokster* involved downloading of entire digital music files, where there was no credible argument of fair use, *de minimis* use, or permission. Explaining that purposeful inducement was premised upon a "clear expression or other affirmative acts taken to foster infringement" and evidencing an "unlawful objective," the Court found inducement liability because the defendants had expended substantial efforts to satisfy a known source of demand for copyright infringement. *See id.* at 924-25, 939-40.[15]

---

[15]     The Court also held that the evidence of defendants' "unlawful objective" took on "added significance" in light of their failure to attempt to develop filtering tools or other mechanisms to diminish infringement. The Court was careful to state that liability could ***not*** be premised upon the failure to take affirmative steps to prevent infringement where the accused technology was otherwise capable of "substantial non-infringing uses." *See Grokster*, 545 U.S. 939, n.12. Similarly, while the Court found that evidence that defendants relied on infringing activity for the success of their business was a "further complement to the direct evidence of unlawful objective," it emphasized that "this evidence alone would not justify an inference of unlawful intent." *Id.* at 939-40. In any event, neither of these nuanced holdings is apposite here, as the DMCA provides different standards with respect to affirmative monitoring and the receipt of financial benefit.

Unlike the defendants in *Grokster*, Vimeo never sought to attract users of notorious infringing services in an effort to build its user base, much less expended significant (or any) resources to recruit such users. In fact, Plaintiffs' motion fails to identify a single specific service for which they claim Vimeo sought infringing users. (*See* Pl. Br. at 45.) Plaintiffs' assertion that "Vimeo refused to employ filtering technologies that limit infringement" (Pl. Br. at 43), thereby "fostering" infringement, is at odds with both the text of the DMCA (*see* 15 U.S.C. § 512(m)) and *Grokster* itself, *see supra* n.15. It is beyond serious dispute that Vimeo has a legitimate business model that does not seek to capitalize on copyright infringement. Instead, Vimeo's success is premised on maintaining the website as a repository for ***original, user-generated*** videos. *See infra* Part III.D.2.

Given the high standard set by the Supreme Court, lower courts have repeatedly rejected copyright holders' attempts to shoehorn legitimate service providers like Vimeo into the *Grokster* paradigm in an effort to make an end-run around the DMCA's notice and takedown regime. Such attempts to equate notorious indirect infringers with legitimate video-hosting websites like Vimeo routinely fail. *See*, *e.g.*, *Io*, 586 F. Supp. 2d at 1153 ("Veoh is distinct from Napster in at least one significant respect. Napster existed solely to provide the site and facilities for copyright infringement …."); *Wolk*, 840 F. Supp. 2d at 751 (explaining that *Grokster*, *Napster* and *Aimster* "involved peer-to-peer websites and evidence that facilitating the unauthorized exchange of copyrighted material was a central component of the defendants' business strategy" and finding that plaintiff had "presented no evidence suggesting that Photobucket sought to encourage copyright infringement or promoted its service as a means of circumventing copyright"); *compare Fung*, 2009 WL 6355911, at *4 & n.11 ("Plaintiffs note that the meta tags used on Fung's websites often included the term 'warez' as a header for every page. … The term 'warez' is a term used to refer to pirated content.").

Plaintiffs devote the lion's share of their *Grokster* arguments to so-called "lip dubs,"[16] claiming that purposeful inducement can be shown by the fact that Vimeo employees created, uploaded, and promoted[17] lip dub videos, wherein individuals appear on video each "lip-synching" to parts of a song.  (Pl. Br. at 38.)  But a lip dub, of course, is not a *per se* instance of copyright infringement, any more than any other video incorporating potentially copyrightable subject matter would be.  Even aside from questions of fair use, there are numerous scenarios in which a lip dub would ***not*** be copyright infringement—such as where the video creator held the necessary rights or permissions to use the song, where the song was in the public domain, or where the portion of the song used was *de minimis*.

And there are yet more instances where a particular use of copyrighted music in another user-generated medium, even if potentially infringing, is not actionable because it constitutes a fair use. *See, e.g.*, *Campbell*, 510 U.S. at 594 (reversing denial of summary judgment of fair use of a song); *Higgins*, 4 F. Supp. 2d at 704-10 (granting defendants' motion for summary judgment and finding fair use where portion of song was used as background music for television program); *Lenz*, 572 F. Supp. 2d at 1151-52 (denying motion to dismiss complaint for misrepresentations in defendants' DMCA notices because plaintiff's use of music in video may be a fair use); *see also Shelter Capital*,

---

[16]   "Lip dub" videos were an Internet fad—or "meme"—that peaked in 2006 and 2007 and have since waned in popularity.  Plaintiffs point to no evidence that demonstrates a meaningful presence of lip dub videos among Vimeo's ***30+ million*** videos in its database.  The Lip Dub Stars channel, for example (Pl. Br. at 38), is one of over 354,000 channels on Vimeo.  (SSUF ¶ 36.)

[17]   Plaintiffs try to manufacture evidence that Vimeo purposefully induced the creation of infringing lip dubs by citing a Vimeo employee's response to a user comment regarding "lip dubs" of various Beatles songs.  (Pl. Br. at 40.)  But this exchange demonstrates nothing—the comment chain makes no mention of permission or infringement at all, let alone encouragement of others to infringe.  Further, Plaintiffs offer no evidence that a single video from this "project" was ever created—thus, there is no evidence this discussion of a "project" ever induced any infringing activity.

667 F.3d at 1036 ("[C]ontrary to UMG's contentions, there are many music videos that could in fact legally appear on Veoh.").

Thus, even accepting Plaintiffs' characterization of the facts, a purposeful inducement to create lip dub videos does not equate to a purposeful inducement to infringe copyright—an individual who receives permission to use a song in a lip dub video, for example, indisputably does not infringe.  *See Grokster*, 545 U.S. at 936-37 (stating that inducement liability is limited to those "who distribute[] a device with the object of promoting its use to ***infringe copyright***" and noting that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability [for inducement]" (emphasis added)); *Grokster Remand*, 454 F. Supp. 2d at 992 (granting summary judgment of inducement after concluding that no reasonable factfinder could find that defendant acted "without the intent to induce ***infringement***" (emphasis added)).  Nor does soliciting videos of a particular genre (such as lip dubs) itself connote the exercise any greater control over an alleged infringement than would operating a themed website for user-generated content.

The fact remains that Vimeo's users were free to post what they wished, featuring whatever content they wished.  If uploaded videos violated Vimeo's Terms of Service, those videos were subject to removal.  That 19 of the 199 Videos-in-Suit were lip dubs does not change the fact that Vimeo lacks the right or ability to control what videos its users upload on an *ex ante* basis—lip dubs or not.  *See Io*, 586 F. Supp. 2d at 1153 (granting summary judgment after noting that "there is no evidence that Veoh can control what content users choose to upload ***before*** it is uploaded" (emphasis added)).

Likewise, Plaintiffs' argument that Vimeo employees purposefully induced infringement through communications with users and by providing technical assistance—thereby establishing the

necessary right and ability to control—also misses the mark. (*See* Pl. Br. at 40-41.) Vimeo employees responded to questions concerning user uploading of general categories of content. Plainly users were free to utilize or disregard Vimeo's responses to their questions; such routine "help desk" types of communications do not purposefully induce or control anything—nor do Plaintiffs point to any authorities defeating safe harbor on this basis. Contrary to Plaintiffs' contention, Vimeo employees did ***not*** inform users that they could upload copyrighted music as a whole without any independent creative contribution. (*See* Pl. Br. at 40.) Employees simply explained that videos are not automatically infringing merely because they contain some music— which is true. (*See*, *e.g.*, Pl. SUF 300.) Similarly, Vimeo employees responded to requests for technical advice concerning the creation of "lip dubs," which as explained above do not *per se* infringe any copyrights, let alone Plaintiffs' copyrights. (Pl. SUF 325.) Again, such technical support is not a basis to find control.

In any event, a few remarks made by a small number of employees years ago are plainly insufficient to deny Vimeo the DMCA safe harbor. These isolated, one-off comments were made to individual users and simply do not constitute purposeful inducement of massive infringement, as Plaintiffs suggest. In fact, Plaintiffs offer no evidence that these remarks actually induced ***any*** infringement. Moreover, these few comments—which are dwarfed by the total volume of communications between employees and Vimeo users—plainly are not reflective of Vimeo's robust corporate policies against copyright infringement, as overwhelmingly demonstrated by the factual record. (Br. at 5-8.); *see also, e.g.*, *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. N.L.R.B.*, 253 F.3d 19, 27 (D.C. Cir. 2001) ("[A] single, isolated remark will rarely be sufficient to trigger employer liability …."); *Warren v. Prejean*, 301 F.3d 893, 902 (8th Cir. 2002) ("[S]tray remarks in the workplace do not necessarily create liability for employers ….").

3.      ***The Court Need Not Even Reach This Question, But If It Does, Plaintiffs Fail to Rebut Vimeo's Showing that It Receives No Financial Benefit Directly Attributable to Allegedly Infringing Activity.***

Because Vimeo lacks the right and ability to control the allegedly infringing activity, Vimeo need not demonstrate that it does not receive a financial benefit directly attributable to that activity. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 806 (9th Cir. 2007) (declining to address issue of direct financial benefit because there was no right and ability to control); *Io,* 586 F. Supp. 2d at 1150 (same); *see also id.* ("'***Both*** elements must be met for the safe harbor to be denied.'" (emphasis added).  But even if the Court reaches this element, Plaintiffs have failed to create a triable issue.

***First***, Plaintiffs claim that "[m]usic constitutes an integral part of Vimeo's audiovisual works" and so acts as a draw to the website.  (*See* Pl. Br. at 20.)  This proves nothing, of course, because it must be the ***infringing nature*** of the music that acts as a draw—not just the presence of music itself.  *See Capitol Records*, 821 F. Supp. 2d at 645.  Plaintiffs offer no such evidence.  Moreover, no direct financial benefit exists where the allegedly infringing draw has non-infringing uses, as music in videos plainly does here.  *See id.*; *Higgins*, 4 F. Supp. 2d at 704-10.

***Second***, Plaintiffs claim that Vimeo receives a financial benefit from the advertising on Vimeo's site.  (Pl. Br. at 18.)  But Plaintiffs offer only theories, not a shred of evidence, that Vimeo obtained any advertising revenues (in the form of ad clicks, for example) specifically due to the fact that a particular song was played, without a license or other permission, while the advertising was being displayed.  *See Wolk*, 840 F. Supp. 2d at 748 (finding no financial benefit directly attributable to the infringing activity because "[t]he Defendants' profits are derived from the service they provide, not a particular infringement").  Plaintiffs cite to the *Perfect 10* case in support of their argument that website advertising provides the requisite direct financial benefit, but they fail to disclose that this aspect of the decision was ***reversed on appeal***.  *See Perfect 10, Inc. v. Amazon.com,*

*Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) ("Perfect 10 must establish a likelihood of proving that Google derives a direct financial benefit from such [infringing] activities. Perfect 10 has not met this burden.").   Courts in this District have similarly recognized that the *Fung* decision, which the Plaintiffs also cite in support of their position, has little application in a DMCA safe harbor analysis. *See Viacom*, 718 F. Supp. 2d at 525-26 (noting that "Fung was an admitted copyright thief," and stating that "[*Grokster*] and its progeny [*Usenet.com*], [*Fung*], and [*Lime Group*] … have little application here.  *Grokster*, *Fung*, and *Lime Group* involved peer-to-peer file-sharing networks which are not covered by the safe harbor provisions of DMCA § 512(c).").   Nor is Plaintiffs' argument even plausible; Vimeo's advertising revenues do not depend on the type of user submission (infringing or not).

      ***Third***, Plaintiffs assert that Vimeo otherwise would have had to license the music in the Videos-in-Suit.  Plaintiffs selectively quote *Cybernet* in support of this proposition but fail to include the court's entire statement, which demonstrates that it found sufficient financial benefit from the ***draw*** of infringing materials rather than the fact that they were provided at a lower cost.  *See Cybernet*, 213 F. Supp. 2d at 1171 ("Taking Perfect 10's allegations of 10,000 infringing images at face value, as Cybernet does for purposes of this test . . .  Cybernet benefits from the ***draw*** posed by the existence of these works provided at a cost far below that provided by the copyright owner." (emphasis added) (citation omitted)).  Moreover, unlike Vimeo, Cybernet's business model relied heavily upon infringement.  *See id.* at 1171 ("Cybernet benefits directly from these infringing sites …."); *id.* at 1181 ("The more new visitors an infringing site attracts, the more money Cybernet makes.").  Similarly, the *Grokster Remand* decision did not discuss direct financial benefit as an element of DMCA safe harbor analysis but instead was addressing inducement liability.  454 F. Supp. 2d at 988-89.  Simply put, Vimeo is not required to obtain licenses for non-infringing music,

nor for music being employed as a fair use in conjunction with audiovisual works.  *See* 17 U.S.C.

§ 107 ("[T]he fair use of a copyrighted work … is not an infringement of copyright.").  Moreover,

Plaintiffs' argument would render this element a tautology, as it is ***always*** the case that if

infringement is demonstrated, a license may have to be paid.

     ***Fourth***, Plaintiffs claim that Vimeo signed up new "Premium Members" due to the alleged

infringement.  Plaintiffs offer no evidentiary support for this claim.  Plaintiffs' reliance on *Lime

Group* is misplaced because that case involved a file-sharing service that deliberately aimed to foster

infringement.  *See Viacom*, 718 F. Supp. 2d at 525-26 ("*Lime Group* [ ] do[es] not even mention the

DMCA.").  In addition, Plaintiffs fail to mention that *Lime Group* turned on the fact that "LimeWire

profited from its ability to ***attract infringing users***, including through increased advertising revenue

and increased sales of LimeWire Pro and authorized music."  *Arista Records LLC v. Lime Group

LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011).  In contrast, Vimeo's subscription revenues are the

same regardless of the content (infringing or not) subscribers decide to upload. Congress expressly

kept such revenue within the safe harbor when it enacted the DMCA.  *See* S. Rep. No. 105-190, at

44 (1998); H.R. Rep. No. 105–551, pt. 2, at 54 (1998).  And finally, Plaintiffs incorrectly claim that

"'Premium Members' paid a fee for ***additional benefits*** including the ability to download an

unlimited number of infringing works."  (Pl. Br. at 23.)  In fact, all Vimeo users can view or

download an unlimited number of videos regardless of whether they are Basic (free) users or choose

to become paid subscribers.[18]  Thus, "where there is no evidence in the record that the service

provider 'attracted or retained subscriptions because of the infringement or lost subscriptions

because of its eventual obstruction of the infringement,' no reasonable jury could conclude that the

---

[18]    Vimeo offers three levels of membership to its users: one free and two premium paid memberships.  All three plans allow users to view and upload videos.  The premium paid subscribers do not receive any special viewing privileges related to the content of videos.

service provider received a direct financial benefit from providing access to the infringing material."

*Wolk*, 840 F. Supp. 2d at 748 (citation omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, Vimeo's motion for summary judgment should be granted, and Plaintiffs' motion for partial summary judgment should be denied.

Dated: November 16, 2012
       New York, New York

                              Respectfully submitted,

                              ___/s/ Robert L. Raskopf_____
                              Robert L. Raskopf
                              Jessica A. Rose
                              Todd Anten
                              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                              51 Madison Avenue, 22nd Floor
                              New York, NY 10010
                              (212) 849-7000

                              Rachel Herrick Kassabian (*pro hac vice*)
                              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                              555 Twin Dolphin Drive, 5th Floor
                              Redwood Shores, CA 94065
                              (650) 801-5000

                                    - and -

                              Michael A. Cheah
                              VIMEO, LLC
                              555 West 18th Street
                              New York, New York 10011
                              (212) 314-7457

                              *Attorneys for Defendants Vimeo, LLC and*
                              *Connected Ventures, LLC*