UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; VIRGIN RECORDS AMERICA, INC., a California Corporation,<br><br>      Plaintiffs,<br><br>v.<br><br>VIMEO, LLC d/b/a VIMEO.COM, a Delaware Limited Liability Company; CONNECTED VENTURES, LLC, a Delaware Limited Liability Company, and DOES 1-20, inclusive,<br><br>      Defendants. | CASE NOS. 09 CV 10101 (RA)<br>      09 CV 10105 (RA)<br><br>**PLAINTIFFS' REPLY MEMORANDUM (1) IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DEFENSE UNDER SECTION 512 OF THE DMCA, AND (2) IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation; EMI APRIL MUSIC, INC., a Connecticut Corporation; EMI VIRGIN MUSIC, INC., a New York Corporation; COLGEMS-EMI MUSIC, INC., a Delaware Corporation; EMI VIRGIN SONGS, INC., a New York Corporation; EMI GOLD HORIZON MUSIC CORP., a New York Corporation; EMI U CATALOG, INC., a New York Corporation; EMI UNART CATALOG INC., a New York Corporation; JOBETE MUSIC CO., INC., a Michigan Corporation; and STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation,<br><br>      Plaintiffs,<br><br>v.<br><br>VIMEO, LLC d/b/a VIMEO.COM, a Delaware Limited Liability Company; CONNECTED VENTURES, LLC, a Delaware Limited Liability Company, and DOES 1-20, inclusive,<br><br>      Defendants. | |

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................................... 1

I.      VIMEO HAS NOT CARRIED ITS BURDEN OF SHOWING THAT IT LACKS
        THE RIGHT AND ABILITY TO CONTROL INFRINGEMENT.................................... 1

        A.      Vimeo Engages In The "Something More" Identified By *Viacom* ...................... 1

        B.      "Right And Ability To Control" Does Not Require Control Over Users Or
                Prescreening Of Content. ..................................................................... 4

        C.      Vimeo Also Controls Infringing Activity By Encouraging And Inducing Its
                Users To Infringe Copyrighted Music. ...................................................... 6

        D.      Vimeo Receives A Direct Financial Benefit From Infringement. ......................... 9

II.     VIMEO IS DISQUALIFIED FROM SAFE HARBOR BECAUSE OF ITS
        KNOWLEDGE OF AND WILLFUL BLINDNESS TO INFRINGEMENT. ................. 11

        A.      Vimeo Cannot Distance Itself From Its Employees' Conduct And
                Knowledge. ..................................................................................... 12

        B.      Vimeo Had Actual Or Red Flag Knowledge Of Specific Infringements. ........... 12

        C.      Vimeo Rendered Itself Willfully Blind To Infringement Of Music. .................... 16

III.    VIMEO DID NOT ADOPT, COMMUNICATE, AND IMPLEMENT AN
        EFFECTIVE REPEAT INFRINGER POLICY. ............................................... 17

IV.     VIMEO IS INELIGIBLE FOR SAFE HARBOR FOR OTHER REASONS. ................. 19

Conclusion ................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ....................................................................... *passim*

*Arista Records LLC v. Lime Group LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ..............................................................10, 11

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) .....................................................................6

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) ...............................................................................................12

*Capitol Records, Inc. v. MP3Tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) ....................................................................12

*Columbia Pictures Indus., Inc. v. Fung*,
  2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ...............................................7, 8, 12

*Corbis Corp. v. Amazon.com, Inc.*,
  351 F. Supp. 2d 1090 (W.D. Wash. 2004) ..........................................................5, 17

*Datatech Enterprises LLC v. FF Magnat Ltd.*,
  2012 WL 4068624 (N.D.Cal. Sept. 14, 2012) .......................................................18

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) ...............................................................................10

*Fonovisa v. Napster, Inc.*,
  2002 WL 398676 (N.D. Cal. Jan. 28, 2002) ......................................................8, 19

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) .................................................................................16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*
  (*"Grokster I"*), 545 U.S. 913 (2005)................................................................ *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
  (*"Grokster II"*), 454 F. Supp. 2d 966 (C.D. Cal. 2006) .................................7, 9, 11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...............................................................................10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ..................................................... *passim*

*Perfect 10 v. Google, Inc.*,
  416 F. Supp. 2d 828 (C.D. Cal. 2006) ....................................................... 10

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) .................................................................. 15

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010) ..................................................................... 16

*Tur v. YouTube, Inc.*,
  2007 WL 1893635 (C.D. Cal. June 20, 2007) .......................................... 4

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  667 F.3d 1022 (9th Cir. 2011) ................................................................. 20

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  718 F. Supp. 514 (S.D.N.Y. 2010) ............................................................. 8

*Viacom International, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ...................................................................... *passim*

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012) ......................................................... 5

### STATUTES

17 U.S.C.
  § 101 ......................................................................................................... 20
  § 512(c) .................................................................................................. *passim*
  § 512(i)(1)(A) ............................................................................................ 17
  § 512(m) .................................................................................................... 17

### OTHER AUTHORITIES

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats:*
  *Reckoning the Future Business Plans of Copyright-Dependent Technology*
  *Entrepreneurs*, 50 Ariz. L. Rev. 577 (Summer 2008) ........................... 15, 17

## Introduction

This motion is ***not*** about 199 videos.  It is about a course of conduct that disqualifies Vimeo on multiple grounds from claiming the DMCA safe harbor defense.  Vimeo concedes, as it must, over 250 facts in Plaintiffs' Statement of Undisputed Facts.[1]  *See* Pls' Reply to Resp. to Stmt. of Undisputed Facts.  Under the standards set forth in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), these admissions are sufficient to grant Plaintiffs' motion.  In addition, Vimeo's alleged "disputes" are unsupported, generally unspecified, and largely based on its executives' self-serving, conclusory reply declarations that in crucial respects contradict prior sworn testimony.  *See* Pls' Motn. to Strike Suppl. Cheah Decl.  Unable to deal with the undisputed facts, Vimeo argues for an interpretation of the DMCA that would result in ***no ISP*** ever having the right and ability to control, actual or red-flag knowledge of infringement, or being willfully blind.  At the end of the day, Vimeo's opposition brief devolves to the same wrong argument that it made in its opening brief – that responding to DMCA notice is the only requirement for safe harbor.  *E.g.*, Opp. at 1, 13, 14, 17, 18, 27.  That construct was explicitly rejected by *Viacom*, eliminates most of section 512(c), and is not the law.  *Viacom,* at 27-28.

Vimeo cannot carry its burden of proof on the DMCA affirmative defense.  Summary judgment for Plaintiffs is warranted.

## I.      VIMEO HAS NOT CARRIED ITS BURDEN OF SHOWING THAT IT LACKS THE RIGHT AND ABILITY TO CONTROL INFRINGEMENT.

### A.      Vimeo Engages In The "Something More" Identified By *Viacom*.

*Viacom* described the facts of *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d

---

[1]  As just an example, Vimeo does not dispute that its Staff members uploaded videos using unlicensed music (including Plaintiffs') and frequently provided "music credits" for commercial sound recordings used in their videos, does not dispute that its home page gave instructions to synchronize "high quality" copies of songs with videos, and does not dispute that since this litigation began, its Staff members have continued adding videos containing Plaintiffs' musical works to its curated channels such as "Staff Picks."  SUF 290-295, 297, 326, 332, 342, 348, 362.

1146 (C.D. Cal. 2002) as *one* "example[]" of the right and ability to control. *Viacom*, 676 F.3d at 38.[2]  Like Cybernet, Vimeo "instituted a monitoring program by which user[s] … received 'detailed instructions regard[ing] issues of layout, appearance and content'" and "forbade certain types of content and refused access to users who failed to comply with its instructions." *Viacom*, 676 F.3d at 38 (quoting *Cybernet*, 213 F. Supp. 2d at 1173).  Vimeo's own employees recognized the obvious:  "we are just straight controlling our website" and engaging in "hardline Vimeo editorial fascism."  SUF 102, 103.

Vimeo promulgated and rigorously enforces a set of detailed *subjective* content-based restrictions that prohibit a variety of content (such as "unoriginal" content, "commercial" content, and gameplay videos).  SUF 31-39; *see Viacom*, 676 F.3d at 38.  Vimeo gives its users detailed instructions (including participating in lengthy public forums) as to the types of content permitted and prohibited.  Vimeo purports to "bar access to users who fail to comply with its instructions."  SUF 100, 116.  Vimeo Staff regularly communicate, promote, and endorse specific content (including infringing content) via "likes" and positive comments, participate in group projects (including those involving infringing content), populate a "Staff Picks" channel (including with infringing videos), and make and upload their own "Staff" videos (including infringing videos).  SUF 47, 50, 51, 55, 64, 290-95, 333-34, 344, 348.  Current employees of Vimeo LLC have published *88,500* "likes," submitted *110,000* comments, and added *5,000* user videos to the "Staff Picks" channel.  Pile Suppl. Decl., ¶¶ 10, 15 (Vimeo Staff use "likes" to show support for "a prolific user.")

Vimeo does still more.  Vimeo Staff each spend several hours a day on the site, subscribe to channels, users, groups, and key words, and receive links to those videos, scan lists of videos

---

[2]  Understandably, Vimeo tries to characterize *Viacom*'s reference to *Cybernet* as "dicta" (which it is not, and it would make no difference if it were).  *See* Opp. at 20.  *Viacom* specifically chose *Cybernet* to illustrate the "something more" standard.

or video tags, and otherwise review the website "to see what's on there."  SUF 44, 50, 55, 109, 113, 121, 135.  Through automated screening and other sophisticated and unique "back-end mechanisms," including *40* "mod tools" and "filters," as well as manual review of videos that Vimeo Staff receive daily, Vimeo aggressively and proactively *monitors* and *deletes* a wide variety of content that it deems undesirable and inconsistent with its business model and brand. *See*, *e.g.*, SUF 104-105, 121, 123-128, 157, 166, 199, 212-213.  These include "movies, tv shows, and stuff you found on the web," gameplay videos, "fan vids," "real estate home tours," "someone else's original videos," "sexually illicit[sic] material," and anything else that in the subjective judgment of its Staff "should not be on Vimeo."  SUF 33, 105.  Vimeo further controls content by "burying" videos it does not wish users to see and "whitelisting" those it approves and does not want deleted.  SUF 137-148.  Vimeo can easily and quickly control content because, *unlike* Cybernet (and others), its content resides on, and is performed and distributed from, its servers, and only Vimeo has access to its video database.  SUF 75, 89, 94.

In this context, Vimeo's glib characterization of Plaintiffs' position – that Vimeo is not doing enough to combat copyright infringement and at the same time doing too much (Opp. at 23) – is sophistry.  It does, however, sharply illustrate the fallacy in Vimeo's overall position. Vimeo does prohibit, monitor, and delete "unoriginal" content, but it carves out and permits "unoriginal" (i.e., copied) music ("our website is about original videos, not original music.") SUF 287.  Vimeo also now claims it monitors for copyright infringement (a new claim on its part).  But even if it does, again it specifically does not monitor for or care about copyrighted music, and its content guidelines do *not* prohibit the use of copyrighted music.  ("We allow it"; "shouldn't be a problem"; "just place tags on the video…").  SUF 95, 129, 172, 302, 303, 309, 318.  This only serves to prove that Vimeo has "instituted a monitoring program" to *selectively* exercise control over its content.  It could control the use of infringing *music* as it does other

content, but intentionally does not.  To the contrary, Vimeo exercises this extensive control to permit infringement of music and it does not remove videos with infringing music even when it sees them.  (Indeed, its Staff create and post infringing videos.) [3]  Vimeo's active and affirmative control is pervasive and by design.  It is **not** to ensure that content is noninfringing, but rather to further its own business model and to curate and mold a unique commercial environment that **includes** the unauthorized use of copyrighted music.  *See* SUF 99 (Vimeo Staff had a "specific idea of what type of video we wanted and anything that was not that was to be removed.")  No other website – not YouTube and not Veoh – exercises anywhere near this magnitude of control.

### B.   "Right And Ability To Control" Does Not Require Control Over Users Or Prescreening Of Content.

Vimeo's primary argument is that the reference to "right and ability to control" the "**infringing activity**" in section 512(c)(1)(B) really means the right and ability to control, "*ex ante,* what its **users** choose to post." Opp. at 22, 25 (emphasis added).  This argument falls of its own weight.  No website or ISP can control what a user does on a home computer.  Cybernet could not control its users, *ex ante*.  *Cybernet*, 213 F. Supp. 2d at 1160 ("The **webmaster** is responsible for providing all content.  Cybernet disclaims any responsibility for content.") (emphasis added).  Neither could YouTube, and *Viacom* never stated that YouTube must be able to control its users' conduct **before** videos are uploaded, as opposed to controlling infringement on its own website.  *See Tur v. YouTube, Inc.*, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) (denying summary judgment for YouTube despite its claim that it "does not have the

---

[3]  Vimeo's **new** claim that it removes videos containing copyrighted music is difficult to fathom when, among other things, its own Staff puts up and keeps up infringing videos and clearly does not remove others when it sees them.  The only support for this claim is Vimeo's belated and self-serving declarations, contradicted by prior sworn testimony and the evidence.  *See* Cheah Depo. [Frackman Decl., Ex. 6] at 79:9-13 ("[Q]: What if it were original video content with preexisting music or copyrighted music, would that be taken down?  [A]: Generally speaking, no.  We would wait for a DMCA takedown notice."); SUF 38 ("we ignore music and say that legality doesn't matter when it comes to the uploading rules….").  *See* Pls' Motn. to Strike; Supplemental Declaration of James D. Berkley ("Berkley Supp. Decl."), ¶¶ 5-7 & Exs. 4-5.

technical capabilities needed to detect and prescreen allegedly infringing video tapes" because "[t]here is clearly a significant amount of maintenance and management that YouTube exerts."); *Cybernet*, 213 F. Supp. 2d at 1174 (defendant "controls consumer access, and promotes its services"); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) ("Napster had the right and ability to police ***its system*** and failed to exercise that right to prevent the exchange of copyrighted material.") (emphasis added).  Of course, as discussed herein and in Plaintiffs' motion, in a real sense Vimeo does control user conduct in a variety of ways, such as by instructing users how to infringe, prohibiting certain types of content, and inducing users to infringe music.

 Similarly, control does not require that Vimeo prescreen content.  If this were necessary, then the larger the infringer, the less the liability, and an infringer effectively could become too big to be disqualified from DMCA immunity.  If prescreening were a prerequisite, there would be no need for safe harbor disqualification based on the right and ability to control because by prescreening an ISP would obtain actual or constructive knowledge of infringement.  *Viacom*, 676 F.3d at 36 (reversing district court's holding that the ISP "'must know of the particular case before he can control it.'")[4]  *Viacom* did not refer to prescreening at all when it described *Cybernet*'s control.  Contrary to Vimeo's assertion, Cybernet could not prescreen the over 20 million (and constantly increasing) ***images*** available on its independent participating websites, and it did not even have those works on its servers or database.  *See Cybernet*, 213 F. Supp. 2d at 1158.  Cybernet's control consisted of a monitoring program and content restrictions that

---

[4] Defendants' reliance on *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012), is misplaced.  The facts in that case were significantly different than here and not well-developed by the *pro se* defendant, and her motions to amend her complaint and to admit expert testimony were denied.  More important, *Wolk* was decided before *Viacom*, did not cite *Cybernet* at all, and wrongly relied on *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004), which did not hold that prescreening was required for the right and ability to control.  (In that case, as the court noted, the defendant was "never in possession of the [allegedly infringing] products….." *Id.* at 1110.)

5

"exert[ed] substantial influence on the activities of users, without [Cybernet] necessarily – or even frequently – acquiring knowledge of specific infringing activity." *Viacom*, 676 F.3d at 38.

### C.    Vimeo Also Controls Infringing Activity By Encouraging And Inducing Its Users To Infringe Copyrighted Music.

Among other things, Vimeo employees advised (and in places still advise) that the use of copyrighted music was "not a big deal," the "FBI won't be busting down your door," "[w]e allow it," "we do pay royalties" (when they don't), "I don't think you have anything to worry about," and "you can use the music." SUF 303-305, 307, 311. At the same time, Vimeo informed its users that other content, such as gameplay videos, was impermissible and that it would remove (and did remove) them by the thousands. SUF 115. To make sure, Vimeo developed and devoted sophisticated tools to filter a myriad of content. Vimeo could have used these and other available technologies that it was offered and tested to filter copyrighted music and limit infringement (as its own expert testified and as others do, including YouTube and Veoh). SUF 221. Vimeo decided not to do so. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* ("*Grokster I*"), 545 U.S. 913, 939 (2005) ("failure to develop filtering tools or other mechanisms to diminish the infringing activity" "underscores [defendants'] intentional facilitation of their users' infringement.")

Vimeo did more than that. It uploaded its own infringing videos. It participated in and promoted "group" projects that invited infringement of music and created, sponsored, and highlighted a category of videos ("lip dubs") that it knew was infringing, featured these as a "Vimeo Obsession" on its home page, instructed users to make similar types of videos using "a high quality copy of the song in an editing program," and used "lip dub" as an invisible metatag on its web pages to increase the likelihood that pages from the Vimeo Website would be returned in search-engine results. *Arista Records LLC v. Usenet. com, Inc.*, 633 F. Supp. 2d 124, 133

6

(S.D.N.Y. 2009) (discussing metatags); SUF 269, 319-321 (If Vimeo "suddenly started to ban videos with copyrighted music, like lipdubs, then I would be pissed but I would have to realize it's their final decision."), 326-327, 333-334.  Vimeo taught users how to infringe by synchronizing copyrighted music from their iTunes library. SUF 353.  It told users to tag their clips with the names of popular artists (such as "music:the Beatles" or "music:Beck").  SUF 84, 301.  It encouraged infringers by "liking," promoting and commenting on their infringing videos. SUF 19, 331, 341, 344.  This active inducement to infringe ***independently*** constitutes control (*Viacom*, 676 F.3d at 38), is clearly outside the "passive transmission or storage of infringing materials" (*Columbia Pictures Indus., Inc. v. Fung*, 2009 WL 6355911, at *16 n.26 (C.D. Cal. Dec. 21, 2009)), and removes safe harbor protection.

All this (and more) was done in the context of Vimeo's knowledge that commercial recordings and musical compositions are subject to copyright (SUF 67, 77-79, 235-236), and its recognition that the use of music "generally" constitutes infringement.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster II*"), 454 F. Supp. 2d 966, 992 (C.D. Cal. 2006) ("[I]t is common knowledge that most popular music and movies are copyrighted.").  Vimeo also expressly acknowledged that 10-20% of its videos used infringing music, and that "[c]opyright holders are expected to charge a revenue share of 20-50% for use of music."  SUF 72.  Vimeo's statements are not "isolated, one-off comments" by "a small number of employees."  Opp. at 30. They are published on its website to its multitude of users and are supported by hundreds of pages of evidence.  The infringing videos that Vimeo Staff created or approved also were made available to millions of users and provided an object example of permissible content (including copyrighted music).  By its conduct and words Vimeo created an environment that not only tolerated but fostered and attracted infringement as reflected by its users' statements.  ("Vimeo offers a platform which allows me to upload my work without copyright issues and conflicts

which I run into with YouTube many times"; "The YouTube version of this music video is blocked by EMI and WMG, so I hope Vimeo remains a more tolerant environment for music and animation lovers.")[5]  SUF 274-75.

<u>So-Called "Legitimate" Service Providers Who Infringe Are Liable.</u>  Inducement focuses on **conduct** and **intent**.  As set forth in *Grokster I*, 545 U.S. at 936:

> "[A]dvertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use…."

The quantum of infringement resulting from that conduct is irrelevant.  All copyrighted works are protected, and any infringement is infringement, especially where the infringement is of some of Plaintiffs' most valuable copyrights.[6]  *Viacom* rejected the district court's suggestion that *Grokster* applied only to "admitted copyright thie[ves]" or services that exist "'solely to provide the site and facilities for copyright infringement.'"  *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 514, 526 (S.D.N.Y. 2010).  Rather, *Grokster* inducement liability could apply to YouTube, a service that clearly does not fit that definition.  *Viacom*, 676 F.3d at 38.  Similarly, Vimeo's contention that its service is capable of "substantial non-infringing uses" would not excuse inducing infringement.  The "substantial non-infringing use" defense is never mentioned in *Viacom* (or *Cybernet*) as relevant to the DMCA, even though certainly YouTube (and Cybernet) were capable of (and had) substantial non-infringing uses.  In fact, that defense does not even apply to claims of direct infringement or vicarious liability, and has only limited utility

---

[5]  Although Vimeo's inducement did result in specific infringement, *see, e.g.*, SUF 343, *Viacom* held that inducement is a form of the right and ability to control, and the right and ability to control does not require evidence of specific infringement.  676 F.3d at 38; *See Fung*, 2009 WL 6355911, at *10 ("Importantly, liability may attach even if the defendant does not induce specific acts of infringement.").

[6]  In addition to the 199 "representative" infringements on the schedules to the Complaints, these include the over 1,000 additional copyrights identified in Plaintiffs' new schedules, which include infringements discovered or that took place after filing of the lawsuit.  These additional infringements are relevant.  *See* Pls' Mtn. at 6 n.5; *see also Cybernet*, 213 F. Supp. 2d at 1170 n. 15 ("[T]he Court notes that in [*Fonovisa* and *Napster*] the courts relied to some extent upon allegations in the complaint and post-filing conduct.").

to contributory infringement liability.  *See Napster*, 239 F.3d at 1020.

       <u>Vimeo's Purported "Prohibition" on Infringement Is Unavailing.</u>  "Terms of Service" that give lip service to prohibiting infringement do not provide immunity for Vimeo's actual conduct. *See, e.g., Grokster II*, 454 F. Supp. 2d at 980 (terms prohibiting copyright infringement were irrelevant because "aside from admonishments to users, [Defendant] did not believe it had any responsibility to prevent use of its software for infringement").  Additionally, Vimeo's oblique "stock" response to direct inquiries about the use of music (not instituted until late 2008), far from discouraging infringement, ***encouraged*** it.  SUF 313.  Vimeo did not respond that the use of copyrighted music violates its Terms of Use; it pointedly did ***not*** say that if the use of music appeared to be infringing the video would be taken down; and it did not in any manner attempt to dissuade users from using infringing music – even when responding to users announcing an intent to infringe.  *See*, *e.g.,* Cheah Suppl. Decl. Ex. 1 at VCV034793 ("Searched a bunch on your site and elsewhere and can't get a clear answer."); Cheah Suppl. Decl., Ex. 2 at p. 7 ("the few videos I have made have soundtracks taken from commercial artist CDs"); Cheah Decl., Ex. 2, p. 5 ("I was wondering if I can upload a video I personally made and use background music that is not mine.  Like Pussycat Dolls, Rhianna, and so on").  As a result, and as reflected in the exhibits on which Vimeo relies, users uploaded infringing works ***after*** receiving the stock response.  Vimeo did nothing.  *See* Berkley Suppl. Decl., ¶ 5 & Ex. 4.

       **D.**     **<u>Vimeo Receives A Direct Financial Benefit From Infringement.</u>**

       Plaintiffs described four ways that Vimeo financially benefits from infringement:

       <u>Draw.</u>  Vimeo ignores the draw of infringing music, including the admitted more than 950,000 user visits to infringing content identified in Plaintiffs' original schedules (and the many identified in Plaintiffs' new schedules) and that users migrated to Vimeo from legitimate websites because of the presence of or ability to upload infringing music, specifically including

Plaintiffs' music.  The ability given to users to upload infringing music is a draw **and** the ability

of users to view and listen to infringing content is a draw.  Vimeo must, but does not, provide

evidence to the contrary.  *See Cybernet*, 213 F. Supp. 2d at 1172-73 ("Cybernet has given no

reason to believe that these [infringing] pages do not attract consumers, thereby creating a

financial benefit…").  The amount of the draw is irrelevant (*Ellison v. Robertson*, 357 F.3d

1072, 1079 (9th Cir. 2004)), and it may be purely prospective.  *Napster*, 239 F.3d at 1023.

      <u>Ad Revenue.</u>  Vimeo used infringing music as part of its marketing strategy.  *See, e.g.,*

SUF 253-257 (commercial sponsorship of infringing "lip dubbing channel").  Vimeo's primary

advertising model is **not** "pay per click."  Opp. at 31.  Rather, Vimeo is paid based on the

number of times an ad is **displayed** (*i.e.*, per 1000 "impressions").  SUF 244.  To the extent

Vimeo argues that advertising revenue somehow (it doesn't say how) must be derived

"specifically due to the fact that a particular song was played" in a video (Opp. at 31), it misses

the point.  Vimeo is paid for ads it chooses to display directly with infringing videos, regardless

of why the user views them, and also for ads displayed to users who visit Vimeo to view those

videos or who stay on Vimeo thereafter and view other videos (and ads).  If there was no

infringing video, there would be no ad to view and no revenue from it.  *Perfect 10 v. Google,*

*Inc.*, 416 F. Supp. 2d 828, 857 (C.D. Cal. 2006) ("Google certainly derives a direct financial

benefit if users visit AdSense partners' websites that contain such infringing photos.  If Google

serves advertisements that are displayed on such sites, it will share in the ad revenue.  Hence, its

financial benefit is direct.");[7] *see Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398,

435 (S.D.N.Y. 2011) ("The financial benefit need not be tied directly to the sales of the

infringing goods").

---

[7]  The Ninth Circuit did not "reverse" this finding, as Vimeo states.  Opp. at 31.  It did not reach this issue.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1146, 1175 n.15 (9th Cir. 2007) ("[W]e need not reach Perfect 10's argument that Google received a direct financial benefit.")

Cost Savings.  Vimeo's competitors pay for the music that Vimeo takes for free.  Vimeo quantified this benefit as a "revenue share of 20-50% for use of music" and later as a budgetary item of more than a million dollars for 2008 (that it never paid).  SUF 237-240;  *see Grokster II*, 454 F. Supp. 2d at 989 ("Of course, it helped [defendant's] profitability that it did not incur any costs to obtain the content that was used to attract users."); *Cybernet*, 213 F. Supp. 2d at 1171 (benefit when "works [are] provided at a cost far below that provided by the copyright owner").

Premium Memberships.  Vimeo ignores that it placed its "house ads" (soliciting "premium memberships") on the same pages as infringing videos.  SUF 282-83.  Some of the hundreds of thousands of users (or more) who viewed those videos purchased premium memberships.  *See Lime Group*, 784 F. Supp. 2d at 435 (infringing content attracts users, some of whom purchased premium "LimeWire Pro" software).  Premium memberships required an additional fee for additional privileges (*e.g.*, removing a limit on number of downloads).  Vimeo's rejoinder that "all Vimeo users can view or download an unlimited number of videos" (Opp. at 33), omits that this policy is recent and well after the lawsuit was filed.

## II.    VIMEO IS DISQUALIFIED FROM SAFE HARBOR BECAUSE OF ITS KNOWLEDGE OF AND WILLFUL BLINDNESS TO INFRINGEMENT.

There is no dispute that none of the videos at issue, posted as early as 2005, were removed or disabled until Plaintiffs' Complaints were filed, notwithstanding that Vimeo's employees uploaded at least 10 of them and another 45 (a total of 55) were "commented on," "liked," selected as "Staff Picks," whitelisted, "buried," or otherwise reflect direct involvement by Vimeo employees.  Opp. at 15 (admitting Vimeo was aware of "55 Videos-in-Suit").[8]  Thus, Vimeo's initial claim that there is "no evidence that Vimeo knew these videos were even on its system" (Vimeo Motn. at 22) was false.

---

[8]  Many additional videos in these categories, including uploads by Vimeo employees, were later identified by Plaintiffs.  *See*, *e.g.*, SUF 66, 143, 152, 344, 348.

A.    **Vimeo Cannot Distance Itself From Its Employees' Conduct And Knowledge.**

Vimeo cannot qualify for safe harbor for its own activities. 17 U.S.C. § 512(c)(1) (safe harbor applies only to "storage at the direction of a *user*") (emphasis added). Seven of the 10 videos uploaded by Vimeo employees were uploaded while the creators were employed (and an eighth by an intern). All 10 videos remained on Vimeo's servers and were distributed and performed by Vimeo *after all* the makers became employed and when they had knowledge these videos were infringing and the power to remove them. Vimeo Staff serve as its "editorial voice." SUF 50, Ex. 119. Vimeo assigns them status and powers and they act under its control and for its benefit, with their activities publicized by a "Staff Badge." Their job includes the creating, uploading, viewing, monitoring, and deleting of videos. SUF 43, 45, 50, 54. Their conduct is Vimeo's conduct. *See Fung* at *13 & n.21 (acts of *unpaid* "'moderators'" – "'whose job it is to look after the running of the forums'" and who have the power to "edit, delete, and reorganize" postings – are imputed to the employer); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (conduct "'actuated, at least in part, by a purpose to serve the [employer],'" is within the scope of employment "even if it is forbidden by the employer").[9] Thus, "there is an agency relationship between these individual moderators (or 'admins') and Defendants," even "though there is no evidence that the moderators were specifically authorized to post messages in these forums....."[10] *Fung* at *13 n.21.

B.    **Vimeo Had Actual Or Red Flag Knowledge Of Specific Infringements.**

Vimeo Viewed And Was Aware Of At Least 55 Of The Videos at Issue. In addition to

---

[9]  Unlike here, in *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011) (Opp. at 3), the songs in question were downloaded to personal accounts, not uploaded to the defendant's website and made available to all Defendants' users.

[10]  Vimeo distances itself from the infringing activities of David Fishel and Amir Blumenfeld because they were employees of Defendant Connected Ventures. Opp. at 9 n.6. Prior to July 2008, Vimeo was owned by Connected Ventures. Cheah Decl., ¶ 20 n. 2.

the 10 employee-uploaded videos, discussed above, Vimeo had subjective and/or objective knowledge of videos that its employees "commented" on, "liked," designated as "Staff Picks," "whitelisted" or "buried," and/or reviewed as the content of "Plus" subscribers (a minimum of 55 videos).[11]  "Comments" are posted after viewing specific videos (as evidenced by statements such as "nice execution," "very cool song selection," and "haven't heard this song in years"). SUF 343, 345.  "Staff Picks" are selected by watching videos.  "Likes" "indicate to a person whose video you watched that you enjoyed it."  "Burying" is used to make a video "not overly apparent to users."  A "whitelisted" video means a "moderator has looked at this."  Vimeo moderators also looked at the videos of Plus users.  SUF 70, 118, 139, 147, 178.  Vimeo has not provided ***any*** declaration from any Staff that he or she did not actually view these videos or lacked knowledge they were infringing.  In the absence of such testimony, Vimeo cannot refute that its Staff saw the videos.

<u>At Minimum, Vimeo Had Knowledge of Facts and Circumstances From Which Infringement Is Apparent.</u>  Vimeo focuses almost exclusively on ***subjective*** (actual) knowledge, and minimizes the extensive evidence of "facts and circumstances" from which infringing activity is apparent to a reasonable person (red flag/***objective*** knowledge).  The evidence of infringement includes much more than "a textual description of the music used" (Opp. at 17), although Vimeo does not dispute that such information was almost universally apparent and makes clear the nature of the work.  SUF 82.  They contain other obvious indicia of infringement, such as Plaintiffs' name, the name of the popular recording artist, the name of the song, and descriptions of the video.  Frackman Decl., Exs. 17-24.  These videos contain the

---

[11]  Vimeo mischaracterizes the evidence concerning the 55 videos.  ***32*** videos were commented on, liked, selected as "Staff Picks," individually whitelisted, or some combination of the foregoing.  Of the remainder, 10 were uploaded by users whose accounts were "whitelisted;" 2 more had been "buried;" and 11 more were uploaded by "Plus" users. Many of these were subject to more than one type of direct Staff involvement.  Berkley Suppl. Decl., ¶ 2, 4 & Ex. 1 (providing chart).

entirety or a substantial portion of the commercial work, and in no case was the music incidental, muffled, or otherwise obscured.  Vimeo does not provide any examples where infringement was anything other than obvious. [12]

Vimeo's claim that it cannot distinguish infringing from non-infringing content is further belied by its statements:  "adding a third party's copyrighted content to a video generally … constitutes copyright infringement"  (SUF 78), using copyrighted music is not legal but "the FBI won't be busting down your door" (SUF 307), and (falsely) Vimeo "pay[s] royalties on any music used on Vimeo" (SUF 304).  Moreover, Vimeo is a sophisticated company whose executives were involved in or familiar with the music industry, it protects and warns against infringement of its own intellectual property, it requires that its own users grant it licenses for videos uploaded by them, and it now even issues its own music licenses.  It cannot reasonably claim ignorance of copyright law.  *See Napster*, 239 F.3d at 1020 & n.5 ("apparent" knowledge where "Napster executives have recording industry experience," "enforced intellectual property rights in other instances," "downloaded copyrighted songs from the system," and "promoted the site with infringing files.")  In fact, Vimeo knew about infringing music as early as 2007, when its executives recognized that "big media companies might dispute ***our use of copyrighted*** music in our videos."  SUF 72, 79, 235, 237, 238.

<u>Vimeo Cannot Rely on Its Users' Hypothetical Affirmative Defenses.</u>  Once again (as with inducement liability) Vimeo's primary argument is that infringement ***never*** can be "apparent" because music "***can be***" used in a lawful manner, positing a purely hypothetical license or fair use defense.  Opp. at 16.  However, if a service "provider could simply claim that the possibility that some files might be fair use" or claim doubt as to the copyright or licensing

---

[12]  Vimeo has now provided a single video to the Court.  For the Court's convenience, Plaintiffs herewith are providing a DVD containing more than 50 of the 55 videos referenced, as well as certain additional videos referenced in Plaintiffs' original or new schedules and SUF.  *See* Berkley Suppl. Decl., ¶ 3 & Ex. 2.

status of a work, then "infringement never can be 'apparent' as to any file," making the knowledge provision of the DMCA a nullity.  Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats*, 50 Ariz. L. Rev. 577, 598 (Summer 2008); *see Cybernet*, 213 F. Supp. 2d at 1169 (rejecting argument that defendant "would not necessarily know Perfect 10's copyrights were infringed because they might be licensed").  If Vimeo were correct, *Viacom* would not have been reversed, and Vimeo does not identify ***any*** circumstance that could constitute knowledge under its hypothetical construct.

 Not one of the makers of any of these videos asserted a fair use or license defense; nor has Vimeo attempted to explain how the fair use defense might apply to any (except for one video by Vimeo's co-founder that featured an officer of defendant using a copied commercial recording for more than one minute and identified as "Music:Natasha Bedingfield").  More to the point, even if Vimeo's users had some claim of fair use for ***their own*** personal use of Plaintiffs' music (of which there is no evidence), Vimeo's own copying, distribution, and public performance of the music in order to advance its ***own*** commercial purposes would not be fair use.  *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1386 (6th Cir. 1996) ("It is true that the use to which the materials are put by the students who purchase the coursepacks is noncommercial in nature…. What the publishers are challenging is the duplication of copyrighted materials for sale by a for-profit corporation that has decided to maximize its profits – and give itself a competitive edge over other copyshops – by declining to pay the royalties requested by the holders of the copyrights.").  Vimeo also knew that, unlike other sites (e.g., YouTube), ***it*** did not have a license for any of the works that it copied, performed or distributed.  If Vimeo has any fair use or license defense (extremely unlikely), it will have the burden of proving it (on a case-by-case basis) as a defense to ***liability***, not to whether it may invoke safe harbor. (The fair use cases cited by Vimeo are on liability issues, not

15

the DMCA safe harbor.  *See* Opp. at 16.)

###   C.   **Vimeo Rendered Itself Willfully Blind To Infringement Of Music.**

Vimeo's conduct parallels the willful blindness described in *Tiffany (NJ) Inc. v. eBay,*

*Inc.*, 600 F.3d 93 (2d Cir. 2010), cited by *Viacom* and discussed at length in Plaintiffs' motion

(yet Vimeo never refers to *eBay* in its brief argument on this issue).  At the same time Vimeo

was instructing users how to infringe music, it created a system to maintain plausible deniability

("Don't ask, Don't tell"; "We can't officially tell you that using copyright [sic] music is OK.

But...").  SUF 35, 36, 38, 86, 91, 308.  Vimeo admits that it ignored warnings and reports of

infringing conduct (SUF 90, 91), and deliberately disabled or refused to implement functions or

features that would have alerted it to infringement or made its awareness of specific

infringements clear (SUF 96, 97); *see* Pls.' Motn. at 16-18, 43-44.

Vimeo's primary argument that it can be liable only if it viewed a video, based on that

viewing suspected it was infringing, and *then* did nothing, illogically requires that an ISP see

that which it has blinded itself from seeing.  Such a requirement conflates willful blindness with

actual or "red flag" knowledge.  However, *Viacom* specifically differentiated (even using

separate headings) between actual and red flag knowledge (awareness of "facts and

circumstances from which infringing activity is apparent") and knowledge imputed by "'looking

the other way.'"  Vimeo looked the other way when it had every reason to suspect infringement

was taking place because it committed infringement and induced it.  *Viacom*, 676 F.3d at 35

(quoting *eBay*, 600 F.3d at 109 ("[W]hen it has reason to suspect that users of its service are

infringing a protected mark, [an ISP] may not shield itself from learning of *the particular*

*infringing transactions* by looking the other way.") (emphasis added)).  In other words, willful

blindness is equivalent to knowledge.  Had Vimeo not taken steps to avoid learning of *particular*

*infringements*, infringement would have been apparent. *See In re Aimster Copyright Litig.*, 334

16

F.3d 643, 650 (7th Cir. 2003) (holding that "[w]illful blindness *is* knowledge, in copyright law" and finding willful blindness where the use of encryption "prevented [defendant] from knowing what songs were being copied by the users of his system") (emphasis added). [13]

Section 512(m) Does Not Shield Vimeo's Willful Blindness.  Section 512(m) cannot be used as a shield to avoid willful blindness, especially by a service that chooses to actively monitor and filter content in order to curate its website, while at the same time ignoring (indeed, encouraging) a certain class of infringements.  *See Viacom*, 676 F.3d at 35 ("512(m) limits – but does not abrogate – the [willful blindness] doctrine."); Ginsburg, 50 Ariz. L. Rev. at 598 ("512(m)'s dispensation of service providers from 'affirmatively seeking facts indicating infringing activity,' should not entitle the service provider to remain militantly ignorant.").

## III.    VIMEO DID NOT ADOPT, COMMUNICATE, AND IMPLEMENT AN EFFECTIVE REPEAT INFRINGER POLICY.

According to Vimeo's own evidence, Vimeo had no repeat infringer policy prior to ***May 2008.***  As Vimeo concedes, its Terms of Service at that time made no mention of repeat infringers, copyright infringement, or terminating users for repeat copyright violations.  Instead, the Terms of Service referred only to removal of "***content*** that violated its Terms of Service" Opp. at 9 (emphasis added); Cheah Supp. Decl., ¶ 11.  That is not a ***repeat infringer*** policy.  *See Cybernet*, 213 F. Supp. 2d at 1177 ("[S]ection 512(i) is focused on infringing users, whereas 512(c) is focused primarily on the infringing material itself."); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1102 (W.D. Wash. 2004) (ISP must "inform users that … it may terminate the user's accounts for repeated ***copyright infringement***") (emphasis added).

Until ***November 2008***, Vimeo had no system to track repeat infringers, and therefore no

---

[13]   Vimeo's argument that it removed infringing videos "upon receiving Plaintiffs' Complaints" (Opp. at 18) not only is untrue, but misses the point of "willful blindness."  Vimeo's willful blindness is what prevented Vimeo from identifying the infringing videos in the first instance.

way to implement a repeat infringer policy.  Cheah Supp. Decl., ¶ 9.  More than *75* of the videos in Plaintiffs' Complaints were uploaded during this period of non-compliance.  Berkley Suppl. Decl., ¶¶  2, 4 & Exs. 1, 3.  The self-serving declaration of Vimeo's in-house counsel, claiming that Vimeo "has implemented a policy of terminating the accounts of repeat infringers pursuant to the DMCA since its inception," is unsupported.  Cheah Supp. Decl., ¶ 8.  The documents he submits are random e-mails that in fact show no tracking of repeat offenders prior to *November 2008*.  *See* Cheah Supp. Decl., ¶¶ 8 & Exs. 4.  (Cheah did not begin work at for Vimeo until December 2009*, Cheah Depo.*, 17:9-12, and Staff that were working then could not identify any policy [SUF 370-374]); *Datatech Enters. LLC v. FF Magnat Ltd.*, 2012 WL 4068624 at *4 (N.D.Cal. Sept. 14, 2012) (conclusory claims of a formal policy insufficient).

Even after Vimeo purportedly implemented a "purgatory" system in *November 2008* (which it claims tracks repeat infringers), Vimeo's policy (if it had one at all) was not effectively implemented.  Vimeo's unique policy counted as a single "strike" all takedowns within 72 hours (no matter how many infringements), and no "strikes" were given for takedowns of infringing content without DMCA notice.  *Compare Viacom*, 718 F. Supp. 2d at 528 (two-hour period employed by YouTube).  SUF 384; Cheah Supp. Decl., ¶ 6.  Vimeo claims to have terminated "at least 89 user accounts" as repeat infringers, but only provides as "evidence" an unexplained spreadsheet that refers only to one video for each of these accounts and does not indicate that the users were terminated, let alone as repeat infringers and pursuant to a repeat infringer policy. Cheah Suppl. Decl., ¶ 9 & Ex. 5.

Only in 2011, only after this lawsuit was filed and after Plaintiffs pointed out to Vimeo all of the infirmities of its policy, did Vimeo finally adopt and communicate a repeat infringer policy.  SUF 375, 382-83.  Plaintiffs themselves identified from Vimeo's records no fewer than 6 users who should have been terminated as repeat infringers, but who were not terminated until

18

Plaintiffs identified them.  Vimeo did not even block IP addresses of "repeat infringers" and, contrary to Vimeo's assertion (Opp. at 4), even after these belated terminations, at least two of the users apparently *still* have active accounts.  Berkley Suppl. Decl., ¶¶ 8-14, Exs. 6-11; SUF 393; *see A&M Records, Inc. v. Napster, Inc.*, 2000 WL 573136, at *9 (N.D. Cal. May 12, 2000) ("Napster has not shown that it reasonably implemented a [repeat infringer] policy" because "Napster does not block the IP addresses of infringing users.")

## IV.   VIMEO IS INELIGIBLE FOR SAFE HARBOR FOR OTHER REASONS.

1.   <u>Failure to Expeditiously Remove Infringing Content.</u>  The Court need look no further than the infringing videos posted by its own employees and those they viewed (*see* pp. 12 to 14) for conclusive evidence that Vimeo did not expeditiously remove infringing content or enforce a repeat infringer policy.  These videos were posted as early as January 2007, and were not removed until December 31, 2009, or later.  Berkley Supp. Decl., ¶ 15 & Ex. 12; SUF 400. Further, Vimeo admits that infringing videos were made available for download as many as two years after Vimeo initially claimed they were removed.  The failure to remove them alone is disqualifying.  This failure was true not only for Plaintiffs' videos, but also for videos claimed by third parties to be infringing.  SUF 401, 403.  Vimeo cannot evade responsibility by characterizing this as an "error" or "bug."  There is no "error" or "bug" or "negligence" exception to the DMCA, and the harm to copyright owners is the same regardless of the reason. Nor can Vimeo claim that it did not have any duty to remove these videos because they were not brought to its attention via a DMCA notice.  Vimeo is required to "expeditiously remove the infringing content" of which it has DMCA "notice" *or* other "knowledge."  *Viacom*, 676 F.3d at 27-28; *see Fonovisa v. Napster, Inc.*, 2002 WL 398676 at *11 (N.D. Cal. Jan. 28, 2002).

2.   <u>Preventing Identification of Infringing Content.</u>  Vimeo does not dispute that it prevents copyright owners from viewing "private" videos, which comprised 9.5% of all Vimeo

videos in 2010.  But "private" is a misnomer.  Vimeo can access and view these videos and they can be viewed by up to 1000 "public" users or by anyone supplied a password.  *See* 17 U.S.C. § 101 (defining "public performance").  Providing a means to shield infringement from discovery by copyright owners is contrary to the DMCA.  Vimeo's excuse that Plaintiffs did not have "any trouble" identifying infringing content (Opp. at 4) is peculiar.  Only *after* Vimeo produced a database of videos (including private videos), could Plaintiffs identify multiple private videos with obvious indicia of infringement.  Before that only Vimeo could.  SUF 25, 26.

   3. <u>Conduct Outside the Scope of "Storage."</u>  Content downloaded by Vimeo to its users then resides on the ***user's*** computer and no longer "resides on a system or network controlled or operated by or for" Vimeo, as required by section 512(c)(1).  Vimeo does not respond to this argument, and contrary to its assertion, this specific argument was not addressed in *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011).

   4. <u>Pre-1972 Sound Recordings.</u>  Vimeo's opposition does not address pre-1972 recordings.  As noted in Plaintiffs' motion, this issue has not been addressed by an appellate court and the DMCA's plain language limits its applicability to claims for federal ***copyright infringement***.

<u>**Conclusion**</u>

   Plaintiffs respectfully submit that Vimeo's motion for summary judgment should be denied and Plaintiffs' motion for partial summary judgment should be granted.

DATED: December 21, 2012      MITCHELL SILBERBERG & KNUPP LLP
      New York, New York

                   By: /s/ Russell J. Frackman
Christine Lepera (ctl@msk.com)     Russell J. Frackman (*pro hac vice*)
12 East 49th Street, 30th Floor      11377 West Olympic Boulevard
New York, New York  10017      Los Angeles, California 90064-1683
Telephone:  (212) 509-3900      Telephone: (310) 312-2000
                   *Attorneys for Plaintiffs*

20