D7IBCAPC                          Oral Argument

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CAPITAL RECORDS, LLC, a
     Delaware limited liability
4    company, et al.,,

5                  Plaintiffs,

6            v.                              09 CV 10101 (RA)

7    VIMEO, LLC, a Delaware
     limitied liability company
8    doing business as Vimeo.com,
     et al.,
9
                  Defendants.
10
     ------------------------------x
11                                          New York, N.Y.
                                            July 18, 2013
12                                          10:13 a.m.

13   Before:

14                    HON. RONNIE ABRAMS,

15                                          District Judge

16                      APPEARANCES

17   MITCHELL SILBERBERG & KNUPP LLP
          Attorneys for Plaintiffs
18   RUSSELL J. FRACKMAN

19   QUINN EMANUEL URQUHART & SULLIVAN, LLP
          Attorneys for Defendants
20   ROBERT L. RASKOPF
     RACHEL HERRICK KASSABIAN
21   TODD ANTEN
     JESSICA A. ROSE
22
     ALSO PRESENT:
23        JAMES BERKLEY, Paralegal

24

25

D7IBCAPC                         Oral Argument

1            (In open court)

2            THE DEPUTY CLERK:  In the matter of *Capital Records v.*

3    *Vimeo*, Docket Number 09 Civil 10101.

4            Counsel, please state your name for the record.

5            MR. FRACKMAN:  Good morning, your Honor.  Russell

6    Frackman, Mitchell Silberberg & Knupp.  With me is James

7    Berkley, a paralegal from our law firm.

8            THE COURT:  Good morning.

9            MR. RASKOPF:  Good morning, your Honor.  Robert

10   Raskopf from Quinn Emanuel with my colleagues, Jessica Rose,

11   Todd Anten and Rachek Kassabian.

12           THE COURT:  Good morning.  We're here for oral

13   argument on Vimeo's motion for summary judgment and plaintiffs'

14   partial motion for summary judgment.

15           I have the morning set aside.  How long do you expect

16   your presentation to take?

17           MR. RASKOPF:  I think, Judge, our presentation just

18   straight out will be maybe 40 minutes.

19           THE COURT:  I think that makes sense because it will

20   give each of you time to respond.

21           MR. RASKOPF:  All right.  We'll try to keep it to 40,

22   maybe 45 tops.

23           THE COURT:  Okay.  That sounds good.  We've been

24   having problems with the acoustics in the courthouse since

25   we've returned here.  So I would just encourage you to speak

D7IBCAPC                          Oral Argument

1    into the microphone or at the podium, because there's a

2    microphone there, as well.

3            MR. RASKOPF:  Will do.

4            THE COURT:  Okay.  Why don't we start with you, with

5    Vimeo.

6            MR. RASKOPF:  Thank you, your Honor.  I appreciate it.

7            So, as I said, my name is Robert Raskopf.  My

8    colleagues at the counsel table here.  I would like the Court

9    to know that also representing Vimeo in the courtroom today are

10   Michael Cheah, Vimeo's general counsel.

11           THE COURT:  Good morning.

12           MR. RASKOPF:  And Ed Ferguson, who is associate

13   general counsel of Interactive Corp.--

14           MR. FERGUSON:  Good morning, your Honor --

15           MR. RASKOPF:  -- which is Vimeo's parent company.

16           THE COURT:  Good morning.

17           MR. RASKOPF:  Your Honor, we all think Vimeo is a

18   picture-perfect candidate for complete DMCA safe harbor

19   protection and we plan to show you why this morning.

20           So what is Vimeo?  Vimeo identifies itself as "Video

21   and You."  Vimeo hosts and enables the sharing of original,

22   high-quality, user-generated videos.  It was started by a

23   couple of guys in a garage -- maybe not in a garage, but

24   working part time -- in 2004, nine years ago, which is a

25   century ago by internet standards.  But Vimeo now has 12.3

D7IBCAPC                    Oral Argument

million users who upload 43,000 videos a day.  Vimeo is one of
the 130 most-visited websites on the entire internet.

THE COURT:  Approximately how many employees does
Vimeo have?

MR. RASKOPF:  Vimeo now has approximately 74
employees.  At the time this complaint was filed in 2009, it
had 20 employees.

There are over 31 million videos at Vimeo.  I should
tell the Court that Vimeo is also an award-winning website.  It
provides notable user tools and quality video technology.
Vimeo is basically for anyone interested in video.  It's the
prototypical success story that Congress sought to enable when
it enacted the DMCA 15 years ago.

Organizations like the White House, CNN, the New York
Times, Yale Law School, the Metropolitan Museum, Viacom, Warner
Brothers, are registered Vimeo users.  You've got entertainers
like Beyoncé, Van Halen, Jason Reitman.  They have accounts.
At Vimeo, Judge, you can see home videos, animation,
documentaries, indie films, shorts, time-lapse videos.
Original user-generated videos are the touchstone of the
company's business.

So Vimeo just can't, doesn't, and isn't designed to
review every video that's uploaded every day.  As your Honor
asked, and as I told you, we had 20 employees in 2009, when the
complaint was started, filed, and we're up to 74 now.  But any

 1   way you do the math, Vimeo doesn't work that way.  It can't

 2   work that way.  Basic Vimeo membership, I should tell your

 3   Honor, is free of charge.  There are some enhanced services

 4   available, for example, for a fee through a Vimeo Plus

 5   membership.

 6          So, Judge, what does Vimeo represent?  It's an

 7   appealing product.  It promotes creativity, above all else.

 8   It's an acclaimed corporate citizen.  It's a clear winner in

 9   the internet space.  So why is Vimeo here?  Well, that is the

10   one question I think only plaintiffs can answer.  Because in

11   this case I know that the plaintiffs' agenda is not to have

12   clips with their music taken down expeditiously.  It's not to

13   follow the DMCA.  Both before and after they filed their case

14   against Vimeo, whenever they sent us, Vimeo, a DMCA notice, we

15   took down the identified clips expeditiously.  This is an

16   ambush.  No DMCA notice ever came.  They just filed.  After we

17   got the complaint, we took down the clips anyway, just so your

18   Honor knows.

19          Now, your Honor, there are a set or a series of

20   requirements, sort of introductory requirements, for an ISP, an

21   internet service provider, to qualify for DMCA safe harbor.

22   Let me call them the structural requirements because they

23   don't pertain directly to the clips in suit, the 199 clips in

24   suit.  In a nutshell, Judge, once DMCA's -- DMCA compliance

25   system has to be up and running.

D7IBCAPC                        Oral Argument

1             My partner, Rachek Kassabian, with the Court's

2    permission, will address DMCA's system now, but then I would

3    return, with your Honor's permission, to just deal with the

4    case-specific question of whether under Viacom, the Viacom

5    decision of the Second Circuit, Vimeo had knowledge of or was

6    willfully blind to any of the 199 clips in suit.  Sneak peak,

7    Judge:  The answer is no, not a single one.

8             With the Court's permission, may I turn it over to

9    Rachel?

10            THE COURT:  Yes, absolutely.

11            MR. RASKOPF:  Thank you.

12            MS. HERRICK KASSABIAN:  Good morning, your Honor.

13   Rachek Kassabian of Quinn Emanuel for Vimeo.

14            THE COURT:  Good morning.

15            MS. HERRICK KASSABIAN:  As the Court knows, and as my

16   colleague, Mr. Raskopf, just alluded to, the DMCA lays out a

17   series of requirements that all ISPs must meet in order to

18   obtain safe harbor.  We've briefed them extensively for your

19   Honor and we believe that Vimeo satisfies them all.

20            With your permission, your Honor, we'd like to hand up

21   a small binder with a few demonstratives in it for your

22   reference and convenience.  We've shared them with opposing

23   counsel about 20 minutes ago.

24            May we approach?

25            THE COURT:  Yes, you may.

D7IBCAPC                        Oral Argument

1              MS. HERRICK KASSABIAN:  Thank you.

2              THE COURT:  Thank you.

3              MS. HERRICK KASSABIAN:  So, your Honor, at Tab 1

4    you'll just find a nice, handy list of the prerequisites for

5    safe harbor, but I'd like to tick through and demonstrate

6    Vimeo's satisfaction of each.

7              First, of course, you have to be a service provider to

8    claim safe harbor, and Vimeo is.  The plaintiffs don't dispute

9    that.  In fact, on the very first page of their brief, they

10   call Vimeo a service provider.

11             Next, of course, you have to have a registered agent

12   for receiving notices and a working DMCA notification system.

13   It is undisputed that Vimeo has both of those things.  And I

14   would refer the Court to paragraph 31 of our statement of

15   undisputed facts, where those facts are not in dispute in this

16   case.  Vimeo has had a registered agent for more than seven

17   years, and Vimeo's policies and procedures for complying with

18   the DMCA are all laid out in its on-line terms of service.

19             Next, you have to have adopted and reasonably

20   implemented a repeat infringer policy.  And Vimeo has done

21   that.  By that what I mean is Vimeo terminates the accounts of

22   users whose uploaded videos have been the subject of multiple

23   DMCA notices.

24             THE COURT:  Can we actually talk about this for a

25   minute?  In your view, what's the relevant date for determining

D7IBCAPC                          Oral Argument

1   whether Vimeo had an adequate repeat infringer policy?

2              MS. HERRICK KASSABIAN:  Well, your Honor, the closest

3   authority we have found for that is the *Wolk v. Kodak* case from

4   this district last year, which basically looked at the time

5   period in which a DMCA complaint, or rather notice, was sent to

6   the service provider.  And the Court looked, at that time

7   frame, what was the status of the repeat infringer policy?

8              So here, of course, we don't have the benefit of

9   having ever received a DMCA notice from the plaintiffs

10  regarding the 199 videos in suit.  The closest thing we have is

11  the complaint itself.  So it's our position that that's the

12  relevant time period.  You look to when we received some form

13  of notice.  A complaint is not a compliant DMCA notice, as

14  cases like *Perfect Ten v. Amazon* have held, but that's the

15  closest thing we have here to a DMCA notice.  So that would be

16  December of 2009.

17             THE COURT:  I should just ask, what evidence is

18  there that Vimeo had adopted a repeat infringer policy prior to

19  2008?

20             MS. HERRICK KASSABIAN:  That would be in the Cheah

21  declaration, your Honor.  And let me grab my list of

22  exhibits.

23             THE COURT:  Sure.  Just while you're getting that, the

24  Purgatory tool was implemented in November of 2008.  Is that

25  right?

D7IBCAPC                            Oral Argument

1          MS. HERRICK KASSABIAN:  That's right.  So Purgatory

2    basically automated the process on a larger scale because at

3    that point, by the fall of 2008, Vimeo was receiving more DMCA

4    notices.  Obviously its service was growing, it was becoming

5    more popular.  So it chose to automate the process and

6    implement a software program to help it track repeat

7    infringers.  Before that-- and, your Honor, that's the

8    Supplemental Cheah Declaration Exhibit 4 that talks about

9    before that.

10         So before Purgatory was implemented, the record is

11   undisputed that Vimeo was receiving roughly five or less DMCA

12   notices per month.  That's about one e-mail a week.  So in that

13   earlier time period, what Vimeo did was tracked repeat

14   infringers manually.  And typically Vimeo would actually

15   terminate accounts after receiving only a single or maybe two

16   notices.  One or two strikes, in other words, was often

17   sufficient to terminate an account back in those early days.

18         THE COURT:  Is there any documentary evidence of that?

19         MS. HERRICK KASSABIAN:  Yes.

20         THE COURT:  I see you're turning to Exhibit 4.

21         MS. HERRICK KASSABIAN:  Yes.  Exhibit 4 shows examples

22   of user accounts that were terminated by Vimeo under the repeat

23   infringer policy before November of 2008, when the process

24   became more automated.

25         THE COURT:  Okay.  And let me just ask you one more

1   question.  When did Vimeo start using rap sheets?

2              MS. HERRICK KASSABIAN:  Sorry.  I just wanted to make

3   sure I made that clear on the record.  It's the Supplemental

4   Cheah Declaration at Exhibit 4 that has the pre-November 2008

5   examples of terminations of accounts.

6              THE COURT:  Okay.

7              MS. HERRICK KASSABIAN:  The rap sheet was implemented

8   right around the same time, in the fall of 2008.

9              So Vimeo has terminated thousands of accounts over the

10  years, many of which were terminated for specifically violating

11  Vimeo's repeat infringer policy.  And Vimeo does more than

12  simply terminate accounts.  It actually goes above and beyond

13  what the DMCA requires in at least two ways:  When an account

14  is terminated, Vimeo tracks that e-mail address and makes sure

15  that a new account is not opened with that same e-mail address.

16  It's not a requirement, but Vimeo does it.  Vimeo also uses

17  software technology to make sure that the same file, video

18  file, that was blocked as a result of a DMCA notice is not

19  simply reuploaded again in a different account by a different

20  user.

21             Now, on this issue, EMI tries to manufacture some

22  dispute by saying, Well, we don't like the manner in which

23  you've implemented your policy.  We don't like the fact that if

24  multiple DMCA notices can come in within the space of a

25  three-day period, you count that as a single strike.

D7IBCAPC                          Oral Argument

1          Well, that's an immaterial quibble with our policy

2     because, as we know, Congress left it to ISPs to define the

3     precise contours of their policies based on what makes business

4     sense as long as the letter and spirit of the repeat infringer

5     policy requirement was implemented.  And we know this not just

6     from Congress, but also from the Viacom decision, where a very

7     similar argument was made by Viacom regarding YouTube's policy.

8          So YouTube also has a policy of considering multiple

9     notices received within a certain time frame as a single strike

10     for purposes of tracking repeat infringers.  And the Court

11     rejected Viacom's argument and found that policy reasonable at

12     page 528 of the first district court decision in Viacom.

13          So the bottom line here is that reasonable

14     implementation is what's required and that's what Vimeo has

15     done.  There are no dispute on the material facts of Vimeo's

16     repeat infringer policy.

17          If your Honor doesn't have any other questions about

18     repeat infringer, I'm happy to move on to the next element.

19          THE COURT:  You may.  Thank you.

20          MS. HERRICK KASSABIAN:  So, finally, Vimeo has to not

21     interfere with standard technical measures used by rights

22     holders.  This is an easy one because no statute and no Court

23     has ever defined or identified any agreed-upon standard

24     technical measure.  There do not appear to be any at the moment

25     in the law that have to be observed.

D7IBCAPC                        Oral Argument

1          And certainly in the briefing plaintiffs have not

2     identified any candidates either.  All they point to is the

3     fact that Vimeo users have the options of making their videos

4     private.  They argue that somehow that's an interference with

5     standard technical measures, but it's not.  There's no

6     authority holding that a privacy feature offered to website

7     users would automatically disqualify you as an ISP from seeking

8     safe harbor.  It doesn't make any sense.  In fact, there are

9     many, many video websites that offer such a privacy feature for

10    users.  It's not an interference with the standard technical

11    measure.

12          THE COURT:  Does that make it harder for them if they

13    go on Vimeo to find potentially infringing videos?

14          MS. HERRICK KASSABIAN:  Your Honor, if a video is

15    marked private, it can only be viewed by the account holders

16    who have authorization and anyone they choose to share it with.

17    So if it's not shared with a copyright holder, they would not

18    see it, nor would anyone else.

19          THE COURT:  Right.  So if they went on Vimeo and they

20    did a search for Let It Be or some other song, and there were

21    some videos that had the song Let It Be on it that were

22    password protected, those videos would not come up in that

23    search.

24          MS. HERRICK KASSABIAN:  That's exactly right.  And we

25    know from the *Viacom* Second Circuit decision that offering or

1   limiting access to user tools, such as in the *Viacom* case

2   content I.D. tools, does not constitute interference with

3   standard technical measures.  And that's at page 41 of the

4   Second Circuit decision.  So that issue has already been

5   decided in this circuit.

6        And the *Wolk v. Kodak* case found very similarly.

7   There, there was a photo editing feature that the plaintiff was

8   claiming allowed users -- not the service, but users -- to, if

9   they wanted, to take off copyright watermarks.  Obviously the

10  editing tool could be used for any number of things and that

11  was one of the things that the plaintiffs said constituted an

12  interference with the standard technical measure.

13       And *Wolk*, just like the Second Circuit in *Viacom* said,

14  no, offering user tools like that is not an interference.  And,

15  of course, the person using that tool, if for alleged nefarious

16  purposes, if they chose to remove a watermark would be the

17  user, not the service.

18       So those two decisions have rejected arguments very

19  similar to what the plaintiffs are making here.

20       So, your Honor, having satisfied the prerequisites for

21  safe harbor, I'd like to move on and talk about the specific

22  requirements under Section 512(c) for safe harbor for

23  user-generated content sites.  And you'll see at Tab 2 in your

24  binder, we've got just for a reference tool the handy checklist

25  of requirements.  And let me walk through them and tell you why

D7IBCAPC                         Oral Argument

1    they're all satisfied here.

2            So there's no question that Vimeo stores videos at the

3    direction of its users.  That is undisputed, and I'd refer the

4    Court to paragraph 5 of the statement of undisputed facts.

5            Now, again, to try to create a dispute here on this

6    record, EMI says, well, okay, fine, maybe you do store videos

7    at the direction of users, but you also let users download

8    those videos.  So that download feature can't qualify for safe

9    harbor.  That's not stored at the direction of the user.  But

10   that argument has already been rejected at least twice.

11           We know from the *UMG v. Shelter Capital* case in the

12   Ninth Circuit that downloading does qualify as a

13   storage-related function because it's part of the ISP's service

14   to facilitate access to user-uploaded materials.  And we also

15   know from the Second Circuit's *Viacom* decision that -- and I'm

16   quoting here -- "The safe harbor extends to software functions

17   performed for the purpose of facilitating access to user-stored

18   material."  That's at page 39 of the Second Circuit's opinion.

19   And there functions like transcoding and playback were at

20   issue, which *Viacom* argued was not part of storage at the

21   direction of a user, and the Second Circuit rejected that

22   argument.  So there are no triable issues on that issue.

23           Second, Vimeo does not have the right and ability to

24   control infringing activity on its service.  It is undisputed

25   that Vimeo cannot control what a user chooses to upload to

Vimeo's website.  And, of course, courts are clear, crystal
clear, that the right or ability to take down content that
might be complained about -- for instance, in a DMCA notice --
after the fact, that doesn't satisfy the "right and ability to
control" test.  Because of course if it did, then the takedown
requirements in one section of the DMCA would automatically
disqualify you under the "right and ability to control" prong
in another part of the DMCA.

       *So instead the Second Circuit in Viacom said, well,*
*something more is required.  The service provider must exert*
*"substantial influence on the activities of its users."  And in*
*defining what that means, the Second Circuit pointed to two*
*examples.  First they said, well, there's the Cybernet* case out
in California.  That is the only reported decision that we're
aware of -- and it was the one that the Viacom case pointed
to -- where the service provider was found to have the right
and ability to control infringement on its site.  And there, of
course, what I *Cybernet* was doing was it was monitoring
prescreening and providing editing instructions and final
approvals to each and every account holder that wanted to join
*Cybernet's* Adult Check service.

       So that's one way you can have a right and ability to
control if you're prescreening and editing and actively
participating in each and every file or video uploaded to your
system.

1          The other way that the Second Circuit pointed to is

2     *Grokster*.  The Court said, well, okay, if you are inducing,

3     actively participating in, encouraging, facilitating

4     infringement on a massive scale, à la *Grokster*, that could

5     constitute right and ability to control in certain

6     circumstances.

7          So here the plaintiffs have pointed to certain

8     curating features on Vimeo and they say that's it.  That's the

9     substantial influence that the Second Circuit was talking

10    about, but it's not.  So, for instance, they say, well, Vimeo

11    offers technical assistance and answers questions when users

12    submit them.  But, you know, offering a standard tech support

13    desk and responding to user questions, as most websites do, at

14    least the ones we like, does not make Vimeo in any way, shape

15    or form an active participant in what users end up doing or not

16    doing with whatever answers they might receive in response to

17    their questions to tech support.  But offering tech support

18    does not, again, defeat safe harbor for ISPs.

19         THE COURT:  I guess one question I have is how a

20    service provider as big as Vimeo or YouTube would ever be found

21    to have the right and ability to control infringing content if

22    prescreening was always required.

23         MS. HERRICK KASSABIAN:  So the Second Circuit said

24    it's not always required.  Right?  It is one example of active

25    participation.  Now, in *Cybernet* it was prescreening of every

1    single video-- or, sorry, every single account, but the Court

2    also said if there is active inducement and participation in

3    user infringements, encouragement of infringement, like there

4    was in Grokster and similar P2P file sharing cases, the Court

5    said that's another scenario where you could be found to have

6    the right and ability to control.

7           But I guess what I'm saying here, your Honor, is our

8    facts are not even anywhere in that universe.  So

9    hypothetically what facts could there be to find right and

10   ability to control?  I can imagine a number of scenarios that

11   might fit under the Second Circuit's analysis, but we're not

12   even close to that here so it's immaterial in terms of what

13   could be the case.  Discovery's closed.  The record's closed.

14   There's nothing even approaching inducement à la Grokster or

15   the type of *Cybernet*-style active participation in editing and

16   scripting and approving particular content that's going up on a

17   site.

18          Plaintiffs also point to moderator tools.  They say,

19   well, Vimeo has these moderator tools.  They allow employees to

20   tag videos or mark videos after they've been posted.  And they

21   say, well, that's substantial influence over the content of the

22   videos, and of course it's not.  The videos have already been

23   created by the user and uploaded by the user.  Flagging it or

24   tagging it or marking it after the fact does not in any way

25   have any impact on the substance of the video and whether it's

1   infringing or not.  But even if it did, the record is

2   undisputed that far less than even 1 percent of all of the

3   videos on Vimeo have ever been interacted with via a moderator

4   tool in any way.

5          THE COURT:  I don't have that chart in front of me,

6   but of the 199, it was somewhere, I think, between 55 and 61

7   that had been interacted with--

8          MS. HERRICK KASSABIAN:  That's right.

9          THE COURT:  -- in some way.  Is that right?

10          MS. HERRICK KASSABIAN:  That's right.  Fifty-five I

11   believe was the number.

12          THE COURT:  And were any of those plaintiffs -- sorry.

13   Give me one second.

14          (Pause)

15          THE COURT:  This is one of them.  I'm just looking at

16   one that appears was not interacted with in any way.  Let's

17   take Let It Be from the Beatles just as an example.  If an

18   employee had seen that and either put on a like to it or buried

19   it or done something else, with a song that's so well known,

20   what, if any, obligation would you think that employee had?

21          MS. HERRICK KASSABIAN:  Your Honor, I think that the

22   mere presence of commercial music, especially a song that's 40

23   years old, 30 years old, I do not think that that rises to the

24   level of saying that there is some knowledge conferred and some

25   obligation to do something about it in the absence of anything

1  else.

2            We all know that the use of commercial music or any

3  kind of music in a video or other creative enterprise can

4  certainly be authorized.  It can be a fair use.  It just might

5  not even be something that the copyright holder cares about.

6  It may be something that they actually like or aren't bothered

7  by.  So, no, it would not be a clear example of infringement.

8            I should also say, your Honor, that Mr. Raskopf is

9  going to address knowledge --

10           THE COURT:  Yes, I jumped around.  I apologize for

11 that.  You can continue the way you were proceeding.

12           MS. HERRICK KASSABIAN:  That's okay.  But in terms of

13 right and ability to control, again, moderator tools, flagging

14 a tiny, tiny, minuscule percentage of all of the videos on

15 Vimeo, in any way marking it, however you might-- however the

16 plaintiffs have described it, none of that has anything to do,

17 though, with right and ability to control, the actual creation

18 and uploading of the content.

19           And, of course, next they say, well, Vimeo has

20 guidelines for use of its site.  So that constitutes

21 substantial influence on the videos uploaded to the site, but

22 that also doesn't satisfy the test.  I mean, virtually every

23 user-generated content site out there has guidelines, has

24 rules, terms of service.  We've all seen them.

25           The most recent on remand Viacom district court

1  decision by Judge Stanton just three months ago held

2  specifically that "enforcing basic rules regarding content,

3  such as limitations on violent, sexual or hate material" does

4  not constitute evidence of right and ability to control.  And

5  that is at page 9 of the Westlaw citation for the remanded

6  district court decision.

7       THE COURT:  In analyzing right and ability to control,

8  should I be looking at the total videos on Vimeo that employees

9  interact with or only the 199?

10      MS. HERRICK KASSABIAN:  Your Honor, I think that the

11 Second Circuit opinion established that there's no specific

12 knowledge requirement for right and ability to control.  It can

13 be more on a platformwide or sitewide basis.  Either way it's

14 not satisfied here.

15      In fact, I mean, to suggest-- I mean, the rule that

16 the plaintiffs really take issue with here in terms of Vimeo's

17 guidelines is they say, hey, you know, you prohibit infringing

18 content.  You encourage original context.  You tell people not

19 to upload rips and music videos.  It's just ironic that that

20 would be a term of service or a guideline that the plaintiffs

21 would use or take issue with to try to suggest that Vimeo

22 should be deprived of safe harbor for discouraging

23 infringement.  So that just doesn't come close to satisfying

24 the test.

25      Instead it's clear from the thrust of the plaintiffs'

1    brief is that what they're really saying is we think Vimeo has

2    the right and ability to control because they're the next

3    *Grokster*.  That's really what they're saying here.  They

4    allege, accuse, that Vimeo induces, actively participates in

5    user infringement of those 43,000 videos uploaded every single

6    day on a massive and sitewide scale like a peer-to-peer

7    file-sharing service.  And nothing could be further from the

8    truth.  There is no evidence whatsoever in the record to

9    support that accusation.

10           They say, well, okay, there's a handful of e-mails

11   where there are some stray comments from employees that we

12   don't like.  And they say, oh, well, there's some lip dubs.

13   There's a couple of lip dub videos where people are singing

14   along and dancing around to a song and horsing around and they

15   put up the video on Vimeo of a lip dub.  And they say, well,

16   you know, that kind of evidence equates to the kind of massive

17   sitewide fostering of infringement that courts have found in

18   the P2P file-sharing cases.  And, again, it's just not a

19   credible argument.

20           I think probably the first Viacom district court

21   decision said it best when it said, "The Grokster model does

22   not comport with that of a service provider who furnishes a

23   platform on which its users post and access all sorts of

24   materials as they wish."  And that's at page 514 of the first

25   district court decision.  A platform that receives and

1   processes DMCA notices like Vimeo, it's not a *Grokster*.  A

2   platform that's a good internet citizen like Vimeo is not a

3   *Grokster*.

4          You can just see the difference in the P2P cases that

5   the plaintiff cites that they just have no application here.

6   In *Grokster* the Court found that 90 percent of the files on

7   that platform were infringing.  In Aimster the Court found that

8   Aimster "predicates its entire service upon furnishing a road

9   map for users to find, copy and distribute copyrighted music."

10  Obviously, Vimeo doesn't do anything like that.

11         This is not *Arista v. Lime Group* either, which the

12  plaintiffs also cite, where the Court found that the LimeWire

13  service was "overwhelmingly for infringement."  The P2P cases

14  have no application here and this argument in support of a

15  claim that Vimeo as a platform for uploading and hosting user

16  videos somehow falls within that paradigm just doesn't hold

17  water.  There is no right and ability to control here.

18         And, fourth, even if Vimeo could control what users

19  choose to upload 43,000 times a day, it does not receive any

20  direct financial benefit attributable to that infringing

21  activity.  It's undisputed that Vimeo users pay nothing to view

22  content.  It's also undisputed that the vast majority of

23  Vimeo's revenues come in the form of subscription fees for

24  premium accounts.  And the account holders who choose to have

25  premium accounts, they pay the same regardless of what types of

D7IBCAPC                          Oral Argument

 1    videos they choose to create and upload to Vimeo's system.  And

 2    we know from the 1998 House and Senate reports preceding the

 3    enactment of the DMCA that that sort of a content-neutral, flat

 4    service fee is not the type of direct financial benefit that

 5    Congress was talking about.

 6           Now, Vimeo also receives some revenues from

 7    advertising, as described in the Mellencamp declaration.  But

 8    that advertising is not contextual in that it does not depend

 9    on the type of video posted; whether the video is infringing,

10    whether it has music, whether it doesn't.  That has no impact

11    on the advertising.

12           Same with the so-called house ads that the plaintiffs

13    point to.  They say, well, you have ads for Vimeo premium

14    accounts on some of these pages so that must be a direct

15    financial benefit, but it's not.  There's no evidence at all in

16    the record that any users have ever signed up for a premium

17    account because they saw and clicked on and followed through

18    with an ad that was displayed on a web page displaying an

19    allegedly infringing video.

20           And, lastly, I think plaintiffs say, well, music is a

21    draw on Vimeo, so that is a direct financial benefit.  But of

22    course they're conflating music with infringing music.  Music

23    being a draw is completely immaterial.  The whole world likes

24    music.  It's not a draw-- offering music and having that

25    attract people to your site has nothing to do with direct

D7IBCAPC                         Oral Argument

financial benefit under the DMCA.  You have to show that people

are coming to your site and using it and you're making money

specifically because you offer a haven for infringement.  And

of course Vimeo doesn't and there's no record of that.

          We also know from the 2013 Ninth Circuit Shelter

Capital decision that just offering commercial music or using

commercial music in videos is not the type of draw regarding

infringement that the Congress was talking about regarding the

financial benefit prong.  So there's no evidence, no

connection of any kind, between any infringement and any

financial benefit that Vimeo might receive as part of its

service.

          And, finally, under the last prong of the safe harbor

test you have to, as an ISP, respond expeditiously to any DMCA

notice that you receive.  And of course this is an easy one

here because of the 199 videos in suit, not one of them was

subject to a DMCA notice.  Vimeo did not receive any DMCA

notices regarding any of the 199 videos in suit.

          So that means that Vimeo was not obligated to

expeditiously respond to anything, but it doesn't matter

because Vimeo did.  Upon receiving the complaint in the middle

of December of 2009, right before the holidays, Vimeo treated

this lawsuit like a DMCA notice, even though there's no

obligation to do that, and it expeditiously blocked all of the

videos at issue in the attachments to the complaint within a

D7IBCAPC                    Oral Argument

1   couple of weeks.  And that is expeditious under any standard.

2   There's no case that I'm aware of finding that a two-week

3   processing time period for a noncompliant DMCA notice is not

4   expeditious; or even, frankly, for a compliant one.

5           In sum, your Honor, I really appreciate the time

6   you've given me here today to share this with you.  We don't

7   think there are any hard questions at all here.  We think this

8   is a very clean, open-and-shut case, just involving a direct

9   application of the Second Circuit's Viacom decision to our

10  undisputed record here.

11          We think that Vimeo's system under the DMCA is

12  compliant, it's reasonable, and we satisfy the test.  This is

13  precisely the type of case that the DMCA was meant to apply

14  to.

15          THE COURT:  Thank you.

16          MS. HERRICK KASSABIAN:  Thank you.  I'd like to turn

17  it back over to Mr. Raskopf to discuss Vimeo's lack of

18  knowledge of the videos in suit.

19          MR. RASKOPF:  Thank you, your Honor.  So let's turn to

20  those 199 clips in suit.

21          THE COURT:  Yes.  I'm sorry I got ahead of myself

22  there.  I apologize.

23          MR. RASKOPF:  Well, you're way ahead of me, too, so

24  I'm glad to see that.

25          We already know from Viacom that some general

D7IBCAPC                         Oral Argument

awareness that there's some infringing activity on the website

can't be substituted for knowledge of a particular clip in

suit.  No general information addresses the knowledge

requirement.  Under Viacom we have three types of knowledge:

Actual knowledge, red flag knowledge, and willful blindness.

Again, all three types of knowledge must concern the particular

clips in suit.  Generalities don't matter; particulars do.

This can't be disputed.

        So what's plaintiffs' evidence of Vimeo's knowledge of

the particular clips in suit?  And, your Honor, in our demo

binder at Tab 5 is a little aid if you would care to look at it

as we move forward.  And you'll immediately see that your Honor

is way ahead of me, if you do, because we identified the 199

clips, which is at the top, and there are only 55 clips in

suit.  The first 144 of the 199, the plaintiffs have brought

you zero proof that Vimeo is even aware of them.  Zero.  No

evidence at all.  So under Viacom, absent any knowledge of

them, these clips are safe harbored.

        So as to the 55 where they even claim that Vimeo was

aware of them, let's discuss.  The best plaintiffs' evidence

shows is that someone at Vimeo watched the video.  Now, we

dispute that the evidence shows even that.  We pointed it out

in our opposition and reply brief.  We showed you why, on pages

15 to 16 of the brief, a lot of these tools don't necessarily

indicate that someone actually watched the video by a mile.

D7IBCAPC                          Oral Argument

1          But let's assume arguendo that plaintiff actually

2     proved that Vimeo watched these 55 videos.  Well, that's not

3     nearly enough to confer knowledge under Viacom.  Because to

4     lose safe harbor under Viacom, Vimeo must encounter

5     infringement that is blatant or obvious -- not just a seemingly

6     innocuous home video with music -- in order for infringement to

7     be obvious.  Vimeo must know a lot more about the music in the

8     video than merely that the video exists.

9          And what I've done for your Honor is I gave you Tab 6,

10    which I think fairly succinctly outlines the gaps in

11    plaintiffs' case.  The demonstrative is entitled "Awareness is

12    not equal to obvious infringement."

13         So let's just run through the checklist.  First, Vimeo

14    has no know that the video contains music.  Now, in some cases

15    that means that Vimeo must have watched the video all the way

16    to the end, because that's where the music is, or the part in

17    the middle or some other part.  But as I said, let's just go

18    past that.  Here's where they fail completely:  Vimeo must know

19    that the music is not in the public domain.  Is Vimeo supposed

20    to have in mind the public domain status of every song ever

21    made just as it hears the music in the video?  What if the

22    person at Vimeo who's looking at the music or listening to the

23    music in the video doesn't recognize it?  Does Vimeo know the

24    song at all?

25         It gets deeper and more difficult for plaintiff as we

D7IBCAPC                    Oral Argument

1    move forward.  Does Vimeo know that the uploader owns the music

2    in the video?  And much of this was made in the Viacom case,

3    the phenomenon of stealth marketing, where you have an owner of

4    copyrighted music who wants a viewer to think that she is

5    looking at an unauthorized copy, when in fact she's not.

6    Stealth marketing, you know, a relatively new marketing tool,

7    but widespread, supposedly adds appeal to the content.  So how

8    is Vimeo supposed to know if the music in a particular clip is

9    being stealth marketed in that video?

10              Let's take another one.  Vimeo must know that the

11   uploader doesn't have a license.  How is Vimeo supposed to know

12   that?

13              THE COURT:  Let me just ask you this about the entire

14   argument you're making now.

15              MR. RASKOPF:  Sure.

16              THE COURT:  How could a service provider ever be found

17   to have red flag, put aside actual knowledge, in light of the

18   arguments you're making?  What would an example of that look

19   like?

20              MR. RASKOPF:  I can give you I think a reasonable

21   example of that, your Honor.  Red flag knowledge, one that we

22   think in which it would be fair to argue that red flag

23   knowledge had been established, would be if Vimeo received an

24   e-mail from a user that says, "I just uploaded to Vimeo a

25   complete rip of a feature-length film that I didn't make at the

D7IBCAPC                         Oral Argument

1   following URL and I didn't have permission to do it," and that

2   comes into Vimeo.

3           Now, those are facts that would make a reasonable

4   person conclude that that particular video is obviously or

5   blatantly infringing.  That's the standard.  So here's an

6   example of a situation in which Vimeo could reasonably be

7   charged with red flag knowledge.  The standards are very high.

8   That is the standard which has been set in the Viacom case, so

9   I'm merely reciting to your Honor the law in the circuit.  So

10  you have the stealth marketing problem.

11          Now the licensing problem.  How is Vimeo supposed to

12  know whether the thing is licensed or not?  And Judge Stanton

13  weighed in on this issue in his first Viacom opinion in 2010.

14  He said, "If an ISP can't determine if the music is licensed

15  just by inspecting it"-- really by inspection-- "it lacks

16  knowledge that the music is infringing."

17          Vimeo must also -- to have knowledge, to have red flag

18  knowledge-- and every one of these -- this is a cumulative

19  thing.  Vimeo has to also know that the copyright holder

20  actually objects to the use of the music in the videos.  Again,

21  Judge Stanton wrote about that.  And it makes sense.  I mean,

22  after all, some artists think it's good business not to object

23  to a video when their music is used in the video.  It's good

24  marketing.  No problem.  I don't object to that.  I like it.

25  I'm flourishing because someone else is using my music in a

D7IBCAPC                          Oral Argument

1     way that doesn't hurt me at all.  Perfect sense.  Marketing

2     101.

3                 THE COURT:  I think they would say, I imagine, that it

4     is hurting them because that means that people aren't buying

5     their songs on iTunes.  Instead, they're getting it through

6     Vimeo.  Right?

7                 MR. RASKOPF:  Well, that depends on the kind of song

8     it is and the kind of video it is.  It would depend on a lot of

9     things.  But I would say not completely, Judge.  And certainly

10    some people would say that and other people would say, no, not

11    at all.  I love it that my music is being used in this little

12    video.  The point is, how is Vimeo supposed to know?  It's not

13    who's right or wrong in that particular debate.  It's that we

14    are bystanders in that debate.  That's the key.  We're an

15    internet service provider.

16                Finally, Vimeo must be able to tell just by watching

17    the video, by mere inspection, according to Judge Stanton, that

18    the use of the music is not a fair use.  Now, this can be--

19    copyright fair use is a fairly complex area.  It's, I'd say,

20    daunting for copyright lawyers let alone lay persons.  Let's

21    not forget that the entity closest to most, if not all, of

22    these questions that are in Tab 6 of your demo binder is the

23    plaintiff.  But they, of course, refuse to send us a DMCA

24    notice.

25                Now, you don't have to take my word for it how

1   difficult these determinations are because the very industry

2   association that represented the plaintiffs, the Recording

3   Industry of America, the Recording Industry Association of

4   America, has admitted it.  Believe it or not, the RIAA sent the

5   very first DMCA notice to Vimeo, that Vimeo ever received, in

6   April of 2006.  That notice concerned eight videos.  It's at

7   Tab 8 of your exhibit binder.  It's a small exchange, but I'd

8   really like to draw your attention to the correspondence.

9   Starting at the bottom of the chain, it's the last e-mail in

10  your-- in Tab 8 and then we'll work our way up to the front.

11          So first e-mail is from RIAA.  By the way, they come

12  in at-- they notify you that they are antipiracy at riaa.com.

13  So the e-mail chain starts as follows:  "I am contacting you on

14  behalf of the RIAA and its member record companies."  This is

15  the takedown notice.  Now, this is 2008, Judge-- I'm sorry.

16  2006?  Okay.  2006.

17          So back in 2006, seven years ago, with the DMCA

18  protocol being brand new to him, Vimeo's founder, Jake Lodwick,

19  wrote back to the RIAA.  That's the second e-mail.  So Jake

20  writes back.  He gets a DMCA takedown notice.  Get rid of these

21  eight.  You guys are infringing, whatever.  And Jake writes

22  back, "I received your notice about the removal of music video

23  clips from Vimeo.com.  I was happy to remove most of them, but

24  the first three in your list were not actual music videos with

25  the RIAA artists, but rather homemade music videos.  Could you

D7IBCAPC                        Oral Argument

1    please clarify your policy on these clips?"

2           Next e-mail.  It's in yellow.  I think it's

3    highlighted in yellow, Judge.

4           THE COURT:  It is.  Thank you.

5           MR. RASKOPF:  Okay.  The next one is sort of a-- the

6    initial stern, and probably canned, response from RIAA back to

7    Jake:  "The three videos referenced use sound recordings

8    without permission from the copyright owner.  These videos are

9    infringing and must be removed."  Standard stuff probably.

10   Just guessing.

11          To which Jake replies-- and Jake goes back.  Jake is

12   interested.  He writes back, founder of Vimeo, wants to learn

13   the story, trying to work it out, writes back, "Has RIAA

14   pursued legal action for this type of video in the past, using

15   copyrighted music in the background, but with noncopyrighted

16   video playing?  I ask because this seems to open a new can of

17   worms for you guys."

18          Final response from RIAA:  "Please disregard our

19   message relating to the following three videos," and those were

20   the three videos that Jake brought to their attention in the

21   first place.  So not even the most knowledgeable and ardent

22   defenders of recorded music rights, the owners themselves,

23   claim that every video and music is infringing.

24          In sum, Judge, none of the 55 videos here raise even a

25   plausible claim for Viacom to find knowledge because of all of

1   the questions we laid out.

2            Now, plaintiffs try to salvage 10 of the 55 clips as

3   to which there was someone at Vimeo who may have touched it in

4   some way.  And these ten they claim -- and it's in your-- back

5   to your Tab 5.  The little chart that starts with 199 and ends

6   with zero.  We're down to the last ten.  So these ten

7   supposedly were uploaded by Vimeo employees and, therefore, not

8   stored at the direction of the user.  And for various reasons

9   that argument also fails.  First--

10           THE COURT:  Can I just stop you before you get into

11   the ones uploaded by employees?

12           MR. RASKOPF:  Sure, Judge.

13           THE COURT:  What relevance, in your view, is there of

14   some of the e-mails in the record-- I'm looking at Exhibit 116

15   and Exhibit 180, for example-- where there are questions posed?

16   One e-mail is written to Vimeo and says, "I have noticed

17   several people using copyrighted material on Vimeo.  What do

18   you do about this?"

19           The answer from someone at Vimeo is "Ignoring, but

20   sharing."

21           Another e-mail, Exhibit 180, "Hey, guys, I see all the

22   time at Vime videos, (for example lip-dub) music being used

23   that is copyrighted.  Is there any problem with this?  Can I do

24   it?  Thanks."

25           Answer:  "We allow it, however if the copyright holder

D7IBCAPC                        Oral Argument

1    sent us a legal takedown notice, we would have to comply.  Best

2    wishes."

3              I don't need to go through all of them, but what is

4    your response with what I should do with them?

5              MR. RASKOPF:  They're totally irrelevant.  Zero.

6    Every one of those does not deal with a specific clip in suit.

7    It must be the clip in suit under Viacom that is the subject of

8    a discussion in order for there to be any relevance to it.

9    That is where we are here, Judge.  None of those e-mails, and

10   there are a few, out of 23,000 documents that we produced in

11   the case, that sort of one-on-one e-mails as opposed to what

12   the whole website -- what people see when they visit the

13   website completely, are relevant.

14             We have a standard response, and I think we produced

15   something like 80 examples of it, when someone asks us about

16   what do you do with copyright?  How do you handle it?  There's

17   a standard response in the declaration of Michael Cheah at

18   Exhibit 1.  That is exactly what is ordinarily submitted.

19   Okay.  The supplemental declaration, not the original

20   declaration.

21             But the bottom line is, Judge, that these are

22   completely irrelevant because you need knowledge of the

23   particular clip in suit.  That's where it has to be.  None of

24   those e-mails have anything to do with the 55 that are the

25   subject-- well, it's 199, but 144 there's nothing on them.  But

1    even the 55, that I've gotten now down to 10, there's not a

2    single connection between one of those e-mails and my clips.

3              So let's go to the --

4              THE COURT:  Well, just one more question, if I can.

5              MR. RASKOPF:  Sure, Judge.

6              THE COURT:  Why wouldn't it be an issue for the jury,

7    let's say looking at the 55 number, as to what exactly the

8    knowledge was?  And if Vimeo, for example, is willfully blind?

9    I mean, why is that an issue for the jury to look at?  Look,

10   how does burying exactly work and what did they know?  Why is

11   that not a factual question for the jury?

12             MR. RASKOPF:  Because all of those issues, there is no

13   evidence whatsoever in this record -- and we have had a full

14   record.  We've had full discovery.  There's no evidence in this

15   record -- and it's plaintiffs' burden to come forward with

16   it -- that there was any of these discussions such as, let's

17   say, I don't want to hear about that video or, you know,

18   anything that relates -- there's nothing that relates to the 55

19   videos.  So there is no issue of fact because it hasn't been

20   created.

21             What we have is simply an association between one--

22   there's no discovery on, an association-- and discovery is

23   over.  An association between one video and the video.  You

24   know, bury-- bury doesn't even mean that-- buried does not even

25   mean that it was necessarily observed.

1          But we're past that because even if you assume that

2     they were watched, there's no evidence that there was anything

3     more than that they were watched in this record, and that

4     doesn't nearly get you home under Viacom.  It's just not

5     enough-- there's no evidence.  It's not a question of whether

6     there's something out there that was observed in discovery that

7     is before the Court.  There isn't anything.  They've completely

8     chronicled everything they had in terms of what Vimeo's

9     relationship is to the 55 videos and not one of them sheds any

10    light on all of the questions that I put to your Honor in that

11    demo tab for the very reason that there's no evidence.

12         THE COURT:  Thank you.  I'm sorry, you were starting

13    to talk about employee evidence.  I didn't mean to take you off

14    track.

15         MR. RASKOPF:  Sure, Judge.

16         So, first, of the ten remaining clips in suit, three

17    of them were uploaded by one user named Julia Heffernan, who

18    only later became a Vimeo employee.  Long before she became

19    employed by Vimeo.  So knowledge of these videos can't be

20    imputed to Vimeo.  She wasn't employed by Vimeo when she

21    uploaded them, so they were obviously stored at the direction

22    of a Vimeo user at the time they were uploading.

23         Three more of the remaining ten were uploaded by

24    people who were never Vimeo employees, Messrs. Fishel and

25    Blumenfeld, who worked on a website called CollegeHumor that's

1    owned by Connected Ventures, but they don't work for Vimeo.

2                So those clips, those three clips, were also stored at

3    the direction of a user.  So we're really down to four videos

4    as to which is a claim because those videos were, indeed,

5    uploaded by users who were also video employees at the time of

6    the upload.  Those clips aren't official Vimeo videos or

7    otherwise made at Vimeo's behest.  There's zero proof in this

8    record that Vimeo solicited them, that asked that they be made.

9                Ms. Dae Mellencamp, Vimeo's president, put in a

10   declaration in this case saying that there are only a couple of

11   videos that are made by Vimeo employees such as those made for

12   the Vimeo Video School.  So the four in issue here aren't about

13   Vimeo at all.  If you look at them, you'll see in a second that

14   they're not.  They're personal videos.  I mean, you're not

15   required to quit your membership in the human race or your zest

16   for using Vimeo to upload your personal videos when you become

17   a Vimeo staffer.  You're still also a Vimeo user.

18               So I think holding otherwise would mean that Vimeo

19   staffers would have to stop using Vimeo personally because

20   Vimeo would become automatically responsible for their content.

21   These employees, most, if not all, of whom were Vimeo users

22   long before being Vimeo employees, would need to stop using the

23   video site for their personal videos.  So we are now down to

24   zero, Judge.

25               THE COURT:  When employees upload or when they do

D7IBCAPC                          Oral Argument

1   anything, whether it's a like or it's called white-listing or

2   burying or anything -- I guess I have a question of exactly how

3   it works.  The employees have a badge on it.  Right?  So if an

4   employee says I like this or an employee uploads something, it

5   will indicate that a Vimeo employee did that.  Right?  Because

6   there will be a badge icon of sorts.  Is that right?

7            MR. RASKOPF:  Yes, your Honor.

8            THE COURT:  I just wanted to make sure that I

9   understood that.

10            MR. RASKOPF:  That's all right.  But, as I say, it

11   doesn't mean that the mere fact that whatever they're doing has

12   something next to it does not mean that they're created in

13   their official capacity.  I think all you have to do is look at

14   the videos and you'll see that.

15            So for the sake of completeness, I'll briefly address

16   willful blindness.  Under Viacom the only other way to

17   demonstrate knowledge is to show that Vimeo was willfully blind

18   to obvious -- obvious -- infringement in the clips in suit.

19            And as I stated earlier under Viacom, evidence of

20   willful blindness, like both actual and red flag knowledge,

21   must relate to the individual clips in suit.  So there's no

22   evidence at all in this record-- I know you asked me about it,

23   but there's no evidence at all in this record that Vimeo was

24   willfully blind to any of the 199 clips we just addressed.

25   They don't really make an argument to the contrary.

1          Infringement --

2          THE COURT:  What is the difference, really, in this

3   context between willful blindness with the specific instance of

4   infringement and red flag knowledge?

5          MR. RASKOPF:  Sure.  I gave you the example of red

6   flag knowledge.

7          THE COURT:  Right.  What would an example of willful

8   blindness in this context be?

9          MR. RASKOPF:  Okay.  So Vimeo gets an e-mail from a

10  user, and the e-mail says I just uploaded to Vimeo a complete

11  rip of a feature-length film that I didn't make and I didn't

12  have permission to do so.  Let's say that that particular user

13  has five hundred videos in his account.  So he says, Do you

14  want me to send you the URL for the video?  I just uploaded and

15  ripped the Man of Steel.  It's playing right now.  I uploaded

16  it.  I don't have a right to it, but this kind of thing

17  happens.

18          And so the user says, do you want me to send you the

19  URL?  Meaning that if that URL is submitted, then Vimeo has

20  specific knowledge of a specific location for a specific clip.

21  And instead of saying okay, Vimeo says, nah, don't send us the

22  URL.  We don't want to know about it.  Okay?  So there you have

23  a situation in which Vimeo has deliberately avoided

24  confirmation that a particular video is infringing in the face

25  of facts suggesting a high probability that it is.  Now, this

D7IBCAPC                          Oral Argument

1    is the law.  That's the law.  That's what willful blindness is.

2                   Red flag knowledge is facts that make a reasonable

3    person conclude that a particular video is obviously or

4    blatantly infringing.  This is the law we have.  And so we talk

5    about the Beatles, we talk about any-- these are videos that

6    happen to have music.  And we went through the list of things

7    that can't be known by Vimeo.  And certainly none of this

8    rises, not even close, not one of these clips rises, with the

9    evidence that's been presented -- discovery's over, motion for

10   summary judgment.  Someone's got to raise a genuine issue of

11   material fact as to the specific clips in suit.

12                   And, your Honor, we don't believe that a single clip

13   qualifies to go beyond this point.  We think every one of these

14   clips deserves safe harbor for the reasons that I stated at

15   this time.

16                   Thank you.

17                   THE COURT:  Thank you very much.

18                   Mr. Frackman.

19                   MR. FRACKMAN:  Thank you, your Honor.  If I may impose

20   on the Court, they took my watch downstairs when I came in.  So

21   if you can give me-- is there a clock here?

22                   THE COURT:  Yes, there is.  So I'll let you know.

23                   MR. FRACKMAN:  Part of the problem that I have

24   responding is kind of the problem we had in doing our briefs.

25   There's an embarrassment of riches here and I, frankly, don't

D7IBCAPC                        Oral Argument

1      know where it's best to begin, so I'll begin at the end if I

2      may.

3                  THE COURT:  Sure.

4                  MR. FRACKMAN:  I do suggest to the Court that not only

5      is there a lot of material and a lot of evidence recited in our

6      briefs, but frequently what the Court will find and what I

7      found is that some of the same materials and some of the same

8      documents and some of the same evidence overlap these various

9      issues and so they have to be considered in a certain extent as

10     a whole.

11                 Let me make one quick comment while it's in my head on

12     blindness.  It seems to me the inability of Mr. Raskopf to

13     provide a reasonable, understandable example of either willful

14     blindness or of red flag knowledge goes back to really how he

15     ended his presentation, which is how they began this case and

16     how they began their brief:  The DMCA is a notice and takedown

17     statute.  That's what almost everything he said comes down to

18     and that's what the Viacom case said is not the law.

19                 So if you dissect -- and I'll start with willful

20     blindness.  I didn't quite understand the example, but I must

21     say, if your policy, if your stated internal policy, is, among

22     other things, don't ask/don't tell, then Mr. Raskopf's example

23     disappears and there is no willful blindness under those

24     circumstances.

25                 And, indeed, your Honor, I would suggest as with

D7IBCAPC                         Oral Argument

knowledge, as with right and ability to control, as with

inducement, you end up with -- again, as Mr. Raskopf argued,

you end up with just complete freedom on the part of the

internet service provider no matter what it says, what it does,

what it instructs, what its policy is.

        THE COURT:  So is your argument, just to clarify, that

the defendant need not be willfully blind to a specific

instance of infringement but to the possibility of infringement

generally?

        MR. FRACKMAN:  It's neither of those, your Honor.

It's somewhere beyond general knowledge because it requires

something on the part of the ISP.  It requires them to

construct a service that is willfully blind.  It doesn't mean

that just with general knowledge of infringement and nothing

more, but if there's infringement going on and you construct a

service that makes you willfully blind-- and I would submit is

intended to make you willfully blind-- then you are willfully

blind to the infringement that's going on on the service.

        Just like in Aimster, your Honor, that the person who

ran the Aimster service constructed something so that he would

be willfully blind to everything.  He had a system set up so

that he could argue plausible deniability.  And the Court in

Aimster, Judge Posner said, well, in those circumstances you

have knowledge.  And I think if you read the Viacom opinion --

        THE COURT:  Well, I was actually going to turn to

1     that.  I was going to ask you how I'm supposed to read the

2     language from the Viacom decision stating that "the willful

3     blindness doctrine may be applied in appropriate circumstances

4     to demonstrate knowledge or awareness of specific instances of

5     infringement under the DMCA."  What do I do with that under

6     your theory?

7          MR. FRACKMAN:  I think what you do with it, your

8     Honor, and as I read it, and as I think the only way to read it

9     is, after all, you can't have specific knowledge of something

10    that you're blinding yourself to.  It's just a logical

11    inconsistency.

12         So I think what the Court is saying, and does actually

13    say, is that willful blindness imputes knowledge, a deliberate

14    effort to avoid guilty knowledge, imputes the necessary

15    knowledge.  And quoting from the eBay court, here's what the

16    Second Circuit said:  A service provider is not permitted

17    willful blindness.  "When it has reason to suspect that users

18    are infringing a protected mark, it may not shield itself from

19    learning of the particular infringing transactions."

20         And going on, quoting, "The willful blindness doctrine

21    may be applied, in appropriate circumstances, to demonstrate

22    knowledge or awareness of specific instances of infringement."

23    It's implied.  It's implicit.  It's the penalty you pay for

24    setting up a system where you're using copyrighted material and

25    then you shield yourself from making a determination.  You

D7IBCAPC                         Oral Argument

1    don't ask; you don't tell.  As Mr. Pile said, we ignore music.

2            All of these, by the way, all of these internal

3    documents are far more important than Mr. Raskopf alluded to,

4    and I'll get to that in a moment.

5            They set up their entire website globally and

6    intentionally and told everybody to be willfully blind.  If

7    they hadn't been, as we pointed out in our papers, it would

8    have been readily obvious -- and I think they admit it -- it

9    would have been readily obvious that these were commercial

10   recordings that could not be used without permission.  They had

11   the names of artists.  They had the names of record companies.

12   They had all the indicia of being a copyrighted commercial

13   recording.

14           THE COURT:  Do you have evidence that Vimeo was

15   willfully blind to any of the specific videos in suit?

16           MR. FRACKMAN:  The specific ones in suit?

17           THE COURT:  Yes, the 199.

18           MR. FRACKMAN:  The reason I can't directly answer that

19   is because I don't see how anybody could be willfully blind to

20   a direct-- to a specific infringement, to a specific use.  It's

21   either red flag knowledge or it's actual knowledge or, at the

22   end of the day, you've built a system where your willful

23   blindness demonstrates -- as the Court said, demonstrates --

24   knowledge.  It's separate, obviously, from both red flag and

25   from actual.  It's separated by the Court from both of those.

1          So the answer to your Honor's question is, no, I can't

2     point to one because I wouldn't know how to point to one.  I

3     really wouldn't.  And I don't know-- I don't think Mr.

4     Raskopf's example was an example of willful knowledge, and I

5     don't know how anybody could point to one unless you accept

6     what I think is the reasonable interpretation.

7          And you do have to go beyond-- you do have to go

8     beyond generalized knowledge.  You have to look at what they

9     were doing here.  You have to look at how they built their

10    system.  You have to look at how they ignored music.  You have

11    to look how they didn't put music as something that was

12    forbidden.  You have to look at they didn't flag music.  You

13    have to look at how they white-listed infringing music and made

14    it available.  You have to look at all of those things and

15    more.  You have to look at how they didn't remove stuff.  You

16    have to look at how they induced -- and we'll get to that --

17    invited, taught.

18          THE COURT:  What do you think a company like that, a

19    service provider, that has 70-some-odd people, what should

20    their obligation be to look into every song that, what, that

21    they recognize?  I mean, as a practical matter, what do you

22    think they need to do?

23          MR. FRACKMAN:  Well, let me take that for a moment,

24    your Honor, because those are two different questions.  Maybe

25    they're ten different questions, actually.

1          The first thing is absolutely and without a doubt if

2      they induce infringement -- if we're talking about right and

3      ability to control, you gave, I think, Mr. Raskopf a couple of

4      examples of documents.  And he said, well, those don't refer to

5      clips in suit.  They don't have to.  They're inducement

6      evidence.  And inducement evidence does not refer, as the

7      Viacom court was crystal clear, does not deal with specific

8      infringements.  If you induce, you're liable.  And they

9      induced.  So that's number one.

10          Number two, in terms of knowledge, if I can go through

11      it, I think there are several layers to it.  Let me start with

12      the staff.  There is evidence in our reply documents that the

13      way they wanted to characterize the ten people is just not

14      accurate and not based on the records that we have.  But

15      leaving that aside, there's no doubt that those ten individuals

16      made, uploaded, and appeared in infringing videos.  Most of

17      these wore a badge.  They're not users.  Their job

18      responsibilities included making videos.  They were frequent

19      users.  They were told to make videos to inspire other users.

20      They didn't just create these; they uploaded them.  They were

21      identified with them.  The music was identified.  And it was

22      accessible both on the website and in their profile pages.

23          So there's no way that you could disassociate those

24      people from that material.  And, clearly, they knew.  They knew

25      because when they had their depositions taken-- well, anyone

D7IBCAPC                        Oral Argument

 1   would know, I would think, that if you copy the Beatles, you're

 2   infringing somebody's rights.  But when they had their

 3   depositions taken, they, frankly, admitted how they made it.

 4   And the website teaches others how to make infringing videos,

 5   including with the step of purchasing an MP3 from iTunes, a

 6   commercial recording, and syncing it into your video.

 7           I would submit there's no way to get away from those.

 8   By the way, just as an aside, Mr. Fishel was an employee of

 9   Connected Ventures.  We've shown that Connected Ventures at the

10   time owned Vimeo.  Connected Ventures is a defendant in the

11   case.  A minor point, because I think all ten of those are

12   swept under the rubric of knowledge, of actual knowledge.

13           The other ones -- and I'll work my way up to the ones

14   where they commented or liked, which, again, was part of their

15   job; specifically instructed to do that.  In order-- and they

16   testified in order to like something -- and it's logical, of

17   course -- you have to see it.  And when you see it, when you

18   see these, you know.  You know that they're by artists, in our

19   case a whole laundry list of artists who clearly are commercial

20   artists.  And I won't read them to you in detail, your Honor.

21   You have them in the exhibits to our complaint.  But they

22   include, of course, the Beatles, Fergie, Nelly, The Four Tops,

23   Gladys Knight, The Jackson 5, Tupac.  There's something for

24   everybody there.  But they're clearly commercial recordings for

25   which there is no permission.

1        Now, let me answer a couple of questions on that, on

2   how would we know.  First of all, the issue of maybe they're

3   licensed is a red herring.  As some of the courts say, and I

4   think most frequently in *Fung*, record companies don't go around

5   licensing individual people to use their recordings and videos.

6   They just don't do it.

7        Number two, if they did, it would be a license to that

8   individual.  It wouldn't be a license to Vimeo to use it on its

9   own website in a commercial purpose, for a commercial purpose,

10  and obviously a very lucrative one.  That's what they make

11  their money out of, those videos which they say are enhanced

12  greatly by music.

13       THE COURT:  When you say that's how they make that

14  money, are you talking through advertising? subscriptions?

15       MR. FRACKMAN:  I'm talking about several different

16  things.  If I can finish this one thought first--

17       THE COURT:  Please, go ahead.  Absolutely.

18       MR. FRACKMAN:  -- I'll try and come back to that.

19       THE COURT:  Absolutely.

20       MR. FRACKMAN:  If I could make a note.

21       And, your Honor, Vimeo knows it's not licensed.  It

22  talked about gets licenses.  A little bit more willful

23  blindness there.  It talked about getting licenses, but decided

24  that they didn't want to spend the money.  So the license issue

25  I think in many ways shows the weakness of that aspect of the

D7IBCAPC                          Oral Argument

1    case:  How would we know?

2            Fair use, the same.  Fair use is a defense to an

3    individual user.  First of all, there's no evidence here that

4    any of these constituted fair use.  Second of all, this is not

5    the time to discuss fair use.  That's at the liability stage.

6    And, third, it's not Vimeo's defense.  We're talking about

7    direct infringement by Vimeo, not secondary liability in this

8    instance where you have to have a direct infringer.  They're

9    the direct infringer.  It's not fair use.

10           And, your Honor, we quoted Professor Jane Ginsberg in

11   our papers, who basically said -- and I think it's

12   self-evident -- that if those arguments succeed, then no

13   service provider can ever have knowledge because they always

14   can say that.  They've come up with another one now:  Maybe

15   it's in the public domain.  Well, again, no service provider

16   could ever be found liable.

17           My colleague pointed out to me that if you look at

18   Mr. Pike's video, one of the ten, and he is-- I'm sorry,

19   Mr. Pile's video; he doesn't write very well-- he's one of the

20   ten and he was a chief development officer.  It's about Vimeo.

21   The Street Team video is about Vimeo.  Some of these are

22   directly about Vimeo and how you disassociate yourself from

23   that.  And this was-- I have to emphasize this was their job.

24   Their job was to make music videos to inspire.  Similarly,

25   their job was to comment and like videos to inspire; to put

D7IBCAPC                        Oral Argument

1    them on staff channels where everybody was automatically

2    subscribed.

3          THE COURT:  But is this different from what Judge

4    Pauley found in the MP3/TCase?  I believe that he found that

5    personal uploads of employees were personal actions that were

6    not within the scope of employment and could not be imputed to

7    the employer.  How is this different?

8          MR. FRACKMAN:  This is different, your Honor-- and I'm

9    not sure he was talking about uploads or downloads there.

10   That's different.  I seem to recall he was talking about

11   downloads, but I may be mistaken.  If you give me a minute, I

12   might be able to...

13         THE COURT:  Sure.

14         MR. FRACKMAN:  At the moment I can't locate it.

15         THE COURT:  That's okay.  You may proceed.

16         MR. FRACKMAN:  Let me make the point that from my

17   point, it doesn't matter.  What we have here is that this was

18   their job.  This was their job.  It had their badge next to it.

19   It was on their profile page.  They were instructed to do this

20   as part of their job.  And whether it happened -- although I

21   don't think it did -- before or after, the fact of the matter

22   is it continued to be performed after they became monitors or

23   community members.  That's an infringement.  That performance

24   is an infringement and they definitely were then part of Vimeo.

25         So if I can, just very quickly, we do have a chart

D7IBCAPC                    Oral Argument

 1    that was submitted to the Court that basically shows of the 199

 2    works, ten were uploaded by employees, 25 were commented or

 3    liked on, and frequently when you look at these comments or

 4    likes, you can tell that they've obviously seen the material

 5    and they testified that they would have seen it in order to

 6    comment or like on it.  Two are on staff channels, 20 are

 7    white-listed.  Your Honor knows what white-listing means.  They

 8    can't be flagged.

 9         It's more evidence of willful blindness, by the way.

10    They can white-list an entire user and it makes no difference

11    what you put up after that.  You're a good guy, as

12    Ms. Mellencamp says.  You're a good guy and you can put up

13    whatever you want.  Twenty of ours are white-listed and there's

14    testimony that they look at stuff before they determine that

15    someone is a good guy and can be white-listed.  And four are

16    buried where you also have to look at the material before you

17    make that decision.

18         Then we also add to that, your Honor -- and Mr.

19    Raskopf didn't talk to about that -- the plus subscribers.

20    There are 30 plus subscribers.  And the testimony I think from

21    Ms. Allen was that they reviewed the accounts of plus

22    subscribers to make sure that they are compliant.

23         And I believe there's even a M.O.D. tool for that.  So

24    we add those and we end up with 56 of direct infringement

25    knowledge or, at the very least, because of what these

D7IBCAPC                              Oral Argument

1    reportings were, red flag knowledge.  There were recordings of

2    well-known artists and well-known songs without any license or

3    consent.

4           And, by the way, your Honor, I would point out there's

5    not a single declaration from any of these employees that says

6    anything about why they did it, when they did it, how they did

7    it, whether they knew or didn't know.  Nothing.  And I would

8    submit because they can't.  They can't.

9           If I can get from there to -- your Honor I think did

10   raise direct financial benefit.  And our view is, as we put in

11   our papers, is that there are several ways that there's a

12   direct financial benefit.  But the most direct way, I would

13   think, is because there are advertisements on the very pages of

14   our infringing recordings.  And not only that, but the

15   testimony is or the evidence is that Vimeo gets paid every time

16   somebody goes to that page.  Display advertisement.  They don't

17   even have to watch the video.  They're attracted to it maybe

18   because it says the Beatles.

19          They also have banner advertisements, little boxes,

20   where Vimeo gets paid every time there is a click.  So they get

21   paid directly from advertising revenue on the pages that have

22   our material.

23          In addition, those per-click advertisements are served

24   by Google.  They're AdSense advertisements.  And there is

25   testimony that they are targeted in some sense to the material

D7IBCAPC                          Oral Argument

1    on the website.

2            In addition, as we pointed out to the Court, there's

3    evidence of one major sponsor, CarMax, who decided and paid

4    Vimeo to sponsor the lip dub channel.  I believe it's 20 or 30

5    of our videos are lip dubs, as your Honor may know.  CarMax

6    advertised on pages that had infringing lip dubs and they were

7    attracted because of the very nature of the material of lip

8    dubs.

9            Finally, your Honor-- maybe not finally-- Vimeo

10   decided for its own purposes to have at least two tiers of

11   subscribers and their pro user pays more money.  And they

12   advertise for pro users right on the same pages that had our

13   infringing videos.

14           And then, finally, we get to two other points on

15   financial benefit.  One is ever since my great-grandmother went

16   to dance halls in the early 1900s, when music was played,

17   infringing music was played, some infringing music was played,

18   it was a draw.  And all you have to do is look at these videos

19   and turn down the music and you can see how important the music

20   is.  And they recognized how important the music is.  It

21   enhances; their word, I believe.  It's a new type of music

22   video is what one of the founders I think called it.

23           The draw is there.  It's self-evident.  It's the use

24   of intellectual property and it brings people either to the

25   website or permits them or makes them or encourages them to

D7IBCAPC                    Oral Argument

 1    stay on the website.  And the amount of the resulting financial

 2    benefit is, at this stage of the game, not relevant.  It's just

 3    not relevant.  That's a damage issue.  As long as it's a

 4    draw -- and they knew it was a draw.  They said it was a draw.

 5    They encouraged it to be a draw.  And as your Honor knows, the

 6    bar for direct financial benefit in the cases has been set very

 7    low.  In this case we clearly, clearly, pass that bar.

 8           Now, I can also point out to your Honor, as we pointed

 9    out to the Court, the term "lip dubs," which were inevitably

10    and necessarily infringing, using commercial music -- in fact,

11    they taught their users how to infringe by making lip dubs and

12    encouraged them-- was one of the top, five top, referral terms

13    from search engines.  They--

14           MR. BERKLEY:  Seven.

15           MR. FRACKMAN:  They embedded the word "lip dub" in

16    their meta tags, in their code, even if the video didn't apply

17    to lip dubs because they knew people were looking for lip dubs.

18    It was also one of the top search terms, keyword search terms,

19    on Vimeo.  And a fair amount of those lip dubs were ours, were

20    infringing lip dubs, which kind of takes me, I think, maybe

21    directly to the issue of inducement.

22           THE COURT:  Can I just ask you a question about

23    knowledge before you get to inducement?  When I'm thinking

24    about whether your evidence of Vimeo interacting with the

25    videos in suit through liking or white-listing, et cetera, as

D7IBCAPC                        Oral Argument

we talked about, am I considering in your view a question of

law as to what constitutes knowledge or a question of fact that

should be decided by the jury?

          MR. FRACKMAN:  I think in this instance it's a

question of law because the key facts are undisputed.  The key

facts are undisputed.  We know that these people made them.  We

know how they labeled them.  We know they put them up.  We know

it was part of their job.  We know it was stamped "staff," and

we have evidence that it was during their employment.  It

doesn't matter whether it was during their employment.  We know

the specific videos.  And based on that, they have knowledge.

You know when you make one what it is and you know when you see

one that identifies it.  And most of these, if not all of

these, have clear identification of what the music is.

          So there really isn't anything, in my view, on those

55 plus, there isn't anything that would take that away from

the jury.  Moreover, if you took it away from actual knowledge,

it's clearly red flag knowledge.  Once they look at these those

videos and they see all the indicia of both what's within in

the video, which is our music, and how it's described, that

subject of knowledge applied to any reasonable person, the

conclusion would have to be -- knowing that you don't have a

license to do it, would have to be that there's red flag

knowledge, or else I would submit to the Court red flag

knowledge becomes pretty useless, becomes moot.

D7IBCAPC                          Oral Argument

1          THE COURT:  Do you have any evidence of knowledge or

2     awareness of the other videos other than the 55, the remaining

3     144?

4          MR. FRACKMAN:  The position we have on that, yes, your

5     Honor.  Here's how I would argue this.  And this is an

6     overflow, perhaps one of those areas to willful blindness.  The

7     Vimeo people knew that music was integral to their website, to

8     their videos.  It makes a good video great, is what they said.

9     The site really couldn't exist without music.  They built the

10    website in large part on lip dubs, on music.

11         On their face, the music is not incidental.  It's

12    throughout most of these videos.  It has all of these indicia

13    on it:  Famous artists, plaintiffs' names, credits.  Even

14    several we point out to the Court are actually videos of a

15    vinyl record that it has *Capital Records* on it.  Widely known

16    people.

17         And these people are sophisticated business people, on

18    a business that relies on intellectual property.  They protect

19    their intellectual property.  They even sell music now

20    themselves.  They even get licenses from their users, but not

21    from us, so they knew it had to be licensed.

22         We know that these people were trolling the website.

23    We know that they had tools to go through the website.  We know

24    at one time they were looking, they say, at every video.  As

25    that got more difficult, they developed tools to look at the

D7IBCAPC                          Oral Argument

 1    video.  We knew they were looking at tens or hundreds or

 2    thousands or more videos because they subscribed not only to--

 3    they not only got their own, but they subscribed to channels,

 4    to users.  They went on the website to see what was Vimeoesque.

 5    They went on the website to delete material.

 6         What we don't have, we don't have a declaration from

 7    any of these people saying what they saw or why they would not

 8    in the course of their exploration have seen these videos and

 9    have been able to determine through red flag knowledge that

10    they were infringing.  They know what a copyright is.  They say

11    that over and over again.

12         THE COURT:  But they have no affirmative duty to

13    monitor under Section 512(m).  Right?  So putting aside the

14    ones for a minute where there was some interactions, on the

15    other ones what's your argument?

16         MR. FRACKMAN:  They have no affirmative duty to

17    monitor, but-- and that's to monitor ab initio.  Once you start

18    to explore, filter, monitor -- in their words, police -- you

19    can't just do it to develop your website to ignore music.  And

20    that gets really to inducement, your Honor.  It gets really to

21    inducement.  But once you start monitoring for the purpose of

22    building a specific type of website, they set out to do

23    something here.  They set out to build a website that was not

24    YouTube.  That was different.  That would redefine the music

25    video.  That they would curate, curate by policing, monitoring,

D7IBCAPC                    Oral Argument

1   by setting up a system and a guideline-- and this comes true

2   over and over and over again.  We want -- our website is going

3   to be original videos.  Original videos, but not original

4   music.

5           They eschewed videos that were not original to the

6   user, but over and over again, when they saw it, when they

7   talked about it, when they put their guidelines up, the only

8   time we take down music is with a DMCA notice.  So we want good

9   music for these original videos, and that's going to be our

10  website.  And they went out to do it.  And the way they went

11  out to do it, your Honor, is how they induced.  It's both

12  inducement and control under *Cybernet*.

13          The control under *Cybernet* eliminated, in large part,

14  the videos or the users they didn't want.  Inducement, on the

15  other hand-- and these two joined together, although it's not

16  necessary under Viacom, that you have both inducement and

17  *Cybernet*-type control.  But the inducement part of it is how

18  they got the music.  And what they did -- purposeful conduct,

19  which is what inducement requires, exerting substantial

20  influence on the activities of users.  They wanted this user,

21  but they didn't want to pay for it, your Honor, I should say

22  because, as your Honor knows, they calculated what it might

23  cost, they budgeted for it.  We have 10 to 20 percent

24  infringing music on here.  Here's what the record labels are

25  going to ask for, but they didn't want to pay it.  So they

D7IBCAPC                    Oral Argument

1   induced their users to do it.  They broadcast a message to

2   stimulate others to commit violations.  That's a quote.

3          And they did it in the variety of means, one or two of

4   which your Honor pointed out to Mr. Raskopf.  Responses to

5   individual users which are evidence of inducement.  Hey, guys--

6   I'm reading, your Honor, from Exhibit 180.  "Hey, guys, I see

7   all the time at vime videos" -- it's a typo, Vimeo videos --

8   "(for example, lip dub) music being used, that is copyrighted.

9   Is there any problem with this?  Can I do it?

10          Answer from Mr. Verdugo, somebody high up in their

11   community:  "We allow it.  However, if the copyright holder

12   sent us a legal takedown notice, we would have to comply."

13   Back to DMCA takedown.  Back to the position that YouTube took

14   originally with Judge Stanton and the position that Viacom said

15   was absolutely wrong.

16          THE COURT:  Do you know if the person who wrote this

17   e-mail uploaded one of the 199 --

18          MR. FRACKMAN:  It doesn't matter.  It doesn't matter.

19   As the Court in Viacom said, there doesn't have to be knowledge

20   of any infringement, any specific infringement, as a result of

21   inducement.  When you induce, inducement doesn't have -- is

22   different than the knowledge segment.  When you induce

23   infringement and you fall under the right and ability to

24   control, you are liable for the results of that inducement.

25   You've induced infringement.  We show that there was

D7IBCAPC                         Oral Argument

1  infringement.  That's it.  That's it.  There's no specific

2  knowledge requirement.

3          In fact, what Viacom says, "We remand to the district

4  court to consider in the first instance whether the plaintiffs

5  have adduced sufficient evidence to allow a reasonable jury to

6  conclude YouTube had the right and ability to control the

7  infringing activity and received a financial benefit."  And

8  earlier "Both of these examples" -- *Cybernet* and *Grokster*,

9  inducement.  "Both of these examples involve a service provider

10 exerting substantial influence on the activities of users

11 without necessarily or even frequently acquiring knowledge of

12 specific infringing activity."

13         That's the price you pay.  And we do have evidence

14 that there was inducement of specific infringements.  There's a

15 very interesting series of-- or an e-mail string between

16 Mr. Pile and a user.  It's Exhibit 329.  The user says, "I have

17 seen you video on Vimeo (very well done) and we are jumping on

18 the bandwagon at our company and doing one for our end of

19 financial year party and possibly post it.  Did you apply for a

20 license to use the song?"

21         Here's what Mr. Pile says to the user:  "Michelle, we

22 don't have a license to use that song specifically, however we

23 do pay royalties on any music played on Vimeo."  Outright lie

24 and Mr. Pile admitted that in his deposition.

25         And then what happened is Michele, the user, put up

D7IBCAPC                         Oral Argument

her video with our music on it.  That's how inducement works

and that's how it worked here.

          And that wasn't the only example.  There are others.

There's a lip dub called Girls and Boys where I believe they

said they were inspired by a lip dub that Vimeo did.  So there

is evidence, but you don't need it.  They don't need to know

about specific infringements; we don't need to know about

specific infringements.  I think the law is clear on that going

back to *Grokster*.

          But if I can just take a few minutes to finish up on

inducement, because that's not the only way they induced.

That's not the only way they induced.  Their own infringements

were inducing.  Probably the most inducing evidence you can

find and probably unique to Vimeo, in terms of all of these

cases, if you go up on a website and you see staff members

putting up their own music, their own infringing music videos,

well of course what's the natural inclination, the natural

conclusion that you draw?  But they didn't -- and those

included videos by their founder, by their head of technology,

by the head of the community team, by the founder of Connected

Ventures.  These top guys are putting up vivid music videos,

infringing our copyrights by the way.

          So what more inducement can you have?  But there is

more.  They instructed people how to infringe.  They actually

gave instructions, including a couple of videos at least that

D7IBCAPC                           Oral Argument

1   infringed our rights.  Exhibit 53 is a lip dub, includes

2   Smashing Pumpkins, which is an EMI song.  And then on the same

3   page, here's what they said:  "Check out these lessons to learn

4   more about how you can make videos like this one.  And go to

5   Video 101," which is their tutorial, "editing sound and music

6   with Windows Live Movie Maker."  And you go to their tutorials

7   and they tell you to use commercial music.

8           This is an overwhelming case, your Honor, of

9   inducement.  There isn't another one out there.  And I'm not

10  finished yet.  They liked, commented, talked favorably.

11  Whether you call that knowledge or not -- and it certainly

12  is -- a user, when he or she sees a video that has infringing

13  music with a like or a comment, a favorable comment, by a staff

14  member, that's inducement.  That's inducement.  And bearing in

15  mind that lip dubs were their signature genre.

16          THE COURT:  To satisfy Section 512(c)(1)(B), do you

17  need to show that Vimeo induced infringement or do you need to

18  demonstrate that Vimeo's inducement of infringement reflects

19  its ability to control infringing context?

20          MR. FRACKMAN:  If I understand, your Honor, number

21  one, we did show that they induced infringement.  But since you

22  can't-- you don't have to tie inducement to specific

23  infringements by parity of reasoning, you don't have to show

24  that they induced a specific infringement.  And I think we

25  cited in our brief some authority for that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          The point is, as one of the courts said, maybe it's

2     Fung, it's not the specific videos; it's the construct that

3     Vimeo prepared and conveyed to the infringers.  They conveyed

4     the idea that this was permissible.  And once you do that,

5     you're liable for the consequences.  And once the Court finds

6     inducement, they're liable for the consequences for all of the

7     infringements that we are able to prove because that's how they

8     ran their website.

9          If you do whatever you can to have somebody do

10    something, you're responsible when they do it.  And when you

11    provide the information, the tools, the location, everything

12    that's needed to do it, you're liable for inducement.

13    Otherwise, inducement would disappear, essentially, because you

14    couldn't prove specific infringements.  And otherwise Viacom

15    would have said just the opposite of what the courts said.  It

16    would have said, Go back and see if you can prove inducement of

17    specific infringements.  The Court said, No, just the opposite.

18    Because you have the right and ability to control, you're

19    responsible for what you don't control, especially when you're

20    inducing people to do that.

21          So I hope I answered the Court's question.

22          I would point out to the Court, as your Honor probably

23    knows, we have in the wings either an amended complaint or a

24    new complaint that has a thousand infringements.  Many of these

25    were staff picks or modeled on staff videos, as well as others.

D7IBCAPC                        Oral Argument

1   So the inducement continues, if you will.

2              THE COURT:  You had asked me to tell you about time.

3   Why don't you take just a few more minutes and then we'll hear

4   responses from both sides.

5              MR. FRACKMAN:  Okay, your Honor.  So let me just

6   finish going through inducement, because we're still not done

7   with that.

8              Remember, they're broadcasting a message.  As I left

9   off, I think, they instructed people.  They communicated, they

10  had internal communications between themselves, among

11  themselves, which is another way to prove inducement.  They

12  refrained from specifically saying you can't use music, even

13  though one of their founders, Jacob Lodwick, sent a memo saying

14  "I think the text on the upload page must say you can only

15  upload a video if you are the copyright holder," and they

16  decided not to do that.

17             And these are, your Honor, all in the record, but they

18  did other things as well.  When they finally-- when they

19  started to respond to DMCA notices-- this is at SUF. 312--

20  Somebody is asking them, Mr. Verdugo, if they can use music.

21  And the response is, and it's typical, "Yes, you can, but if we

22  receive DMCA takedown notices from the copyright holders, we

23  have to comply with them."  What clearer message can there be?

24  Put it up.  It will stay up as long as we don't get a DMCA

25  takedown notice.  And your Honor knows, I think from our

D7IBCAPC                         Oral Argument

1    briefs, how difficult it is to continue to send DMCA takedown

2    notices.

3           They finally morphed to what they call their canned

4    response to this question if they can use music.  And, again,

5    although they did it indirectly, and the inducement message

6    does not have to be direct, "We cannot opine specifically on

7    this situation you are referring to.  Adding a third-party's

8    copyrighted content to video, generally, but not always,

9    constitutes copyright infringement.  Under U.S. law, should a

10   copyright owner come across their copyrighted content on one of

11   our sites, they can submit a takedown notification requesting

12   that we remove the content.  This same area of law affords the

13   operator of the site some level of protection."

14          Kind of ironic, I would think, your Honor.  They're

15   basically saying the same thing again.  A little bit more

16   verbose.  Put it up.  If the copyright owner sends a takedown

17   notice...  When they're told we're putting up infringing music.

18   And there are, as Mr. Raskopf alluded to, copy after copy after

19   copy after copy of these kinds of responses.

20          And then, finally, if I can make two more comments on

21   inducement, your Honor.  Filtering.  As your Honor knows,

22   there's no obligation to filter.  But as your Honor also knows

23   under *Grokster*, the failure to filter, especially when you're

24   filtering lots and lots and lots of other stuff, is evidence of

25   inducement.  Selective filtering.

D7IBCAPC                    Oral Argument

1          And your Honor knows here they had all sorts of

2   filters -- they're in the record -- to look at users, to look

3   at their accounts, to look at videos, to look at television

4   shows, to look at game playing, which they finally took off and

5   were able to control.  Taken off the system.  To look at

6   virtually everything on the system.  That's why they designed

7   it, devised it, 40 tools available only to Vimeo people.  And

8   it reviewed, by some accounts, every day or almost every day.

9   And then, on top of that, not only didn't they design or use

10  one of these, a keyword filter -- they used the keyword filter

11  for movies.  So they would search for *Gone with the Wind*.  And

12  if it popped up, they'd check it out.  But they didn't search

13  for Beatles.  They didn't search for *White Christmas*.  Maybe

14  they did, because that's a movie also.  But they could have

15  easily done it, as our expert says.  Our expert -- and they

16  don't have an expert.  The reason they don't have an expert is

17  we took his deposition and he was able to determine at his

18  deposition several recordings, at least one Beatles recording,

19  using an app on an iPhone, on Vimeo.  But in addition to that,

20  we know that they spoke to Audible Magic, a well-known content

21  filterer, used and referred to in other cases, they didn't want

22  to pay the money for it.

23          THE COURT:  But do you think that it was Congress's

24  intention to penalize a website's development of sophisticated

25  tools that stopped some incident of infringement just because

D7IBCAPC                         Oral Argument

1    it doesn't do enough?  I mean, isn't that your argument?  It

2    does some, but it doesn't do enough?

3            MR. FRACKMAN:  They're not developing it to stop

4    infringement.  They're developing them, by their own testimony,

5    to mold their website.  They are using these not for the

6    purpose of stopping infringement.  It's all part of their game

7    plan to build a website that has commercial music on original

8    videos.  And when you do that -- and the cases are clear.  What

9    they say in some of the documents, we're straight-out

10   controlling.  We're fascist.  We're editorializing.  That's

11   what they're using these for.  But they could have used them to

12   locate music.

13           And the cases are clear, going back to *Grokster*, I

14   believe, in the Supreme Court, that the failure to implement

15   the filtering tool is evidence of inducement.  It's not

16   inducement in and of itself.  Under these circumstances, where

17   they had all these other tools to use for their own purposes,

18   where they could have been adopted and adapted to get music,

19   that's evidence of inducement.

20           And then I could go on and on, your Honor.  I'll make

21   one other point, I think, which maybe at the end of the day is

22   a minor point that I missed, but it sort of seals the deal in

23   my view.  They had an award, Vimeo awards that they advertised,

24   they put out a press release.  It's in the record.  It was a

25   big deal called "Captured," was the award.  It was our music.

D7IBCAPC                         Oral Argument

1    They put up for a public award our music.  Inducement.

2    Inducement.  I don't know any other word that you could use to

3    characterize it.  You see Vimeo itself nominating for an award

4    an infringing video.

5           And then there is one final thing, and that's what the

6    courts also talk about, and that is inducement when a website

7    capitalizes on taking infringing customers away from another

8    website.  In their internal documents, it's Exhibit 376, under

9    "Themes and Trends," they say, "People want an alternative to

10   YouTube for a variety of reasons, and Vimeo is showing early

11   signs of capturing the defections."

12          Well, I'll tell you, at least in part, why they

13   captured the defections.  Exhibit 28 to my declaration is an

14   infringing video.  It's part of 28.  I stand corrected.  An

15   infringing video, infringing our music.  And here's what the

16   user said:  "Can't think of a title.  Number 15 [bracket]

17   blocked by YouTube because of copyrights from EMI."

18          Here's another one that's ours:  "It was originally

19   made for YouTube, but since YouTube doesn't allow EMI music and

20   videos, I couldn't upload it."

21          And then, finally-- and these are examples, your

22   Honor-- "Copyrights are stupid.  This video was supposed to go

23   to YouTube, but it deleted the song so it's going here now."

24          I have a lot more to say, but at the risk of

25   overstaying my welcome, I'll sit.

1        THE COURT:  Thank you, Mr. Frackman.

2        Mr. Raskopf, any response?

3        MR. RASKOPF:  Yes.  Thanks, Judge.  I'm going to be

4   very, very brief.  I know the Judge wants me to be brief, and I

5   will be.  I'm just going to touch the clips in suit issue and

6   turn it over to Rachel to deal with this *Grokster* thing that

7   has been brought to the floor by Russ.

8        The case on the clips in suit is dead on arrival, as I

9   believe has now been made obvious here, because the music-- we

10  have videos here with some music on them.  The test is whether

11  the music on the video is blatantly or obviously infringing

12  upon mere inspection.  That's the question.  And none of these

13  are like that.  None of these videos are like that.

14        The big thing that they talk about is lip dubs?  I'd

15  like to see the case that says that a lip dub infringes

16  copyright rights, the music -- the copyrighted music.  There is

17  no case.  As far as I'm aware, there is none.  And they didn't

18  cite you a case for that because when music is put into a

19  video, well, the music is transformed.  It tells a different

20  story.  This is copyright Fair Use 101.

21        Now, the question whether a particular case winds up

22  infringing or not is not Vimeo's problem.  That's a problem

23  between the plaintiff and someone who uploads that video.  The

24  infringement-- the test for Vimeo is whether that infringement

25  is blatant or obvious.

D7IBCAPC                          Oral Argument

1          In the Cheah declaration, we take down -- we show you

2     examples of taking down videos that don't look right to us,

3     that are obviously infringing even without a DMCA notice.  But

4     this is not-- we just do that as a matter of course.  That's

5     Cheah, Supplemental Cheah 3.

6          So what I'm here to tell your Honor is that this is a

7     very carefully constructed statute and it's been very carefully

8     and well-interpreted by the Second Circuit in Viacom.  Let's

9     have in mind that a service provider-- a safe harbor cannot be

10    conditioned upon a service provider monitoring its service or

11    affirmatively seeking facts indicating infringing activity.

12         So this is how-- so the Second Circuit understands the

13    ISP's obligations, takes common law rights and articulates them

14    in a way that makes sense given the fact that there's only so

15    much that an ISP is supposed to do in order for it to function

16    the way Congress intended it to function.  And in that range of

17    activities, there's a limited role in which we might have some

18    issue, which does not appear here because any specific clip has

19    to be, upon mere inspection, blatantly or obviously infringing.

20         They don't show you one of those.  There isn't one.

21    And that's all they have, as I told your Honor, is, at complete

22    best:  We may have seen a video.  That's it.  And discovery's

23    over.  I don't have to put in an affidavit.  I don't have to

24    say anything.  Okay?  The best, all they have for any one of

25    the 55 videos is we commented, we liked.  Whatever.  That's it.

D7IBCAPC                    Oral Argument

1    That's the whole case.  And that is a complete failure, which

2    is why we're now talking about likening Vimeo to the *LimeWire*

3    *Grokster* line of cases.  And I'm pleased to allow Rachel to

4    deal with that question.

5            Thank you for allowing us all this time.  I appreciate

6    it, Judge.

7            THE COURT:  Thank you.

8            MR. RASKOPF:  Yes.

9            MS. HERRICK KASSABIAN:  I'll now say good afternoon.

10   I'll try to be brief, your Honor.  Mr. Frackman has covered a

11   lot of territory here.

12           I guess we'll start with the inducement theory of

13   right and ability to control.  I'd note that I think everything

14   we heard from Mr. Frackman was about comments on using music.

15   And, again, the fundamental failure of that argument is that

16   music does not equal infringing music.  They are two very, very

17   separate things.  There's nothing wrong with using music or

18   other creative content.  There's a problem with using

19   infringing music or creative content.  We didn't hear anything

20   suggesting that that is what Vimeo is encouraging users to do.

21   Telling someone how to sync an audio file with a video file is

22   not an act of infringement, nor is it an act of encouraging

23   others to infringe.

24           Now, Mr. Frackman read from the greatest hits, this

25   handful of stray comments in six or seven e-mails that were

D7IBCAPC                          Oral Argument

submitted with the briefs regarding one-to-one e-mail

conversations between a Vimeo staffer and an individual.  So

all of those comments put together relate to six, seven videos

out of 45 million that have been on Vimeo.  That is not

inducement.  That is not *Grokster*.

          I believe I also heard Mr. Frackman say any time

there's an encouragement to use music, it must be an active

inducement because major recording artists don't license their

music.  It must be an infringement.  And of course we know

that's not true, but it's not just a matter of common sense.

Exhibit 7 to the Cheah declaration attaches a number of counter

notices where, upon ordinary inspection, if Mr. Frackman were

correct, you might say, Well, gosh, there's a video of Kanye

West, for example.  The user name doesn't say Kanye West.

Maybe that's not authorized.

          Of course that's not the standard.  Vimeo got a

counter notice in response to a takedown demand sent about a

Kanye video.  The counter notice was from a man named Nabil who

said, Hold on a second.  I'm the director.  I have a right to

display that video.  And then I believe he even went and got a

letter from Kanye or from the recording company.  So that's

Exhibit 7 to the Cheah declaration.

          There are a number of examples where commercial music

was used in the video, was taken down, and we received a

counter notice saying, Put it back up.  We have rights.

1          I believe-- I'm going to try to stay in order here, on

2     right and ability to control.  I'll come back to financial

3     benefit, because I believe Mr. Frackman switched back and forth

4     between those two.  He said, Vimeo built it's website on lip

5     dubs.  First of all, as Mr. Raskopf explained, a lip dub is not

6     a dirty word.  It is not an active infringement, per say.  And

7     there's also no evidence in the record that Vimeo built its

8     website on lip dubs.  I'm not sure where he got that.

9          I believe I also heard Mr. Frackman says Vimeo looks

10    at every video, and that is also incorrect.  There's no

11    evidence in the record of that.  And we know, again, that there

12    are 43,000 videos uploaded per day.  Vimeo does not review

13    every video.

14         I believe I also heard Mr. Frackman say there's no

15    evidence of what Vimeo employees saw when they looked at-- or

16    assuming they looked at certain videos that were tagged.  Well,

17    we, Vimeo, did not depose Vimeo employees.  The plaintiffs did.

18    And they didn't get any testimony confirming or suggesting that

19    anything that any employee saw, that they knew or understood

20    that to be infringing.  So that means there's no evidence in

21    the record of that.

22         That was to your question of whether, is there a

23    question of fact here on these issue or not?  There's not

24    because there has to be a disputed fact to send to the jury.

25    You cannot send a case to the jury on pure speculation as to

1    what might have been in the minds of Vimeo employees when they

2    allegedly tagged a video or liked a video.  You have to have

3    competent evidence to give that jury so that there's something

4    to resolve.  And there's just no evidence on their side on the

5    issue of knowledge.

6          I also believe I heard Mr. Frackman say-- sorry, that

7    was me -- once you start monitoring, you can't stop.  So if you

8    do a little bit of monitoring, then that suggests that you have

9    the right and ability to control.  And, again, that's a

10   nonstarter because we know that there is no obligation to

11   police, and right and ability to control means doing something

12   other than removing ex post anything that you might see on the

13   site that is alleged to be infringing.

14         And we also note that Viacom rejected that exact same

15   argument.  This is the remand decision from the district court

16   in April of this year.  Viacom made this same argument.  They

17   said, well, YouTube disabled community flagging for

18   infringement and they declined to develop a feature to send

19   automated e-mail alerts to copyright owners when illegal

20   content was uploaded.  And they eventually stopped monitoring

21   their site for infringements.  Instead, waiting until YouTube

22   received a takedown notice from the actual copyright owner

23   identifying a specific infringing clip by URL and demanding its

24   removal from the site.  So that was what Viacom argued and the

25   Court rejected it.

1            That evidence, the Court said, proves that YouTube,

2     for business reasons, placed much of the burden on Viacom and

3     the other studies to search YouTube-- the other studios to

4     search YouTube 24/7 for infringing clips.  That is where it

5     lies under the safe harbor.  But the Court made short work of

6     that argument and went on to say "YouTube's decision to

7     restrict its monitoring efforts to certain groups of infringing

8     clips, like its decisions to restrict access to its proprietary

9     search mechanisms, does not exclude it from the safe harbor

10    regardless of its motivation."

11            In other words, if a service provider decides to be a

12    good internet citizen like Vimeo and like YouTube, it makes

13    efforts to try to combat infringement whatever way it can,

14    whether it be through some filtering or some automated tools to

15    catch full-length, you know, 30-minute clips that are probably

16    sitcoms or something like that.  That does not defeat safe

17    harbor.  You don't punish that conduct; you reward it.

18            Next Mr. Frackman said-- I believe you asked a

19    question, your Honor.  He read an e-mail from Dalas Verdugo

20    saying not that you can commit infringement, but simply saying

21    you can use music if you want.

22            And you asked, Well, did Mr. Verdugo upload one of the

23    199 videos?  Did he have anything to do with those?

24            And the answer to your question is, No, he did not.

25            And, again, I point out the question to Mr. Verdugo

D7IBCAPC                    Oral Argument

1    was, Can I upload music?  Not Can I infringe?  Or, I don't have

2    rights; is this okay?  I don't think this is a fair use; can I

3    do this anyway?  I'd like to infringe on your website.  There's

4    no evidence like that in the record.  Explaining how to use

5    music is not the same as fostering or encouraging infringing

6    music.

7         I'll also point out that none of the 199 videos have

8    any connection with the six or seven stray e-mails that Mr.

9    Frackman quoted into the record.

10        THE COURT:  Just back to the Verdugo e-mail for a

11   minute.  What it says is "Hey, guy, I see all the time at" --

12   there's a misspelling, but -- "Vimeo videos, (for example lip

13   dub) music being used that is copyrighted.  Is there any

14   problem doing this?  Can I do it?  Thanks."

15        Answer is, "We allow it, however if the copyright

16   holder sent us a legal take down notice, we would have to

17   comply.  Best wishes."

18        Suggesting that  you can go ahead, even if it's

19   copyrighted, but we're only going to do something about it if

20   we get a legal takedown notice.

21        MS. HERRICK KASSABIAN:  Well, the DMCA does set forth

22   the notice and takedown procedure, and that comment alone does

23   not in any way endorse or support any active infringement.  If

24   the user uploaded a video that was clearly infringing and

25   somebody saw it and satisfied, you know, the red flag test,

1    then it would have to come down.  But everything he said there

2    is true --

3              THE COURT:  But if a video with infringing music had

4    been uploaded after this e-mail, would Vimeo have been

5    willfully blind or on red flag notice?

6              MS. HERRICK KASSABIAN:  Definitely not because

7    copyrighted music, again, does not equal infringing music.  For

8    instance, it could be that this fellow went and created a video

9    with a three-second de minimis sampling of the intro to a song

10   or something like that.  Well, of course, de minimis use of a

11   copyrighted work is not infringement.  And there obviously

12   could also be a fair use.  It could be a longer clip, but

13   clearly used for parody or satire or something else.

14             So, no.  Telling someone, you know, yes, that you can

15   use copyrighted music is not inducement to infringe.  Moreover,

16   again, we're talking about a handful of stray e-mails and what

17   the plaintiffs are trying to suggest is that that's the real

18   policy.  Not everything that's on Vimeo's website, not their

19   standard response that they send to the hundreds or thousands

20   of people whose videos get blocked in response to a takedown

21   notice, not the terms of service that have been published on

22   the website for the last seven, eight years.  That's not the

23   policy.  It's this random e-mail from Dallas Verdugo in 2008.

24   That's the real policy.  And that's just not reality.  That's

25   not what the record shows.  That is not sufficient to create a

D7IBCAPC                     Oral Argument

1    triable issue.

2         We know what Vimeo's policy is.  It's stated all over

3    the place.  Mr. Frackman read an excerpt from the canned

4    response, the standard response that Vimeo sends in response to

5    questions like this.  Dallas's was a stray comment.  I don't

6    think there was anything wrong with it, but it was a stray

7    comment.  The official policy is, I believe, Exhibit 1 to the

8    Cheah declaration.  And Mr. Frackman read-- to the Supplemental

9    Cheah declaration.  Mr. Frackman read part of it, but then he

10   stopped, so I'd like to read the whole thing.

11        He read you the following part:  "Under relevant U.S.

12   laws, should a copyright owner come across their copyrighted

13   content on one of our sites, they can submit a takedown

14   notification requesting that we remove the content.  This same

15   area of law affords the operator of the site some level of

16   protection from claims of copyright infringement when dealing

17   with user-generated content."  That's where he stopped.

18        Let me keep reading.  "The same protection does not

19   apply to the actual poster of the content."

20        So Vimeo's official policy is to tell users, Don't do

21   it.  You don't get safe harbor.  You are not an ISP.  That is

22   the opposite of inducement.

23        And I believe I also heard Mr. Frackman say that,

24   well, all of the filtering tools that Vimeo uses, they don't

25   use that to combat infringement.  They use it for some other

D7IBCAPC                          Oral Argument

1    purpose.  I don't quite understand that part of his comment.

2    But the first part of his comment is incorrect.

3            Mr. Pile submitted a declaration on our motion.

4    Paragraph 24 says "Vimeo removes videos that violates the terms

5    of service to set an example for users and demonstrate that

6    Vimeo takes these policies seriously."  And there he's talking

7    about the filtering tools in paragraph 24 that Vimeo uses that

8    filter out things like full-length movie clips and television

9    shows, because they tend to be an exact certain length and so

10   automated filters can sometimes find those and filter them out.

11           Again, that's what a good internet citizen does.  It's

12   not -- the act of making some attempt to combat infringement on

13   your system without waiting for a DMCA notice is not a basis to

14   deny safe harbor.

15           THE COURT:  The response that you read in Exhibit 1,

16   how long has Vimeo been providing that response?

17           MS. HERRICK KASSABIAN:  The one I'm holding here, your

18   Honor, is from April of 2009.

19           THE COURT:  Right.  I see that.  But you said that

20   this is-- I believe you described it as a canned response of

21   some sort.

22           MS. HERRICK KASSABIAN:  Okay.  Your Honor, I believe

23   that if you look at all 80 examples in supplemental Cheah

24   Declaration Exhibit 2, you'll see this response going back to

25   the middle of 2008.  There are 80 different instances.

D7IBCAPC                      Oral Argument

1          I would also direct you, again, on the issue of what

2     is Vimeo's policy with respect to music to supplemental Cheah

3     Declaration Exhibit 2.  Again, not a random, stray e-mail from

4     five years ago from Mr. Verdugo, but rather to Vimeo's posted

5     policies.  And Exhibit 2 says:  "Are we allowed to have music

6     in our videos?"  And then it explains Vimeo's policy, but

7     obviously infringing music is not allowed.  It's not to say no

8     music is allowed.  That's not Vimeo's policy, nor does it need

9     to be.  Infringing music is not allowed.

10          So that would be, again, the fact that what Vimeo has

11     submitted is affirmative and overwhelming evidence of its

12     policies on its website, in e-mails, et cetera.  A random,

13     stray e-mail here and there from an employee who maybe didn't

14     quote it just right or didn't get it just right does not create

15     a triable issue as to what Vimeo's policy was.  In further

16     support, obviously, is the extensive record of takedowns in

17     this case enforcing that policy.

18          THE COURT:  And how long has this answer effectively

19     been up on the website?

20          MS. HERRICK KASSABIAN:  Exhibit 2?  I'll have to check

21     with my team on that, but I do see that obviously the print

22     date on this page --

23          THE COURT:  No, I see the date.  I'm just wondering

24     how long this-- it's phrased as an answer -- but how long this

25     answer or policy has been up on the website.

D7IBCAPC                    Oral Argument

1           MS. HERRICK KASSABIAN:  Okay.  My understanding is

2      it's about the middle of 2008.  It's about the same time period

3      as the canned response that we talked about in Supplemental

4      Cheah Declaration Exhibit 1.

5           You also asked a question of Mr. Frackman, your Honor.

6      You said, Do you have to show that the inducement influenced

7      the right and ability to control, or do you just have to show

8      inducement?

9           And, you know, the answer is, of course, the former.

10     This is not a merits motion.  We're not moving on liability.

11     The plaintiffs are not here presenting their case in chief on

12     their claims of inducement on the merits.  Rather, we're just

13     talking about DMCA safe harbor and the Second Circuit's opinion

14     that, depending upon the circumstances, you might be able to

15     show right and ability to control if you see the type of

16     conduct that we saw in *Grokster*:  Active inducement of

17     infringement, where you are actually participating in the

18     creation of this content through advice, through encouragement,

19     through direction, or what have you, but it's infringing.  Not

20     just advice on content, but advice to infringe.

21          There's no evidence of that here.  Everything we've

22     heard talks about a handful of stray e-mails talking about,

23     again, six or seven videos out of the 45 million, that's what

24     they came up with in opposition to our motion where there's

25     some advice about using music.  No advice about infringement.

D7IBCAPC                          Oral Argument

1        I'm just trying to make sure I covered everything,

2   your Honor.  I think those are all of Mr. Frackman's points on

3   inducement.

4        So I can move on to, just quickly, financial benefit

5   unless your Honor has any other questions--

6        THE COURT:  No, thank you.

7        MS. HERRICK KASSABIAN:  -- on inducement.

8        Oh, sorry, I have one last point about the music

9   equals infringement paradigm which I believe is not supported

10  by the case law or the facts.

11       And I mentioned earlier that, again, to Mr. Frackman's

12  comments that, well, if there's commercial music, it must be

13  infringing.  Not only is that, I don't think, supported by

14  logic, but I mentioned also that the Shelter Capital Ninth

15  Circuit 2013 decision made reference to this argument that UMG

16  had made in that case.  And the Court said, "As an initial

17  matter, contrary to UMG's contentions, there are many music

18  videos that could, in fact, legally appear on Veoh.  Among the

19  types of videos subject to copyright protection but lawfully

20  available on Veoh's system were videos with music created by

21  users and videos that Vimeo provided pursuant to arrangement."

22       So just the point being that, again, this notion that

23  lip dubs or videos with some music must be infringing is just

24  not supported by the case law or the record here.

25       And just lastly, quickly, your Honor, on direct

1   financial benefit, Mr. Frackman made a couple of points.  He

2   said advertisements are targeted to websites.  I believe the

3   record on that issue is in the Mellencamp declaration,

4   paragraph 8, which says, "other Than Vimeo's home page and the

5   video upload page, display advertisements are not targeted to

6   specific pages but are placed wherever there is available

7   inventory on Vimeo pages."  So that's the evidence in the

8   record on whether there's some connection between the

9   advertising and whether or not a video might be infringing.

10          He also mentioned lip dub sponsorship.  CarMax

11   sponsored a lip dub channel or promotion or something like

12   that.  Again, that's not relevant because lip dubs do not equal

13   infringement.  So whether or not there might have been some

14   revenue tied to a lip dub promotion is not revenue tied to an

15   act of infringement.  We all know that lip dubs could be

16   authorized, could be used in public domain music, could be a

17   fair use, could be de minimis.  It does not equate to

18   infringement, your Honor.

19          And I think that covers it unless you have any other

20   questions.

21          THE COURT:  No.  Thank you.

22          Mr. Frackman.

23          MS. HERRICK KASSABIAN:  Thank you.

24          MR. FRACKMAN:  I used to have a partner, your Honor,

25   who used to say, I could call it a ham sandwich, but it would

D7IBCAPC                         Oral Argument

1    still be the same thing.  And that's exactly the argument we're

2    hearing now.  It might not be infringing.  It's not infringing

3    music.  Well, it becomes infringing music when it's used

4    without consent.  And this is infringing music.

5          It's not, as the Veoh Court referenced, user music.

6    There's not a bit of music that a user made up any of this

7    music.  The evidence is all to the contrary.  It's not like

8    Veoh said that Veoh may have done it pursuant to an

9    arrangement.  I believe it was an arrangement with another

10   record company, Sony BMG.  They don't license it from any

11   record companies.  So they don't have those outs here if they

12   are, indeed, outs.

13         A couple of other points.  This construct -- and we've

14   done it in our reply, so I don't want to belabor it.

15   Mr. Pile's construct that we now have takedown music because of

16   a DMCA policy or a non-DMCA policy is just wrong.  Their real

17   position, repeated over and over again in the depositions, and

18   it's in our brief, is, for example, Andrea Allen:

19   "Q.  "So the policy was to permit any music, any copyrighted

20   music, to be used on videos as long as the user created the

21   video portion.  Correct?

22   "A.  Yes, unless we receive the DMCA takedown notice."

23         So that was their policy.  They got nervous at the end

24   of this motion period and they put in Mr. Pile's declaration.

25   If you look at the exhibits, they don't prove-- Mr. Cheah's

1  declaration, I should say.  The exhibits, if you look at

2  them -- and we tried to point that out -- don't prove what he's

3  saying or what counsel is saying.

4        They had one policy, and that policy was original

5  video copyrighted music.  And that comes across over and over

6  again.  And that's why, among other things, the tools that they

7  used, the tools that they used, are important.  And that's why

8  filtering is important here.  They were filtering to make up

9  their-- to build up their brand, as they put it.  And their

10  brand was original video copyrighted music.  And they did it in

11  a whole number of ways.  And they started out-- I won't get

12  into that.

13        The phrase "a few stray e-mails" I think resonates,

14  because I think it's in one of the other cases.  It may be

15  *Fung*, it may be *LimeWire*, and it was discounted by the Court.

16  Because one way to show intent is internal e-mails; one way to

17  show intent are e-mails with users.

18        So among the exhibits, which I didn't have a chance to

19  get to, are e-mails in community forums that are available to

20  all their-- I don't remember what they said-- 20 million users.

21        THE COURT:  What's that exhibit number?

22        MR. FRACKMAN:  I'm sorry?

23        THE COURT:  Is there an exhibit number for that?

24        MR. FRACKMAN:  Yes.  I'll give you a few exhibit

25  numbers.  Exhibit 162, Community Forums.  Question was "I was

D7IBCAPC                      Oral Argument

1    wondering if it's possible to legally use copyrighted music if

2    you put it in a private channel," which of course it isn't.

3    And which, of course, comes back to a question your Honor

4    asked, which is, willful blindness includes letting people put

5    stuff in a private channel.

6              Andrea Allen, one of their people-- I'm sorry, Julia

7    Quinn, one of the people whose music was taken down pursuant to

8    a takedown notice, moved it to a private channel.  We only

9    found that out when we got their database.

10             But, anyway, Exhibit 162 is an example:  "I was

11   wondering if it's possible to legally use copyrighted music if

12   it's private invite channel?"

13             "Technically no, but I'm sure the FBI won't be busting

14   down your door anytime soon.  There are too many people doing

15   it for it to be enforced unless it's being used for commercial

16   purposes."  162.  To everybody.

17             User forum, Exhibit 29 to Mr. Lodwick.  User posted a

18   forum question:  "I know you guys haven't been living under a

19   rock, so I was wondering what is the risk of having lip dubs be

20   included in 'Vimeo Obsessions' because they are technically

21   copyright infringement."

22             Vimeo never answered that one.

23             Your Honor, there are others.  They're all in the

24   record.

25             One more that I found on the forum, a question:  "I

D7IBCAPC                        Oral Argument

1    uploaded a video to YouTube which is blocked at my school and I

2    am showing it Wednesday.  Vimeo isn't blocked so I'm going to

3    use this instead.  Plus the quality and everything else means I

4    would use Vimeo anyway, but it has 'Don't Stop Me Now' in the

5    background.  Goes brilliantly with the video."

6             Answer by staff:  "You can use the music.  There are

7    tons of videos on here with music.  Just be sure to mention the

8    artist, especially if it's something educational."

9             So while my colleague is looking, I'll make another

10   point.

11            In an interview that, I believe it's Mr. Whitman gave,

12   a request for judicial notice, Exhibit 1, he says, 'We got

13   hundreds and hundreds of resumes,' Lodwick says.  He's talking

14   here about-- the article is about lip dubs.  "'We've got

15   hundreds and hundreds of resumes,' Lodwick says."  It put us on

16   the map because you wouldn't expect a company to produce

17   something like that."  And he is talking about lip dubs.  And

18   it did put them on the map.

19            Another forum question:  "I'd like to have a feature

20   like the cast of One, but to show the tracks used as soundtrack

21   on the clips."  Mr. Lodwick responds, "Good idea.  For now just

22   tag the clip with the music, the Beatles, or Music Beck or

23   whatever."

24            And then, finally, your Honor, on the home page-- and

25   there are more, but I know it's getting late.  On the home

page, lip dubbing became, on the home page, a Vimeo obsession,

which are put on the home page, where they feature what they

want to feature.  And it says "Lip dubbing.  Like a music

video.  Shoot yourself mouthing along to a song, then sync it

with a high-quality copy of the song in an editing program."

        And then finally, your Honor, all of these videos, all

of these videos that they didn't take down on their own

volition, all of these videos that they put up, all of these

comments, went to their millions and millions of users.  On the

199 recordings on this schedule, they were viewed nine and a

half million times.  Oh, I'm sorry, 950,000.  Wishful thinking.

950,000 times.  On the ones on the new schedule that are

infringing, I believe it was two million times.  These are not

stray e-mails.  They show what they're communicating

internally; what they're communicating outside.

        By the way, your Honor, the Google ads, AdSense, which

are one of the ads, type of ads, that are placed on the page,

are textual in nature.  That's what Google AdSense is.  So

there are ads that are not textual; there are ads that are

textual.  At the end of the day, it doesn't really matter.

They both bring in money to Vimeo.

        THE COURT:  Any final remarks?

        MR. FRACKMAN:  I'm sorry?

        THE COURT:  Any final remarks?

        MR. FRACKMAN:  Yes, your Honor.  Two things, or three

D7IBCAPC                    Oral Argument

1  things.  I'm not sure where this blatant and obvious language

2  comes from.  I don't think it comes from the Viacom case in

3  terms of knowledge.  I think you have to have specific

4  knowledge of the infringing videos.  At least I didn't see it

5  again when I took a look.  But I'm not sure in the context here

6  that it makes any difference.

7            I don't want to get into the repeat infringer policy.

8  We spell it out in our papers.  Your Honor asked some

9  questions.  I don't think you got answers.  And I think it's

10 pretty clear that they didn't have a "three strikes policy"

11 until November of 2008, when they invented Purgatory.  And they

12 didn't have a written repeat infringer policy until, I think,

13 2011.

14           And, indeed, when two people who should know,

15 Mr. Lodwick and Mr. Verdugo, were asked at their deposition

16 about an infringer policy, one said "I don't know of any" and

17 the other one said "I don't know of anything in writing."  It's

18 a strange policy to begin with, as your Honor knows, and I

19 don't think it's duplicated anyplace else.  It's unusual in its

20 leniency.

21           As we spell out in our papers, they also didn't

22 expeditiously remove.  By the way, they keep saying

23 expeditiously remove after DMCA notice.  That's not what the

24 statute says.  Expeditiously remove after knowledge, not DMCA

25 notice.  And we've shown you they've had knowledge of these

D7IBCAPC                          Oral Argument

1   things for years and years and years, including the stuff they

2   put up.  That's expeditious removal.

3            When it comes down to it-- and I just want to make one

4   final point that's argued in the brief, but obviously a new

5   case since we argued it.  And that's on the pre-'72 sound

6   recordings.  And your Honor probably knows of the Escape Media

7   case, which I think puts an end to that argument.  I think we

8   have, I don't remember, but your Honor's schedule, maybe 20

9   including very, very valuable recordings of the Beatles that

10  are pre-'72 recordings.

11           And the Escape Media case, understanding that it

12  disagrees with MP3.com, but what it does is talk about the

13  strict language of the copyright statute.  And, frankly,

14  pre-'72 recordings do not fall under the DMCA because they're

15  not federally copyrighted recordings anymore than I could stand

16  here and ask your Honor for statutory damages for pre-'72

17  recordings because they don't fall under the Copyright Act.

18  And the Escape Media case cites to the copyright office study,

19  and I think quotes it, which in no uncertain terms says we

20  think MP3.com is wrong.

21           So I would submit that those pre-'72 recordings as a

22  matter of law should be carved out and we're entitled to

23  summary judgment on those as well.

24           So just to conclude, your Honor, we're not asking that

25  Vimeo go out of business.  We're asking that they do what

1  YouTube now does, what Veoh now does, what pretty much

2  everybody else now does, which is pay for their music.  And

3  they can do it, they can find it, or they can block it.  There

4  are all sorts of things they can do.  But when you come to the

5  end of it, there are two principles:  Number one, they set out,

6  unlike any other website -- unlike Veoh, unlike YouTube -- to

7  build a certain type of website and they built it in part on

8  the backs of copyrighted music that they didn't pay for.

9          Number two, when you parse through, I would suggest,

10  the argument that counsel has made, the argument is an ISP can

11  never be excluded from safe harbor.  They can't be excluded

12  because they'll never know.  They can't being excluded because

13  they'll never be willfully blind.  They can't be excluded

14  because they can't induce specific infringements.  They can't

15  be excluded because it may be licensed or it may be fair use.

16  And that's just not what the law is.

17          Thank you, your Honor.

18          THE COURT:  Thank you.

19          I'd like to thank all of the lawyers for their

20  excellent advocacy here today and in the briefs and I will

21  reserve decision.

22          Thank you.  Have a nice day.

23          MR. FRACKMAN:  Thank you, your Honor.

24          MR. RASKOPF:  Thank you, your Honor.

25          (Adjourned)