```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/18/13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                         :

CAPITOL RECORDS, LLC, et al.,         :

                         :

              Plaintiffs,  :       OPINION AND ORDER

                         :

         -v-             :       No. 09 Civ. 10101 (RA)

                         :

VIMEO, LLC d/b/a VIMEO.COM, et al., :

                         :

             Defendants.  :

-----------------------------------------------------------X
                         :

EMI BLACKWOOD MUSIC, INC, et al.,  :

                         :

              Plaintiffs,  :

         -v-             :       No. 09 Civ. 10105 (RA)

                         :

VIMEO, LLC d/b/a VIMEO.COM, et al., :

                         :

             Defendants.  :

                         :
-----------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

       Plaintiffs Capitol Records, LLC, Caroline Records, Inc., Virgin Records America, Inc. (collectively, "Capitol"), EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music Inc., Colgems-EMI Music, Inc., EMI Virgin Songs, Inc., EMI Gold Horizon Music Corp., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc. and Stone Diamond Music Corporation (collectively, "EMI" and, with Capitol, "Plaintiffs") bring this copyright infringement action against Defendants Vimeo, LLC and Connected Ventures, LLC (collectively, "Vimeo"). Before the Court is Vimeo's motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment. For the following reasons, each motion

is granted in part and denied in part.

## I.    Background

### A.  The Vimeo Website

In 2004, employees of Connected Ventures, LLC, began developing an online platform that would enable users to upload, share and view original videos.  (Defs.' 56.1 ¶ 2.)[1]  The resulting website, called "Vimeo" and located at the URL http://vimeo.com ("the Website"), launched in 2005.  (Id. ¶¶ 1-3, 6.)[2]

Vimeo differentiates itself from other video-sharing platforms by requiring that those who upload a video to the Website must have created, or at least participated in the creation of, the video.  (Pls.' 56.1 ¶¶ 29, 31.)  As Vimeo's President, Dae Mellencamp, explained, "Vimeo has become an online destination for filmmakers who want to share their creative works and personal moments."  (Declaration of Dae Mellencamp, Sept. 7, 2012 ("Mellencamp Decl.") ¶ 3.)  The diverse array of videos on the Website includes, *inter alia*, animation, documentaries and personal home videos uploaded by, *inter alia*, artists, politicians, educational institutions and entertainment companies.  (Id. ¶ 5; Defs.' 56.1 ¶¶ 17, 54.)

Vimeo has grown considerably since its inception in 2004.  In 2009, when this action was filed, Vimeo had twenty employees.  (Mellencamp Decl. ¶ 22.)  By July of this year, it had seventy-four employees.  (Id.; Oral Argument Tr., July 18, 2013 ("Tr.") at 4:24-25.)  As of September 2012, Vimeo was one of the top 130 most-visited websites in the world and one of the top ten online distributors of web video.  (Defs.' 56.1 ¶ 16.)  It has approximately 12.3 million

---

[1]    Where only one party's Rule 56.1 statement is cited, the opposing party either does not dispute that fact or has offered no admissible evidence to controvert it.

[2]    In 2008, Connected Ventures, LLC contributed the assets pertaining to the Website to Vimeo, LLC. (Defs.' 56.1 ¶ 3.)

registered users in forty-nine countries.  (Id. ¶¶ 15, 18.)  Each day, approximately 43,000 new videos are uploaded to Vimeo's database, which now contains more than 31.7 million videos. (Id. ¶ 18.)

### B.  How Vimeo Works

Any Internet user may access and view videos on the Website free of charge.  (Id. ¶ 7.) To upload a video, however, a user must register for an account on the Website.  (Id. ¶ 9; Pls.' 56.1 ¶ 23.)  "Basic" registration can be obtained at no charge but requires a user to provide a user name, password and e-mail address and to agree to Vimeo's Terms of Service.[3]  (Defs.' 56.1 ¶ 9; Pls.' 56.1 ¶ 23.)  Basic registration affords users access to certain features on the Website, such as the ability to "like" or comment on videos.  (Pls.' 56.1 ¶ 23.)  Alternatively, a user can purchase a "Vimeo Plus" or "Vimeo PRO" subscription that affords them additional benefits such as increased file storage and advanced customization options. (Defs.' 56.1 ¶ 62.)  The "vast majority" of Vimeo's revenue comes from user subscription fees, although advertising sales are also a primary revenue source.  (Id. ¶ 61.)

When uploading a video, a user can assign the video a title, a description and a series of "tags" (i.e., keywords associated with the video).  (Pls.' 56.1 ¶ 13.)  A user can make a video available to the general public or can limit its access through various privacy restrictions.  (Id. ¶ 25.)  For instance, a user can password-protect a video or establish a "private group" that limits access solely to group members and Vimeo employees.  (Id. ¶¶ 25, 28.)  In 2010, approximately 9.5% of videos on the Website had some form of privacy setting.  (Id. ¶ 26.)

To watch a video uploaded to the Website, a user simply selects the video, which initiates a "playback request."  (Defs.' 56.1 ¶ 14.)  The Website responds to the playback request by automatically "streaming" a copy of the requested video from Vimeo's servers to the user's

---

[3]       The relevant portions of Vimeo's Terms of Service are discussed in greater detail below.

device (e.g., laptop or cell phone) for viewing.  (Declaration of Andrew Pile, Sept. 7, 2012 ("Pile Decl.") ¶ 22.)  Streaming allows a user to begin watching a video stored on Vimeo's servers before the entire file has been transmitted.  (Defs.' 56.1 ¶ 14.)  In addition, Vimeo permits a user to download a video to his or her own device unless the video's uploader has disabled that functionality.  (Id. ¶ 14; Pls.' 56.1 ¶ 16; Pile Decl. ¶ 22.)

A registered user can also interact with videos and other Website users in several ways. For instance, in addition to "liking" and commenting on videos, a registered user can subscribe to "groups" of users who share a common interest and can create or subscribe to "channels," which are collections of videos based on theme.  (Pls.' 56.1 ¶ 19.)  All users can search the Website's index for available videos and can access its "Community Forums," "Help Center," "Staff Blog" and other pages on the Website that discuss, recommend and refer to specific videos, as well as to Vimeo's practices and guidelines.  (Id. ¶ 22.)

### C.  Vimeo's Content Restrictions and Monitoring Tools

In order to register on the Website, a user must accept Vimeo's Terms of Service, which are available at a clickable link in the footer of every page on the Website and on the Website's "Help" page.  (Defs.' 56.1 ¶ 21.)  By acknowledging the Terms of Service, the user agrees not to upload videos that infringe another's rights.  (Supplemental Declaration of Michael A. Cheah, Nov. 16, 2012 ("Supp. Cheah Decl.") ¶ 11 & Exs. 6-10.)  Vimeo also has "Community Guidelines" that provide additional content restrictions and a web page dedicated to its copyright policy, both of which are incorporated by reference into its Terms of Service.  (Defs.' 56.1 ¶¶ 22, 24; Pls.' 56.1 ¶ 32.)  The web page dedicated to its copyright policy, entitled "Vimeo.com DMCA (Copyright) Notifications and Counter-Notifications Process," communicates Vimeo's policies and procedures for notifications and counter-notifications pursuant to the Digital

Millennium Copyright Act ("DMCA").  (Defs.' 56.1 ¶ 24.)  Lastly, each time a user uploads a video, the Website displays to the user the following three rules: (1) "I will upload only videos I created myself," (2) "I will not upload videos intended for commercial use," and (3) "I understand that certain types of content are not permitted on Vimeo."  (Declaration of Michael A. Cheah, Sept. 7, 2012 ("Cheah Decl.") ¶¶ 8-9 & Ex. 3.)  More information as to each rule is provided at a user's request.  (Id.)

Acknowledgement of Vimeo's Terms of Service notwithstanding, a user has the technical ability to upload any video content whether or not it complies with those Terms, and Vimeo does not pre-screen videos before they are uploaded to the Website.  (Defs.' 56.1 ¶¶ 11-12.)  Vimeo instead purports to enforce its content restriction policies through its "Community Team."  (Id. ¶¶ 27-30.)  The Community Team, which in 2012 comprised sixteen of Vimeo's seventy-four employees, reviews videos suspected of violating Vimeo's policies and can remove both videos and entire user accounts from the Website.  (Id. ¶¶ 29-30; Mellencamp Decl. ¶ 22.)  The Community Team is aided by a series of "Moderator Tools"—of which there were nearly forty in 2012—that filter suspect videos on the Website which are then reviewed by the Community Team and other Vimeo staff several times each week.  (Pls.' 56.1 ¶¶ 124-26.)  It is undisputed that Vimeo has terminated thousands of user accounts for uploading videos the content of which violated the Terms of Service.  (Defs.' 56.1 ¶ 30.)

### D.  The Videos-In-Suit and Procedural History

On December 10, 2009, Capitol and EMI—record and music publishing companies— filed separate complaints alleging, *inter alia*, direct, contributory and vicarious copyright infringement.  The complaints each contain a schedule of URLs corresponding to a total of 199 videos that had been uploaded to the Website.  (Id. ¶¶ 1-7, 69.)  Plaintiffs own copyrights to

musical recordings used in these 199 videos (hereinafter, "Videos-in-Suit").  It is undisputed for purposes of the instant motions that these musical recordings were used without authorization and infringed Plaintiffs' copyrights.  (Pls.' 56.1 ¶ 7; Defs.' Resp. 56.1 at n.3.)

On May 21, 2012, Plaintiffs sought leave to amend their complaints to add over 1,000 additional allegedly infringing videos.  (Defs.' 56.1 ¶¶ 70-71.)  By order dated May 31, 2012, Judge Castel, to whom this case was previously assigned, denied Plaintiffs' application.  (Dkt. No. 43.)  Concerned that the proposed amendment would "require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions," Judge Castel directed that "[t]he motion to amend may be filed within 30 days of the Court's ruling on summary judgment and the timeliness will be assessed as if the motion were made today."  (Id.)

On September 7, 2012, Vimeo moved for summary judgment, asserting entitlement to "safe harbor" protection pursuant to the DMCA.  On November 16, 2012, Plaintiffs cross-moved for partial summary judgment seeking a ruling that Vimeo is ineligible for such protection.  The question before the Court is whether Vimeo is entitled to safe harbor protection pursuant to the DMCA.[4]

For the reasons set forth below, the Court finds that triable issues remain as to whether Vimeo is entitled to safe harbor protection as to the fifty-five of the 199 Videos-in-Suit that Vimeo employees interacted with or uploaded.  Vimeo is entitled to summary judgment as to the remaining 144 Videos-in-Suit.[5]

---

[4]     The parties have filed three applications ancillary to their competing summary judgment motions. Plaintiffs have filed a motion to strike portions of one of Vimeo's affidavits.  Plaintiffs also request that the Court take judicial notice of several documents.  Vimeo has moved to strike Plaintiffs' 56.1 statement.  The Court addresses each of these applications below in § III ("Preliminary Matters").

[5]     This holding is modified to the extent that any of the Videos-in-Suit contain Plaintiffs' infringed-upon copyrighted material that pre-dates February 15, 1972.  See infra § V.C.

## II.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact."  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor."  Id. at 340 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration."  Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011).  "Each movant must present sufficient evidence to satisfy its burden of proof on all material facts."  Morris v. N.Y.C. Emps. Ret. Sys., 129 F. Supp. 2d 599, 605 (S.D.N.Y. 2001) (citing Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988)).

## III.     Preliminary Matters

Before turning to the merits of the parties' substantive motions, the Court must address three evidentiary motions.  See Colon v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion.").   Specifically, the Court must dispose of: (1) Plaintiffs' motion to strike portions of the Supplemental Declaration of Michael Cheah ("Supplemental Cheah Declaration"); (2) Plaintiffs' request that the Court take judicial notice of, *inter alia*, newspaper articles, Vimeo press releases and screenshots of the Website and other video-sharing

websites; and (3) Vimeo's motion to strike Plaintiffs' 56.1 statement.

### A.  Plaintiffs' Motion to Strike

Plaintiffs first move to strike paragraphs 4, 6-9, 11, 15 and 19 of the Supplemental Cheah Declaration on the basis that the averments in those paragraphs regarding Vimeo's infringement policies "lack foundation, are conclusory in nature, or otherwise are wholly unsupported."[6] (Plaintiffs' Motion to Strike Portions of Supplemental Declaration of Michael A. Cheah (Dkt. 101) at 4.)  In his Supplemental Declaration, Cheah describes the Website's policies regarding the use of third-party copyrighted content in videos, its policies and procedures for DMCA compliance and Vimeo's removal of the Videos-in-Suit.

Affidavits submitted in support of or in opposition to a summary judgment motion must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).

The Court rejects Plaintiffs' assertion that the contents of Cheah's Supplemental Declaration are unsupported.  Cheah explicitly states in his declaration that he has personal knowledge of the averments at issue through his role as Vimeo's General Counsel, in which he has responsibility for the "oversight and implementation of Vimeo's copyright policies and compliance with the online safe-harbor provisions of the Digital Millennium Copyright Act." (Cheah Decl. ¶ 1.)  Courts have found that declarations or affidavits made on such knowledge satisfy Rule 56's requirements.  See, e.g., SCR Joint Venture L.P. v. Warshawsky, 559 F. 3d 133, 138-39 (2d Cir. 2009) (finding that a witness's affidavit stating that he was a former vice

---

[6]    Plaintiffs also move to strike paragraphs 2 and 5 on the basis that these statements contradict Cheah's deposition testimony.  Because the Court does not rely on these paragraphs in adjudicating the parties' substantive motions, Plaintiffs' motion to strike them is denied as moot.  See APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc., 890 F. Supp. 2d 360, 373 (S.D.N.Y. 2012).

president of the defendants' business and was "fully familiar with the facts and circumstances set forth" therein satisfied the requirements of Rule 56); <u>Searles v. First Fortis Life Ins. Co.</u>, 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000) (A witness "may testify as to the contents of records she reviewed in her official capacity" in preparing her affidavit in connection with summary judgment.).[7]

Based on the foregoing, the Court concludes that a "reasonable trier of fact could believe the witness had personal knowledge." <u>United States v. Tocco</u>, 135 F. 3d 116, 128 (2d Cir. 1998). Accordingly, Plaintiffs' motion to strike is denied.

## B. Plaintiffs' Request for Judicial Notice

Plaintiffs also request that the Court take judicial notice of a number of documents submitted in connection with their summary judgment motion. Because the Court has not relied on these documents in resolving the summary judgment motions, the request is denied as moot. <u>See</u> <u>Dobina v. Weatherford Int'l Ltd.</u>, 909 F. Supp. 2d 228, 258-59 (S.D.N.Y. 2012).

## C. Vimeo's Motion to Strike

Vimeo moves to strike Plaintiffs' 56.1 statement on the grounds that it is not "a short and concise statement" and that it includes "non-material facts." (Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Local Rule 56.1 Statement at 1.) Although Plaintiffs' ninety-page, 403-paragraph 56.1 statement is certainly lengthy, the Court does not find it to be unduly so in light of the numerous and complex issues raised in this case and the large body of evidence Plaintiffs have supplied in connection with their motion. Accordingly, the Court denies

---

[7]     As to his averments regarding facts that pre-date his employment at Vimeo, Cheah explains that he has "become familiar with Vimeo's past and current products and services, DMCA policies, and processing of DMCA take down notices" in the course of his duties as Vimeo's General Counsel. (Cheah Decl. ¶ 1.) This is sufficient to establish his personal knowledge. <u>See</u> <u>Searles</u>, 98 F. Supp. 2d at 461-62 (review of relevant business records by qualified affiant satisfies personal knowledge requirement of Rule 56).

Vimeo's motion to strike Plaintiffs' 56.1 statement.[8]

## IV.   The DMCA

Congress enacted the DMCA in 1998 "to update domestic copyright law for the digital age." Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 26 (2d Cir. 2012). Title II of the DMCA, codified at 17 U.S.C. § 512, seeks to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in a digital networked environment." S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551 (II), at 49 (1998). Congress recognized that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." S. Rep. No. 105-190, at 8 (1998). "[B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." Id.

In furtherance of these policy considerations, Title II of the DMCA "establishe[s] a series of four 'safe harbors' that allow qualifying service providers to limit their liability for claims of copyright infringement." Viacom, 676 F.3d at 27. "[A] finding of safe harbor application necessarily protects a defendant from all affirmative claims for monetary relief." Id. at 41. "Because the DMCA safe harbors are affirmative defenses, [a defendant] has the burden of establishing that he meets the statutory requirements." Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020, 1039 (9th Cir. 2013); see also WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 278 (2d Cir. 2012).

To qualify for protection under any of the safe harbors, a party must first establish that it

---

[8]     Vimeo also raises numerous evidentiary objections to materials cited in various paragraphs of Plaintiffs' 56.1 statement. The Court need not consider a large portion of these objections, as it has not relied on the objected-to material in adjudicating the parties' motions. To the extent the Court has relied on such material, the Court has also considered, and overrules, Vimeo's corresponding evidentiary objections.

meets three threshold criteria. <u>Viacom</u>, 676 F.3d at 27.  The party: "(1) must be a 'service provider' as defined by the statute; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works."  <u>Wolk v. Kodak Imaging Network</u>, 840 F. Supp. 2d 724, 743 (S.D.N.Y. 2012).

If the service provider meets these threshold criteria, it must then establish the requirements of the safe harbor it invokes.  Here, Vimeo asserts that it qualifies for safe harbor protection pursuant to § 512(c).[9]  Section 512(c)(1) provides:

**(c) Information residing on systems or networks at direction of users.**

**(1) In general.**  A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

**(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

**(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

---

[9]      The three other DMCA safe harbors are not at issue in this litigation.  <u>See</u> § 512(a) (protecting service providers that act as conduits for transmission of material); § 512(b) (protecting service providers that provide temporary storage); and § 512(d) (protecting service providers that link users to online locations).

Id. § 512(c)(1).  Section 512(c)(2) further requires that service providers "designate[] an agent to receive notifications of claimed infringement" (commonly known as "takedown notices") from copyright holders.  Id. § 512(c)(2).[10]

## V.    Discussion

### A.    Threshold Criteria

#### 1.    Service Provider

The first threshold criterion requires Vimeo to demonstrate that it is a "service provider." For purposes of the § 512(c) safe harbor, the DMCA defines "service provider," in pertinent part, as "a provider of online services or network access, or the operator of facilities therefor."  17 U.S.C. § 512(k)(1)(B).[11]  This definition "is clearly meant to cover more than mere electronic storage lockers."  Viacom, 676 F.3d at 39.  Rather, it is "intended to encompass a broad set of Internet entities."  Wolk, 840 F. Supp. 2d at 744.  Indeed, one court commented that the DMCA defines "'service provider' . . . so broadly that [it had] trouble imagining the existence of an online service that *would not* fall under the definitions."  In re Aimster Copyright Litig., 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002), aff'd, 334 F.3d 643 (7th Cir. 2003) (emphasis in original).

Unsurprisingly, therefore, courts have consistently found that websites that provide services over and above the mere storage of uploaded user content are service providers pursuant to § 512(k)(1)(B).  See, e.g., Obodai v. Demand Media, Inc., No. 11 Civ. 2503 (PKC), 2012 WL 2189740, at *3 (S.D.N.Y. June 13, 2012) (website that publishes its own content in addition to hosting and sharing users' content is a service provider); Wolk, 840 F. Supp. 2d at 744

---

[10]    The parties do not dispute that "Vimeo has designated a DMCA agent with the Copyright Office and posts DMCA contact information."  (Pls.' Resp. 56.1 ¶ 31.)

[11]    The DMCA contains an alternative definition of the term "service provider" that is applicable to a different safe harbor provision.  Because Vimeo seeks safe harbor under only § 512(c), the above-quoted definition applies. See 17 U.S.C. § 512(k); Viacom, 676 F.3d at 39.

("Because Photobucket offers a site that hosts and allows online sharing of photos and videos at the direction of users, Photobucket, like YouTube.com or Veoh.com, qualifies as a 'service provider' under § 512(k)(1)(B).").  The parties do not dispute that Vimeo is a provider of online services that hosts and distributes user material by permitting its users to upload, share and view videos.  (Defs.' 56.1 ¶ 6.)  Even though Vimeo's activities are not limited to such, the Court concludes that Vimeo qualifies as a service provider under § 512(k)(1)(B)'s expansive definition.

**2.        Repeat Infringer Policy**

The second threshold criterion requires Vimeo to demonstrate that it has adopted and reasonably implemented a policy for the termination, in appropriate circumstances, of users who are repeat infringers.   Specifically, § 512(i)(1)(A) requires that a service provider seeking DMCA safe harbor protection show that it:

> has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers[.]

§ 512(i)(1)(A).  To fulfill these requirements, "a service provider must (i) adopt a policy that provides for the termination of service access for repeat infringers; (ii) inform users of the service policy; and (iii) implement the policy in a reasonable manner."  Wolk, 840 F. Supp. 2d at 744; see also Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004).  As one court observed, "[t]he purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights."  Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011), reconsideration granted on other grounds, 2013 WL 1987225 (S.D.N.Y. May 14, 2013).

The following facts from the record inform the Court's analysis of each of the three requirements set forth above:

- From at or around Vimeo's inception, Vimeo required users to agree to its Terms of Service, which contained language stating that users will not use the Website to infringe any copyright or other proprietary rights, before uploading a video. (Supp. Cheah Decl. ¶ 11 & Exs. 6-10.)

- From at or around its inception, Vimeo's Terms of Service contained language warning users that Vimeo reserves the right to remove videos and terminate user accounts for violations of the Terms of Service. (Id.) Beginning no later than May 5, 2008, the Terms of Service specifically warned that Vimeo "will terminate rights of subscribers and account holders in appropriate circumstances if they are determined to be repeat infringers." (Id. ¶ 11 & Exs. 7-9.) As early as June 2007, Vimeo actually disabled user accounts upon discovery of infringing conduct. (Id. ¶ 8 & Ex. 4.)

- From at or around its inception through mid-2008, Vimeo received approximately five or fewer takedown notices a month. (Defs.' 56.1 ¶ 37.) Beginning in mid-2008, it received approximately five or fewer takedown notices a week. (Cheah Decl. ¶ 30.) During the pre-mid-2008 time frame, Vimeo employees, of which there were no more than twenty working full-time (Mellencamp Decl. ¶ 22), would identify repeat infringers by reviewing e-mail records or recalling the names of users previously implicated in a takedown notice. (Cheah Decl. ¶ 40.) Cheah, avers that user accounts violating the terms of service "were often terminated upon the receipt of the first DMCA takedown notice." (Id.)

- At some point after its inception, although the precise date is unclear, Vimeo began to employ a "three strikes" rule whereby it would terminate a user's account if the user became the subject of three separate, valid takedown notices. (Id. ¶ 34.) Under this policy, takedown notices received within three days of one another are treated as a single instance of infringement. (Id.) The e-mail address associated with the terminated account is added to a list of banned e-mail addresses that may not be used in connection with a new account. (Id. ¶ 38; Supp. Cheah Decl. Ex. 4; Tr. at 10:11-15.) In addition, when Vimeo reviews a user account pursuant to a takedown notice that identifies allegedly infringing content in a video, it also reviews the other videos in that user's account for additional violations of Vimeo's Terms of Service. (Cheah Decl. ¶ 39.) Finally, under this rule, any video that is removed pursuant to a takedown notice is placed on a "blocked video" list, which prevents any Vimeo user from re-uploading the same video file. (Id. ¶ 36; Tr. at 10:16-20.)

- In October 2008, Vimeo began utilizing a "Purgatory Tool," which facilitates the tracking of repeat infringers by collecting and maintaining all videos and accounts removed from the Website, including those removed due to DMCA takedown notices. (Pile Decl. ¶¶ 30-31.) A video that is in Purgatory is no longer accessible to anyone except Vimeo employees with "Moderator status." (Id. ¶ 32.) When a user account is placed in Purgatory, all of that user's videos are automatically placed in Purgatory as well. (Id. ¶ 33.)

Plaintiffs assert that Vimeo did not have any repeat infringer policy prior to the

implementation of the Purgatory Tool in October 2008 and that the policy adopted thereafter was not communicated to its users or reasonably implemented.  Contrary to these assertions, the Court finds that Vimeo has established each prong of the repeat infringer policy requirement.  It addresses each in turn.

### a.  Adoption of a Policy

Vimeo must first establish that it adopted a policy providing for the termination of access for repeat infringers.  This statutory requirement emanates from Congress' concern that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."  H.R. Rep. 105-551 pt. 2, at 61 (1998).

Although the case law is sparse on what procedures are sufficient to establish the adoption of a repeat infringer policy, a court having had occasion to address the issue suggested that "[t]he fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined."  Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1101 (W.D. Wash. 2004), overruled on other grounds Cosmetic Ideas, Inc. v. IAC/Interactivecorp, 606 F.3d 612 (9th Cir. 2010).

The Court agrees with the general sentiment expressed in Corbis that the threshold requirement of the adoption of a repeat infringer policy should not be an overly burdensome one to meet.  At this stage of the analysis, it appears sufficient that Vimeo demonstrate that it took a clear position that those who chose to violate another's copyright would not be permitted to avail themselves of the service Vimeo provides.

The Court finds that Vimeo, from at or around its inception, espoused a policy providing

for the termination of repeat infringers. Vimeo's Terms of Service required users to "agree not to use the Service to . . . upload, post, email, transmit or otherwise make available any Content that infringes any patent, trademark, trade secret, copyright or other proprietary rights" and further advised that Vimeo reserved the right to remove videos and user accounts for violation of these Terms. (Supp. Cheah Decl. ¶¶ 9, 11 & Ex. 6.) This language reflects the adoption of a policy that users could, in appropriate circumstances, be terminated for uploading infringing content. That Vimeo adopted such a policy is further supported by e-mails dated between June 2007 and October 2008 demonstrating that Vimeo did in fact terminate accounts upon notice of repeat infringement and, indeed, did so upon receipt of a single takedown notice. (Supp. Cheah Decl. ¶¶ 8, 40 & Ex. 4.)

As discussed further below, Vimeo's policy became more structured and refined as Vimeo's employee roster and user base grew, but the evidence establishes that Vimeo had a policy in place that provided for the termination of service for repeat (or even first-time) infringers from the company's inception. The DMCA requires nothing more at this threshold stage.

### b. Informing Users of the Policy

Section 512(i)(1) also requires that a service provider "inform[] subscribers and account holders of . . . [its] policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." This language has been interpreted to require that the service provider "put users on notice that they face exclusion from the service if they repeatedly violate copyright laws." Corbis Corp., 351 F. Supp. 2d at 1102. The statute, however, does not "suggest what criteria should be considered by a service provider, much less require the service provider to reveal its

decision-making criteria to the user." Id.

In Obodai v. Demand Media, Inc., No. 11 Civ. 2503 (PKC), 2012 WL 2189740 (S.D.N.Y. June 13, 2012), the repeat infringer requirement was met where the defendant's Terms and Conditions provided contact information for a DMCA designated agent, provided that the defendant could terminate "any Account or user for repeated infringement . . . and [] reserve[d] the right to terminate an Account or user for even one infringement." Id. at *4; see also Perfect 10, Inc. v. CCBill, LLC, 340 F. Supp. 2d 1077, 1088-89 (C.D. Cal. 2004) (policy stating a user's access may be terminated deemed sufficient communication). From its inception, as in Obodai, Vimeo provided contact information for its DMCA designated agent, required registered users to agree not to infringe others' copyrights, and notified users that their accounts may be terminated for violation of the Terms of Service.

The Court rejects Plaintiffs' argument that Vimeo cannot establish the second prong because it did not communicate to its users a specific "repeat" infringer policy until 2011. While it is undisputed that Vimeo's formal "Repeat Infringer Policy" was not published to the Website until in or about January 2011,[12] Vimeo communicated a more general policy—threatening account termination upon any violation of the Terms of Service including single or repeated instances of infringement—from at or around its inception, and this suffices to meet the second prong of this threshold requirement.

Accordingly, the Court finds that Vimeo adequately communicated its policy to its users.

### c. Reasonable Implementation of the Policy

Finally, § 512(i)(1)(A) requires that a service provider's repeat infringer policy be "reasonably implemented." While the statute does not define "reasonably implemented," the

---

[12]     Although, as Vimeo notes, its Terms of Service communicated to users as early as May 2008 that repeat infringement would result in account termination.

case law provides that a reasonably implemented policy can utilize a "variety of procedures" and does not require that the service provider "affirmatively police its users for evidence of repeat infringement." Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109-11 (9th Cir. 2007). Another court has observed that § 512(i) "does not impose an obligation on service providers to track their users in any particular way." Perfect 10, Inc. v. Google, Inc., No. CV 04-9484 (AHM), 2010 WL 9479059, at *5 (C.D. Cal. July 26, 2010).

"A substantial failure to record [infringers]" may, however, "raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy." See CCBill, 488 F.3d at 1110; Ellison, 357 F.3d at 1080 (unreasonably implemented policy where defendant "allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded"); In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003) (policy was not reasonably implemented because "by teaching its users how to encrypt their unlawful distribution of copyrighted materials [defendant] disable[d] itself from doing anything to prevent infringement"). Implementation also has been deemed unreasonable when service providers failed to terminate users who "repeatedly or blatantly infringe copyright." CCBill, 488 F.3d at 1109; Datatech Enters. LLC v. FF Magnat Ltd., No. C 12-04500 (CRB), 2013 WL 1007360, at *6 (N.D. Cal. Mar. 13, 2013) ("woefully inadequate" policy demonstrated by evidence "show[ing] that when [defendant] learned that particular users were engaged in extensive repeat infringement . . . [defendant] regularly declined to ban them despite requests from copyright holders").

The Court finds that Vimeo's repeat infringer policy was reasonably implemented. In its nascent years, Vimeo employees identified repeat infringers by reviewing e-mail records or recalling the names of users previously implicated in a takedown notice. (Cheah Decl. ¶ 40.) As

Cheah avers, user accounts violating the Terms of Service "were often terminated upon the receipt of the first DMCA takedown notice," (id.), and as early as June 2007, Vimeo disabled user accounts upon discovery of infringing conduct, (Supp. Cheah Decl. ¶ 8 & Ex. 4). This evidence establishes that Vimeo reasonably implemented its policy from the beginning.

The Court's finding of reasonableness is also informed by the evidence of Vimeo's business circumstances as they evolved during the relevant period. That is, the policies Vimeo implemented in the first several years of its operation, as described above, were reasonable ones in light of the fact that Vimeo was, at the time, a small service provider, the twenty full-time employees of which were tasked with processing only a trickle (zero to five) of takedown requests per month. The evidence reflects that as the flow of those requests increased, Vimeo's policy became more robust—first in the form of a "three strikes" rule and a blocked video list, implemented at some point after Vimeo's inception, and eventually in the form of the "Purgatory" tool, implemented later in October 2008. That Vimeo's enforcement mechanisms advanced in step with the realities of its growing business further supports the reasonableness of its implementation system.

Plaintiffs advance several arguments as to why Vimeo's repeat infringer policy has not been reasonably implemented. The Court finds each to be unavailing.

Plaintiffs argue that Vimeo's failure to establish an adequate repeat infringer policy resulted in repeat and blatant infringers remaining on the Website. Plaintiffs rely on the deposition testimony of Dalas Verdugo, a "Community Director" at Vimeo who assisted with DMCA compliance beginning in late 2006 or 2007. (Cheah Decl. ¶ 18; Cheah Dep. 118:17-120:8.) When asked whether he could find a list of users who had been banned as repeat infringers, Verdugo answered, "I don't believe I would be able to do that and I'm not sure who

would be able to do that." (Declaration of Russell J. Frackman (1) In Support of Plaintiffs' Motion for Partial Summary Judgment, and (2) In Opposition to Defendants' Motion for Summary Judgment, Oct. 12, 2012 ("Frackman Decl.") Ex. 5 ("Verdugo Dep.") at 137:4-12.) Additionally, when asked how he ensured that the Videos-in-Suit, which were removed following the filing of the Complaint, would not be reposted in the future, Verdugo responded that he was "not aware of something that would allow [him] to do that." (Id. at 18:24-19:10.) This statement reveals that Verdugo was unaware of Vimeo's "blocked video list," which it describes as a mechanism for ensuring that a removed infringing video is not re-posted.

Verdugo's testimony certainly demonstrates a troubling ignorance of Vimeo's tools for terminating infringing activity. Implementation, however, need not be perfect. Rather, by the terms of the statute, it need only be "reasonable." In any event, even assuming one could infer from Verdugo's apparent ignorance of aspects of Vimeo's tools for terminating infringement that Vimeo's overall implementation of its policy was affected in some way, such isolated comments, while certainly unfortunate, do not reflect the sort of "substantial failure," see CCBill, 488 F.3d at 1110, that courts have held gives rise to a genuine dispute as to the reasonableness of a repeat infringer policy. See Ellison, 357 F.3d at 1080; Datatech, 2013 WL 1007360, at *6; Aimster, 252 F. Supp. 2d at 659 (service provider failed to reasonably implement repeat infringer policy when it actively blocked the collection of information on infringers and voluntarily implemented an encryption scheme rendering impossible a determination of which users were engaged in infringement). Indeed, Verdugo himself elsewhere testified as to the process Vimeo takes "in general" in response to takedown notices: "when a request is received, it's forwarded to a lawyer at Vimeo who reviews the request and determines whether it['] s sufficient, and if it['] s sufficient, then the material is removed as per the DMCA." (Verdugo Dep. 112:20-113:7.) That process is,

no doubt, a reasonable one.

Plaintiffs also contend that Vimeo's policy of blocking only the e-mail address of a repeat infringer is insufficient because it allows a repeat infringer to set up another account using a different e-mail address.  They rely on <u>A&M Records, Inc. v. Napster, Inc.</u>, C 99-05183 (MHP), 2000 WL 573136 (N.D. Cal. May 12, 2000), in which the court concluded that the defendant's repeat infringer policy was insufficient in part because it blocked only an infringer's password, rather than his or her IP address,[13] after terminating the account.  <u>Id.</u> at *9-10.

At least one court has since distinguished <u>A&M Records</u> on the basis that the record in that case included evidence showing that the service provider could—and sometimes did—block IP addresses.  <u>Io Grp. Inc. v. Veoh Networks, Inc.</u>, 586 F. Supp. 2d 1132, 1143-45 (N.D. Cal. 2008).  The <u>Io</u> court concluded that without testimony describing a more feasible or effective alternative, the defendant's policy of blocking a terminated user's e-mail account was reasonable.  <u>See id.</u>  Here, too, the Court finds no evidence that Vimeo's implementation of its repeat infringer policy, which blocks e-mail addresses but not IP addresses, is unreasonable.  <u>See id.</u> at 1144 ("[T]he hypothetical possibility that a rogue user might reappear under a different user name and identity does not raise a genuine issue as to the implementation of Veoh's policy.").

Finally, Plaintiffs contend that Vimeo's repeat infringer policy was inadequate because it treated all notices received within a three-day period as a single instance of infringement. Plaintiffs argue that this policy "would have permitted a user to be subject to a notice on day one and have his infringing works removed, then all of the same works re-posted on day two and have all of them removed, and then all of the same works re-posted on day three and as a result

---

[13]     An IP address—or Internet Protocol address—is "[t]he unique identification of the location of an end-user's computer."  <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 407 n.4 (2d Cir. 2004).

incur only one strike." (Memorandum of Law of Plaintiffs (1) In Support of Motion for Partial Summary Judgment on Defendants' Defense under Section 512 of the DMCA, and (2) In Opposition to Defendants' Motion for Summary Judgment, Oct. 12, 2012 ("Pls.' Oct. 12 Mem.") at 46.) As an initial matter, Plaintiffs provide no evidence that Vimeo users actually engage in such conduct. In any event, taking Plaintiffs' hypothetical concern to its logical extreme, users who feverishly uploaded previously-removed content on a daily basis would still incur their third strike in little over a week. Finally, simply because, as Plaintiffs point out, a YouTube user may earn two separate strikes for takedown notices received only three hours apart pursuant to a policy this Court has found to be reasonable, see Viacom Int'l, Inc. v. YouTube, Inc., 718 F. Supp. 2d 514, 523 (S.D.N.Y. 2010), it does not follow that Vimeo's somewhat more lenient policy (three days, rather than two hours), creates a factual issue as to the reasonableness of that policy.

Having considered Plaintiffs' arguments regarding the adoption, communication and reasonable implementation of Vimeo's repeat infringer policy, the Court concludes that Vimeo meets the threshold requirement of § 512(i)(1)(A).

### 3.    Interference with Standard Technical Measures

The final threshold criterion is that a service provider seeking protection under a DMCA safe harbor must not interfere with "standard technical measures" as defined by § 512(i)(2), which provides that:

> the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—
>
> **(A)** have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;
>
> **(B)** are available to any person on reasonable and nondiscriminatory terms; and

**(C)** do not impose substantial costs on service providers or substantial burdens on their systems or networks.

§ 512(i)(2).  "Refusing to accommodate or implement a 'standard technical measure' exposes a service provider to liability."  <u>Viacom</u>, 676 F.3d at 41.

Although Plaintiffs do not explicitly argue that Vimeo fails to meet this requirement, they do claim that Vimeo's privacy settings prevent copyright owners from collecting information needed to issue a takedown notice.  Even if Plaintiffs' claim is true, however, it is insufficient to demonstrate a service provider's failure to meet this threshold requirement because Plaintiffs have not identified a "standard technical measure" that comports with the definition above.  <u>See</u> <u>Viacom</u>, 676 F.3d at 41 ("In this case, the class plaintiffs make no argument that the content identification tools . . . constitute 'standard technical measures,' such that YouTube would be exposed to liability under § 512(i).").  Accordingly, although Plaintiffs' evidence regarding Vimeo's privacy settings may be relevant to other provisions of the DMCA, <u>see</u> <u>infra</u> § V.B.3, privacy settings do not constitute interference with standard technical measures.  <u>See</u> <u>Obodai</u>, 2012 WL 2189740, at *5.

## B.    The Safe Harbor Requirements Pursuant to § 512(c)

Having satisfied the threshold criteria, Vimeo must next establish that it meets the requirements of § 512(c), which apply to any claims "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  § 512(c)(1).  Plaintiffs argue that Vimeo has not satisfied the requirements for safe harbor protection pursuant to § 512(c) because: (1) the infringing content in the Videos-in-Suit was not "by reason of the storage at the direction of a user"; (2) Vimeo had actual or "red flag" knowledge of infringement, or was willfully blind to it;

(3) Vimeo had the right and ability to control the infringement and financially benefited from it; and (4) Vimeo did not expeditiously remove infringing material.  Each argument will be discussed in turn.

### 1.        "Storage at the Direction of a User"

Section 512(c) only provides a defense against infringement that is "by reason of the storage at the direction of a user."  § 512(c)(1).  The applicable legislative history provides that "[i]nformation that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c)."  S. Rep. No. 105-190, at 43 (1998).

Plaintiffs argue that the infringing content at issue was not "stor[ed] at the direction of a user" because: (1) Vimeo employees uploaded certain of the Videos-in-Suit; and (2) videos on the Website may be downloaded and, according to Plaintiffs, are thus not "stor[ed]" as that word is used in § 512(c)(1).

### a.  Employee-Uploaded Videos

It is undisputed that ten of the 199 Videos-in-Suit were uploaded by users who were at the time, or later became, Vimeo employees.  To determine whether these employee-uploaded videos may be deemed to have been stored "at the direction of a user," the Court must determine whether, under traditional principles of agency law, Vimeo's employees stored their videos as independent "users" or rather on behalf of the company as Vimeo staff.  See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1161-62 (2d Cir. 1971).

Arguing that the employee-uploaded videos were being stored at the direction of Vimeo, Plaintiffs rely on Columbia Pictures Industries, Inc. v. Fung, No. CV 06-5578 (SVW), 2009 WL 6355511 (C.D.Cal. Dec. 21, 2009), aff'd in part and modified, 710 F. 3d 1020 (9th Cir. 2013),

which found an employer liable for inducement of infringement in part as a result of its employees' actions.  Id. at *13.  The defendants in Fung, which included several websites, employed "moderators" to run day-to-day activity on their forums.  These moderators "gave technical assistance and aid in the organized forum discussions that furthered the third parties' infringement using the sites."  Id.  The court conducted the following agency analysis to determine that the moderators' conduct extended to the defendant websites, explaining that:

> [u]nder common law principles of agency, the "moderators" were the Defendants' agents with respect to their interactions with the online message boards and forums.  Even though there is no evidence that the moderators were specifically authorized to post messages in these forums, the websites' act of designating them as "moderators" and providing them with specific forum-related powers leads a "third party reasonably [to] believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency, § 2.03 (2006) (describing "apparent authority").

Id. at *13 n.21.

Here, Plaintiffs cite evidence that Vimeo employees serve as an "editorial voice" for the Website, (Verdugo Dep. 31:25-32:13; Frackman Decl. Ex. 12 at Dep. Ex. 199),[14] and emphasize that the web pages displaying these videos indicated that the video was posted by a Vimeo employee.  In all but two of the videos, the web page also included the employee's name. (Frackman Decl. Ex. 17.)  Further, in several instances, a yellow box containing the word "STAFF"—the so-called "staff badge"—appeared next to the employees' user names, as it does for all actions taken by an employee on the Website.  (Id.; Pls.' 56.1 ¶ 51.)  Based on this evidence, Plaintiffs argue that the ten employee-uploaded videos may not fairly be characterized as stored at the direction of users but rather must be characterized as stored at the direction of Vimeo through common law agency principles.

---

[14]    Citations to the deposition exhibits included in Exhibit 12 to the Frackman Declaration hereinafter will be cited simply as "Dep. Ex. __."

In response, Vimeo directs the Court to Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627 (S.D.N.Y. 2011), reconsideration granted on other grounds, 2013 WL 1987225 (S.D.N.Y. May 14, 2013), in which Judge Pauley concluded that the employees' personal use of the defendant's website could not be the basis of a direct infringement claim against the defendant. Id. at 649. In MP3tunes, it was undisputed that executives and employees of the defendant website downloaded and stored music using the website. Id. Citing testimony that the employees "maintained private accounts and used MP3tunes lockers for their personal benefit," Judge Pauley denied summary judgment to the plaintiff on its direct infringement claim because "a genuine dispute exist[ed] as to whether any of the [] songs in question were downloaded by employees in the course of their employment." Id.

On balance, it is less clear to the Court than it was to the court in Fung that a user would conclude that the employee-uploader was acting on behalf of the service provider. Reasonable minds could differ, as in MP3tunes, as to the extent to which the videos at issue here were uploaded by Vimeo employees in their personal capacities as opposed to as agents of Vimeo. Accordingly, a triable issue has been raised with respect to whether the employees were storing their content as "users" within the meaning of § 512(c) or as employees acting within the scope of their employment.

### b. Downloading

Plaintiffs next argue that because Vimeo permits downloading of videos on the Website, it does not provide "storage" pursuant to § 512(c). Plaintiffs rely on language from Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197 (C.D. Cal. 2007), which observed that downloading allowed users to "obtain 'perfect copies' of [p]laintiffs' work that can be inexpensively reproduced and distributed *ad nauseam*," and thus concluded that the plaintiff

had shown irreparable harm for purposes of granting a permanent injunction.  Id. at 1218. Although that proposition is certainly true and Grokster highlights the challenges that copyright holders face in the digital age in which their works may be downloaded with ease to users' devices, these general principles do not govern the inquiry at hand—i.e., whether service providers that permit users to download content are *per se* ineligible for safe harbor protection.

Indeed, in UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006 (9th Cir. 2013), the Ninth Circuit noted that "access-facilitating processes" such as downloading are encompassed in § 512(c)'s language "by reason of the storage at the direction of a user."  Id. at 1018-19.  Plaintiffs have provided no case law—and the Court is not aware of any—holding or even suggesting that a service provider must be denied DMCA safe harbor protection because it allows its users to download content.  The Court accordingly declines to deny safe harbor protection on this basis.

### 2.      Knowledge of Infringement

The § 512(c) safe harbor is available only to a service provider that does not have knowledge of infringement on its website.  § 512(c)(1).  Specifically, the statute provides that a service provider may be disqualified from safe harbor protection if it possesses one of two types of knowledge.  First, the service provider must not have "actual knowledge that the material . . . on the system or network is infringing."  § 512(c)(1)(A)(i).  Second, even without actual knowledge, a service provider may be disqualified if it was "aware of facts or circumstances from which infringing activity [was] apparent."  § 512(c)(1)(A)(ii).  This second category is often referred to as "red flag" knowledge or awareness.  In addition, "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA."  Viacom, 676 F.3d at 35.

### a.   Actual or "Red Flag" Knowledge

In <u>Viacom International, Inc. v. YouTube, Inc.</u>, 676 F.3d 19 (2d Cir. 2012), the Second Circuit clarified the relationship between actual and red flag knowledge.  First, the court affirmed the district court's holding that "the statutory phrases 'actual knowledge that material . . . is infringing' and 'facts or circumstances from which infringing activity is apparent' [both] refer to 'knowledge of specific and identifiable infringement.'"  <u>Id.</u> at 30 (quoting <u>Viacom</u>, 718 F. Supp. 2d at 523).  The court next explained that although both the actual and red flag knowledge provisions apply only to specific instances of infringement, they each "do independent work." <u>Id.</u> at 31.  It explained as follows:

> The difference between actual and red flag knowledge is thus not between specific and generalized knowledge, but instead between a subjective and an objective standard.  In other words, the actual knowledge provision turns on whether the provider actually or "subjectively" knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement "objectively" obvious to a reasonable person.

<u>Id.</u>

The Second Circuit ultimately vacated the district court's grant of summary judgment in favor of the defendant because it was "persuaded that the plaintiffs may have raised a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement."  <u>Id.</u> at 34.  Viacom had presented evidence including e-mails among YouTube executives discussing uploaded content that appeared to be "clearly infringing, official broadcast footage" and "blatantly illegal."  <u>Id.</u>  The court held that "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent."  <u>Id.</u>  Accordingly, the Second Circuit remanded, instructing the district court to determine "whether any specific

infringements of which YouTube had knowledge or awareness correspond[ed] to the clips-in-suit." Id.

To demonstrate that Vimeo had actual or red flag knowledge of the infringing content in the Videos-in-Suit, Plaintiffs point to evidence that Vimeo employees interacted with some of the videos using various features available to them on the Website. Specifically, Plaintiffs note the fact that Vimeo employees:

- Entered comments on the designated web pages of some of the Videos-in-Suit. Any registered user may comment on a video. (Frackman Decl. ¶ 8 & Ex. 18; Pls.' 56.1 ¶ 19.)

- "Liked" some Videos-in-Suit by clicking a virtual button. Any registered user may "like" a video. (Frackman Decl. ¶ 8 & Ex. 18.)

- Placed some Videos-in-Suit on channels. (Supplemental Declaration of Andrew Pile, Nov. 16, 2012 ("Supp. Pile Decl.") ¶ 16; Pls. 56.1 ¶ 19.) Any user can create a channel or place a video on an existing channel, although some channels (e.g., the "Staff Picks" and "Vimeo HD" channels) can only be created and added to by employees. (Pls.' 56.1 ¶¶ 341-42.)

- "Whitelisted" some Videos-in-Suit by disabling a function that allows users to "flag" a video he or she believes violates Vimeo's Terms of Service. (Supp. Pile Decl. ¶ 5.) Only staff members may whitelist videos. (Frackman Decl. Ex. 19; Declaration of James D. Berkley, Oct. 12, 2012 ("Berkley Decl.") ¶ 38.)

- "Buried" some Videos-in-Suit by preventing them from appearing on the Website's "Discovery" tab, through which logged-in users may access a selection of currently popular videos. (Pls.' 56.1 ¶ 138.) The Discovery tab appears to logged-in users on the Website's home page. (Id.) Only staff members may bury videos. (Supp. Pile Decl. ¶ 2.)

- Reviewed some uploaded Videos-in-Suit in "Plus" users' accounts. (Frackman Decl. Ex. 3 ("Allen Dep.") at 164:15-166:12 & Ex. 85.)

A summary exhibit submitted by Plaintiffs indicates that Vimeo employees interacted, in one or more of the above-described ways, with fifty-five of the 199 Videos-in-Suit. (Supplemental Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkley Decl.") Ex. 1.) These videos unlawfully incorporated copyrighted music by well-known artists such as The

Beatles, The Beach Boys, The Jackson 5, Radiohead, Beyonce, Usher and Jay-Z.[15]  Plaintiffs'

chart reflects that Vimeo employees provided comments or "liked" twenty-six of the fifty-five

videos, placed two on channels, "whitelisted" twenty and "buried" four.  (Id.)  Twenty-nine of

these videos were uploaded by Plus users.  (Id.)  Included in the fifty-five videos are the ten

employee-uploaded videos previously discussed (see supra § V.B.1.a) for which there is a triable

issue as to storage "at the direction of a user."  (Id.)

Plaintiffs claim that Vimeo employees' interactions with these fifty-five Videos-in-Suit

necessitates a determination that Vimeo had actual or red flag knowledge of the videos'

infringing content.  The Court disagrees.  Despite the fact that these interactions are undisputed

and that most, if not all, of the copyrighted songs used in the videos would be characterized by

many as popular, and in some cases legendary—indeed, it is difficult to think of a song more

iconic than The Beatles' "All You Need is Love"—the Court is not prepared to hold that this

automatically compels the conclusion that the service provider, through its employees, was

aware of facts and circumstances that would make it objectively obvious to a reasonable person

that those videos were infringing.  Rather, the Court finds that a triable issue remains as to

---

[15]      The following is a complete list of the copyrighted songs (with the artists that performed them in a parenthetical) used in the fifty-five videos with which Vimeo employees interacted: "Stars and Boulevards" (Augustana); "Surfin' USA" (The Beach Boys); "Wouldn't It Be Nice" (The Beach Boys); "Sabotage" (Beastie Boys); "Sure Shot" (Beastie Boys); "A Day in the Life" (The Beatles); "All You Need is Love" (The Beatles); "Baby, You're a Rich Man" (The Beatles); "Don't Let Me Down" (The Beatles); "I'm Only Sleeping" (The Beatles); "Octopus's Garden" (The Beatles); "She's Leaving Home" (The Beatles); "Taxman" (The Beatles); "Crazy in Love" (Beyonce); "White Wedding" (Billy Idol); "My Love" (The Bird and the Bee); "No Rain" (Blind Melon); "All the Small Things" (Blink-182); "Call Me" (Blondie); "Far Out" (Blur); "Girls & Boys" (Blur); "We've Got a File on You" (Blur); "Oye Como Va" (Carlos Santana); "Genie in a Bottle" (Christina Aguilera); "Aerodynamic" (Daft Punk); "Around the World" (Daft Punk); "Digital Love" (Daft Punk); "Words" (Doves); "Praise You" (Fatboy Slim); "Glamorous" (Fergie); "Do You Realize??" (Flaming Lips); "Stacy's Mom" (Fountains of Wayne); "19-2000" (Gorillaz); "DARE" (Gorillaz); "Feel Good Inc." (Gorillaz); "The Pink Panther Theme" (Henry Mancini); "The Passenger" (Iggy Pop); "I Want You Back" (The Jackson 5); "Jane Says" (Jane's Addiction); "Dirt Off Your Shoulder" (Jay-Z); "Universe & U" (KT Tunstall); "Simba" (Les Baxter); "In the Good Old Summertime" (Les Paul and Mary Ford); "A Milli" (Lil Wayne); "Everything's Just Wonderful" (Lily Allen); "Move (If You Wanna)" (Mims); "Unwritten" (Natasha Bedingfield); "Lump" (The Presidents of the United States of America); "Peaches" (The Presidents of the United States of America); "Everything in Its Right Place" (Radiohead); "Ghostbusters" (Ray Parker Jr.); "Tonight, Tonight" (The Smashing Pumpkins); "Fat Lip" (Sum 41); "I Can't Help Myself (Sugar Pie Honey Bunch)" (The Four Tops); and "Love in This Club" (Usher).

whether, under the totality of the circumstances, this standard is met as to each of the fifty-five videos in question.

In so doing, the Court is also unwilling to adopt Vimeo's argument that it has met its burden with regard to the actual or red flag knowledge prong of the statute. Vimeo has not presented any evidence disputing that its employees interacted with these videos in the above-mentioned ways but rather argues that proof of these interactions is insufficient to raise a triable issue, let alone to warrant summary judgment for Plaintiffs. It contends that some evidence of its employees' interactions with the Videos-in-Suit does not suffice to prove that the employees actually watched the videos, or that, even if they did watch them, they would have acquired actual or red flag knowledge. Indeed, at oral argument, Vimeo's counsel suggested that an e-mail from a user stating, "I just uploaded to Vimeo a complete rip of a feature-length film that I didn't make at the following URL and I didn't have permission to do it," would be a "reasonable" example of information sufficient to supply a service provider with red flag knowledge. (Tr. at 28:20-29:2.) The Court declines to set the bar for a service provider's acquisition of such knowledge quite so high.

Although it is conceivable that a Vimeo employee "liked," commented on or otherwise interacted with a video without actually watching it—a proposition the Court finds dubious—Vimeo has presented no evidence indicating that this is the case as to any of the videos in question. To the contrary, Vimeo does not dispute that videos placed on the "Staff Picks" channel were watched by the employees who selected them. (Pls.' 56.1 ¶ 118.) And at least one Vimeo employee, Jonathan Marcus, testified that he watched the videos that he "liked." (Frackman Decl. Ex. 9 ("Marcus Dep.") at 92:9-16; Declaration of Katie McGregor, Nov. 16, 2012 ("McGregor Decl.") ¶ 2.)

The Court is further unpersuaded by Vimeo's contention that, even if its employees did watch the videos they interacted with, they could not have obtained actual or red flag knowledge that the videos contained infringing content as a matter of law.  It is of course true that "commercially produced music in a video . . . does not constitute *per se* copyright infringement," and that copyrighted music could be legally used in a video for a variety of reasons "such as when the material in question is used with the permission of the rights holder or in a manner that constitutes fair use."   (Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Reply in Further Support of Defendants' Motion for Summary Judgment Pursuant to the DMCA Safe Harbor, Nov. 16, 2012 ("Defs.' Nov. 16 Mem.") at 16.)   See also Shelter Capital, 718 F.3d at 1021 ("[C]ontrary to UMG's contentions, there are many music videos that could in fact legally appear on Veoh.").  It is also true, as courts have observed, that a service provider may not be able to determine whether a particular work is infringing solely by the act of viewing it.  See CCBill, 488 F.3d at 114 (rejecting argument that a service provider's knowledge that its service hosted websites named "illegal.net" and "stolencelebritypic.com" amounted to "red flag" knowledge of infringement); Viacom, 718 F. Supp. 2d at 524 (observing that service providers "cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting"); MP3tunes, 821 F. Supp. 2d at 644 ("[I]f investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'").

The Court is nonetheless unprepared to hold as a matter of law that a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's

awareness that the uploader has no legal defense for his or her otherwise infringing conduct.[16] That standard would collapse the distinction the DMCA makes between actual and red flag knowledge and would run contrary to the statute's requirement that infringing content only be "objectively obvious to a reasonable person." See § 512(c)(1)(A)(ii); Fung, 710 F.3d at 1043 ("The material in question was sufficiently current and well-known that it would have been objectively obvious to a reasonable person that the material solicited and assisted was both copyrighted and not licensed to random members of the public . . . .").

Accordingly, triable issues exist as to whether Vimeo acquired actual or red flag knowledge of the infringing content in the fifty-five videos with which Vimeo employees interacted and summary judgment is denied as to them. See Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931 (WHP), 2013 WL 1987225, at *4 (S.D.N.Y. May 14, 2013) ("Since something less than a formal takedown notice may now establish red flag knowledge and EMI offers communications acknowledging likely infringement, the issue of [d]efendants' red flag knowledge cannot be resolved on summary judgment."). "On these facts, a reasonable juror could conclude that [Vimeo] had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent." Viacom, 676 F.3d at 34.

By contrast, there is no evidence that Vimeo acquired actual or red flag knowledge as to the 144 videos with which Vimeo employees indisputably did not interact, and Vimeo is thus entitled to summary judgment as to these videos.

---

[16]     Consider, for example, Verdugo's testimony that he watched a video incorporating Usher's "Love in this Club," commented on the video and admitted that he was aware that the song was performed by Usher, (Verdugo Dep. 247:9-248:14 & Dep. Ex. 224), or the fact that a Vimeo employee whitelisted a video and added it to the "Vimeo HD Channel" despite that the video's description stated: "I mixed it with the track 'Harder better faster stronger' from Daft Punk live record 'Alive 2007.'" (Berkley Decl. ¶ 42 & Ex. 38).

### b. Willful Blindness

In <u>Viacom</u>, the Second Circuit held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 35. As Judge Pauley recently noted, however, "<u>Viacom</u> offers little guidance on how to reconcile the tension between the doctrine of willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content." <u>MP3tunes</u>, 2013 WL 1987225, at *2. Section 512(m) of the DMCA provides that "[n]othing in [§ 512] shall be construed to condition the applicability of [the safe harbors] on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m). Accordingly, while a service provider may lose safe harbor protection for being willfully blind to infringement, it may not be disqualified for failure to affirmatively seek out instances of infringement. Applying this doctrine, therefore, requires careful "attention to its scope." <u>Viacom Int'l Inc. v. YouTube, LLC</u>, No. 07 Civ. 2103 (LLS), 2013 WL 1689071, at *4 (S.D.N.Y. Apr. 18, 2013).

A service provider is willfully blind to infringement if it is "aware of a high probability of the fact [of infringement] and consciously avoid[s] confirming that fact." <u>Viacom</u>, 676 F.3d at 35 (quoting <u>United States v. Aina-Marshall</u>, 336 F.3d 167, 170 (2d Cir. 2003)). Plaintiffs cite to evidence suggesting that Vimeo has turned a blind eye to infringement of musical recordings on the Website. A sample of this evidence includes the following:

- Verdugo responded to a user's question that he "see[s] all the time at vime[o] videos, (for example Lip-dub) music being used that is copyrig[ht]ed, is there any problem with this?" by telling the user "[w]e allow it, however, if the copyright holder sent us a legal takedown notice, we would have to comply." (Verdugo Dep. 118:11-120:24 & Dep. Ex. 180.)

- Blake Whitman, a member of Vimeo's Community Team, responded to a question regarding Vimeo's "policy with copyrighted music used as audio for original video

content" by telling the user, "[d]on't ask, don't tell ;)."   (Frackman Decl. Ex. 4 ("Whitman Dep.") at 233:10-234:19 & Dep. Ex. 164.)

- In an internal e-mail thread discussing whether Vimeo should stop permitting "gameplay" videos (described below) and if it can disallow such videos on a legal basis, Andrew Pile, the Vice President of Product and Development at Vimeo, wrote "[l]egal is kind of a cop out in my opinion since we ignore music and say that legality doesn't matter when it comes to the uploading rules (it[']s about you making it, which these still fulfill)."   (Verdugo Dep. 122:20-126:10 & Dep. Ex. 182.)

- Andrea Allen, a member of Vimeo's Community Team, received a message from a user providing a link to a video and stating, "I have noticed several people using copyrighted music on Vimeo.  What do you do about this?"   Allen forwarded the e-mail internally with the comment "[i]gnoring, but sharing."   (Allen Dep. 258:17-259:20 & Dep. Ex. 116.)

Although undoubtedly disconcerting, these examples—none of which relates to the Videos-in-Suit—are simply insufficient to establish willful blindness of specific instances of infringement at issue in the litigation, as is required to impute knowledge.   In the DMCA context, a plaintiff may demonstrate a service provider's knowledge of infringement by demonstrating its willful blindness thereto; as in other areas of the law, willful blindness amounts to knowledge.   See Viacom, 676 F.3d at 35 ("A person is 'willfully blind' or engages in 'conscious avoidance' *amounting to knowledge* where . . . .") (emphasis added); Aimster, 334 F.3d at 650 ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally."). Logically, then, just as the knowledge prong of § 512(c) may be met only where the plaintiff is able to prove actual or red flag knowledge as to the specific infringing content at issue in the litigation, Viacom, 676 F.3d at 34, so too must proof of willful blindness be tailored to that same infringing content.   To hold otherwise—i.e., that instances of willful blindness as to infringing content collateral to the litigation are sufficient to divest a defendant of safe harbor protection— would swallow Viacom's requirement that actual or red flag knowledge be specific to the sued- upon content.   It would, as well, complicate rather than resolve the tension described above

between "willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content."   MP3tunes, 2013 WL 1987225, at *2.

Here, it is undisputed that none of the above-provided examples—or any other piece of evidence Plaintiffs assert bears on Vimeo's willful blindness to infringement—suggests that Vimeo employees were willfully blind to infringing content in any of the 199 Videos-in-Suit. Accordingly, while Plaintiffs express frustration with what they describe generally as Vimeo's "policy of willful blindness to music infringement," (Pls.' Oct. 12 Mem. at 16), the evidence they have adduced is ultimately insufficient.

Plaintiffs' reliance on the Seventh Circuit's 2003 opinion in In re Aimster Copyright Litigation, 334 F.3d 643 (7th Cir. 2003)—which they assert stands for the proposition that a service provider can be held liable for "*all* infringements on its website" based on a showing of willful blindness (Pls.' Oct. 12 Mem. at 15)—is wholly misplaced.  In that case, the service provider took affirmative steps to encrypt information that would otherwise reflect the songs being shared on its system in an attempt to "shield itself from actual knowledge of the unlawful purposes for which the service was being used."  334 F.3d at 651.  The Seventh Circuit rejected the service provider's attempts to "obtain immunity" through such means, particularly since the record was devoid of "any evidence that [Aimster] ha[d] ever been used for a noninfringing use." Id. at 653.  Here, there is no dispute that the Website has many non-infringing purposes, and, in stark contrast to the defendant in Aimster, there is no evidence that Vimeo took affirmative steps to blind itself to infringement on a wholesale basis.

What remains of Plaintiffs' willful blindness argument amounts to little more than their frustration that Vimeo did not use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content.   As noted above, however, § 512(m) and

attendant case law make clear that service providers are under no affirmative duty to seek out infringement.  See, e.g., Viacom, 676 F.3d at 35 ("DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider."); CCBill, 488 F.3d at 1113 ("The DMCA notification procedures place the burden of policing copyright infringement . . . squarely on the owners of the copyright."); UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1112 (C.D. Cal. 2009) ("[T]he DMCA does not place the burden of ferreting out infringement on the service provider.").  This remains the case even when a service provider has developed technology permitting it to do so.  Thus, Plaintiffs' willful blindness arguments do not prevail.

### 3.    Right and Ability to Control Infringing Content From Which It Financially Benefits

Section 512(c) also provides that, to obtain safe harbor protection, a service provider must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  Protection is therefore lost if a service provider (1) has the right and ability to control the infringing activity and (2) receives a financial benefit attributable to that activity.  Id. For the reasons set forth below, the Court concludes that Vimeo lacked the right and ability to control infringing activity as that language has been defined by courts addressing § 512(c)(1)(B) of the safe harbor.  The Court thus need not decide whether it received a financial benefit.  See Io Grp., 586 F. Supp. 2d at 1150 ("Both elements must be met for the safe harbor to be denied.") (quoting Corbis Corp., 351 F. Supp. 2d at 1109).

The Second Circuit's Viacom opinion clarified what it means for a service provider to have "the right and ability to control," as the term is used in § 512(c)(1)(B).  The Court held that the right and ability to control "'requires *something more* than the ability to remove or block

access to materials posted on a service provider's website.'"  Id. at 38 (quoting MP3tunes, 821 F.

Supp. 2d at 645) (emphasis added); see also Fung, 710 F.3d at 1045.  It reasoned that because the

DMCA presupposes that service providers have the ability to remove or block content—and in

fact, requires removal in the event of actual or red flag knowledge of infringement—defining the

control provision to require nothing more than the ability to remove or block content would

"render the statute internally inconsistent."  Viacom, 676 F.3d at 37.

        As the Viacom court acknowledged, the remaining question—what amounts to

"something more" than the ability to remove or block content—is a difficult one.  Id. at 38.  It

observed that:

> [t]o date, only one court has found that a service provider had the right and ability
> to control infringing activity under § 512(c)(1)(B).  In Perfect 10, Inc. v. Cybernet
> Ventures, Inc., 213 F. Supp. 2d 1146 (C.D. Cal. 2002), the court found control
> where the service provider instituted a monitoring program by which user
> websites received "detailed instructions regard[ing] issues of layout, appearance,
> and content."  Id. at 1173.  The service provider also forbade certain types of
> content and refused access to users who failed to comply with its instructions.  Id.
> Similarly, inducement of copyright infringement under Metro-Goldwyn-Mayer
> Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005) [hereinafter "Grokster"],
> which "premises liability on purposeful, culpable expression and conduct," id. at
> 937, might also rise to the level of control under § 512(c)(1)(B).  Both of these
> examples involve a service provider *exerting substantial influence on the
> activities of users*, without necessarily—or even frequently—acquiring knowledge
> of specific infringing activity.

Id. (emphasis added); see also Shelter Capital, 718 F.3d at 1030 ("[I]n order to have 'the right

and ability to control,' the service provider must 'exert[] substantial influence on the activities of

users.'") (quoting Viacom, 676 F.3d at 38).  On that precedent, the Court interprets its task here

to be to assess whether, based on the evidence in the record, a reasonable juror could find that

Vimeo "exert[ed] substantial influence on the activities of [its] users" and therefore had the right

and ability to control infringing conduct on the Website.[17]

---

[17]     Viacom also clarified that § 512(c)(1)(B) "does not include a specific knowledge requirement."  676 F.3d

In so doing, the Court finds it appropriate to use the cases cited in the above-quoted paragraph from Viacom—Cybernet and Grokster—as analytical guideposts, both because these cases provide the basis for Plaintiffs' arguments that Vimeo satisfies the control provision and because each supplies a distinct example of conduct which the Second Circuit has suggested could constitute "something more."[18]

### a.  Cybernet—Substantial Influence Through a Monitoring Program

In Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp. 2d 1146 (C.D. Cal. 2002), an adult magazine sued a service provider that supplied age verification services to a network of participating adult websites.  Id. at 1152-53.  The participating websites—the "users" in the context of § 512(c)(1)(B)—provided adult content for Internet viewers.  Id. at 1160.  These websites joined Cybernet's network, free of charge, to take advantage of age verification software that ensured that patrons of their website were of legal age.  Id. at 1157.  Viewers accessing the websites were automatically redirected to Cybernet's website, which required that they verify their age and pay a fee.  Id. at 1158.  Upon doing so, they would gain access to the network of participating websites.  Id.  Cybernet would then pay the participating websites a commission.  Id. at 1158-59.

The Cybernet court considered Cybernet's right and ability to control in two contexts. First, discussing the right and ability to control as an element of the plaintiff's vicarious liability claim, the court found:

---

at 38.  It reasoned that "importing a specific knowledge requirement into § 512(c)(1)(B) renders the control provision duplicative of § 512(c)(1)(A)," i.e., the knowledge provision discussed above.  Viacom, 676 F.3d at 36. Thus, safe harbor protection may be lost where a service provider has the right and ability to control infringing activity, even if it has no knowledge of the specific instances of infringement at issue in the litigation.

[18]     The other examples of control provided by the Second Circuit in Viacom are not relevant here.  See Viacom, 676 F.3d at 38 n.13 (acknowledging that control may exist "where the service provider is 'actively involved in the listing, bidding, sale and delivery' of items offered for sale or otherwise controls vendor sales by previewing products prior to their listing, editing production descriptions, or suggesting prices.") (internal quotations omitted).

> Cybernet has a monitoring program in place. Under this program, participating sites receive detailed instructions regard[ing] issues of layout, appearance, and content. Cybernet has refused to allow sites to use its system until they comply with its dictates. Most importantly, it monitors images to make sure that celebrity images do not oversaturate the content found within the sites that make up Adult Check. It forbids certain types of images. This ability to control other types of images belies any attempt to argue that Cybernet does not exercise sufficient control over its webmasters to monitor and influence their conduct or to deny copyright offenders the benefits of its service.

Id. at 1173. Thereafter, considering whether Cybernet was disqualified from seeking safe harbor protection under § 512(c) based on its right and ability to control, the court stated that "Cybernet prescreens sites, gives them extensive advice, prohibits the proliferation of identical sites, and in the variety of ways mentioned earlier exhibits precisely this slightly difficult to define 'something more.'" Id. at 1181-82.

Plaintiffs argue that Vimeo's control over user content through its monitoring program similarly amounts to "something more" than the mere ability to remove or block access to infringing materials, and that Vimeo therefore exerts the type of "substantial influence" over users' activities that compels a determination that Vimeo had the right and ability to control.

Vimeo indeed has a monitoring program implemented by its employees, the foundation of which is its Terms of Service and Community Guidelines. The Terms of Service, agreed to by all registered Vimeo users, sets forth the Website's prohibited conduct and warns users that their videos or accounts may be terminated at Vimeo's discretion. (Supp. Cheah. Decl. ¶ 11 & Exs. 6-10.) Vimeo's Community Guidelines expand upon the Terms of Service, setting forth restrictions as to the content of uploaded material. (Pls.' 56.1 ¶ 32.) For instance, the Community Guidelines prohibit, inter alia, unoriginal content as well as commercials, real-estate walkthroughs and "fan vids." (Id. ¶ 33.)

Members of Vimeo's Community Team—including the aforementioned Blake Whitman, Dalas Verdugo and Andrea Allen—enforce these content restrictions with the aid of Moderator Tools.  (Id. ¶ 101.)  Vimeo's approximately forty Moderator Tools include:

- The "Thin Ice" and "Wiretap" tools, which allow the Community Team to monitor the activities of specific users suspected of uploading content violative of Vimeo's policies.  (Pls.' 56.1 ¶¶ 160, 169.)

- The "Sweet Spot" filtering tool, which searches for and lists videos the duration of which Vimeo has determined corresponds to the duration of uploaded television shows or movies.  (Id. ¶ 154.)

- The "Movie Search" tool, which runs automated keyword searches for movies currently in theaters.  (Id. ¶ 157.)

The record reflects that these monitoring efforts can be effective at removing undesirable content from the Website.  For example, in mid-2008, Vimeo instituted a policy, communicated to Vimeo users, that it would ban "game play" videos—i.e., videos that depict screen shots of video games as they are played by Vimeo users or other individuals.  (Whitman Dep. 152:2-153:6 & Dep. Ex. 131.)  Following this decision, Community Team members, using Moderator Tools, began searching the Website for offending game play videos.  (Verdugo Dep. 124:3-20; Whitman Dep. 151:6-11; 155:19-157:6.)  To demonstrate the success of these efforts, Plaintiffs point to an e-mail from Verdugo responding to a user's complaint that his gaming video was removed.  In it, Verdugo states, "[w]e are working to remove all game play videos . . . [w]e remove thousands every day and we will keep removing them."  (Frackman Decl. Ex. 13 at VC032412.)

As to the videos that are compliant with Vimeo's content restrictions, the evidence demonstrates that Vimeo staff has significant discretion to manipulate the visibility of such content on the Website.  (See Verdugo Dep. 122:20-123:10 & Dep. Ex. 182 (commenting in an internal e-mail that "we are just straight controlling our website," and adding that "hardline

Vimeo editorial fascism is important to keeping our website from becoming a trashpile.").)  In exercising such discretion, Vimeo staff members may "promote" a particular video on a popular "channel" (such as the "Staff Picks" channel), described by Verdugo as Vimeo's "version of front paging something," (Verdugo Dep. 192:7-10), "like" videos or leave positive comments on a video's web page.  As discussed above, Vimeo staff members may likewise "demote" a video through the use of a "burying" tool, the effect of which is that the video does not appear on the "Discover" tab, which displays popular videos that appear on the home screen of a logged-in user.  (Pls.' 56.1 ¶ 138.)

Finally, the record contains evidence that Vimeo staff communicated directly with some of its users regarding content, at times suggesting to them that it would tolerate the uploading of copyrighted material.  For instance, Allen responded to a question about whether a video containing copyrighted music could be uploaded by providing Vimeo's canned response for the question,[19] prefaced with, "[t]he [o]fficial answer I must give you is . . . ."  (Allen Dep. 252:8-20 & Dep. Ex. 112.)  At the bottom of the e-mail, however, she added, "[o]ff the record answer . . . go ahead and post it.  I don't think you'll have anything to worry about."  Id.  Additionally,

---

[19]     Vimeo's pre-scripted response is as follows:

> While we cannot opine specifically on the situation you are referring to, adding a third party's copyrighted content to a video generally (but not always) constitutes copyright infringement under applicable laws.

> Under relevant U.S. laws, should a copyright owner come across their copyrighted content on one of our sites, they can submit a takedown notification requesting that we remove the content.  This same area of law affords the operator of the site some level of protection from claims of copyright infringement, when dealing with user-generated-content.  The same protection does not apply to the actual poster of the content.

> Again, we cannot provide any legal advice on this subject, so if you are genuinely concerned, we suggest you contact an attorney.

(Allen Dep. 252:8-20 & Dep. Ex. 112.)

Whitman instructed a user that "[w]e can't officially tell you that using copyright music is okay. But . . ."  (Dep. Ex. 418B.)

While the foregoing establishes that Vimeo did utilize a form of monitoring program, the Court cannot conclude, based on the record, that use of that program amounted to the exertion of substantial influence on the activities of users such that the right and ability to control test is met. Rather, Vimeo's monitoring program—which, in sum and substance, consists of the Community Team's removal of certain content from the Website with the assistance of Moderator Tools, its discretion to manipulate video visibility and its intermittent communication with users—lacks the "something more" that Viacom demands.

Absent from this program are the characteristics the court found present in Cybernet's monitoring system, including guidelines that dictated to users (i.e., the participating adult websites) "layout, appearance, and content," and Cybernet's "refus[al] to allow sites to use its system until they compl[ied] with [those] dictates."  Cybernet, 213 F. Supp. 2d at 1173.  While Vimeo's monitoring program aims to filter from the Website content that veers from its mission to provide a platform for user-created "creative works and personal moments," it does not purport to, and in practice does not, exert substantial influence over the content of the uploaded material.  To the contrary, Vimeo leaves such editorial decisions in the hands of its users.

Moreover, contrary to Plaintiffs' argument, although there is evidence demonstrating that Vimeo engaged in a concerted effort to remove "game play" videos on the Website, the evidence—including the e-mail from Verdugo claiming that thousands of game play videos had been removed—does not establish that Vimeo actually did so.  In any event, it does not necessarily follow that Vimeo had control over videos containing infringing music, or any other content, beyond its ability to remove or block it upon discovery.  To conclude that evidence of

the ability to remove certain content requires a finding of control over all such content would run contrary to § 512(m)'s dictate that a service provider's safe harbor protection is not lost for failure to "monitor[] its service or affirmatively seek[] facts indicating infringing activity." It would also potentially create the perverse result that service providers stay out of the monitoring business altogether even if monitoring efforts as to some website content might be deemed fruitful to the aims of the service provider and the copyright holder alike. See Viacom, 2013 WL 1689071, at *8 ("YouTube's decisions to restrict its monitoring efforts to certain groups of infringing clips . . . do not exclude it from the safe harbor, regardless of their motivation.").

The Court further rejects the argument that because Vimeo employees have discretion as to how they interact with content on the Website—as demonstrated through its manipulation of the visibility of certain videos—it exerts substantial influence over user activity. Indeed, it is difficult to imagine how Vimeo's staff of seventy-four (as of 2012) could, through its discretionary and sporadic interactions with videos on the Website, exert substantial influence on approximately 12.3 million registered users uploading 43,000 new videos each day. (Defs.' 56.1 ¶ 18.) Vimeo presented evidence that, as of November 2012, the "likes" of current Vimeo employees constituted approximately 0.2% of all "likes" on the Website and the comments left by current Vimeo employees constituted 1.6% of all comments. (Supp. Pile Decl. ¶ 15.) Similarly, the Staff Picks channel represents only one of the approximately 354,000 channels that were on the Website in November 2012. (Id. ¶ 16.) These statistics demonstrate that the degree of influence Vimeo exerts on user activities through its staff's promotion or demotion of user content is far from substantial; indeed, it is rather arguably de minimis.

Finally, the Court rejects Plaintiffs' argument that evidence of Vimeo's communication with users with respect to the Website's content reflects the right and ability to control. As noted

above, although the Court is troubled by Vimeo employees' responses to certain user questions about possible infringement, this evidence speaks less to control than to those employees' attitudes towards infringement or their knowledge of it, which the Court has already addressed. The scattered examples of communication with users simply do not demonstrate a substantial influence over users' activities.

Having considered the totality of Vimeo's monitoring program, the Court rejects Plaintiffs' arguments and finds no triable issue as to the exertion of substantial influence on user activity.

### b. Grokster—Substantial Influence through Inducement of Infringement

Plaintiffs argue that Vimeo's substantial influence over users' activities is also demonstrated by its inducement of infringement. Conscious that the link between inducement and § 512(c)'s control provision stems from Viacom's qualified language, the Court considers Plaintiffs' inducement argument with caution. See Viacom, 676 F.3d at 38 ("[I]nducement of copyright infringement under [Grokster], which 'premises liability on purposeful, culpable expression and conduct,' . . . *might* also rise to the level of control under § 512(c)(1)(B).") (emphasis added) (quoting Grokster, 545 U.S. at 937).

In Grokster, the Supreme Court considered "under what circumstances the distributor of a product capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties." 545 U.S. at 918-19. The plaintiffs sought to hold the defendants, distributors of software products that allowed computer users to share electronic files, secondarily liable for the copyright infringement of their users. Id. at 919-21. The Supreme Court rejected the defendants' argument that because their products were capable of substantial non-infringing uses, they could not be held secondarily liable absent proof that they had actual knowledge of

specific infringement and were capable of preventing it.  Id. at 933.  It held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  Id. at 936-37.  The Court provided, however, that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject [a defendant] to liability."  Id. at 937.

Following Viacom's suggestion that inducement could establish the right and ability to control, the Ninth Circuit expounded upon the inducement theory in Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020 (9th Cir. 2013).  In that case, the individual defendant, Fung, operated websites from which users downloaded infringing copies of the plaintiffs' copyrighted works.  Id. at 1023-24.  After finding that, under Grokster, the defendants were secondarily liable for inducing infringement, id. at 1039, the Fung court proceeded to reject their attempt for safe harbor protection on the same basis.  It found that there was:

> overwhelming evidence that Fung engaged in culpable, inducing activity like that in [Grokster].  Although Fung's inducement actions do not *categorically* remove him from protection under § 512(c), they demonstrate the substantial influence Fung exerted over his users' infringing activities, and thereby supply one essential component of the financial benefit/right to control exception to the § 512(c) safe harbor.

Id. at 1046 (emphasis in original).

Fung's conclusion that evidence of "inducement actions" does not "*categorically* remove" a service provider from § 512(c) protection is a logical one.  Reading the DMCA to mandate that a service provider lose such protection for conduct identical to that which would subject it to affirmative inducement liability would mean that any attempts by a service provider to seek safe harbor protection upon a finding of affirmative inducement liability would necessarily end before they could even begin.  Cf. Viacom, 676 F.3d at 37 ("[I]f Congress had

intended § 512(c)(1)(B) to be coextensive with vicarious liability, 'the statute could have accomplished that result in a more direct manner.'") (quoting <u>Shelter Capital</u>, 667 F.3d at 1045). Accordingly, even if Plaintiffs' inducement argument has some force here, the Court is skeptical that, under the circumstances of this case, inducement alone could provide an adequate basis for a finding that Vimeo had the right and ability to control.

Plaintiffs raise several arguments to support their contention that Vimeo induced infringement and therefore had the right and ability to control infringing material.  The Court finds none to be compelling and rejects each in turn.

Plaintiffs first contend that Vimeo induces infringement "by example"—specifically by making videos that incorporate infringing content and by supporting and participating in group projects involving infringement.  Plaintiffs point to the following evidence to support this contention:

- Vimeo employees uploaded ten of the Videos-in-Suit, each of which is assumed for purposes of this motion to contain infringing music.  (Pls.' 56.1 ¶ 63.)

- One of the Videos-in-Suit was created by the "Vimeo Street Team," a group of employees at Vimeo who "create[d] videos and engage[d] with the community." (Marcus Dep. 111:11-113:12; Frackman Decl. Ex. 1 ("Lodwick Dep.") at 118:11-123:7.)

- Some Vimeo employees uploaded videos (which are not among the Videos-in-Suit) with copyrighted or unlicensed music, at least one of which has been the subject of a DMCA takedown notice.  (Pls.' 56.1 ¶¶ 290-95; Frackman Decl. Ex. 7 ("Pile Dep.") at 153:21-23.)

- On two occasions, Website users who later became Vimeo employees participated in Vimeo group projects in which several users collaborated to create videos to every song in a The Beatles album.  (Frackman Decl. Ex. 28 at EMI 00930; Lodwick Dep. 177:3-180:10 & Dep. Ex. 15.)  Because staff badges are applied to content uploaded by Vimeo employees, including content uploaded prior to their hire, a staff badge identifies Vimeo staff members participating in these collaborations.

- A web page featuring a video entitled "Helter Skelter," which incorporated The Beatles' copyrighted recording of the same name, contained a link to a lesson offered

from the "Vimeo Video School"—created in late 2010 or early 2011 by Vimeo to offer tutorials to users. The web page to which the link directs users contained the heading, "Related lessons from Vimeo Video School" and stated, "Check out these lessons to learn more about how you can make videos like this one!" (Pls.' 56.1 ¶ 351; Frackman Decl. Ex. 10 ("Mellencamp Dep.") at 184:4-188:22 & Dep. Ex. 417.)

- Vimeo created and encouraged "lip dubs." The concept of "lip dubbing" was explained on the Website as follows: "Lip Dubbing . . . Like a music video. Shoot yourself mouthing along to a song. Then sync it with a high quality copy of the song in an editing program." (Frackman Decl. Ex. 2 ("Klein Dep.") at 167:20-168:2 & Dep. Ex. 17.) The origin of lip dubbing traces to Vimeo's co-founder, Jacob Lodwick, who uploaded to the Website a video of himself lip-synching to a commercial musical recording. Other Vimeo employees appeared in or created additional lip dubs, including a particularly popular lip dub created by the entire Vimeo staff at a holiday party. (Pls.' 56.1 ¶¶ 292, 327, 338.) Vimeo encouraged the creation of lip dubs, asking users, "Why don't YOU make one??" (id. ¶ 315), and it featured lip dubs on its home page as a "Vimeo Obsession," which has been described as "cool things that our community was making on Vimeo." (Id. ¶ 327.) Others, interested in the concept of creating their own music video to a commercial song, created similar videos and soon lip dubs were an immensely popular type of video on both the Website and other video-sharing websites. (Id. ¶ 261; Lodwick Dep. 208:8-210:17 & Dep. Ex. 21; Frackman Decl. Ex. 18.)

This evidence simply does not rise to the level of that adduced in Grokster—either in quantity or in kind. In Grokster, the record was "replete with evidence" that defendants "clearly voiced the objective that recipients use [their product] to download copyrighted works." 545 U.S. at 923-24. The examples supplied by Plaintiffs reflect no such thing. To be sure, some of the videos discussed above created by Vimeo employees (for example, Lodwick's lip dub) incorporated infringing music, and users' submissions may have often incorporated the same. But the relevant standard at issue here—inducement by way of the exertion of substantial influence on the activities of users—cannot be met by evidence of stray instances of wrongful conduct by Vimeo employees on the Website and/or a generalized effort to promote videos that incorporate music. This is so particularly in light of the Supreme Court's acknowledgement in Grokster that courts be "mindful of the need to keep from trenching on regular commerce or

discouraging the development of technologies with lawful and unlawful potential."  545 U.S. at 937.  Accordingly, the Court rejects Plaintiffs' argument that Vimeo employees' purported "by example" conduct rises to the level of inducement.

Plaintiffs next argue that evidence of Vimeo employees' communication with, and provision of technical assistance to, Vimeo users constitutes inducement of infringement.  To support this argument, Plaintiffs cite to evidence that:

- A user posted a video entitled, "Julia Attempts to Lip Dub Fergie's Glamorous While Driving" and described her difficulty syncing the music with the video in the description field below the video.  Lodwick posted a comment below the user's video saying, "I will help you export with the original audio track."  (Lodwick Dep. 164:9-167:12 & Dep. Ex. 12.)

- Lodwick suggested to users through a forum post that "if they have a video with music in it, they should tag it with the word 'music' colon and then the name of that artist."  (Lodwick Dep. 186:16-187:3.)  Specifically, he wrote, "just tag the clip with music:The Beatles or music:Beck or whatever."  (Dep. Ex. 16.)

- In responding to a question about how to sync music with a video, Whitman instructed a user on a forum post that "unless you have a clap board to sync audio and the visual, it[']s usually just trial and error.  You have to get the song pretty close to start, and then just move the audio track back and forth until you get it close . . . good luck!"  (Whitman Dep. 204:24-205:21 & Dep. Ex. 154.)

- Whitman posted a comment on the Website's Help Center instructing a user to "[b]ring the music into itunes, then convert the song into AIFF, then import that file into FCP and you will be golden.  Took a while for me to figure out too."  (Frackman Decl. Ex. 28 at EMI 00571.)

- Verdugo responded to a user's inquiry about uploading lip dubbed music by writing, "[i]t[']s a pesky Windows Media problem.  If you can export your videos in another format, it should fix it."  (Berkley Decl. ¶ 70 & Ex. 66.)

- A Vimeo Video School lesson entitled, "Video 101: Editing Sound & Music with iMovie" states in part: "Then there's music.  Music does a great job setting the mood you want for your video.  To add music, click the music icon below the viewer, which will open your Music and Sound Effects libraries on the right side of the screen. There you can choose from the iMovie and iLife Sound Effects folders as well as GarageBand and iTunes.  Once you've found the piece of music or sound effect that you're looking for, drag it into the timeline."  (Berkley Decl. ¶ 54 & Ex. 50.)

Instructing users how to engage in an infringing use may be the kind of "active step[] . . . taken to encourage direct infringement" that leads to a finding of inducement. Grokster, 545 U.S. at 936 (citation omitted). Offering technical support as to the ordinary use of a service, however, is not inducement. Id. at 937. The above-referenced evidence suggests the latter. In this case, Vimeo offered technical support as to how users could incorporate music into videos; its instructions applied to lawfully and unlawfully incorporated music alike. A conclusion that the technical assistance itself is inducement of infringement because it may be relied upon by an infringer would "compromise legitimate commerce or discourage innovation having a lawful promise." Id.[20]

Similarly, with respect to Vimeo employees' communications with users, Plaintiffs provide a handful of additional examples of Vimeo employees responding to user inquiries about copyrighted music with statements that indicate tacit, or at times explicit, acceptance of infringing uploads. To be sure, some of these communications, such as Allen's advice that a user "[g]o ahead and post" a video containing infringing content, (Allen Dep. 252:8-20 & Dep. Ex. 112), may have induced a particular user to infringe in that instance. But, again, the relevant standard here—inducement by way of exertion of substantial influence on users' activities—is not met by the limited anecdotal evidence Plaintiffs have provided. To establish the right and ability to control, there must be a showing that the service provider's substantial influence over users' activities was significantly more widespread and comprehensive.

Next, Plaintiffs argue that certain structural aspects of the Website—its privacy settings for instance—amount to inducement of infringement. The Court disagrees. Nothing in the record suggests that Vimeo's privacy settings, or any other structural aspect of the Website, were

---

[20]      This conclusion notwithstanding, the fact that some of these examples implicate the popular artists The Beatles, Beck and Fergie may have some bearing on the knowledge prong of § 512(c) discussed in the preceding section.

implemented in order to enable users to upload infringing material and then restrict copyright holders' access to it.  Even if there was such evidence, it does not naturally follow that the establishment of those settings on the Website would serve to induce users to infringe or would otherwise serve to exert a substantial influence over users.

Plaintiffs further contend that evidence of inducement may be found in Vimeo's failure to implement filtering technologies that could be used to locate infringing content.  But as the Court explained above in response to a similar argument (see supra V.B.2.b), just because Vimeo can exercise control does not mean that it must.  A holding to the contrary would conflict with the express language of § 512(m), which makes clear that service providers may not lose safe harbor protection for failure to monitor or affirmatively seek out infringement.

Plaintiffs also argue that Vimeo's intent to induce infringement is reflected through its employees' internal e-mail communications regarding the current litigation.  Plaintiffs cite to e-mails in which Vimeo employees respond flippantly to Plaintiffs' efforts to thwart copyright infringement on the Website.  For instance, in an e-mail sent to Whitman and Verdugo (and also to all@vimeo.com), Pile wrote: "Who wants to start the felons group, where we just film shitty covers of these songs and write 'FUCK EMI' at the end?"  (Dep. Ex. 330.)  His and other Vimeo employees' reactions to the lawsuit, however, are of no moment to the inquiry at hand, which concerns only whether such internal comments can establish Vimeo's exertion of substantial influence over its users' infringing activities.  Undoubtedly, they could not.

Finally, Plaintiffs cite evidence that they claim demonstrates that Vimeo sought to use its supposed permissive policy toward infringement of musical recordings as a selling point to attract users from other video-sharing websites.  This argument also fails to show a substantial influence on users' activities.  In Grokster, the Supreme Court found inducement of infringement

based, in part, on the defendant's efforts to attract users who previously used the Napster service, a website notorious for facilitating the download of illegal content.  545 U.S. at 937-38.  The record in <u>Grokster</u> included internal company documents and advertising materials aimed at capturing Napster's user-base if Napster was shut down.  <u>Id.</u> at 924-25.  Plaintiffs do not point to similar evidence here, such as affirmative efforts or a desire by Vimeo to attempt to position itself as a platform for infringement.  Plaintiffs instead cite only to evidence that Vimeo chose not to implement the filtering technology that other video-sharing websites used and evidence that users chose Vimeo, in part, because they were able to upload videos containing infringing music.

In sum, having examined the record as a whole, the Court finds no basis to conclude that Vimeo exerted substantial influence on its users' activities through inducement.  This conclusion is perhaps not surprising given the nature of Vimeo's business model as compared to the business models at issue in <u>Grokster</u> and <u>Fung</u>.  Both <u>Grokster</u> and <u>Fung</u> involved peer-to-peer networks, which are ideally-suited for sharing large files and are thus attractive tools for those seeking to share and access copyrighted music and video files without authorization.  <u>Grokster</u>, 545 U.S. at 920; <u>Fung</u>, 710 F.3d at 1025.  The defendants in both cases provided an expansive platform for wholesale infringement.  In <u>Grokster</u>, the Court noted as much, stating that that the "evidence gives reason to think that the vast majority of users' downloads are acts of infringement, and because well over 100 million copies of the software in question are known to have been downloaded . . . the probable scope of copyright infringement is staggering."  514 U.S. at 923.  Similarly, in <u>Fung</u>, an expert averred that between 90 and 96% of the content of associated files available on Fung's websites were for "confirmed or highly likely copyright

infringing material." Fung, 710 F.3d at 1034 (internal quotation marks omitted).  This case thus presents circumstances dramatically different in kind and smaller in scale and scope.

Accordingly, Plaintiffs' inducement argument fails.

### 4.        Expeditious Removal of the Videos-in-Suit

Section 512(c)(1)(C) requires that a service provider, "upon notification of claimed infringement" as described in § 512(c)(3), which outlines the elements of a conforming takedown notice, "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."

On three occasions, Plaintiffs sent Vimeo a takedown notice and Vimeo removed the videos identified in those notices.  On December 11, 2008, Vimeo received a letter from EMI identifying approximately 170 videos on the Website that infringed EMI's copyrights.  (Defs.' 56.1 ¶ 51.)  Vimeo removed these videos within approximately three and one-half weeks.  (Id.) On June 15, 2010, EMI sent six takedown notices and the referenced videos were removed the same day.  (Id. ¶ 52.)  Most recently, on July 11, 2012, Vimeo removed videos after receiving a takedown notice from EMI the same day.  (Id. ¶ 53.)  Vimeo also removed the 199 Videos-in-Suit upon receiving the complaints in this action, although some of the Videos-in-Suit placed on one of the Website's channels remained accessible for download.  (Supp. Cheah Decl. ¶¶ 13-19.)

Vimeo's removal of the videos identified in the takedown notices satisfies § 512(c)(1)(C).  It cannot be disputed that Vimeo's one-day response time for Plaintiffs' June 15, 2010 and July 11, 2012 takedown notices constitutes expeditious removal.  With respect to the December 11, 2008 letter identifying approximately 170 infringing videos, the Court finds that, given the number of infringing videos at issue, the three and one-half week period it took Vimeo to comply with this notice constitutes expeditious removal.  See Google, Inc., 2010 WL

9479059, at *9 (finding an issue of fact as to whether a service provider expeditiously removed content when the evidence reflected that "sometimes [the defendant] waited between four and seventeen months to process a number of the [] notices, as well as evidence that some notices were not processed at all").  Moreover, because the complaints in this action did not constitute valid takedown notices, Vimeo was not obligated by § 512(c)(1)(C) to remove them.  See Perfect 10, Inc. v. Amazon.com, Inc., No. CV 05-4753 AHM(SHx), 2009 WL 1334364, at * 5 (C.D. Cal. May 12, 2009) (noting that it would be an "absurd result" if "the complaint or any other pleading that contains sufficient identification of the alleged infringement could count as a DMCA notification").

### C.    Pre-1972 Recordings

Lastly, Plaintiffs argue that, even if the Court finds that Vimeo is entitled to safe harbor protection, that protection cannot extend to recordings first "fixed" (i.e., recorded) before February 15, 1972.  Their argument is rooted in Section 301(c) of the Copyright Act which provides, in relevant part, that:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067.

17 U.S.C. § 301(c).  Plaintiffs contend that, because application of the DMCA affects copyright holders' rights and remedies, § 301(c) precludes such application to pre-February 15, 1972 recordings.

In December 2011, the Copyright Office published a report concluding that the DMCA safe harbors do not apply to pre-1972 records.  See Federal Copyright Protection for Pre-1972 Sound Recordings, (Dec. 2011), available at http://www.copyright.gov/docs/sound/pre-72-report.pdf (the "Copyright Office Report").  Although the Copyright Office Report notes that

there is "no reason" why DMCA safe harbors should not apply to the use of pre-1972 recordings, id. at 130, based on a reading of the statute it concludes that "it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings," id. at 132.  In UMG Recordings, Inc. v. Escape Media Grp., Inc., 964 N.Y.S.2d 106 (1st Dep't 2013), the Appellate Division reached the same conclusion after engaging in an extensive review of the statutory language and legislative histories of the relevant statutory provisions.  Id. at 110-12.

The Court shares the view that "it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings, both with respect to the rights granted under the Act and the limitations on those rights (such as section 512) set forth in the Act."  Copyright Office Report at 132; see also UMG Recordings, Inc., 964 F.Y.S.2d at 112 (it would "be far more appropriate for Congress, if necessary, to amend the DMCA to clarify its intent, than for this Court to do so by fiat.")  Accordingly, the Court grants summary judgment to Plaintiffs for all applicable Videos-in-Suit.[21]

---

[21]     One court in this district has concluded otherwise.  In MP3tunes, Judge Pauley, recognizing the issue as "one of first impression," concluded "that there is no conflict between section 301 and the DMCA's safe harbors for infringement of pre-1972 recordings."  821 F. Supp. 2d at 640.  Judge Pauley reasoned that although "[r]ead in context, section 301(c) is an anti-preemption provision ensuring that the grant of federal copyright protection did not interfere with common law or state rights established prior to 1972," it did not "prohibit all subsequent regulation of pre-1972 recordings."  Id. at 641.  He further stated that "[l]imiting the DMCA to recordings after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties."  Id. at 642.  After the publication of the Copyright Office's report, Judge Pauley, deciding a motion to certify an interlocutory appeal in the same case, noted that his prior decision on this point "may involve a substantial ground for difference of opinion, particularly in light of the Copyright Office's recent determination that the DMCA safe harbors do not apply to pre-1972 recordings."  Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931 (WHP), 2012 WL 242827, at *2 (S.D.N.Y. Jan. 9, 2012) (internal quotation marks omitted).

## VI.   Conclusion

For the foregoing reasons, a triable issue exists as to whether the ten employee-uploaded videos were "stored at the direction of a user" and as to whether Vimeo had knowledge or awareness of infringing content in the fifty-five of the 199 Videos-in-Suit with which Vimeo employees interacted. Accordingly, Vimeo's motion for summary judgment seeking safe harbor protection is granted as to the remaining 144 Videos-in-Suit, save for those Videos-in-Suit containing infringed-upon material recorded before February 15, 1972. Plaintiffs' cross-motion for partial summary judgment is granted solely as to Videos-in-Suit containing infringing musical recordings which were recorded prior to February 15, 1972.

A telephone conference has been scheduled for October 4, 2013 at 3:00 p.m. The parties shall jointly call Courtroom Deputy Allison Cavale at (212) 805-0162 at that time.

The Clerk of Court is respectfully directed to close the motions at docket numbers 52, 68, 79 and 99.

SO ORDERED.

Dated:      September 18, 2013
            New York, New York

Ronnie Abrams
United States District Judge

56