UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware limited liability company; CAROLINE RECORDS, INC., a New York Corporation; VIRGIN RECORDS AMERICA, INC., a California Corporation, | CASE NOS. 09 CV 10101 (RA)  09 CV 10105 (RA) |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION AND MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL** |
| v. | |
| VIMEO, LLC d/b/a VIMEO.COM, a Delaware Limited Liability Company; CONNECTED VENTURES, LLC, a Delaware Limited Liability Company, and DOES 1-20, inclusive, | |
| Defendants. | |
| EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation; EMI APRIL MUSIC, INC., a Connecticut Corporation; EMI VIRGIN MUSIC, INC., a New York Corporation; COLGEMS-EMI MUSIC, INC., a Delaware Corporation; EMI VIRGIN SONGS, INC., a New York Corporation; EMI GOLD HORIZON MUSIC CORP., a New York Corporation; EMI U CATALOG, INC., a New York Corporation; EMI UNART CATALOG INC., a New York Corporation; JOBETE MUSIC CO., INC., a Michigan Corporation; and STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, | |
| Plaintiffs, | |
| v. | |
| VIMEO, LLC d/b/a VIMEO.COM, a Delaware Limited Liability Company; CONNECTED VENTURES, LLC, a Delaware Limited Liability Company, and DOES 1-20, inclusive, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

Introduction .................................................................................................................... 1

I.   VIMEO IS NOT ENTITLED TO RECONSIDERATION. ............................................... 2

    A.   The Legal Standard ................................................................................. 2

    B.   There Is No Basis To Reconsider The Court's Determination That Issues Of
    Fact Precluded Summary Judgment As To Actual Or Red-Flag Knowledge. ....... 3

        1.   There Was Ample Evidence That Vimeo Knew That The Works At
        Issue Were Infringing Or Was Aware Of "Facts and Circumstances"
        That Made Infringement Apparent. ........................................................... 4

        2.   The Court Correctly Rejected Vimeo's Unsupported Theory That Any
        "Colorable" Defense Necessarily Precludes Knowledge. ......................... 9

        3.   The Court's Order Is Consistent With The Purposes Of The DMCA
        And Does Not Place Vimeo In An "Untenable Position." ...................... 13

II.  THE COURT SHOULD CERTIFY ALL RELEVANT DMCA ISSUES, NOT
    ONLY THE TWO DISCRETE ISSUES RAISED BY VIMEO. .................................... 13

    A.   Only Certification On *All* Of The DMCA Issues Above Would Materially
    Advance The Termination Of The Litigation. ....................................................... 14

    B.   The Decision Presents Controlling Issues Of Law On Which There Is
    Substantial Ground For Difference Of Opinion .................................................... 15

III. PLAINTIFFS CONSENT TO A STAY ONLY IF THE COURT CERTIFIES ITS
    ORDER FOR IMMEDIATE APPEAL ON ALL RELEVANT ISSUES. ...................... 23

Conclusion ................................................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..................................................................7

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.*,
239 F.3d 619 (4th Cir. 2001) ....................................................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................4

*Anwar v. Fairfield Greenwich Ltd.*,
800 F. Supp. 2d 571 (S.D.N.Y. 2011)........................................................3

*Bourne v. Walt Disney Co.*,
68 F. 3d 621 (2d Cir. 1995).........................................................................9

*Capitol Records, Inc. v. MP3tunes, LLC*,
No. 07 Civ. 9931(WHP), 2013 WL 1987225 (S.D.N.Y. May 14, 2013) ...............19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................4

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ....................................................................5

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
681 F. Supp. 2d 470 (S.D.N.Y. 2010)........................................................3

*Hendrickson v. Amazon.com, Inc.*,
298 F. Supp. 2d 914 (C.D. Cal. 2003) .......................................................3

*In re Fosamax Prods. Liab. Litig.*,
No. 06 MD 1789(JFK), 2011 WL 2566074 (S.D.N.Y. June 29, 2011)..................22

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
113 F. Supp. 2d 613 (S.D.N.Y. 2000).........................................................3

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998).........................................................................9

*Isra Fruit Ltd. v. Agrexco Agr. Export Co.*,
804 F.2d 24 (2d Cir. 1986)..........................................................................14

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Klinghoffer v. SNC Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990)...................................................................................22

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   454 F. Supp. 2d 966 (C.D. Cal. 2006) .............................................................5, 18

*Mohawk Indus., Inc. v. Carpenter*,
   130 S. Ct. 599 (2009)...........................................................................................15

*New York v. Parenteau*,
   382 F. App'x 49 (2d Cir. 2010) .............................................................................2

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ........................................................................12, 21

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ...................................................... *passim*

*Phillips ex rel. Green v. City of N.Y.*,
   453 F. Supp. 2d 690 (S.D.N.Y. 2006).....................................................................3

*Primavera Familienstifung v. Askin*,
   137 F. Supp. 2d 438 (S.D.N.Y. 2001)................................................................8, 15

*Stoner v. Young Concert Artists, Inc.*,
   No. 10 CV 8025(RPP), 2011 WL 4809809 (S.D.N.Y. Oct. 11, 2011)....................3

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   600 F.3d 93 (2d Cir. 2010)...................................................................................19

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
   964 N.Y.S.2d 106 (N.Y. App. Div. 2013) ............................................................23

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
   667 F.3d 1022 (9th Cir. 2011) .............................................................................12

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012).......................................................................... *passim*

*Weber v. United States*,
   484 F.3d 154 (2d Cir. 2007)................................................................................14

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012)..................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**STATUTES**

17 U.S.C. § 512(i) ............................................................................... *passim*

28 U.S.C. § 1292(b) ....................................................................14, 15, 22

Fed. R. Civ. Proc. Rule 56(a) ....................................................................4

**OTHER AUTHORITIES**

Charles Alan Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. § 3930 .................................14

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats*,
    50 Ariz. L. Rev. 577, 598 (Summer 2008) ............................................10

H.R. Rep. No. 105-551, pt. 1, at 26 (1998).................................................3

H.R. Rep. No. 105-551, pt. 2, at 49 (1998).................................................13

S. Rep. 105-190 (1998).................................................................10, 11, 21

## Introduction

Vimeo's request that the Court reconsider one discrete portion of the Court's September 18 Order (the "Order") is a thinly disguised appeal brief, which almost entirely rehashes and repeats the same arguments that Vimeo made (extensively) in its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion. Vimeo offers nothing in the way of new law, new facts, or critical errors or omissions that justifies reconsideration of the single aspect of the Court's order at issue – namely, that "***a triable issue remains***" as to whether Vimeo possessed actual or red flag knowledge of infringement as to 35 specific videos with which Vimeo interacted. Order at 30 (emphasis added).[1]

As the Court found, there was ample evidence in the record that Vimeo had viewed or otherwise interacted with each of the 35 videos and that the facts and circumstances surrounding those videos were such that Vimeo knew or should have known that they were infringing. By contrast, Vimeo never proffered any evidence (far less sufficient evidence to meet its summary judgment burden) that it was unaware of the 35 videos or that it actually believed or had any reason to believe that the works were not infringing. Vimeo's sole legal argument – that it can **never** be imputed to have knowledge of infringement as long as there is some hypothetical defense to infringement albeit not supported by any facts in the record – was briefed by Vimeo, considered by the Court, and properly rejected. *See id.* at 32-33 ("The Court is nonetheless unprepared to hold as a matter of law that a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's awareness that the uploader has no legal defense for his or her otherwise infringing conduct.").

---

[1]  Pursuant to Judge Castel's May 31, 2012 Order, Plaintiffs intend to file a Motion for Leave to Amend their Complaints to add additional infringements that were discovered during the pendency of this lawsuit. Plaintiffs' proposed amended schedules would add more than 1,000 additional infringed works, including works used in videos that were uploaded by Vimeo employees or that Vimeo interacted with in ways equivalent to those noted in the Court's Order, as well as sound recordings that were fixed prior to February 15, 1972.

Appellate review solely on the two narrow issues on which Vimeo seeks certification – (1) whether issues of fact exist as to its actual or red-flag knowledge, and (2) whether the DMCA applies to state law claims involving pre-1972 sound recordings – would not further interests of judicial economy and efficiency.  To the contrary, immediate appeal solely on these issues would result in multiple and piecemeal appellate proceedings concerning interrelated "controlling issues" interpreting the DMCA, with the first proceeding addressing those portions of the Order that Vimeo disagrees with and the remaining issues later addressed only after final judgment. Thus, while Plaintiffs do not dispute that the Order *as a whole* presents important and novel issues that are properly the subject of immediate appeal, the only certification order that would be appropriate is one that includes *all* relevant issues, including the issues of Vimeo's right and ability to control infringing activity on its system, its willful blindness to infringing activity, its actual or red flag knowledge (of the 35 videos subject to Vimeo's motion, the 10 employee-uploaded videos, and the remaining videos as to which the Court found no knowledge), and its repeat infringer policy.

Finally, if there is to be an immediate appeal, the record in this Court should be as complete as possible.  Therefore, in the event the Court elects to certify the Order, Plaintiffs request that the Court first rule on Plaintiffs' motion to amend.  In that event, Plaintiffs do not oppose a stay of the proceedings.  However, if the Court issues the more limited certification order requested by Vimeo, then Plaintiffs submit there is no reason to issue a stay.

## I.      VIMEO IS NOT ENTITLED TO RECONSIDERATION.

### A.      The Legal Standard

Motions for reconsideration are "generally not favored."  *New York v. Parenteau*, 382 F. App'x 49, 50 (2d Cir. 2010).  Rather, they are "extraordinary remed[ies] to be employed

sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000).  A request for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Stoner v. Young Concert Artists, Inc.*, No. 10 CV 8025(RPP), 2011 WL 4809809, at *3 (S.D.N.Y. Oct. 11, 2011); *see also Anwar v. Fairfield Greenwich Ltd.*, 800 F. Supp. 2d 571, 573 (S.D.N.Y. 2011).  Moreover, "a motion for reconsideration is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." *EMI Entm't World, Inc. v. Karen Records, Inc.*, 681 F. Supp. 2d 470, 471 (S.D.N.Y. 2010).  As set forth below, Vimeo cannot and does not point to any "controlling decisions or data" overlooked by the Court.  Instead, its Motion is precisely the type of "wasteful repetition of arguments already briefed, considered, and denied." *Phillips ex rel. Green v. City of N.Y.*, 453 F. Supp. 2d 690, 745 (S.D.N.Y. 2006).

### B.    There Is No Basis To Reconsider The Court's Determination That Issues Of Fact Precluded Summary Judgment As To Actual Or Red-Flag Knowledge.

The DMCA is an ***affirmative defense*** on which Vimeo bears the burden with respect to each element – including that it "does not have actual knowledge that the material or an activity using the material on the system or network is infringing" or "in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c); *see also* H.R. Rep. No. 105-551, pt. 1, at 26 (1998) ("[A] defendant asserting [Section 512(c)] as an affirmative defense … bears the burden of establishing its entitlement."); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914, 915 (C.D. Cal. 2003) ("[B]ecause Amazon is asserting an affirmative defense … it must establish all elements of the safe harbor rule under the DMCA.").  As the moving party, Vimeo had both an initial burden of production and the ultimate burden to persuade the Court that there is "no genuine dispute as to any material

fact."  Fed. R. Civ. Proc. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (all evidence must be viewed in the

light most favorable to the non-moving party, and all justifiable inferences are to be drawn in

their favor).

> **1.     There Was Ample Evidence That Vimeo Knew That The Works At Issue Were Infringing Or Was Aware Of "Facts and Circumstances" That Made Infringement Apparent.**

Contrary to Vimeo's (repeated) assertion, the Court's ruling was based on far more than

"mere awareness on the part of Vimeo employees that certain Videos-in-Suit contained

commercial music" (Motion at 11), although that would have been sufficient since Vimeo knew

*it* did not have consent or authorization to use that commercial music in its business.  Rather, the

Court's decision was based on 35 *specific* infringing videos that, based on the record, Vimeo

plainly had seen, commented on, or otherwise interacted with.  In its Order, the Court correctly

noted that (1) Vimeo employees (prominently identified as Vimeo "Staff") commented on or

"liked" at least *26* of the videos (including at least 15 of those for which it now seeks

reconsideration); (2) Vimeo employees placed *two* of the infringing videos on channels created

or "curated" by Vimeo (such as Vimeo's "Staff Picks" channel); (3) Vimeo employees

"whitelisted" *20* infringing videos and "buried" *four* more, both acts which require review of the

videos or of the users' accounts; and (4) *29* videos are identified as uploaded by subscribers to

Vimeo's "Plus" service (a premium fee-based service), whose accounts and videos Vimeo states

it reviews for compliance with its policies.  *See* Order at 29-30.  Thus, the evidence was clear

that Vimeo had seen and encountered these videos.  Vimeo did not proffer a single declaration

from any Vimeo Staff claiming that he or she did not see the videos at issue or denying

knowledge that any particular video featured infringing music.[2]  *See id.* at 31 ("Although it is conceivable that a Vimeo employee 'liked,' commented on or otherwise interacted with a video without actually watching it – a proposition the Court finds dubious – Vimeo has presented no evidence indicating that this is the case as to any of the videos in question."); *id.* ("Vimeo has not presented any evidence disputing that its employees interacted with these videos….").[3]

Nor did the Court "presume[]" that the works were *"per se"* infringing or that viewing them "*ipso facto* could give rise to 'red-flag' knowledge."  Motion at 6.  Rather, its conclusion was that in each of the 35 instances, the "totality of the circumstances" (Order at 31) supported an inference that Vimeo knew or should have known that the music was unauthorized and thus infringing, or at the least, that a "'reasonable juror'" could so conclude on the basis of the record. *Id.* at 33.  For example, the Court noted that "most, if not all, of the copyrighted songs in the videos would be characterized by many as popular, and in some cases legendary.*"  Id*. at 30. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 987 (C.D. Cal. 2006) (popular "Top 40" songs "are almost invariably copyrighted"); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013) ("The material in question was sufficiently current and well-known that it would have been objectively obvious to a reasonable person that the material solicited and assisted was both copyrighted and not licensed to random members of the public….").[4]

---

[2]  In fact, in its Summary Judgment Motion, Vimeo contended that "there is no evidence that Vimeo knew these videos were even on its system at all" (MSJ Brief at 22), which was demonstrably false.

[3]  Vimeo claims that it was undisputed that it had ***not*** viewed 15 videos that had been uploaded by Vimeo "Plus" users and/or by users that had been "whitelisted."  That is false.  Vimeo testified that moderators reviewed all "Plus" accounts, including all videos submitted by "Plus" users.  Plaintiffs' SUF 178-79.  Vimeo also admitted that a video labeled as "whitelisted" would indicate that "a moderator has looked at this already."  SUF 147 (quoting Deposition of Andrea Allen at 182:23-183:15 & Ex. 89).

[4]  Vimeo purports to distinguish *Fung* on the basis that it involved an "online platform that was dedicated to file-sharing."  Motion at 9.  That distinction is irrelevant to the Court's holding, which cited *Fung* for the proposition

The Court also noted that many other indicia reflecting Vimeo's knowledge were present, including (1) a video containing Usher's "Love in this Club," which was viewed and commented on by Vimeo employee Dalas Verdugo, who testified that he knew the work and its performer; and (2) a video containing a Daft Punk recording that was whitelisted and added to the "Vimeo HD Channel" notwithstanding the uploader's comment that he personally mixed the video with the commercial recording.  Order at 33 n.16.  The record is replete with other examples, such as a "Staff Pick" video set to Blur's "Girls and Boys," whose uploaders advised Vimeo (which then responded to them) that they were "motivated" by Vimeo's own posted video set to and synchronized with commercial music, and a video uploaded by a friend of Vimeo founder Jake Lodwick noting that she received assistance from Lodwick in synchronizing the audio.  The infringing nature of the videos also was apparent on the face of the videos and the webpages surrounding them, as several had Plaintiffs' names prominently displayed either in the video itself or in the video description or tags, and many videos included music "credits" with the name of the popular artist and/or song title.  SUF 80-85.

In addition, Plaintiffs presented extensive evidence that these videos were viewed in the context of Vimeo's knowledge and awareness of copyright law and the unauthorized use of music.  For example, Vimeo warned users that adding a third party's copyrighted content to a video "generally" constitutes copyright infringement; wrote internal memoranda stating that "copyright holders are expected to charge a revenue share of 20-50 percent for use of music"; and acknowledged that Vimeo users were including "*copyrighted* music in our videos."  Vimeo also advised users that infringing copyrighted music, while "technically" not legal, was "not a big deal" and that "the FBI won't come busting down your door."  Moreover, Vimeo knew *it* did

---

that the fact that the videos contained extremely popular ("and in some cases legendary") works was relevant to ascertaining Vimeo's actual or red-flag knowledge.  Order at 30.  That basic proposition is not controversial.

not have licenses from music copyright owners for *its* own commercial use of music, while at the same time requiring users to grant Vimeo licenses to use their content.  Nevertheless, Vimeo Staff taught users how to synchronize commercial music to video, created videos in which they used commercial music without authorization (thereby necessarily knowing that the music used was infringing), specifically solicited users to upload videos with infringing music such as "lip dub" videos, and participated in infringing group "projects."  *See*, *e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 & n.5 (9th Cir. 2001) ("apparent" knowledge where "Napster executives have recording industry experience," "enforced intellectual property rights in other instances," "downloaded copyrighted songs from the system," and "promoted the site with screen shots listing infringing files").

Vimeo's claim that the Court now should revisit these issues by independently analyzing each of the 35 videos is disingenuous.  As an initial matter, the evidence sufficient for such an analysis was placed before the Court by Plaintiffs, including not only copies of the videos themselves but relevant screenshots depicting their appearance on the Vimeo website, and, as the Court noted, in a "summary exhibit submitted by Plaintiffs."  Order at 29.  Vimeo was aware of the specific videos at issue from the time Plaintiffs' lawsuit was filed.  Vimeo conceded, for purposes of the motion, that Plaintiffs owned the recordings embodied in the videos.  But Vimeo has not identified a single example of a particular video for which it claims there are no disputed factual issues as to its lack of actual or red flag knowledge.  In its summary judgment papers Vimeo never engaged in the "individualized" analysis it now says is necessary, and it never even proffered the evidence necessary to conduct such an analysis, including the very evidence that Vimeo now claims the Court must undertake to evaluate on its own – such as whether Vimeo might reasonably have believed that the music was in the public domain, that it was owned or

licensed by the uploader, that it was a fair use, or that Plaintiffs engaged in activities that might have led Vimeo to believe that the use was authorized. In fact, while Vimeo criticizes the Court's decision for failing to assess each of the 35 videos individually, the few scraps of "evidence" that it did present on this issue were highly generalized. Motion at 7 n.4 (Vimeo receives counter-notifications from time to time or it sometimes finds it difficult to ascertain the copyright owner); *see also Primavera Familienstifung v. Askin*, 137 F. Supp. 2d 438, 444 (S.D.N.Y. 2001) ("The real difficulty with [defendant's] motion for reconsideration, however, lies in the fact that in its summary judgment briefing [defendant] failed to set forth the undisputed facts and relevant legal theory entitling it to summary judgment….").

The Court's conclusion is wholly consistent with and supported by *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012). In *Viacom*, the Second Circuit reversed summary judgment for the defendant on the issue of actual or red flag knowledge where, for example, defendants searched for particular infringing videos to "gauge their value based on video usage," included examples of certain works at issue in an internal report, and referenced certain infringing videos in internal emails. *Id.* at 33. Also, just as is the case here, the court found that YouTube's awareness of videos uploaded to its system containing content from "well-known shows" may have sufficed to confer actual or red flag knowledge of infringement. *Id.* The court held that "on these facts, a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts and circumstances from which specific infringing activity was apparent." *Id.* at 34. As in *Viacom*, this Court did not find that Vimeo had acquired the requisite knowledge based upon its general knowledge of infringing content on its system; rather, this Court found that with respect to these 35 ***specific*** videos, there was sufficient evidence on which a "reasonable juror could conclude that [Vimeo] had actual

knowledge of specific infringing activity, or was at least aware of facts and circumstances from which specific infringing activity was apparent."  Order at 33.

### 2. The Court Correctly Rejected Vimeo's Unsupported Theory That Any "Colorable" Defense Necessarily Precludes Knowledge.

The remainder of Vimeo's motion for reconsideration is, in essence, a rehash of its argument that infringement cannot be "apparent" as long as there is an hypothetical "colorable" defense to infringement.  Motion at 11 ("[W]here a colorable claim of fair use exists, merely watching an original video that contains copyrighted music, without more, cannot as a matter of law yield evidence of infringement that is sufficiently 'conspicuous and obvious' to qualify as a 'red flag.'").  This is the same argument that Vimeo made in its Motion for Summary Judgment. *See*, *e.g.*, MSJ Brief at 22-23 ("Service providers like Vimeo have no way of knowing which copyright owners have rights in which works; which aspects of those works those rights holders have licensed to which third parties; which materials copyright owners or licensees have chosen to put on the Internet for promotional reasons; and what uses of a given work would be considered de minimis or fair uses under the Copyright Act.").  It was fully considered and rejected by the Court.  Order at 32-33.  Vimeo does not offer any additional facts or legal authority here that it did not present with its Summary Judgment Motion; nor does it identify any portions of the factual record that the Court failed to consider.  Even though Vimeo bears the burden of proving its purported defenses (such as fair use or authorization), neither Vimeo nor any of its uploaders asserted any such defenses to infringement (nor could they), far less put forth any evidence or argument that any defenses are meritorious or even "colorable."  *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) ("Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on the proponent.");

*Bourne v. Walt Disney Co.*, 68 F. 3d 621, 630-31 (2d Cir. 1995) (existence of a license is an affirmative defense on which the defendant bears the burden).

In any event, Vimeo does not cite any authority for its theory, and there is none. The statute and its legislative history are clear that knowledge is present whenever the "infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances" (S. Rep. 105-190, at 44 (1998)), irrespective of whether some hypothetical defense conceivably might be raised. As the Court correctly found, the rule espoused by Vimeo effectively would read the red-flag knowledge standard out of the statute. *See* Order at 32-33 ("The Court is nonetheless unprepared to hold as a matter of law that a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's awareness that the uploader has no legal defense for his or her otherwise infringing conduct."). Put another way, if a service provider "simply could claim that the possibility that some files might be fair use" or claim doubt as to the copyright or licensing status of a work, then "infringement never can be 'apparent' as to any file," making the knowledge provision of the DMCA a nullity. Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats*, 50 Ariz. L. Rev. 577, 598 (Summer 2008); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1169 (C.D. Cal. 2002) (rejecting argument that defendant "would not necessarily know Perfect 10's copyrights were infringed because they might be licensed"). Vimeo does not identify *any* circumstance that could constitute knowledge under its hypothetical construct.[5] Ultimately, Vimeo repeats its position that the DMCA (and its knowledge provision)

---

[5] As the Court noted, Vimeo's hypothetical example of a user e-mail stating "'I just uploaded to Vimeo a complete rip of a feature-length film that I didn't make at the following URL and I didn't have permission to do it'" only proved that Vimeo's theory would set the bar for a service provider's acquisition of knowledge far too high and virtually eliminate red-flag knowledge. Order at 31. In fact, even in this egregious example Vimeo presumably could claim that it lacked knowledge because of hypothetical issues concerning the chain of title, copyrightability, fair use, or some other theoretical defense.

amounts to a "notice-and-take-down" statute, and that no service provider ever could be liable unless it had been provided with formal DMCA notice.  MSJ Brief at 22-23.  That is not the law. *See Viacom*, 676 F.3d at 27-28 ("[A]ctual knowledge of infringing material, [red flag knowledge], or receipt of a takedown notice will each trigger an obligation to expeditiously remove the infringing material."); S. Rep. 105-190 at 45 ("For their part, copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights.").

The few citations offered by Vimeo in support of its "colorable defense" theory are unavailing.  In fact, Vimeo's discussion of the legislative history is wholly (if not deliberately) misleading.  The portions of the Senate and House Reports quoted by Vimeo pertain to the separate safe-harbor in Section 512*(d)*, which "limit[s] the liability of a service provider that refers or links users to an online location containing infringing material or activity by using 'information location tools' such as hyperlink directories and indexes." *Id.* at 48.  While both safe-harbors contain a red-flag knowledge provision, there are critical differences between the two and the manner by which the service provider can acquire knowledge of infringement.  A content-sharing site such as Vimeo maintains the infringing content *on its own system*.  Vimeo has the ability to review specific content, and it regularly exercises that ability, including by cataloging, promoting, burying, whitelisting, commenting on, and frequently deleting content on its system.  The provider of an "information location tool" (such as a search engine), on the other hand, merely links to a third-party website, and thus its ability to review or analyze content contained on that third-party site is necessarily limited.  For that reason, Congress was careful to limit its discussion of "red-flag" knowledge under Section 512*(d)* to activities undertaken by the search engine while compiling its directory of links, such as engaging in a "brief cataloging visit" of the third-party website. *Id.*  Moreover, in **neither** instance was Congress referring to

video-sharing sites such as Vimeo whose business is premised on the collection and exploitation (such as by publicly performing or distributing) of a catalog of video content.  Such websites did not even exist (certainly not in the form taken by Vimeo) in 1998.

Nor is Vimeo's argument supported by the three cases it cites.  Not one of those cases involved circumstances remotely analogous to those here, including because in none of those cases did the service provider review and interact with the specific works at issue, far less engage in activities such as commenting on the works, "liking" them, or featuring and promoting them in special channels.  To the contrary, both *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1038 (9th Cir. 2011), and *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007), involved claims that the defendant **generally** was aware that it was hosting infringing content.  In *Shelter Capital*, the plaintiff argued that the defendant should have been aware of the existence of infringing music videos on its system because it hosted a "music videos" category.  In *CCBill*, the plaintiff claimed only that infringement should have been apparent because the defendant derived some of its content from websites with names such as "illegal.net" and "stolencelebritypics.com."  The only other case cited by Vimeo, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 733 (S.D.N.Y. 2012), involved the completely different, and highly specific, circumstance where the plaintiff attempted to impute knowledge based on an improper DMCA notice.  *See* 17 U.S.C. § 512(c)(3)(B)(i) ("[A] notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) ***shall not be considered … in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent***....") (emphasis added).

12

### 3.      The Court's Order Is Consistent With The Purposes Of The DMCA And Does Not Place Vimeo In An "Untenable Position."

Vimeo's claim that the Court's Order places Vimeo in an "untenable position" and "creates a perverse incentive for service providers … to never view any content posted to its website" (Motion at 9-10) grossly overstates the decision and misunderstands the DMCA (and ignores that Vimeo intentionally viewed and reviewed content on its website in order to "curate" and conform the website to its business model). The DMCA is not a one-way street, designed to protect and immunize service providers from infringing conduct. It was designed to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" (H.R. Rep. No. 105-551, pt. 2, at 49 (1998)), and thus the immunities are accorded only to "innocent" service providers. *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001). Where, as here, a service provider becomes aware of (and in many instances overtly participates in or sanctions) specific infringements, yet fails to remove that content from its system, it is fair to place on the service provider the risk that it will lose safe-harbor.

## II.      THE COURT SHOULD CERTIFY ALL RELEVANT DMCA ISSUES, NOT ONLY THE TWO DISCRETE ISSUES RAISED BY VIMEO.

In addition to (or alternatively to) its request for reconsideration, Vimeo requests certification of the Order, so that the Court of Appeals may consider the two narrow issues (and only the two issues) on which its Motion for Summary Judgment was denied. In contrast to the issues raised by Vimeo, none of which finally decided the case in either party's favor, those portions of the Court's Order *granting* Vimeo's Motion on the issues of the "right and ability to control infringing activity," "willful blindness" to infringement, actual or red flag knowledge, and repeat infringer policy form the large majority of the Court's decision and were dispositive

of much of Plaintiffs' case.  These are complex and novel controlling issues of law on which there is little direct authority.  For certification to be warranted and in the interest of judicial economy and efficiency, ***all*** of the relevant DMCA issues should be addressed in any certification order, and they should collectively and simultaneously be addressed on appeal.[6]

**A.  Only Certification On *All* Of The DMCA Issues Above Would Materially Advance The Termination Of The Litigation.**

Plaintiffs agree that the DMCA issues are critical to this litigation, and thus an immediate appeal of the October 18 Order would further interests of judicial economy and efficiency. Specifically, an immediate appeal would permit the parties to obtain the Second Circuit's guidance on all of the DMCA-related issues involved in the first phase of this case.  An immediate appeal is especially warranted because Plaintiffs are seeking to amend their Complaints to add infringements of more than 1,000 works that they discovered during the pendency of this lawsuit, and thus a large number of works are at issue and potentially impacted by the Order.  Not only the parties to this litigation, but copyright owners and service providers will benefit from guidance on their rights and obligations in the online environment; thus immediate review is in the public interest.  *See Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007) ("Congress [in passing 28 U.S.C. § 1292(b) also sought to assure the prompt resolution of knotty legal problems."); *see also* Charles Alan Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. § 3930 ("The opportunity to achieve appellate resolution of an issue important to other cases … provide[s] an additional reason for certification.").

---

[6]  While "section 1292(b) authorizes certification of *orders* for interlocutory appeal, not certification of *questions*," "in certifying an order for interlocutory review it is helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified…." *Isra Fruit Ltd. v. Agrexco Agr. Export Co.*, 804 F.2d 24, 25 (2d Cir. 1986).  Thus, Plaintiffs request that any certification order include the issues set forth in these papers, and they oppose any certification order that does not include those issues.

It is equally clear that only certification as to all of the relevant questions would serve the purposes of Section 1292(b).  Any other result – including certification as to only the two issues raised by Vimeo – would have the opposite result.  Vimeo's requested certification order would mean piecemeal and multiple appellate proceedings relating to the DMCA.  It necessarily would require that the Second Circuit entertain at least two separate appellate proceedings – one immediate proceeding on the two issues presented in Vimeo's motion, and a second one, after judgment, on the remaining issues.  *See Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009) ("Permitting piecemeal, prejudgment appeals, we have recognized, undermines 'efficient judicial administration' and encroaches upon the prerogatives of district court judges, who play a 'special role' in managing ongoing litigation."); *see also Primavera Familienstifung,* 139 F. Supp. 2d 567, 571 (S.D.N.Y. 2001) ("The institutional efficiency of the federal court system is among the chief concerns underlying Section 1292(b)…. The efficiency of both the district court and the appellate court are to be considered, and the benefit to the district court of avoiding unnecessary trial must be weighed against the inefficiency of having the Court of Appeals hear multiple appeals in the same case.").  The certification order requested by Vimeo also would prejudice Plaintiffs, as it would require them to defend Vimeo's appeal on the two discrete issues to which Vimeo objects, while according them no opportunity to seek appellate review of the majority of the Court's decision, which dismissed much of Plaintiffs' claims.

**B.**     **The Decision Presents Controlling Issues Of Law On Which There Is Substantial Ground For Difference Of Opinion.**

The portions of the Court's September 18 Order not mentioned in Vimeo's Motion present controlling issues of law that are as significant or more significant – both in precedential value and in importance to this litigation – as the two issues raised in its Motion:

1.     **Right And Ability To Control.**  The Court's holding that Vimeo did not have the right and ability to control infringing activity on its system, *see* 17 U.S.C. § 512(c)(1)(B), is the largest and most significant single issue addressed by the Court.  Subsumed within this ruling are several important and novel legal issues, including:

●     Whether acts such as (1) the implementation and use of content monitoring programs designed to manipulate the visibility and availability of specific content and to enforce strict content "guidelines"; (2) providing employee and staff feedback and approval as to uploaded content; (3) providing infringing content, instructing and encouraging users to provide infringing content; and (4) interacting with uploaded content, constitute the "something more" noted by *Viacom* to give rise to the right and ability to control infringement.

*Viacom* recognized that the scope of a service provider's "right and ability to control" is a thorny issue, made especially so by a "confused legislative history," statutory language whose logical interpretation could create a "'catch 22,'" and the fact that "to date, only one court [*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (C.D.Cal.2002),] has found that a service provider had the right and ability to control infringing activity under § 512(c)(1)(B)." 676 F.3d at 37-38.  Moreover, since *Viacom* remanded this issue, it did not determine whether the facts presented there would have met its test, and more generally cited *Cybernet* as an "example" of the right and ability to control, but left open other possible scenarios.

●     Whether conduct and statements that encourage others to infringe – such as posting infringing content, appearing in and assisting with the making and uploading of infringing content, encouraging and sanctioning the creation of infringing videos on a website's home page and public forums (including a type of video – "lip dubs" – that necessarily uses copyrighted music), promoting and "liking" such content, providing technical assistance

16

specifically instructing how to infringe music to those engaged in infringement, communicating both internally and directly to users that infringing works can be posted, hiring a team of employees to monitor and "curate" content, and refusing to implement available filtering technologies – is "inducement" for purposes of the right and ability to control, notwithstanding that the total scope of content on Vimeo may not have been overwhelmingly devoted to acts of "wholesale infringement."  Order at 52.

The *Viacom* Court also held that inducement "*might* also rise to the level of control."  676 F.3d at 38 (the italics were this Court's, but not in the original).  *Viacom* did not further explain that qualification, and this Court was "skeptical that, under the circumstances of this case, inducement **alone** could provide an adequate basis for a finding that Vimeo had the right and ability to control."  Order at 47 (emphasis added).  Clearly, *Viacom* contemplated that at least under some circumstances inducement "alone would be sufficient," but did not provide guidelines or describe the type of evidence that would be sufficient.

Additionally, this Court recognized that "Vimeo did utilize a form of monitoring program," but it found that it was not the type of monitoring program envisioned by Viacom as evidencing the right and ability to control.  Order at 43.  Other than quoting *Cybernet* (which involved a totally different business model), *Viacom* never described the parameters of a monitoring program as it applied to a website and business such as Vimeo's.  Moreover, the Court pointed out that the number of videos on Vimeo demonstrate that "the degree of influence Vimeo exerts on user activity through its staff's promotion or demotion of user is far from substantial…."  *Id.* at 44.  The court in *Viacom* never described how any monitoring program could evidence the right and ability to control given the enormous number of works – never envisioned by the DMCA – on websites like Vimeo (or YouTube).  *Viacom* stated that "[Section]

17

512(m) limits – but does not abrogate – the [willful blindness] doctrine" (676 F.3d at 35), but never explained the nature of the interaction of those two principles, especially where, as here, the service provider engages in a highly developed program of *selective* monitoring of content that specifically excludes music and communicates to its users that using infringing music is permissible.

No court, including *Viacom*, has ever addressed the issue of "right and ability to control" in factual circumstances such as those presented here.  Specifically, *Viacom* and the authorities it cites (*Cybernet* and *Grokster*) never have been applied to a video-sharing site that, while ostensibly not specifically created to foster music piracy, nevertheless has created an environment whereby infringement is not only tolerated, but encouraged and promoted.

**2.      Willful Blindness.**  In rejecting Plaintiffs' argument that Vimeo was willfully blind to infringing content (and granting summary judgment in favor of Vimeo), the Court interpreted *Viacom* to require proof that Vimeo was willfully blind to *specific* instances of infringing content at issue.  Order at 35.  Thus, the Court found irrelevant all of Plaintiffs' evidence of Vimeo's deliberate disregard of warnings and reports of infringing content, as well as Vimeo's decision to use its available technology for a wide variety of curating, monitoring, and enforcement functions but specifically to avoid locating infringing *musical* content, and even Vimeo's apparent admissions of an overt "policy" of willful blindness with respect to the unauthorized use of commercial music (expressed in a variety of contexts).  No other appellate court has addressed the issue of willful blindness in the context of the DMCA.  Moreover, *Viacom* "offers little guidance on how to reconcile the tension between the doctrine of willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service

providers to monitor user content." *Id.* at 34 (quoting *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931(WHP), 2013 WL 1987225, at *2 (S.D.N.Y. May 14, 2013)).

*Viacom* did ***not*** conclude that willful blindness requires that the service provider turn a blind eye to specific content, but only that acts of willful blindness are equivalent to or "'tantamount to knowledge,'" *i.e.,* it "***demonstrate[s]*** knowledge or awareness of specific instances of infringement." *Viacom*, 676 F.3d at 35 (emphasis added).  Nor did *Viacom* provide an explanation of how a service provider could be willfully blind to specific content that, by definition, it did not see.  *See id.* ("When [a service provider] has reason to suspect that users of its service are infringing …, it may not shield itself from learning of ***the particular infringing transaction*** by looking the other way." (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109 (2d Cir. 2010)) (emphasis added)).  At the least, this is an issue that requires clarification from the Second Circuit.

      **3.**      **Knowledge**.  Plaintiffs request certification of two of the Court's related determinations on actual or red flag knowledge (not encompassed in Vimeo's motion).  First, with respect to the 55 videos as to which the Court found an issue of fact, Plaintiffs seek a determination that Vimeo had actual or red flag knowledge that those videos were infringing as a matter of law.  As to the 10 employee-uploaded videos, Plaintiffs similarly seek certification on the issue of whether given, among other things, their employment position, job function, and identification as "Staff," the knowledge of those employees is, as a matter of law, actual or red flag knowledge attributable to Vimeo.

      Second, with respect to the remaining 144 videos, the Court briefly concluded that Vimeo did not have knowledge because Vimeo employees "indisputably did not interact" with them.  Order at 33.  Plaintiffs submitted significant evidence of red flag knowledge, including evidence

that Vimeo Staff had actual or red flag knowledge based on practices and procedures that required watching videos on the website, visiting their web pages, and encountering information about them during their substantial daily moderating activities.  *See, e.g.,* Pls.' SUF ¶¶ 79-84, 101-113.  At the same time, Vimeo failed to provide any evidence reflecting the specific videos that Staff members had viewed or had otherwise become aware of prior to the filing of these actions.  While *Viacom* defined the difference between actual and red flag knowledge, both this Court and *Viacom* referred to certain evidence as showing ***either*** actual or red flag knowledge, and the application of these standards remains imprecise.  In particular, the question remains whether actually "interacting" with videos is required, and if so, the nature that such interaction must take in order to create a reasonable inference of red flag knowledge.

Vimeo already seeks certification with respect to knowledge of infringement.  The foregoing issues are complementary and should be decided at the same time.

**4.   Repeat Infringer Policy.**  The Court held that Plaintiffs had failed to raise an issue of fact as to Vimeo's adoption, "reasonable" implementation, and communication to users of a "policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network."  17 U.S.C. § 512(i).  That determination raises at least the following issues:

● Whether a purported "repeat infringer" policy that provides only that Vimeo "reserves the right" to terminate users who use its service to infringe, without specifying the nature of the conduct or nature or type of violations that would result in termination, effectively communicates to "users that there is a realistic threat of losing … access" to the Vimeo system. S. Rep. No. 105-190, at 52.

20

●   Whether a "repeat infringer" policy has the ability to "maintain the 'strong incentives' for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers" (*Cybernet*, 213 F. Supp. 2d at 1178), when representatives and employees of the service provider are themselves engaged in acts of repeat infringement but are not terminated as users, observe others engaging in acts of repeat infringement, and encourage users to do so, without taking any action.

●   Whether a service provider has reasonably implemented a repeat infringer policy where it fails to engage in any systematic tracking of user violations but instead relies on a demonstrably faulty and ad hoc system dependent upon the memory or subjective evaluation and discretion of the service provider's employees, and where the service provider has produced only scattered documents which it purports to evidence the implementation of such a policy.  Order at 18 ("A substantial failure to record [infringers]' may … 'raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy." (citing *CCBill*, 488 F.3d at 1110)).  Again, the concept of reasonably implementing a repeat infringer policy is antithetical to Vimeo's practice of repeatedly infringing itself, viewing infringing works, and encouraging others to infringe.

As the Court noted, "the caselaw is sparse on what procedures are sufficient to establish the adoption of a repeat infringer policy."  Order at 15.  The statute does not elaborate on what it means for a policy to be reasonably implemented.  These issues were not addressed in *Viacom*, *see* 676 F.3d at 40, and no court has addressed the repeat infringer policy issues in analogous circumstances.

***

The Court is very familiar with these issues and, therefore, Plaintiffs have attempted to highlight and summarize the salient issues. All of the foregoing are "controlling questions as to which there is substantial ground for difference of opinion…." 28 U.S.C. § 1292(b). They are novel issues that have not been addressed by the Second Circuit and on which there is a "relative lack of authority on the precise question," *In re Fosamax Prods. Liab. Litig.*, No. 06 MD 1789(JFK), 2011 WL 2566074, at *5 (S.D.N.Y. June 29, 2011); they plainly are "difficult" (as reflected in part by the Court's lengthy discussion); and they require careful interpretation of statutory language that is vague and conflicts with the common law standards on which they are based. *See Klinghoffer v. SNC Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (certification appropriate where issues were "difficult and of first impression"). The resolution of these DMCA questions will have precedential value for a number of pending cases. *Id.* at 24. In fact, as Vimeo has argued, "[a]s social media and other interactive web-based businesses grow, it will become increasingly important for service providers to have clear guidance as to their legal responsibilities and the availability of the DMCA safe harbor." Motion at 23; *see also id.* at 17 (appellate ruling "will provide important guidance to copyright holders and service providers alike"). Although not necessary, the legal and factual issues implicated by Vimeo's request to certify the question of actual or red flag knowledge also overlap and are relevant to the issues on which Plaintiffs seek certification.

At minimum, each of these issues is at least as "controlling" as those raised by Vimeo, which involve the far less controversial questions of Vimeo's burden of proof on summary judgment as to its lack of actual or red-flag knowledge, or state law as to which there is now

New York appellate authority.  *See UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 964

N.Y.S.2d 106 (N.Y. App. Div. 2013).[7]


### III.  PLAINTIFFS CONSENT TO A STAY ONLY IF THE COURT CERTIFIES ITS ORDER FOR IMMEDIATE APPEAL ON ALL RELEVANT ISSUES.

In the event that the Court elects to certify the Order so that *all* relevant DMCA issues

may be addressed by the Second Circuit, then Plaintiffs agree that a stay is warranted and will

further the interests of judicial economy and efficiency.  However, Plaintiffs request that the

Court first decide Plaintiffs' motion for leave to amend so that the Court of Appeals will have a

complete record.  If the Court issues the more limited certification order requested by Vimeo, no

stay is warranted.  Instead, the Court should permit amendment of the Complaints so that all

works at issue are encompassed within this lawsuit and allow the parties to proceed to trial on the

remaining claims.


<u>Conclusion</u>

For the foregoing reasons, Vimeo's motion for reconsideration should be denied.  The

Court should certify *all* DMCA issues as set forth above, not just the ones selected by Vimeo.

Should the Court do so, then Plaintiffs do not oppose a stay.  However, if the Court issues the

---

[7]  On October 8, 2013, the New York Appellate Division denied Defendants' request for leave to appeal on the issue of whether the DMCA applies to pre-1972 sound recordings.

limited certification order requested by Vimeo, then no stay is warranted and the Court should allow the actions to proceed.

DATED:   October 16, 2013
                 New York, New York

MITCHELL SILBERBERG & KNUPP LLP

By:   ___/s/ Russell J. Frackman_____
          Russell J. Frackman (*pro hac vice*)
          Marc E. Mayer (*pro hac vice*)
          11377 West Olympic Boulevard
          Los Angeles, California 90064-1683
          Telephone: (310) 312-2000

          Christine Lepera (ctl@msk.com)
          12 East 49th Street, 30th Floor
          New York, New York 10017
          Telephone: (212) 509-3900

          *Attorneys for Plaintiffs*