UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  12/31/13
```

CAPITOL RECORDS, LLC, et al.,

                           Plaintiffs,

                -v-

VIMEO, LLC d/b/a VIMEO.COM, et al.,

                         Defendants.

--------------------------------------------------------X

EMI BLACKWOOD MUSIC, INC, et al.,

                           Plaintiffs,

                -v-

VIMEO, LLC d/b/a VIMEO.COM, et al.,

                         Defendants.

--------------------------------------------------------X

OPINION AND ORDER

No. 09 Civ. 10101 (RA)

No. 09 Civ. 10105 (RA)

RONNIE ABRAMS, United States District Judge:

Three motions are currently pending before the Court in these consolidated cases: (1) Defendants' motion for reconsideration pursuant to Local Rule 6.3, (2) Plaintiffs' motion for leave to file amended complaints to add additional works-at-issue, and (3) Defendants' motion for certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court grants Defendants' motion for reconsideration in part—awarding them summary judgment with respect to an additional seventeen of the videos at issue in the complaint (the "Videos-in-Suit")—and denies the motion as to the remaining Videos-in-Suit. The Court grants Plaintiffs' motion for leave to file an amended complaint and certifies for interlocutory appeal its September 18, 2013 Opinion and Order (the "September 18 Order"), as amended by this Order.

## BACKGROUND

The Court's September 18 Order sets forth the full factual background of this action.  See

Capitol Records, LLC v. Vimeo, LLC, --- F. Supp. 2d ----, 2013 WL 5272932 (S.D.N.Y. Sept.

18, 2013).[1]  Below are those facts relevant to the instant motions.

Defendants operate the website "Vimeo," a platform that permits users to upload and

share videos.  Vimeo distinguishes itself from other video-sharing sites by requiring users to

have created, or at least have participated in the creation of, the videos they upload.  As of

September 2012, Vimeo hosted over 31.7 million videos, with approximately 43,000 new videos

added each day.  (Order at 2-3.)

 Plaintiffs—record and music publishing companies—filed suit against Defendants in

December 2009, asserting claims for direct, contributory, vicarious, and common law copyright

infringement, as well as for inducement to infringe copyright and unfair competition.  Their

complaints, filed separately but substantively identical, each contained a list of the 199 Videos-

in-Suit.  Plaintiffs own copyrights to the musical recordings used in each of these videos and, for

purposes of the present motions, Defendants do not dispute that the Videos-in-Suit used the

recordings without authorization.  (Defs.' Response to Pls.' 56.1 Stmt. at ¶ 2 n.3.)

The parties conducted an initial phase of discovery limited to whether any of the Videos-

in-Suit were protected by the "Safe Harbor" provision of the Digital Millennium Copyright Act

("DMCA").  The Safe Harbor limits the liability of service providers for copyright infringement

that occurs "by reason of the storage at the direction of a user of material that resides on a system

or network controlled or operated by or for the service provider," as long as the provider satisfies

certain criteria.  17 U.S.C. § 512(c)(1).  The parties filed cross-motions for summary judgment

---

[1]      Citations to the September 18 Order will be to the version uploaded to ECF, Dkt. # 119 in 09 Civ. 10101,
and will take the form (Order at __).  All further docket entries cited in this Opinion and Order correspond to 09 Civ.
10101.

on the issue of whether Defendants were protected by the Safe Harbor.

In its September 18 Order, the Court granted in part and denied in part both parties' motions. First, it concluded that no evidence suggested that Vimeo's employees had ever viewed the majority of the Videos-in-Suit. Because it found that Defendants had established the other elements of Safe Harbor protection as a matter of law, the Court granted Defendants summary judgment on these instances of infringement. Second, the Court determined that a triable issue existed as to whether Defendants had satisfied the Safe Harbor elements for a second set of Videos-in-Suit. This set consisted of videos with which Vimeo's employees had interacted, because the Safe Harbor requires that service providers not be "aware of facts or circumstances from which infringing activity is apparent." See 17 U.S.C. § 512(c)(1)(A)(ii). It also consisted of videos uploaded by Vimeo employees, because the Safe Harbor only extends to material stored "at the direction of a user." See 17 U.S.C. § 512(c)(1). The Court denied summary judgment to both parties with respect to this set of videos. Third, the Court concluded that the Safe Harbor did not extend to videos containing music recorded before February 15, 1972. Plaintiffs were granted summary judgment on the Safe Harbor issue with respect to these Videos-in-Suit.

The Court thus granted Defendants summary judgment with respect to "144 Videos-in-Suit, save for those Videos-in-Suit containing infringed-upon material recorded before February 15, 1972." (Order at 56.) Based on Plaintiffs' undisputed submissions regarding which videos contained pre-1972 recordings, of the 199 Videos-in-Suit, the September 18 Order granted (i) Defendants summary judgment with respect to 136 Videos-in-Suit; (ii) neither party summary judgment with respect to forty-three Videos-in-Suit; and (iii) Plaintiffs summary judgment on the

3

Safe Harbor issue with respect to the other twenty Videos-in-Suit.[2]

## DISCUSSION

### 1. Motion for Reconsideration

The standard for granting a motion for reconsideration under Local Rule 6.3 "is strict."

In re Optimal U.S. Litig., 886 F. Supp. 2d 298, 311 (S.D.N.Y. 2012). Generally, a court will

deny reconsideration "unless the moving party can point to controlling decisions or data that the

court overlooked—matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.

1995). Courts may also grant reconsideration because of an "intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.

1992). A motion for reconsideration "is not an opportunity to advance new facts, issues or

arguments not previously presented to the Court, nor is it a substitute for appeal." In re Optimal,

886 F. Supp. 2d at 312 (footnote omitted).

As noted above, in its September 18 Order the Court cited evidence that Vimeo's

employees had interacted with a set of the Videos-in-Suit containing copyrighted music and,

from this evidence together with the nature of the videos themselves, determined that a

reasonable juror could conclude that Defendants were "aware of facts or circumstances from

which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). Such awareness—known as

"red flag" knowledge—would disqualify Defendants from Safe Harbor protection. See Viacom

Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir. 2012). The Court thus determined that

---

[2]     Compare Compl. at Schedule B (listing videos containing pre-1972 recordings), with Supplemental
Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkley Decl.") at Ex. 1 (listing videos with which Vimeo
employees interacted). Defendants do not dispute, for purposes of the summary judgment motion, that Schedule B
of the complaint accurately reflects which videos contain pre-1972 recordings. (Defs.' Response to Pls.' 56.1 Stmt.
¶ 3).

summary judgment was inappropriate as to these videos. (Order at 33.)

Defendants now ask the Court to reconsider its decision as to thirty-five such videos.
(See Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 3 & n.1.)
They raise two challenges. First, they assert that no evidence shows that their employees ever
viewed fifteen of those thirty-five videos. Second, they argue that even assuming a Vimeo staff
member watched each of the thirty-five videos, the infringing nature of the videos was not
"'objectively' obvious to a reasonable person," as the Second Circuit has required to support a
finding of red flag knowledge.[3]  Viacom, 676 F.3d at 31.

The Court agrees with Vimeo's first argument but not its second (with the exception of
two videos, described in Subsection B). It therefore grants summary judgment to Defendants on
seventeen of the thirty-five videos for which they seek reconsideration.

## A.    Whether Vimeo Employees Watched Fifteen of the Videos

The September 18 Order described several ways in which Vimeo's employees interacted
with videos: the employees commented on a video's page, "liked" the video, or "buried" the
video so that it no longer appeared on Vimeo's home page. (Order at 29-30.) For each Video-
in-Suit with which employees interacted in one of these ways, the Court concluded, a reasonable
jury could find that the employee viewed the video containing copyrighted music and had "red
flag" knowledge of its infringing nature.

The September 18 Order noted two additional ways in which employees interacted with
Videos-in-Suit. First, although users could upload videos on Vimeo at no cost as long as they
registered for an account, users could also purchase a "Plus" membership, which entitled them to
increased file storage space and additional customization options. (Pls.' Response to Defs.' 56.1

---

[3]        No evidence in the record supported a finding of "actual knowledge" under 17 U.S.C. § 512(c)(1)(A)(i).

Stmt. ¶ 62.) Citing evidence that Vimeo employees "[r]eviewed some uploaded Videos-in-Suit in 'Plus' users' accounts," the September 18 Order concluded that a triable issue existed as to whether Vimeo employees had "red flag" knowledge of the infringing nature of these videos. (Order at 29.)

Second, the Court noted that Vimeo employees (and only Vimeo employees) could "whitelist" videos, which precluded other users from "flagging" the videos for violating the site's Terms of Service. (Id.) Employees could whitelist an individual video or a user's entire account, in which case all of the videos the user had uploaded became whitelisted. (Supplemental Declaration of Andrew Pile, Jan. 5, 2013 ("Supp. Pile Decl."), at ¶¶ 5, 7.) The Court likewise found that a triable issue existed as to whether Vimeo's employees had "red flag" knowledge of the contents of these videos.

Of the videos as to which the Court denied both parties summary judgment, the only evidence of employee interaction with ten of the videos was that the videos had been uploaded by "Plus" users. (See Supplemental Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkeley Decl."), Ex. 1.) For five other videos, the only evidence of employee interaction was that they had been uploaded by "Plus" users and the users' accounts had been whitelisted. Defendants assert that the Court should grant them summary judgment as to these fifteen Videos-in-Suit, because no evidence showed that employees viewed any of the videos.

Upon further review of the record, the Court agrees with Defendants. The only evidence that Vimeo employees viewed "Plus" users' videos came from the deposition of Andrea Allen, a Vimeo community monitor. Allen, who was presented with a page showing a list of "Plus" users, stated that she believed the page was used by moderators to view videos in "Plus" users' accounts to ensure compliance with Vimeo's Terms of Service. (Declaration of Russell J. Frackman, January 6, 2013 ("Frackman Decl."), Ex. 3 at 165:2-19 & Ex. 85.) She noted,

6

however, that she had never used the page, that she considered it "a dinosaur page," and that she did not "know the last time [it] was used or even talked about." (Id. 165:11-14.)

Moreover, Defendants have brought to the Court's attention evidence that "Plus" users have uploaded thirty-six percent of the videos on Vimeo, suggesting that "Plus" users are responsible for a substantial portion of the 43,000 new videos uploaded each day. (Supp. Pile Decl. ¶ 23.) It is simply unrealistic to infer that a Vimeo employee watched every "Plus" video. Indeed, Plaintiffs conceded at oral argument on the motion for reconsideration that they "don't have evidence that the particular ['Plus'] videos were viewed." (Transcript of Oral Argument, November 15, 2013 ("Oral Arg. Transcript"), at 36:23-24.) In the absence of evidence showing that a Vimeo employee watched a particular Video-in-Suit, a reasonable juror could not conclude that Defendants had knowledge of the video's contents. See Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 32-33 (2d Cir. 2000) (noting that the Court need only draw "reasonable inferences" in favor of the party opposing summary judgment). Because Defendants have satisfied the other elements of Safe Harbor protection, they are thus entitled to summary judgment with respect to the ten Videos-in-Suit for which the only evidence of employee interaction was that "Plus" users had uploaded the videos.

The Court reaches the same conclusion with respect to whitelisted videos. The only evidence Plaintiffs cite to show that Vimeo employees watched all whitelisted videos is a statement in Allen's deposition. When presented with an exhibit showing a list of videos marked as "whitelisted," Allen explained that "'White Listed' in this context would indicate to someone, a moderator looking at this, that a moderator has looked at this already" and that the video "complies with the guidelines." (Frackman Decl., Ex. 3 at 183:5-10 & Dep. Ex. 89.) But nowhere does this testimony note whether the videos had been whitelisted individually or whether they had been given that label simply because an entire user's account had been

whitelisted.

To be sure, a jury could infer that when a Vimeo employee whitelists a specific video, the employee has watched that video—a point Defendants do not dispute. (See Def's. Mem. of Law in Support of Motion for Reconsideration and Certification at 13-14.) But an employee's whitelisting of a user's entire account is too tenuous, without more, to permit the inference that the employee has watched all of the user's videos. Vimeo's Vice President of Product and Development averred that "[w]hen an account is whitelisted, Vimeo staff generally do not watch the videos." (Supp. Pile Decl. ¶ 7.) This assertion is consistent with Allen's testimony and is not contradicted by any other evidence in the record. Accordingly, Vimeo is also entitled to summary judgment with respect to the five videos for which the only evidence of employee interaction was that the user's account had been whitelisted.

## B.  Whether the Infringing Nature of the Videos Was Objectively Obvious

Defendants assert that even assuming one of their employees watched each of the remaining videos, they did not have "red flag" knowledge of the videos' infringing content. This argument is focused on the provision of the Safe Harbor requiring that, in order to be protected from liability, a service provider must not be "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). The Second Circuit has explained that this "red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir. 2012).

According to Defendants, the infringing nature of the remaining videos is not "obvious" because each video contains some original elements and their creators thus have at least a colorable defense that they made "fair use" of the copyrighted material. See, e.g., Cariou v. Prince, 714 F.3d 694 (2013) (holding that an artist made "fair use" of copyrighted photographs

8

when he incorporated them into a series of paintings and collages).  Defendants further argue that the Court should not put service providers in the difficult position of having to decide which uses of a copyrighted work are infringing.

The Court has reviewed each of the remaining twenty videos and determines that, with respect to eighteen of the videos, a reasonable juror could—but need not—find that the infringing activity in each video was "'objectively' obvious to a reasonable person."  Viacom, 676 F.3d at 31.  Defendants are entitled to summary judgment on the two other videos: in each of these videos, the copyrighted songs play for only a short time in the background (approximately 38 and 57 seconds, respectively[4]) during the middle of the video and are otherwise a less significant aspect of the videos.  Further, neither the name of the song nor the artist was displayed anywhere in the video or on the web page through which users could view the video.  Although Plaintiffs were free to submit a "takedown notice" requesting that Vimeo remove the videos, see 17 U.S.C. § 512(c)(3), evidence of infringement in these videos was not "objectively obvious."

A juror could reach the opposite conclusion with respect to the other eighteen videos.  In the Court's analysis, seventeen of these eighteen videos play all or virtually all of the copyrighted song.[5]  The eighteenth video lasts for forty-eight seconds, during the entirety of which the song "Stacy's Mom" by the artist "Fountains of Wayne" plays while the lyrics appear against a blue background.  (See Declaration of James D. Berkley, Jan. 6, 2013 ("Berkley Decl."), at Ex. 2.)  Sixteen of these eighteen videos display both the artist and song title, either in the video itself or on the web page where viewers could access the video, and the web pages for

---

[4]      These videos incorporate the songs "All the Small Things" by Blink 182 and "Praise You" by Fatboy Slim, and are associated with Vimeo identification numbers 1889583 and 217550, respectively.

[5]      See Supp. Berkley Decl. at Ex. 1 (chart summarizing the videos with which Vimeo employees interacted); Declaration of James D. Berkley, Jan. 6, 2013, at Ex. 2 (electronic versions of Videos-in-Suit); Compl. at Schedule B (list of pre-1972 videos).

the other two videos display the copyrighted song's title. (See Frackman Decl. at Exs. 17-22.) One of these eighteen videos, titled "Christina Aguilera—Genie in a Bottle," is a full length video showing the artist performing her popular song at a concert, with the location and date of the concert displayed on the web page below the box where users can watch the video. (Id. Ex. 19 at EMI 00283). Many of the other videos are "lip-dubs," showing individuals walking through their homes or offices—or, in one case, driving a car—mouthing the words to a copyrighted song while it plays. (See Berkley Decl. Ex. 2.) All of the videos play, in essentially unaltered form, what a reasonable jury could deem recognizable songs by well-known artists.

Defendants' argument for reconsideration focuses on the Safe Harbor's legislative history. They emphasize a portion of the Senate and House Reports (the "Reports") addressing a provision of the Safe Harbor not at issue here, § 512(d), which provides a safe harbor for service providers—such as search engines—that offer "information location tools." As with § 512(c), which is the focus of this action, § 512(d) disqualifies providers from Safe Harbor protection if they "turned a blind eye to 'red flags' of obvious infringement." S. Rep. No. 105-190, at 48 (1998) ("S. Rep."); H.R. Rep. No. 105-551, pt. 2, at 57 (1998) ("H. Rep."). The Reports note that a copyright holder could show "red flag" knowledge if it demonstrated that the provider knowingly linked to a "pirate" website that provides music and movies for download; "[a]bsent such 'red flags' or actual knowledge," the Committees explained, "a directory provider would not be similarly aware merely because it saw one or more well known photographs of a celebrity at a site devoted to that person." S. Rep. at 48; H. Rep. at 57. The provider, the Reports continue, "could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine." S. Rep. at 48; H. Rep. at 57-58.

Analogizing the example of the celebrity photograph to the use of copyrighted music in the Videos-in-Suit, Defendants assert that the September 18 Order improperly requires Vimeo to make "discriminating judgments" about what constitutes fair use—a burden Congress sought to avoid placing on service providers. (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 10.)

Even assuming that the Reports' discussion of § 512(d) applies equally to § 512(c), however, the infringement the Reports describe is different in kind than the infringements at issue in this case. Here, the copyrighted songs were an integral part of the videos: the videos played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song. A jury could conclude, based on these circumstances, that it would have been "'objectively' obvious to a reasonable person" that the individual users did not have permission to use the well-known songs in their videos. See Viacom, 676 F.3d at 31. Although a jury need not necessarily find that evidence of infringement was obvious in these videos, it certainly could reach such a conclusion in light of the length and recognizable nature of the songs.

Consider, for instance, the video of the artist Christina Aguilera.[6] This video shows the performer and television star singing her song "Genie in a Bottle" at a concert.[7] A rational juror could find that virtually every aspect of this video makes it obvious that it is infringing: the music, the lyrics, the visual image (which consists exclusively of the artist singing at her concert), and the description on the website explaining what the video is and when it was recorded.

Defendants respond that as long as a video's use of copyrighted material can

---

[6]      This video is associated with Vimeo identification number 2021311.

[7]      "Genie in a Bottle" has been described as "one of the best-selling singles of all time." See "Genie in a Bottle," http:// en.wikipedia.org/wiki/Genie_in_a_Bottle.

"conceivably be justified by a colorable claim of license or fair use," employees who view the

video do not have red-flag knowledge of its infringing nature. (Defs.' Reply Mem. of Law in

Support of Motion for Reconsideration and Certification at 5.) As the Court explained in its

September 18 Order, however, this argument threatens to collapse the distinction between

"actual" and "red flag" knowledge, rendering the latter superfluous. (Order at 33.) "Red flag"

knowledge, under Defendants' construction of the statute, would seemingly require not only the

upload of an unaltered, copyrighted work but also some reliable indication that the user did not

have permission to upload the work, in order to negate potential legal defenses to copyright

infringement. (See id. at 31.) But such evidence would be practically indistinguishable from

proof of actual knowledge—that is, that the provider "actually or 'subjectively' knew of specific

infringement." Viacom, 676 F.3d at 31. Presented with a copyrighted work and a statement

from the user that she did not have permission to upload the file or any other legal defense, a

service provider could not plausibly claim that it lacked knowledge of the specific infringement.

Perhaps recognizing the difficulty in this position, Defendants suggested at oral argument

that had Vimeo's employees encountered a video that simply consisted of the upload of a

feature-length film, such as "The Big Chill," those employees would have "red flag" knowledge

of the video's infringing character. (Oral Arg. Transcript at 16:22-17:2.) But at least one of the

videos at issue in this case seems virtually identical to "The Big Chill" example. This video

appears to be the official full-length music video of the song "Move (If You Wanna)" by the

artist Mims.[8] It concludes by displaying, in white font set against a black screen, the phrase "©

2009 Capitol Records. All Rights Reserved." (Berkley Decl. at Ex. 2.) Aside from its length,

---

[8]     This video is associated with Vimeo identification number 3300782. Because the only evidence Plaintiffs
offered to show that a Vimeo employee interacted with the video was that it was uploaded by a "Plus" user, the
Court grants Defendants summary judgment with respect to this video in this Order, despite the fact that a jury could
find that it was obviously infringing. See Section 1.A, supra.

12

the infringing nature of this video seems indistinguishable from that of the example Defendants provide, thus highlighting the difficulty of the Court making such determinations as a matter of law.

Even for those videos that contain an original visual image set to the unaltered infringing music, for purposes of the "red flag" inquiry, the Court finds no legally significant difference between the upload of a full-length and unedited copyrighted film and the upload of a full-length and unedited copyrighted song. A rational jury could find that a video playing the entirety of the Four Tops' hit song "I Can't Help Myself (Sugar Pie Honey Bunch)," or a song by the Beastie Boys, Radiohead, or Usher, provided "objectively obvious" evidence of infringement to a Vimeo employee who viewed the video. Furthermore, as to some of the videos there is additional evidence in the record from which a jury could find "red flag" knowledge. For example, the web page containing one of the videos, the uploading user announced that he had "mixed [the video] with the track 'Harder, better, faster, stronger' from Daft Punk live record 'Alive 2007.'" (Berkley Decl. Ex. 38.) As for another video, a Vimeo employee admitted that he had watched the video, had commented on it, and was aware that it contained music by the artist Usher. (Frackman Decl. Ex. 5 at 247:19-248:6 & Dep. Ex. 224 (deposition of Dalas Verdugo)).

In the context of file-sharing programs, courts have consistently rejected service providers' claims that they were unaware of infringing activity involving well-known works. See Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir. 2013) (concluding that a service provider had red flag knowledge when "[t]he material in question was sufficiently current and well-known that it would have been objectively obvious to a reasonable person that the material solicited and assisted was both copyrighted and not licensed to random members of the public"); see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 987-88 (C.D. Cal. 2006) (finding that a service provider intended to induce copyright

infringement where it provided a search function for "Top 40 Songs," noting that "[s]uch songs are almost invariably copyrighted"). Similarly, based on the type of music the videos used here—songs by well-known artists, whose names were prominently displayed—and the placement of the songs within the video (played in virtually unaltered form for the entirety of the video), a jury could find that Defendants had "red flag" knowledge of the infringing nature of the videos.

Accordingly, the Court grants Defendants' motion for reconsideration as to seventeen of the Videos-in-Suit: the fifteen videos for there was no evidence in the record of employee interaction, and two videos where evidence of infringement was not "objectively obvious." The Court denies the motion with respect to the remaining eighteen Videos-in-Suit.

## 2.   Motion for Leave To Amend the Complaint

Plaintiffs seek leave to file an amended complaint that adds additional instances of infringement. According to their memorandum in support of the motion, the proposed amended complaint seeks to add 1476 new instances of infringement. Almost one quarter of these involve music recorded before February 15, 1972, and almost one third involve videos with which Vimeo employees interacted in one of the ways outlined in the September 18 Order.[9] (Pls.' Mem. of Law in Support of Motion to Amend at 1-3.)

Courts must "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has explained that "district courts should not deny leave unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." Friedl v. City of N.Y., 210 F.3d 79, 87 (2d Cir. 2000).

Nowhere do Defendants assert that amendment would be futile. Instead, they argue that

---

[9]   Presumably, the only evidence of employee interaction for some videos in the latter category will be that the videos were uploaded by "Plus" users or by users whose accounts had been "whitelisted." For the reasons described in this Order, Defendants will be entitled to summary judgment on those videos.

Plaintiffs have unnecessarily delayed the filing of their motion and that granting leave to amend would cause prejudice by requiring additional discovery. These arguments are unavailing.

The record shows that Plaintiffs have contemplated amending their complaint—and have made Defendants aware of their intention—from the earliest stages of the litigation. In the Case Management Plan and Scheduling Order, the parties agreed to permit Plaintiff to seek leave to amend their complaint to add additional instances of infringement, subject to Court approval, beyond the sixty-day period that otherwise limited Plaintiffs' right to amend. (Dkt. No. 24.) Plaintiffs communicated to Defendants their intention to amend in October 2010, and Defendants replied that they "d[id] not anticipate objecting to such amendment," as long as it "would be nothing more than the inclusion of additional sound recordings and musical competitions" and would not affect the first phase of discovery. (Declaration of Marc Mayer, Oct. 21, 2013 ("Mayer Decl.") at Ex. 3; Declaration of Jessica A. Rose, Nov. 4, 2013 ("Rose Decl.") at Ex. F.) Although Plaintiffs did not raise the issue of amendment again until April 24, 2012, the delay was justified: Defendants did not produce certain documents until February 8, 2011, and from March 3, 2011 to April 4, 2012 the case was stayed pending the Second Circuit's decision in Viacom. (Mayer Decl. ¶¶ 9-12; Rose Decl. ¶¶ 24, 26.) In an order dated May 31, 2012, Judge Castel (to whom the case was then assigned) noted that amending the pleading would "require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions." (Dkt. No. 43.) He ruled that the "motion to amend may be filed within 30 days of the Court's ruling on summary judgment and the timeliness will be assessed as if the motion were made today." (Id.) Plaintiffs filed their motion to amend within thirty days of the Court's September 18 Order. They have not acted with undue delay.

Defendants' argument that amendment would cause them undue prejudice is similarly unpersuasive. To date, the parties have only conducted "Phase I" discovery, that is, discovery

relating to the applicability of the DMCA Safe Harbor. (See Dkt. No. 24 at 2.) Plaintiffs represent that the only additional Phase I discovery they seek is an updated version of the database showing the "whitelisted" and "buried" videos. (Pls.' Reply Mem. of Law in Support of Motion to Amend at 2 n.1.) Additionally, although Defendants claim they are entitled to additional discovery, they have not specified what information they would seek. Neither party has given the Court any reason to believe that significant additional Phase I discovery would be required. Plaintiffs have categorized their complaint based on the Court's September 18 Order (noting, for instance, which compositions were recorded before 1972 and which videos were uploaded or "liked" by Vimeo employees). (Mayer Decl. at Exs. 5-7.) To determine which new instances of infringement survive summary judgment, the Court need only apply the principles articulated in its September 18 Order and this Order to the remaining videos.

Finally, Defendants acknowledge that Plaintiffs have the "right" to "fil[e] a new complaint for any alleged infringements that they neglected to include in the course of fact discovery." (Defs.' Mem. in Opp. to Pls.' Motion to Amend at 11.) Defendants have not identified any way in which requiring Plaintiffs to file a new action would be more efficient than permitting them to amend their existing complaint to add new instances of infringement. See Kwon v. Yun, 606 F. Supp. 2d 344, 365 (S.D.N.Y. 2009) (permitting defendant to amend counterclaims in its pleading because defendant "would be free to file a new action" to recover on its claims).

The Court therefore grants Plaintiffs' motion for leave to file amended complaints.

## 3. Motion for Certification for Interlocutory Appeal

Vimeo asks the Court to certify for interlocutory appeal the following two questions:

(1) Are the DMCA's safe-harbor provisions applicable to sound recordings fixed prior to February 15, 1972?

> (2) Does a service provider's mere *viewing* of a user-generated video containing third party copyrighted music automatically give rise to a triable issue of fact as to the service provider's knowledge of infringement under the DMCA?

(Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 15.)
Plaintiffs do not oppose this request as long as the Court certifies "*all* of the relevant DMCA
issues" for interlocutory appeal, including whether Vimeo had the "right and ability to control"
infringing activity, whether it acted with "willful blindness" to infringement, and whether it had
instituted a repeat infringer policy. (Pls.' Opposition to Motion for Reconsideration and
Certification at 14.)

## A.    Legal Standard

28 U.S.C. § 1292(b) presents a limited exception to the "basic tenet of federal law" that
appellate review should be delayed until final judgment is entered. Koehler v. Bank of Bermuda
Ltd., 101 F.3d 863, 865 (2d Cir. 1996). Under this provision, a district court may certify for
appeal an otherwise non-appealable order when the court concludes that the order "[1] involves a
controlling question of law [2] as to which there is substantial ground for difference of opinion
and [3] that an immediate appeal from the order may materially advance the ultimate termination
of the litigation." 28 U.S.C. § 1292(b). District courts must "exercise great care in making a
§ 1292(b) certification," Westwood Pharm, Inc. v. Nat'l Fuel Gas Distrib. Corp., 964 F.2d 85, 89
(2d Cir. 1992), and should invoke the provision only in "exceptional circumstances," Coopers &
Lybrand v. Livesay, 437 U.S. 463, 475 (1978).

With respect to the first prong of the test, the "'question of law' must refer to a 'pure'
question of law that the reviewing court could decide quickly and cleanly without having to
study the record." Consub Delaware LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305,
309 (S.D.N.Y. 2007). The question must also be "controlling," meaning that reversal of the

17

district court's order "would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome." In re Enron Corp., No. 06 Civ. 7828(SAS), 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007).

The second prong of the test, that there exists a substantial ground for difference of opinion, is met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." Id. "The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." In re Flor, 79 F.3d 281, 284 (2d Cir. 1996). Rather, the district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." Id.

Courts "place particular weight" on the third factor: whether an immediate appeal will materially advance the ultimate termination of the litigation. Transp. Workers Union of Am. v. N.Y.C. Transit Auth., 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005). This requirement, which in practice is "closely connected" to the first factor, In re 650 Fifth Ave., No. 08 Civ. 10934(RJH), 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2, 2012), is met when an intermediate appeal "promises to advance the time for trial or to shorten the time required for trial," Transp. Workers Union, 358 F. Supp. 2d at 350.

## B.     Whether Certification Is Appropriate

After reviewing the statutory factors, the Court concludes that two issues from its September 18 Order merit certification. The Court recognizes that § 1292(b) refers to certification of an "order," and that, should the Second Circuit agree to hear the appeal, it "may address any issue fairly included within the certified order." Yamaha Motor Corp., USA v. Calhoun, 516 U.S. 199, 205 (1996). Mindful of the Circuit's statement that "it is helpful for a

18

district court to frame the controlling questions of law that the order involves," United States v. Banco Cafetero Panama, 797 F.2d 1154, 1157 (2d Cir. 1986), the Court specifies the issues it is certifying and explains why, in its view, they satisfy the § 1292(b) criteria.

       *i.*    *Pre-1972 Recordings*

The Court's September 18 Order granted Plaintiffs summary judgment as to those videos that contained music recorded before February 15, 1972, concluding that the DMCA Safe Harbor extended only to those videos that contained music recorded after that date. (Opinion at 55.) The Court concludes that this question satisfies each of the statutory factors.

First, this issue presents a controlling question of law. Because the issue turns almost exclusively on a question of statutory interpretation, "the reviewing court could decide [it] quickly and cleanly without having to study the record." Consub, 476 F. Supp. 2d at 309. Moreover, its resolution "would materially affect the litigation's outcome." In re Enron, 2007 WL 2780394, at *1. Twenty of the videos alleged to be infringing in the existing complaint involved pre-1972 music, (see Compl. at Schedule B) and Plaintiffs' amended complaint adds 332 videos containing pre-1972 recordings (see Mayer Decl. at Ex. 6). With respect to many of the videos, which party prevails on the copyright claims associated with each of these recordings rests exclusively on the reach of the Safe Harbor.

Second, although the Court remains of the view that 17 U.S.C. § 301(c) cannot be read to permit application of the DMCA Safe Harbor to pre-1972 recordings, the Court recognizes that there exists a substantial ground for difference of opinion on this issue. Indeed, Judge Pauley of this Court reached the opposite conclusion, see Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 640-42 (S.D.N.Y. 2011),[10] although the United States Copyright Office has

---

[10]    Although Judge Pauley noted that the question "may involve a substantial ground for difference of opinion," he ultimately declined to certify it for interlocutory appeal because "certification would only delay the

determined that the Safe Harbor does not extend to pre-1972 recordings, see Federal Copyright Protection for Pre-1972 Sound Recordings (Dec. 2011), available at http://www.copyright.gov/docs/sound/pre-72-report.pdf. This issue is a question of first impression in the Second Circuit, and aside from these two decisions no other federal court appears to have addressed the issue. In view of the paucity of case law and these conflicting conclusions, the Court finds that the second statutory factor has been satisfied.

Third, an intermediate appeal will materially advance the ultimate termination of the litigation. As noted above, Plaintiffs' amended complaint adds 332 instances of infringement involving pre-1972 recordings. (Mayer Decl. at Ex. 6.) If the outcome of the summary judgment motion on the current complaint—in which the Court now concludes that the DMCA Safe Harbor extends to almost three quarters of the Videos-in-Suit—is any indication, a large swath of those 332 instances of infringement will be subject to the Safe Harbor protection. Should the Second Circuit conclude that Safe Harbor protection extends to pre-1972 recordings, many of those 332 instances of infringement would be dismissed.

The Court therefore certifies for interlocutory appeal the question of "whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972."

### ii. Knowledge of Infringement

The Court also agrees with Defendants that the issue of their "red flag" knowledge merits certification. But Defendants' articulation of the question to be certified—whether a service provider's "mere *viewing* of a user-generated video containing third party copyright music automatically give[s] rise to a triable issue of fact as to the service provider's knowledge of

---

ultimate resolution" of the case. Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931(WHP), 2012 WL 242827, at *1-*2 (S.D.N.Y. Jan. 9, 2012). Here, a decision by the Second Circuit has the potential to narrow the litigation significantly.

infringement under the DMCA" (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 15)—misconstrues the Court's holding. The Court's conclusion that a triable issue exists as to "red flag" knowledge relies on the videos' use of recognizable songs, played essentially in their entirety and in unedited form. A more appropriate formulation of the legal question is "whether, under Viacom Int'l, Inc. v. YouTube, Inc., a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish 'facts or circumstances' giving rise to 'red flag' knowledge of infringement."

Phrased this way, this question—in the Court's view—satisfies the first requirement for certification. That the "red flag" knowledge inquiry depends in part on the contents of each video does not mean the question is inappropriate for certification. See, e.g., Am. Geophysical Union v. Texaco Inc., 802 F. Supp. 1, 11 (S.D.N.Y. 1992) (Leval, J.) (certifying question of whether company's photocopying of journal articles constituted "fair use" and noting that the inquiry "is highly fact-specific"). Defendants have represented that, for purposes of any interlocutory appeal, they would assume that "Vimeo had actually viewed all of the videos with which it 'interacted.'" (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 22 n.14.) There is no real dispute about the content of the videos: they contain visual images set to copyrighted songs played essentially in their entirety. Determining whether Defendants had "red flag" knowledge turns largely on the construction of 17 U.S.C. § 512 and the Circuit's opinion in Viacom. The Circuit could, in this Court's view, resolve the proposed question "quickly and cleanly without having to study the record." In re Worldcom, Inc., No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

Additionally, the Court recognizes that determining whether a defendant has "red flag" knowledge of infringement is a difficult question that has important ramifications for service providers such as Vimeo. Although nothing in the Court's orders requires providers

affirmatively to police their sites for copyright infringement, see 17 U.S.C. § 512(m), the Court's interpretation of "red flag" knowledge may lead service providers to be more aggressive in further investigating or even removing copyrighted content that they encounter. Viacom defined "red flag knowledge," but it did not address whether content can be obviously infringing on its face or how that concept interacts with various possible defenses to infringement, such as "fair use."

These arguments present a substantial ground for difference of opinion. On the one hand, the legislative history of 17 U.S.C. § 512(c) suggests that service providers should not be placed in a position of having to assess the viability of a user's legal defense to copyright infringement. On the other, insulating a service provider from liability unless all conceivable defenses could be negated would effectively read the "red flag" knowledge provision out of the statute in light of the corresponding "actual knowledge" provision. Resolution these arguments will have far-reaching implications in this case and others. See Klinghoffer v. S.N.C., 921 F.2d 21, 24 (2d Cir. 1990) ("[T]he impact that an appeal will have on other cases is a factor that we may take into account in deciding whether to accept an appeal that has been properly certified by the district court.").

Finally, an appeal on this issue would "materially affect the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The amended complaint alleges 475 infringing videos with which Vimeo's employees interacted. (Mayer Decl. ¶ 15 & Exs. 5-7; Pls.' Mem. of Law in Support of Motion to Amend at 3.) Reversal of the Court's decision on the issue of "red flag" knowledge could lead to a grant of summary judgment in favor of Defendants on most, if not all, of these instances of infringement. Should the Second Circuit agree with Defendants on both the first and second certified questions, the litigation may well be narrowed from 1675 instances of infringement (the total alleged in the amended complaint, see Mayer Decl. ¶ 14) to 29

22

instances (the number of videos allegedly uploaded by Vimeo employees, see Mayer Decl. ¶ 15 & Exs. 5, 7; Pls. Mem. of Law in Support of Motion to Amend at 3; Capitol Records, 2013 WL 5272932, at *15). Certification of the above question is appropriate because a definitive answer may save the Court and parties "vast amounts of expense and time." Am. Geophysical Union, 802 F. Supp. at 29.

### iii.    Plaintiffs' Proposed Questions

Plaintiffs ask the Court to certify a host of issues from its September 18 Order, at times not making any attempt to articulate a precise legal question but instead simply pointing out aspects of the Order raising "issue[s] that require[ ] clarification from the Second Circuit." (Pls.' Opposition to Motion for Reconsideration and Certification at 19.) Although the Circuit is of course free to consider any of the issues Plaintiff raises, see Yamaha Motor Corp., USA v. Calhoun, 516 U.S. 199, 205 (1996)—and a number here indeed are "complex and novel" (Pls.' Br. in Opposition to Motion to Certify at 14)—the Court does not believe any of the proposed questions satisfy the statutory criteria.

First, Plaintiffs ask the Court to certify the issue of whether Vimeo had the "right and ability to control" the infringing activity on its system. See 17 U.S.C. 512(c)(1)(B). The Second Circuit in Viacom concluded that "the right and ability to control infringing activity under § 512(c)(1)(B) requires something more than the ability to remove or block access to materials posted on a service provider's website." 676 F.3d at 38 (internal quotation marks omitted). But the Circuit declined to provide further guidance regarding what constituted the "right and ability to control," beyond noting that inducing infringement and issuing detailed instructions regarding users' content "might" rise to the level of control. Id. In light of the limited guidance in Viacom and the statute's "confused" legislative history, see id. at 37, a "substantial ground for difference of opinion" exists regarding this issue, 28 U.S.C.§ 1292(b).

23

Nonetheless, this issue does not present a "controlling question of law." Id. Plaintiffs are unable to articulate the precise legal question that the September 18 Order raises with respect to this issue; their proposed question essentially asks whether, considering the totality of the circumstances in this case, Defendants had the right and ability to control users' content.[11] To be sure, the Court would welcome guidance from the Second Circuit on this issue, and appreciates that, should the Circuit certify the interlocutory appeal in the fashion that this Court does, a second appeal may be inevitable. Nonetheless, the issue Plaintiffs propose to certify is not a "pure question of law"; it could neither be resolved "quickly" nor "cleanly"; and it would require the Second Circuit "to study the record" closely. Narragansett Elec. Co. v. Am. Home Assur. Co., 921 F. Supp. 2d 166, 196 (S.D.N.Y. 2013).

Second, Plaintiffs seek certification of the Court's holding that Defendants must be willfully blind to specific instances of infringement to lose Safe Harbor protection. (See Order at 3.) This issue presents a "pure question of law" that would not require the Circuit to "study the record." Narragansett, 921 F. Supp. 2d at 196. But it is a question that the Circuit appears to have answered. In Viacom, the Court concluded that "the willful blindness doctrine" is another method of "demonstrat[ing] knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 35. In view of the Circuit's holding that "actual"

---

[11]    Plaintiffs propose two questions with respect to the right and ability to control.  First: "Whether acts such as (1) the implementation and use of content monitoring programs designed to manipulate the visibility and availability of specific content and to enforce strict content 'guidelines'; (2) providing employee and staff feedback and approval as to uploaded content; (3) providing infringing content, instructing and encouraging users to provide infringing content; and (4) interacting with uploaded content, constitute the 'something more' noted by Viacom to give rise to the right and ability to control infringement." (Pls.' Opposition to Motion for Reconsideration and Certification at 16.)  Second: "Whether conduct and statements that encourage others to infringe—such as posting infringing content, appearing in and assisting with the making and uploading of infringing content, encouraging and sanctioning the creating of infringing videos on a website's home page and public forums (including a type of video—'lip dubs'—that necessarily uses copyrighted music), promoting and 'liking' such content, providing technical assistance specifically instructing how to infringe music to those engaged in infringement, communicating both internally and directly to users that infringing works can be posted, hiring a team of employees to monitor and 'curate' content, and refusing to implement available filtering technologies—is 'inducement' for purposes of the right and ability to control, notwithstanding that the total scope of content on Vimeo may not have been overwhelmingly devoted to acts of 'wholesale infringement.'" (Id. at 16-17)

24

or "red flag" knowledge must relate to "specific and identifiable instances of infringement," id., it seems that proof of willful blindness must also be tied to specific instances of infringement. See also id. ("When [a service provider] has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning *of the particular infringing transactions* by looking the other way." (quotation marks omitted and emphasis added)).

Here, although Plaintiffs cited evidence that suggests that Vimeo employees may have turned a blind eye to infringement of musical recordings on the website, none of that evidence connects such "willful blindness" to any of the Videos-in-Suit. Because of this deficiency, the issue does not satisfy the second § 1292(b) criterion for certification.

For the same reason, the Court declines to certify the third issue Plaintiffs seek to appeal, relating to Defendants' knowledge of infringement. No evidence in the record showed that Defendants ever viewed the majority of the Videos-in-Suit; there is no "substantial ground for difference of opinion" on this issue. Nor were Plaintiffs entitled to summary judgment on the issue of knowledge with respect to the videos Vimeo employees uploaded or with which they otherwise interacted: although a jury could find that infringement in these videos was "objectively obvious," the evidence would not *require* such a finding.

Finally, the Court declines to certify Plaintiffs' three proposed questions relating to Vimeo's repeat infringer policy.[12] None of these three questions is a "pure question of law," and

---

[12] The three proposed questions are as follows. First: "Whether a purported repeat infringer policy that provides only that Vimeo 'reserves the right' to terminate users who use its service to infringe, without specifying the nature of the conduct or nature or type of violations that would result in termination, effectively communicates to users that there is a realistic threat of losing . . . access to the Vimeo system." (Pls.' Mem. in Opposition to Certification at 20 (internal quotation marks omitted).) Second: "Whether a repeat infringer policy has the ability to maintain the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers, when representatives and employees of the service provider are themselves engaged in acts of repeat infringement but are not terminated as users, observe others engaging in acts of repeat infringement, and encourage users to do so, without taking any action." (Id. at 21 (internal quotation marks and citation omitted).) Third: "Whether a service provider has reasonably implemented a repeat infringer policy where it fails to engage in any systematic tracking of user violations but instead relies on a demonstrably faulty and ad hoc system dependent upon the memory or subjective evaluation and discretion of the service provider's employees, and

25

all would similarly require the Second Circuit "to study the record." Narragansett, 921 F. Supp. 2d at 196.

## CONCLUSION

To summarize:

(1)     Defendants' motion for reconsideration of the Court's September 18 Order is GRANTED in part and DENIED in part. Defendants are entitled to summary judgment with respect to seventeen additional Videos-in-Suit: fifteen videos for which the only evidence of employee interaction was that the videos were uploaded by "Plus" users or users whose accounts had been "whitelisted," and two videos for which evidence of infringement was not "objectively obvious to a reasonable person."[13] Defendants' motion for reconsideration is denied with respect to the other Videos-in-Suit.

(2)     Plaintiffs' motion for leave to file an amended complaint to add additional works-at-issue is GRANTED.

(3)     Defendants' motion to certify for interlocutory appeal the September 18 Order is GRANTED. The Court certifies the following questions:

> (a)     Whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972; and
>
> (b)     Whether, under Viacom Int'l, Inc. v. YouTube, Inc., a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish "facts or circumstances" giving rise to "red flag" knowledge of infringement.

---

where the service provider has produced only scattered documents which it purports to evidence the implementation of such a policy." (Id. (internal quotation marks omitted).)

[13]     See supra note 4 and accompanying text.

The Court's September 18, 2013 Order is amended to include this Opinion and Order.

Defendants shall have ten days from the entry of this Opinion and Order to apply to the Second

Circuit for leave to proceed with the appeal. The case is STAYED pending a determination by

the Second Circuit.

The Clerk of Court is requested to terminate the motions pending at docket entries 121

and 126 in case number 09 Civ. 10101, and docket entries 117 and 122 in case number 09 Civ.

10105.

SO ORDERED.

Dated:     December 31, 2013
           New York, New York

Ronnie Abrams
United States District Judge

27