14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    **UNITED STATES COURT OF APPEALS**
2    **FOR THE SECOND CIRCUIT**
3
4                         August Term, 2015
5    (Argued:    November 6, 2015                    Decided: June 16, 2016)
6                  Docket No. 14-1048/1049/1067/1068
7    ----------------------------------------------------------X
8    CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE
9    RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA,
10   INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut
11   Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN
12   MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a
13   Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation,
14   EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART
15   CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC
16   CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York
17   Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,
18                   *Plaintiffs-Appellees-Cross-Appellants*,
19   v.
20
21   VIMEO, LLC, a Delaware Limited Liability Company, a/k/a VIMEO.COM,
22   CONNECTED VENTURES, LLC, a Delaware Limited Liability Company,
23                   *Defendants-Appellants-Cross-Appellees,*
24   and
25
26   DOES, 1-20 inclusive,
27                   *Defendants.*
28   ----------------------------------------------------------X
29

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 16, 2016

CERTIFIED COPY ISSUED ON 06/16/2016

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    Before: LEVAL, HALL, LYNCH, *Circuit Judges*:

2

3        Defendant Vimeo, LLC, an Internet service provider, brings this
4    interlocutory appeal on certified questions from the rulings of the United States
5    District Court for the Southern District of New York (Abrams, *J.*), and Plaintiffs,
6    who are owners of copyrights in recorded music, cross-appeal. The complaint
7    alleges that recorded music contained in videos posted by users on the Vimeo
8    website infringes Plaintiffs' copyrights. The certified questions relate to the district
9    court's rulings on motions for partial summary judgment addressed to Vimeo's
10   entitlement to a safe harbor established by the Digital Millennium Copyright Act.
11   17 U.S.C. § 512(c). The court granted partial summary judgment to Plaintiffs as to
12   videos containing pre-1972 recordings, ruling that § 512(c)'s safe harbor was not
13   applicable to sound recordings fixed prior to 1972, because these were protected by
14   state, rather than federal, copyright laws. It granted summary judgment to
15   Defendants as to post-1972 videos not viewed by Vimeo employees, ruling that
16   Plaintiffs could not prevail on the theory of Vimeo's willful blindness to
17   infringements. It denied summary judgment to either party for several videos,
18   concluding that there was a question of material fact whether Vimeo possessed so-
19   called "red flag" knowledge of circumstances that made infringement apparent.
20       We conclude that the safe harbor of § 512(c) applies to pre-1972 sound
21   recordings; the mere fact that a video contains all or virtually all of a
22   "recognizable," copyrighted sound recording and was viewed in some fashion by a
23   service provider's employee is insufficient to prove knowledge or red flag
24   knowledge of infringement; and Plaintiffs' evidence was insufficient to support the
25   imputation of knowledge to Vimeo through the theory of willful blindness.
26
27       Affirmed in part, and vacated in part, and remanded for further proceedings.
28
29
30                           KATHLEEN M. SULLIVAN, QUINN
31                           EMANUEL URQUHART & SULLIVAN,

2

| | |
|---|---|
| 1 | LLP, NEW YORK, NY (Robert L. Raskopf, |
| 2 | Todd Anten, Quinn Emanuel Urquhart & |
| 3 | Sullivan, LLP, New York, NY; Michael A. |
| 4 | Cheah, Vimeo, LLC, New York, NY & |
| 5 | Rachel Herrick Kassabian, Quinn Emanuel |
| 6 | Urquhart & Sullivan, LLP, Redwood |
| 7 | Shores, CA *on the brief*), for *Defendants-* |
| 8 | *Appellants-Cross-Appellees*. |
| 9 | |
| 10 | CARTER G. PHILLIPS, SIDLEY AUSTIN, |
| 11 | LLP, WASHINGTON, DC (Russell J. |
| 12 | Frackman, Marc E. Mayer, Mitchell |
| 13 | Silberberg & Knupp LLP, Los Angeles, CA; |
| 14 | Constantine L. Trela, Jr., Sidley Austin LLP, |
| 15 | Chicago, IL; Christine Lepera, Jeffrey M. |
| 16 | Movit, New York, NY, Kwaku A. |
| 17 | Akowuah, Washington, DC *on the brief*), for |
| 18 | *Plaintiffs-Appellees-Cross-Appellants*. |
| 19 | |
| 20 | Matt Schruers, Computer & |
| 21 | Communications Industry Association, |
| 22 | Washington, DC, for amicus curiae |
| 23 | Computer & Communications Industry |
| 24 | Association. |
| 25 | |
| 26 | Corynne McSherry, Vera Ranieri, Electronic |
| 27 | Frontier Foundation, San Francisco, CA; |

|    |                                                            |
|----|------------------------------------------------------------|
| 1  | Sherwin Siy, Public Knowledge,                             |
| 2  | Washington, DC; Art Neill, Teri Karobonik,                 |
| 3  | New Media Rights, San Diego, CA;                           |
| 4  | Elizabeth Rosenblatt, Rebecca Tushnet,                     |
| 5  | Organization for Transformative Works,                     |
| 6  | New York, NY, Emma Llansó, Center for                      |
| 7  | Democracy and Technology, Washington,                      |
| 8  | DC, for amicus curiae Electronic Frontier                  |
| 9  | Foundation, Organization for                               |
| 10 | Transformative Works, The Center for                       |
| 11 | Democracy and Technology, Public                           |
| 12 | Knowledge, and New Media Rights.                           |
| 13 |                                                            |
| 14 | Michael Elkin, Thomas P. Lane, Winston &                   |
| 15 | Strawn LLP, New York, NY; Robert Turner,                   |
| 16 | Yahoo!, Inc., Sunnyvale, CA; A. John P.                    |
| 17 | Mancini, Mayer Brown LLP, New York,                        |
| 18 | NY, for amici curiae Google Inc., Facebook,                |
| 19 | Inc., Yahoo!, Inc., and Microsoft, Inc.                    |
| 20 |                                                            |
| 21 | Brian M. Willen, Wilson Sonsini Goodrich                   |
| 22 | & Rosati, P.C., New York, NY; Sara E.                      |
| 23 | Rowe, Wilson Sonsini Goodrich & Rosati,                    |
| 24 | P.C., Palo Alto, CA, for amici curiae                      |
| 25 | Pinterest, Inc., Tumblr, Inc., and Twitter,                |
| 26 | Inc.                                                       |
| 27 |                                                            |

1        Thomas G. Hentoff, Jessica S. Richard,
2        Williams & Connolly LLP, Washington,
3        DC, for amici curiae Recording Industry
4        Association of America, Inc., American
5        Association of Independent Music Inc.,
6        National Music Publishers' Association,
7        Inc., The Harry Fox Agency, Inc., Authors
8        Guild, Inc., Association of American
9        Publishers, American Society of Composers,
10       Authors and Publishers, Broadcast Music,
11       Inc., American Federation of Musicians of
12       the United States and Canada, and Screen
13       Actors Guild-American Federation of
14       Television and Radio Artists.
15
16       Andrew H. Bart, Jenner & Block LLP, New
17       York, NY; Luke C. Platzer, J. Douglas
18       Wilson, Jenner & Block LLP, Washington,
19       DC, for amicus curaie The Copyright
20       Alliance.
21

22  Leval, *Circuit Judge*:

23      This is an interlocutory appeal on certified questions from rulings of the

24  United States District Court for the Southern District of New York (Abrams, *J.*).

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    interpreting the Digital Millennium Copyright Act of 1998 ("DMCA"). The

2    DMCA establishes a safe harbor in § 512(c), which gives qualifying Internet

3    service providers protection from liability for copyright infringement when their

4    users upload infringing material on the service provider's site and the service

5    provider is unaware of the infringement. 17 U.S.C. § 512(c). Defendant Vimeo,

6    LLC[1] is an Internet service provider, which operates a website on which members

7    can post videos of their own creation, which are then accessible to the public at

8    large. Plaintiffs are record companies and music publishing companies, which own

9    copyrights in sound recordings of musical performances. Their complaint alleges

10   that Vimeo is liable to Plaintiffs for copyright infringement by reason of 199

11   videos posted on the Vimeo website, which contained allegedly infringing musical

12   recordings for which Plaintiffs owned the rights.

13       The district court ruled on motions for partial summary judgment addressed

14   to whether Vimeo was entitled to the DMCA's safe harbor protections. As for

15   videos that allegedly infringed pre-1972 sound recordings, the court ruled in

_____

[1] Co-Defendant Connected Ventures, LLC is Vimeo's predecessor. "Defendant" or "Vimeo," are
used hereinafter to refer collectively to both defendants.

1    Plaintiffs' favor on the theory that § 512(c)'s safe harbor absolves a service

2    provider only from copyright liability based on the *federal* copyright statute, which

3    does not apply to pre-1972 sound recordings, which are protected only by *state*

4    copyright laws. With respect to post-1972 sound recordings (which all agree are

5    protected by the DMCA's safe harbor when its conditions are met), the district

6    court granted summary judgment to Vimeo as to 153 videos, mostly on the basis

7    that Plaintiffs lacked evidence that Vimeo's employees had viewed them. The

8    court rejected Plaintiffs' arguments that knowledge should be imputed to Vimeo by

9    reason of its alleged general policy of willful blindness to infringement of sound

10    recordings. And as for the remaining challenged videos that incorporated post-

11    1972 sound recordings, the court denied summary judgment to either side,

12    concluding that there was a question of material fact whether Vimeo possessed so-

13    called "red flag" knowledge of circumstances that made infringement apparent,

14    which would make Vimeo ineligible for the protection of the safe harbor under the

15    terms of § 512(c). This interlocutory appeal focuses on three issues: (i) whether the

16    safe harbor of § 512(c) applies to pre-1972 sound recordings; (ii) whether evidence

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    of some viewing by Vimeo employees of videos that played all or virtually all of

2    "recognizable" copyrighted songs was sufficient to satisfy the standard of red flag

3    knowledge, which would make Vimeo ineligible for the DMCA safe harbor; and

4    (iii) whether Plaintiffs have shown that Vimeo had a general policy of willful

5    blindness to infringement of sound recordings, which would justify imputing to

6    Vimeo knowledge of the specific infringements.

7        We affirm the district court's rulings in part and vacate in part. (i) On the

8    first question—whether the safe harbor protects service providers from

9    infringement liability under state copyright laws—we conclude it does and

10    accordingly vacate the district court's grant of partial summary judgment to

11    Plaintiffs on this question. (ii) As to whether some viewing by a service provider's

12    employee of a video that plays all or virtually all of a recognizable copyrighted

13    song is sufficient to establish red flag knowledge, disqualifying the service

14    provider from the benefits of the safe harbor, we rule that, under the standard set

15    forth in *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2012), it

16    does not. We therefore remand for reconsideration of the various denials of

1    summary judgment in Vimeo's favor. (iii) On whether Plaintiffs showed a general

2    policy of willful blindness that disqualifies Vimeo from claiming protection of the

3    safe harbor, we agree with the district court's ruling in Vimeo's favor.

4    **BACKGROUND**

5    **I. The DMCA**

6        "The DMCA was enacted in 1998 to implement the World Intellectual

7    Property Organization Copyright Treaty and to update domestic copyright for the

8    digital age." *Viacom*, 676 F.3d at 26 (internal citations and quotation marks

9    omitted). According to its legislative history, Title II, the Online Copyright

10    Infringement Liability Limitation Act was designed to "clarif[y] the liability faced

11    by service providers who transmit potentially infringing material over their

12    networks," S. Rep. No. 105-190, at 2 (1998), and in the process to "ensure[] that

13    the efficiency of the Internet will continue to improve and that the variety and

14    quality of services on the Internet will expand." *Id.* The Senate Report expressed

15    the view that "without clarification of their liability, service providers may hesitate

16    to make the necessary investment in the expansion of the speed and capacity of the

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1     Internet." *Id*. at 8. To that end, the DMCA established four safe harbors, codified at

2     17 U.S.C. § 512, which protect qualifying Internet service providers from liability

3     for certain claims of copyright infringement. *Viacom*, 676 F.3d at 27. This case

4     focuses on the safe harbor provided by § 512(c), which is supplemented by

5     protections provided in § 512(m).

6       These portions of the statute undertake, through complex provisions, to

7     establish a compromise, which, on the one hand, augments the protections

8     available to copyright owners, and, on the other, insulates service providers from

9     liability for infringements of which they are unaware, contained in material posted

10     to their sites by users, so as to make it commercially feasible for them to provide

11     valuable Internet services to the public.

12       The Act augments the rights of copyright owners by establishing a notice-

13     and-takedown regime. The notice-and-takedown regime requires a service

14     provider, to preserve its eligibility for the safe harbor, to "expeditiously . . . remove

15     . . . material that is claimed to be infringing," or disable access to it, whenever the

16     service provider (1) receives a notice of infringing material on the service

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    provider's site or (2) otherwise becomes aware of the infringement or of

2    circumstances making the infringement apparent. § 512(c)(1)(C), (A)(iii).[2] The

3    provisions favoring Internet service providers, first, immunize those that qualify

4    for the statute's benefits[3] from liability for copyright infringements posted by users

5    on the providers' websites if the service providers are unaware of the

6    infringements, and, second, expressly relieve them of any obligation to monitor the

7    postings of users to detect infringements as a condition of qualifying for the safe

8    harbor. Service providers, however, forfeit entitlement to the safe harbor if they

---

2 The Act provides a mechanism for restoration of the removed material if the user who posted the alleged infringement contests the copyright owner's claim of infringement. Upon receiving an initial notification of infringement, the provider must, in addition to removing the material or disabling access to it, take "reasonable steps promptly to notify the [original poster] that it has removed or disabled access to the material." § 512(g)(2)(A). If the subscriber gives the service provider a "counter notification" contesting infringement, the service provider must "promptly" provide the person who provided the initial notification with a copy of the counter notification and inform the person who provided the initial notification that it will "replace the removed material or cease disabling access to it in 10 business days." § 512(g)(2)(B). After those 10 days have passed, but before 14 days have passed, the service provider must then replace the removed material, unless the service provider receives further notification from the person who provided the initial notification that such person has filed an action seeking a court order to restrain the infringing activity. § 512(g)(2)(C).

3 To qualify for the safe harbors, a party must establish that it meets various threshold criteria, including that it must be a "service provider" as defined in the statute (for purposes of the § 512(c) safe harbor, a service provider is defined as "a provider of online services or network access, or the operator of facilities therefor . . . ", § 512(k)(1)(B)); that it must have adopted and reasonably implemented a policy that, essentially, bans users who repeatedly infringe copyrights; that it must have appointed an agent for receipt of notices of infringements; and that it must accommodate standard technical measures used by copyright owners to identify infringements of copyrighted works. *See Viacom*, 676 F.3d at 27.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    fail to expeditiously remove the infringing material upon receipt of notification of

2    the infringement or upon otherwise becoming aware of it.[4]

3          The terms summarized above are set forth in the following statutory

4    provisions:

5          (c)(1) In general. – A service provider shall not be liable for
6          monetary relief, or [with certain exceptions] for injunctive or
7          other equitable relief, for infringement of copyright by reason
8          of the storage at the direction of a user of material that resides
9          on a system or network controlled or operated by or for the
10         service provider, if the service provider –

11

12    (A)

13               (i) does not have actual knowledge that the material or an activity
14               using the material on the system or network is infringing;

15

16                (ii) in the absence of such actual knowledge, is not aware of facts or
17               circumstances from which infringing activity is apparent; or

18

19                (iii) upon obtaining such knowledge or awareness, acts expeditiously

---

[4] Plaintiffs and their *amici* protest that copyright owners are shortchanged by the compromise. They argue that the notice-and-takedown provisions are of little value for two reasons. First, as soon as infringing material is taken down pursuant to their notifications, users post it again; second, because infringing postings can be downloaded by the public at large, by the time infringements have been removed, innumerable copies of their copyrighted music have been disseminated without payment to the owners. *See* Amicus Brief on behalf of the Recording Industry Association of America, Inc., et al., at 14-15; Amicus Brief on behalf of the Copyright Alliance, at 20.  It may be that Congress overestimated the value to copyright owners of the notice-and-takedown provisions of the statute. We have no way of knowing. But assuming copyright owners' complaint has merit, the need for remediation is a question for Congress. We have no choice but to apply the statute as Congress wrote it.

1              to remove, or disable access to, the material;

2

3          (B) does not receive a financial benefit directly attributable to the

4          infringing activity, in a case in which the service provider has the

5          right and ability to control such activity; and

6

7          (C) upon notification of claimed infringement as described in

8          paragraph (3), responds expeditiously to remove, or disable access to,

9          the material that is claimed to be infringing or to be the subject of

10         infringing activity.

11

12    § 512(c)(1)(A)-(C).

13

14         (m) Protection of privacy.– Nothing in this section shall be construed to

15         condition the applicability of [the safe harbor of § 512(c)] on –

16

17              (1) a service provider monitoring its service or affirmatively seeking

18              facts indicating infringing activity, [with exceptions not relevant to

19              this inquiry].

20

21    § 512(m)(1).

22

23    **II. Vimeo's Website**

24         Vimeo has had great success as a site for the storage and exhibition of

25    videos. Its Website hosts a wide array of home videos, documentaries, animation,

26    and independent films. Founded in 2005, as of 2012 it hosted more than 31 million

27    videos and had 12.3 million registered users in 49 countries. Approximately 43,000

28    new videos are uploaded to Vimeo each day. Users post videos onto the website

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1   without the intervention or active involvement of Vimeo staff, and Vimeo staff do

2   not watch or prescreen videos before they are made available on the website. When

3   a video is uploaded, it is automatically converted to Vimeo's format and stored on

4   Vimeo's servers. Users can view the videos stored on Vimeo servers through a

5   "streaming" process by visiting the website, and in many instances can download

6   them.

7       All Vimeo users must accept its Terms of Service. These require, inter alia,

8   that: users upload (1) only videos that they have created or participated in creating,

9   and (2) only videos for which they possess all necessary rights and that do not

10  infringe on any third party rights. Vimeo's "Community Guidelines" also provide

11  content restrictions and information about its copyright policy. Every time a user

12  uploads a video, the Website displays three rules: (1) "I will upload videos I

13  created myself," (2) "I will not upload videos intended for commercial use," and

14  (3) "I understand that certain types of content are not permitted on Vimeo."

15  Nonetheless, users have the technical ability to upload videos that do not comply

16  with the rules.

17

14

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    Vimeo employs a "Community Team" of 16 employees to curate content.

2  These employees identify some videos with a "like" sign, occasionally prepare

3  commentary on a video, offer technical assistance to users, participate in forum

4  discussions, and at times inspect videos suspected of violating Vimeo's policies.

5  So far as we are aware, the record does not indicate that the videos as to which the

6  district court denied summary judgment were inspected by the Community Team

7  for the purpose of detecting infringement.

8    In order to upload a video to the Website, a user must register for a Vimeo

9  account. Vimeo offers two forms of membership accounts—basic (free) and paid

10  subscription services. It derives revenue from user subscription fees and

11  advertising on its website—the vast majority of its revenue coming from

12  subscription sales. Unless the posting user has limited access, any Internet user can

13  view, download, and copy videos posted on the website for free.

14    A registered user has the ability to note her "likes" or comment on videos,

15  subscribe to "groups" of users with common interests, and subscribe to or create

16  "channels" of videos based on themes.

17

1     Vimeo uses multiple computer programs ("Mod Tools") that assist its

2     Community Team in locating and removing videos that may contain content that

3     violates the Terms of Service. When videos and/or users are identified by one of

4     these tools, Vimeo staff review them individually. Vimeo also enables users to

5     "flag" videos that they believe violate the Terms of Service. Community

6     Moderators evaluate the flagged content and decide whether or not to remove it.

7     The flagging interface also explains how to submit a DMCA claim.

8     Between October 2008 and November 2010, Vimeo deleted at least 4,000

9     videos in response to takedown notices by copyright owners. On the three

10    identified occasions in which Plaintiffs had sent Vimeo takedown notices, the

11    district court found that Vimeo had responded "expeditious[ly]." Plaintiffs did not

12    send takedown notices regarding the videos involved in this suit.

13    While it appears that Vimeo followed a practice of screening the *visual*

14    content of posted videos for infringement of films, it did not screen the *audio*

15    portions for infringement of sound recordings. Plaintiffs contend that this fact,

16    together with statements made by Vimeo employees (found in emails), show

17    indifference and willful blindness to infringement of recorded music, and that

1   Vimeo has furthermore actively encouraged users to post infringing videos.

2   Plaintiffs' evidence of such statements by Vimeo employees included the

3   following:

4   • Dalas Verdugo, a "Community Director" at Vimeo, responded to a user's
5     question that he "see[s] all the time at vime[o] videos, (for example Lip-dub)
6     music being used that is copyrig[ht]ed, is there any problem with this?" by
7     telling the user "[w]e allow it, however, if the copyright holder sent us a
8     legal takedown notice, we would have to comply."
9
10  • Blake Whitman, a member of Vimeo's Community Team, responded to a
11    question regarding Vimeo's "policy with copyrighted music used as audio
12    for original video content" by telling the user, "[d]on't ask, don't tell ;)."[5]
13
14  • On another occasion, Whitman responded to a user who asked about using a
15    Radiohead song in a posted video by writing, "We can't officially tell you
16    that using copyright music is okay. But . . . ."
17
18  • Andrea Allen, a member of Vimeo's Community Team, received a message
19    from a user providing a link to a video and stating, "I have noticed several
20    people using copyrighted music on Vimeo. What do you do about this?"
21    Allen forwarded the e-mail internally with the comment "[i]gnoring, but
22    sharing."
23
24  • In a response to an email asking whether a user would have copyright
25    "issues" with adding the copyrighted song "Don't Worry, Be Happy" by
26    Bobby McFerrin as the "soundtrack" to a home video, Allen responded:
27    "The Official answer I must give you is: While we cannot opine specifically
28    on the situation you are referring to, adding a third party's copyrighted

---

5 The ";)" perhaps indicated a wink.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

content to a video generally (but not always) constitutes copyright infringement under applicable laws . . . Off the record answer . . . Go ahead and post it . . . ."

- In an e-mail sent to Whitman and Verdugo (and also to all@vimeo.com), Andrew Pile, the Vice President of Product and Development at Vimeo, wrote: "Who wants to start the felons group, where we just film shitty covers of these [Plaintiff EMI] songs and write 'FUCK EMI' at the end?"

**III. Proceedings Below**

Plaintiffs filed complaints on December 10, 2009, charging Vimeo with direct, contributory, and vicarious copyright infringement. The complaints identified 199 videos that included recordings of music in which Plaintiffs claimed rights. From March 3, 2011, until April 4, 2012, the case was stayed pending our court's decision in *Viacom*.

In May, 2012, Plaintiffs sought leave to amend their complaints to add more than 1,000 videos to the suit. The Court denied the request without prejudice, on the ground that the additional videos would "require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions." ***Id.***

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    On September 7, 2012, Vimeo moved for summary judgment on the basis of

2    § 512(c)'s safe harbor. On November 16, 2012, Plaintiffs cross-moved for partial

3    summary judgment that Vimeo was ineligible for the safe harbor.

4    In a September 18, 2013 order, the district court granted partial summary

5    judgment to Plaintiffs as to videos that allegedly infringed pre-1972 sound

6    recordings. The court granted summary judgment to Vimeo under the safe harbor

7    as to 136 videos on the basis that there was no evidence that Vimeo employees had

8    observed them. As to videos for which there was evidence of some observation by

9    Vimeo employees, the court denied both sides' motions, ruling that there were

10   triable issues of fact regarding whether Vimeo had acquired actual or red flag

11   knowledge of infringement that would disqualify it from safe harbor protection.

12   *Id.*[6] The district court rejected Plaintiffs' argument that Vimeo should be held

13   liable under a willful blindness theory.

14   On Vimeo's motion for reconsideration, the district court granted Vimeo

---

6 The court denied summary judgment as to ten of these videos because they were uploaded by Vimeo employees, explaining that the safe harbor extends only to material stored "at the direction of a user," and "a triable issue has been raised with respect to whether the employees were storing their content as 'users' . . . or as employees acting within the scope of their employment." This appeal does not concern the status of infringing recordings made by Vimeo's employees.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    summary judgment on an additional 17 videos, on 15 because of insufficient

2    evidence of observation by Vimeo staff, and on two because they contained only

3    short portions of the allegedly infringed recordings, which the court found

4    insufficient to support a finding of red flag knowledge.

5        The court then certified two questions for interlocutory appeal: "(a) Whether

6    the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior

7    to February 15, 1972 "; and (b) "Whether, under the holding of *Viacom,* a service

8    provider's viewing of a user-generated video containing all or virtually all of a

9    recognizable, copyrighted song may establish 'facts or circumstances' giving rise

10    to 'red flag' knowledge of infringement." This court granted Vimeo's petition for

11    interlocutory review of those two questions, and granted Plaintiffs' request for

12    interlocutory review of a third issue: whether Plaintiffs' evidence showed willful

13    blindness that could justify imposition of liability on Vimeo, notwithstanding the

14    safe harbor provisions.

15

16

1    **DISCUSSION**

2    **I. Pre-1972 Recordings**

3    The first question we consider is whether the district court erred in granting

4    partial summary judgment to Plaintiffs, rejecting the availability of the DMCA's

5    safe harbor for infringement of sound recordings fixed prior to February 15, 1972.

6    (For convenience, we use the terms "pre-1972" and "post-1972" to refer to sound

7    recordings fixed before, or after, February 15, 1972.) The district court concluded

8    that, with respect to sound recordings, the safe harbor established by § 512(c)

9    protects only against liability under the *federal* copyright law, and that the DMCA

10   consequently gives service providers no protection for pre-1972 recordings, which

11   are protected only by *state* laws of copyright.

12   Confusion on this issue results from Congress's convoluted treatment of

13   sound recordings. Although sound recordings have existed since the 19th century,

14   for reasons not easily understood Congress first included them within the scope of

15   federal copyright protection on February 15, 1972, and the grant of federal

16   copyright protection to sound recordings on that date applied only to sound

21

1    recordings to be made thereafter. UNITED STATES COPYRIGHT OFFICE, FEDERAL

2    COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS 5 (2011), *available at*

3    http://copyright.gov/docs/sound/pre-72-report.pdf ["Pre-1972 Sound Recordings

4    Report"]. Pre-1972 recordings have never been covered by the federal copyright.

5    Accordingly, copyright protection of pre-1972 sound recordings has depended on

6    the copyright laws of the states. *Id.*

7        In 1976, Congress enacted an overall revision of the law of copyright.

8    Section 301 of the new statute, in subsection (a), asserted federal preemption

9    (ousting all state laws) with respect to works covered by the federal copyright. The

10    preemption did not include pre-1972 sound recordings as these were not covered

11    by the federal copyright. Subsection (c) of § 301 provided with respect to pre-1972

12    sound recordings that "any rights or remedies under the common law or statutes of

13    any State shall not be annulled or limited by this title until" February 15, 2047.

14    After that date, federal law would preempt state law, so that state laws of copyright

15    previously protecting pre-1972 sound recordings would cease to have effect, and

16    all pre-1972 sound recordings would pass into the public domain. *See* Pub. L. No.

1    94-553, § 301, 90 Stat. 2541, 2572 (1976) (codified at 17 U.S.C. § 301).

2    Subsequently, when Congress extended the duration of the federal copyright term,

3    it passed parallel amendments to § 301(c), which similarly extended the period

4    during which pre-1972 sound recordings would continue to be protected by state

5    copyright laws. Section 301(c) in its present form postpones the date at which pre-

6    1972 sound recordings will pass into the public domain until February 15,

7    2067—95 years after February 15, 1972. Pub. L. No. 105-298, 112 Stat. 2827

8    (1998).

9            Plaintiffs argued in the district court, with success, and argue again on this

10   appeal, that the interrelationship of § 301(c) with the safe harbor provision of §

11   512(c) requires that the latter be interpreted to have no application to pre-1972

12   sound recordings. Section 512(c), the safe harbor, provides that service providers

13   meeting the qualifications of the statute "shall not be liable . . . for infringement of

14   copyright." Plaintiffs argue that, if this safe harbor provision is interpreted to

15   protect service providers from infringement liability under state copyright laws, it

16   conflicts irreconcilably with § 301(c)'s provision that, until 2067, "rights or

1   remedies under the common law or statutes of any State shall not be annulled or

2   limited by this title." According to Plaintiffs' argument, the proper way to

3   reconcile § 301(c) with § 512(c), so as to avoid the conflict, is to construe §

4   512(c)'s guarantee that service providers "shall not be liable . . . for infringement

5   of copyright" as meaning that they shall not be liable for infringement of the

6   federal copyright, but as having no application to any liability service providers

7   may incur under state laws.

8        On this question, the district court accepted without discussion the position

9   taken by the United States Copyright Office in a report prepared in 2011 that the

10   safe harbor does not protect against liability for infringement of pre-1972 sound

11   recordings. *Capitol Records, LLC v. Vimeo LLC*, 972 F. Supp. 2d 536-37

12   (S.D.N.Y. 2013). The portion of the Report directed to § 512(c) begins by stating

13   that the Office "sees no reason—and none has been offered—why the section 512

14   'safe harbor' from liability . . . should not apply to the use of pre-1972 sound

15   recordings." *Id.* at 130. It observes that § 512 was "innovative legislation" and that

16   "the concept of providing safe harbors for certain good faith acts on the Internet

1 remains a sound principle." *Id.* The Report found "no policy justification to

2 exclude older sound recordings from section 512." *Id.* We agree completely with

3 those conclusions.

4      Nonetheless, the Report concluded that § 512(c)'s safe harbor does not apply

5 to pre-1972 sound recordings, which are protected only by state law. *Id.* at 132.

6 The Report rejected interpreting § 301(c) as prohibiting "all subsequent regulation

7 [by Congress] of pre-1972 recordings," *id.* at 131,[7] but nonetheless concluded that

8 "Congress did [not] in fact subsequently regulate pre-1972 sound recordings in

9 section 512(c)." *Id.*

10      The Pre-1972 Sound Recordings Report arrived at its conclusion that

11 § 512(c)'s safe harbor applies only to post-1972 sound recordings by the following

12 reasoning: The term "infringement of copyright," which is employed in § 512(c),

---

7 This is certainly correct. The most reasonable reading of § 301(c) is that "this title" refers to Title 17 as it was constituted in 1998, at the time § 301(c) was most recently amended. To read it as placing a limitation on future amendments and additions to Title 17 would mean that Congress was purporting to bind itself for decades, no matter what circumstances would later materialize—such as the arrival of the Internet. "[S]tatutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012). The more natural reading of § 301(c), then, is that it governed the implementation of Title 17 as it stood in 1998.

1    "is defined in section 501(a) as the violation of 'any of the exclusive rights of the

2    copyright owner as provided by sections 106 through 122.'" *Id.* at 131. Therefore,

3    that term, when used in § 512(c), "only refers to infringement of rights protected

4    under title 17, and does not include infringement of rights protected under [state]

5    law." *Id.* at 131-32. The Report buttressed its conclusion by reference to two

6    canons of statutory interpretation: (1) that exemptions from liability "must be

7    construed narrowly, and any doubts must be resolved against the . . . exemption";

8    and (2) that one section of a statute "cannot be interpreted in a manner that

9    implicitly repeals another section." *Id.* at 132.

10          While we unhesitatingly acknowledge the Copyright Office's superior

11    expertise on the Copyright Act, we cannot accept its reading of § 512(c). It is based

12    in major part on a misreading of the statute. The Report's main argument—that

13    § 501(a) defines the words "infringement of copyright" as meaning infringement of

14    the rights granted by the federal statute—misreads this provision. And as for the

15    arguments based on canons of statutory construction, a subject not within the

16    special expertise of the Copyright Office, we respectfully conclude that the

1    pertinent canons were misunderstood and misapplied.

2          The Report begins its analysis by asserting that § 512(c)'s term

3    "infringement of copyright" is defined in § 501(a) as the violation of "any of the

4    exclusive rights of the copyright owner as provided by sections 106 through 122."

5    Section 501(a), however, does not contain such a definition.  The Copyright Act's

6    definitions are set forth in § 101, and do not include a definition for "infringement

7    of copyright." WILLIAM F. PATRY, PATRY ON COPYRIGHT § 9:1 (2016) ("The

8    Copyright Act does not define 'infringement.'") Neither does § 501(a) purport to

9    define "infringement of copyright." It reads: "Anyone who violates any of the

10   exclusive rights of the copyright owner as provided by sections 106 through 122 . .

11   . is an infringer of the copyright." The statement that one who violates rights

12   identified in specified sections is an "infringer of copyright" does not purport to set

13   forth an exclusive definition of "infringer of copyright." This provision of § 501(a)

14   is in no way incompatible with interpreting the safe harbor as applying to

15   infringement of state copyright laws. To state that conduct *x* violates a law is not

16   the same thing as saying that conduct *x* is the *only conduct* that violates the law.

1  And, in fact, within the terms of the Copyright Act, infringements are specified that

2  are not among those specified in sections 106-122. *See, e.g.*, § 1309 (re:

3  infringement of vessel hull designs).

4       A literal and natural reading of the text of § 512(c) leads to the conclusion

5  that its use of the phrase "infringement of copyright" *does* include infringement of

6  state laws of copyright. One who has been found liable for infringement of

7  copyright under state laws has indisputably been found "liable for infringement of

8  copyright." In this instance, Congress did not qualify the phrase "infringement of

9  copyright" by adding, as it did in other circumstances, the words, "under this title."

10  *See, e.g.*, § 106 ("Subject to sections 107 through 122, the owner of copyright

11  under this title has the exclusive rights to do and to authorize any of the following .

12  . . .); § 201(a) ("Copyright in a work protected under this title vests initially in the

13  author or authors of the work."). To interpret § 512(c)'s guarantee that service

14  providers "shall not be liable . . . for infringement of copyright" to mean that they

15  may nonetheless be liable for infringement of copyright under state laws would be,

16  at the very least, a strained interpretation—one that could be justified only by

28

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    concluding that Congress must have meant something different from what it said.

2        In contrast, there is every reason to believe that Congress meant exactly

3    what it said. As explained above, what Congress intended in passing § 512(c) was

4    to strike a compromise under which, in return for the obligation to take down

5    infringing works promptly on receipt of notice of infringement from the owner,

6    Internet service providers would be relieved of liability for user-posted

7    infringements of which they were unaware, as well as of the obligation to scour

8    matter posted on their services to ensure against copyright infringement. The

9    purpose of the compromise was to make economically feasible the provision of

10    valuable Internet services while expanding protections of the interests of copyright

11    owners through the new notice-and-takedown provision. To construe § 512(c) as

12    leaving service providers subject to liability under state copyright laws for postings

13    by users of infringements of which the service providers were unaware would

14    defeat the very purpose Congress sought to achieve in passing the statute. Service

15    providers would be compelled either to incur heavy costs of monitoring every

16    posting to be sure it did not contain infringing pre-1972 recordings, or incurring

1   potentially crushing liabilities under state copyright laws. It is not as if pre-1972

2   sound recordings were sufficiently outdated as to render the potential liabilities

3   insignificant. Some of the most popular recorded music of all time was recorded

4   before 1972, including work of The Beatles, The Supremes, Elvis Presley, Aretha

5   Franklin, Barbra Streisand, and Marvin Gaye.

6        Whether we confine our examination to the plain meaning of the text, or

7   consider in addition the purpose the text was intended to achieve, we find no

8   reason to doubt that § 512(c), as it states, protects service providers from all

9   liability for infringement of copyright, and not merely from liability under the

10   federal statute.

11        Nor do we find persuasive force in the Report's reliance on canons of

12   statutory interpretation. The Report argued that interpreting § 512(c) as protecting

13   service providers from liability under state law would ignore the "general rule of

14   statutory construction that exemptions from liability . . . must be construed

15   narrowly, and any doubts must be resolved against the one asserting the

16   exemption."  Pre-1972 Sound Recordings Report, at 132.  As authority for this

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    "rule," the Report cited our decision in *Tasini v. New York Times Co.*, 206 F.3d

2    161, 168 (2d Cir. 2000), *aff'd*, 533 U.S. 483 (2001). The argument is flawed in

3    several respects.

4        First, the Report's conception that, under the canon it cited, statutes "must be

5    construed" in a certain way misconceives what such canons are. They are not *rules*,

6    but rather suggestive "guides." *See Chickasaw Nation v. United States,* 534 U.S.

7    84, 94 (2001) (emphasizing that "canons are not mandatory rules" and that "other

8    circumstances evidencing congressional intent can overcome their force"). Such

9    guides are based on commonsense logic and can aid in the interpretation of a

10    legislature's intentions in the face of an ambiguous provision, but only to the

11    extent that the logical propositions on which they are based make sense in the

12    particular circumstance.

13        Second, the proposition cited by the Report with citation to our *Tasini*

14    decision was not the proposition we espoused in *Tasini*. What we said in that case

15    was that reading a statutory exception to a general rule "as broadly as appellees

16    suggest would cause the exception to swallow the rule," contravening the principle

1   stated by the Supreme Court in *Commissioner v. Clark*, 489 U.S. 726, 739 (1989),

2   that "when a statute sets forth exceptions to a general rule, we generally construe

3   the exceptions 'narrowly in order to preserve the primary operation of the

4   [provision].'" *Tasini* 206 F.3d at 168 (quoting *Clark*, 489 U.S. at 739). The

5   difference between the proposition cited in the Report and the statements in *Tasini*

6   and *Clark* is significant. The proposition of *Tasini* and *Clark* is supported by

7   commonsense logic. When a statute sets forth a general principle, coupled with an

8   exception to it, it is logical to assume, in the face of ambiguity in the exception,

9   that the legislature did not intend the exception to be so broad as to leave nothing

10  of the general principle. In contrast, the proposition stated by the Report—that

11  exceptions must in *all circumstance*s be construed narrowly, "and any doubts must

12  be resolved against the one asserting the exception"—is arbitrary and without

13  logical foundation. There is simply no reason to assume as a general proposition

14  that a legislature intended all exceptions to all general principles to be construed

15  narrowly—or broadly for that matter.[8]

---

[8]     While the proposition in the Copyright Office Report that "exemptions from liability . . . must be construed narrowly, and any doubts must be resolved against the one asserting the exemption" is not found in the case cited in the Report, we have found similar language in one

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1

---

Supreme Court opinion dating from 1896. *See United States v. Allen*, 163 U.S. 499, 504 (1896) (rejecting the plaintiff's claim with the explanation that it falls "within the general principle that exemptions must be strictly construed, and that doubt must [be] resolved against the one asserting the exemption.")  Consideration of those words in context, however, shows that they must be construed as having a narrower application than appears from those words in isolation.

The plaintiff in *Allen*, an importer of bituminous coal subsequently utilized to power vessels engaged in the coasting trade, paid a tariff on importation of the coal and sued the United States to recover the tariffs it had paid. The plaintiff relied on an 1883 act of Congress, which expressly provided a "drawback" of the tariff on imported coal used to power vessels engaged in the coasting trade. That drawback, if applicable, would have entitled the plaintiff to a refund of the tariff. The problem for the plaintiff was that the 1883 tariff act had been replaced by a new enactment in 1890 that did not include any mention of the drawback for coal used in the coasting trade. The plaintiff claimed that the 1890 act should be interpreted as inferentially incorporating the drawback from the earlier act. The Supreme Court rejected the argument, explaining that the plaintiff's claim would contravene "the general principle that exemptions must be strictly construed, and that doubt must [be] resolved against the one asserting the exemption." As authority for that "general principle," the Supreme Court cited *People v. Cook*, 148 U.S. 397 (1893) and *Keokuk & W. R. Co. v. Missouri*, 152 U.S. 301 (1894).

Those two cases, *Cook* and *Keokuk*, involved claims by railroads that they should be deemed exempt from taxes imposed by their states of incorporation. The Supreme Court rejected both claims. It explained in *Cook* that "exemption *from taxation*, *so essential to the existence of government*, must be expressed in the clearest and most unambiguous language, and not be left to implication or inference." *Cook*, 148 U.S. at 409 (emphasis added). And in *Keokuk*, the Court explained by reference to the "general rule" that "the taxing power of the state should never be presumed to be relinquished, unless the intention to do so be declared in clear and unambiguous terms." *Keokuk*, 152 U.S. at 306. Thus the authorities cited in *Allen* did not lay down a general rule about "exemptions from liability." They specifically addressed claims of taxpayers of exemption from liability *for taxes*, and justified the requirement that the exemption be set forth in clear and unambiguous language by the importance of the taxing power to the survival of the state. The *Allen* case, like the two precedents it cited, was also about a claim of exemption from the taxing power of the state.  In the circumstances, the principle cited in *Allen* that "exemptions must be strictly construed" must be understood as referring to claims of exemption from the obligation to pay taxes, and not to all exemptions from statutory obligations, regardless of subject matter. Apart from the fact that the three Supreme Court cases in question all dealt with

1    The logical principle noted in *Tasini* and *Clark* has no application to the

2    relationship between the general rule of § 301(c) and the exception provided by

3    § 512(c). To construe the safe harbor of § 512(c) as protecting Internet service

4    providers against liability under state law for posted infringements of which they

5    were unaware establishes a tiny exception to the general principle of

6    § 301(c)—that state law will continue for 95 years to govern pre-1972 sound

7    recordings, without interference from the federal statute. The exception does not

8    come close to nullifying the general rule, and the principle of interpretation cited in

9    *Tasini* therefore has no application to these facts. Further, the proposition cited by

10   the Report is particularly without logical force where, as here, the limitation is

11   asserted by a *federal* statute curtailing the operation of *state* law on a matter placed

12   by the Constitution within the authority of Congress.

13   We also disagree with the Report's citation of *Tennessee Valley Authority v*

14   *Hill*, 437 U.S. 153, 189 (1978), for the proposition that "one section of a statute

15   cannot be interpreted in a manner that implicitly repeals another section." Pre-1972

claims of inferential exemption from tax obligations, the Court justified the principle requiring
strict construction of the exemption by the state's need to collect taxes in order to survive. There
is no logical principle that would justify an across-the-board rule requiring strict construction of
all exemptions, regardless of subject matter or of manifestations of legislative intent.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    Sound Recordings Report, at 132. The Report substantially overstated, and

2    misapplied, what the Supreme Court said, which was merely that "repeals by

3    implication are not favored." *Hill*, 437 U.S. at 189 (quoting *Morton v. Mancari*,

4    417 U.S. 535, 549 (1974)). The argument rejected by the Supreme Court was that

5    Congress, by repeatedly funding the construction of a dam, had *by implication*

6    repealed a provision of federal law protecting a wildlife species, the snail darter,

7    whose habitat would be harmed by the operation of the dam. *Id.* Those

8    circumstances had little in common with this one. Here, to the extent that Congress

9    can be said to have repealed by § 512(c) an aspect of the rule it had previously

10   enacted in § 301(c), it was not by implication but by specific statement. In the *Hill*

11   case, the appropriations funding the dam had made no mention of any rule

12   affecting protection of the snail darter, so that repeal through those acts of

13   appropriation could only have been *by implication*.  Here, in contrast, the partial

14   repeal of § 301(c) was by the explicit statement in § 512(c) that "[a] service

15   provider shall not be liable . . . for infringement of copyright . . . ." The *Hill*

16   principle has no application to this issue.

17

1       Finally, construing the safe harbor of § 512(c) as not granting protection to

2    service providers from liability for state-law-based copyright infringements would

3    substantially defeat the statute's purposes. Internet service providers that allow the

4    public to post works on their sites would either need to incur enormous expenses to

5    monitor all postings to ensure the absence of infringing material (contravening the

6    provision of § 512(m) excusing them from such obligation), or would incur state-

7    law-based liabilities for copyright infringement by reason of user-posted

8    infringements of which they were unaware. The financial burdens in either case

9    would be substantial and would likely either dissuade service providers from

10    making large investments in the expansion of the growth and speed of the Internet

11    (which Congress sought to encourage) or perhaps cause them to charge so much

12    for the service as to undermine substantially the public usefulness of the service

13    Congress undertook to promote.

14       Although an opinion expressed by the Copyright Office in such a report does

15    not receive *Chevron* deference of the sort accorded to rulemaking by authorized

16    agencies, we do recognize the Copyright Office's intimate familiarity with the

17    copyright statute and would certainly give appropriate deference to its reasonably

1    persuasive interpretations of the Copyright Act. *See Skidmore v Swift & Co.*, 323

2    U.S. 134, 140 (1944) (explaining that the weight of such an interpretation "will

3    depend upon the thoroughness evident in its consideration, the validity of its

4    reasoning, its consistency with earlier and later pronouncements, and all those facts

5    which give it power to persuade, if lacking power to control"). In this instance,

6    however, for the reasons explained above, we cannot accept its interpretation of

7    § 512(c). *See* PATRY at § 17:102 (stating that courts should defer to the Copyright

8    Office's interpretation of the statute only to the extent they find it persuasive); *see*

9    *also Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir.

10    2008) (assuming that a 2001 report by the Copyright Office "deserve[d] only

11    *Skidmore* deference, deference based on its 'power to persuade,'" and rejecting the

12    Office's interpretation as unpersuasive). We conclude that the safe harbor

13    established by § 512(c) protects a qualifying service provider from liability for

14    infringement of copyright under state law. We therefore vacate the district court's

15    grant of summary judgment to Plaintiffs as to the availability of the DMCA safe

16    harbor to Vimeo in relation to liability for infringement of pre-1972 sound

17    recordings.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    **II.  Red Flag Knowledge of Infringement**

2        The  second certified question is "Whether, under *Viacom Int'l, Inc. v.*

3    *YouTube, Inc.*, a service provider's viewing of a user-generated video containing

4    all or virtually all of a recognizable, copyrighted song may establish 'facts and

5    circumstances' giving rise to 'red flag' knowledge of infringement" within the

6    meaning of § 512(c)(1)(A)(ii). We consider this question in relation to the district

7    court's denial of Vimeo's motion for summary judgment on a number of videos

8    that conform to the facts specified in the district court's question. The district

9    court's formulation of the question in connection with its ruling suggests that the

10   court based its denial on the presence of the facts specified in the question. We

11   conclude that Plaintiffs' establishment of those facts is insufficient to prove red

12   flag knowledge. We therefore vacate the court's order denying Vimeo summary

13   judgment as to red flag knowledge with respect to those videos.

14       Our court explained in *Viacom* that, in order to be disqualified from the

15   benefits of the safe harbor by reason of red flag knowledge under

16   § 512(c)(1)(A)(ii), the service provider must have actually known facts that would

17   make the specific infringement claimed objectively obvious to a reasonable person.

38

1    The difference between actual and red flag knowledge is . . . not
2    between specific and generalized knowledge, but instead between a
3    subjective and an objective standard. In other words, the actual
4    knowledge provision turns on whether the provider actually or
5    'subjectively' knew of specific infringement, while the red flag
6    provision turns on whether the provider was subjectively aware of
7    facts that would have made the specific infringement 'objectively'
8    obvious to a reasonable person.

9

10 *Viacom*, 676 F.3d at 31.

11    The hypothetical "reasonable person" to whom infringement must be

12 obvious is an ordinary person—not endowed with specialized knowledge or

13 expertise concerning music or the laws of copyright. Furthermore, as noted above,

14 § 512(m) makes clear that the service provider's personnel are under no duty to

15 "affirmatively seek[]" indications of infringement. The mere fact that an employee

16 of the service provider has viewed a video posted by a user (absent specific

17 information regarding how much of the video the employee saw or the reason for

18 which it was viewed), and that the video contains all or nearly all of a copyrighted

19 song that is "recognizable," would be insufficient for many reasons to make

20 infringement *obvious* to an ordinary reasonable person, who is not an expert in

21 music or the law of copyright. Because the district court's denial of Vimeo's

22 motion for summary judgment and concomitant certification of this question

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    suggest that the district court believed that the evidence described in the question,

2    without more, could render the service provider ineligible for the safe harbor, and

3    relied on this proposition to deny summary judgment in every instance in which

4    there was evidence that an employee of Vimeo had seen at least a portion of a

5    video that contained substantially all of a "recognizable" copyrighted song, we

6    vacate the district court's ruling on this question and remand for reconsideration in

7    light of our further discussion of the standard for red flag knowledge.

8        A significant aspect of our ruling relates to the burdens of proof on the

9    question of the defendant's entitlement to the safe harbor—particularly with

10    respect to the issue of red flag knowledge. The issue is potentially confusing

11    because of the large numbers of factual questions that can arise in connection with

12    a claim of the safe harbor. A service provider's entitlement to the safe harbor is

13    properly seen as an affirmative defense, and therefore must be raised by the

14    defendant. The defendant undoubtedly bears the burden of raising entitlement to

15    the safe harbor and of demonstrating that it has the status of service provider, as

16    defined, and has taken the steps necessary for eligibility. On the other hand, on the

17    question whether the service provider should be disqualified based on the

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    copyright owner's accusations of misconduct—i.e., by reason of the service

2    provider's failure to act as the statute requires after receiving the copyright owner's

3    notification or otherwise acquiring actual or red flag knowledge—the burden of

4    proof more appropriately shifts to the plaintiff.[9] The service provider cannot

5    reasonably be expected to prove broad negatives, providing affidavits of every

6    person who was in its employ during the time the video was on its site, attesting

7    that they did not know of the infringement and did not know of the innumerable

8    facts that might make infringement obvious. And to read the statute as requiring a

9    trial whenever the plaintiff contests the credibility of such attestations would

10   largely destroy the benefit of the safe harbor Congress intended to create.

11         The Nimmer copyright treatise, noting Congress's failure to prescribe a

12   roadmap, and observing that "courts [must] muddle through," furnishes valuable

13   guidance on the shifting allocation of burdens of proof as to a service provider's

14   entitlement to the protection of the safe harbor. *See* MELVILLE B. NIMMER &

15   DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.04[A][1][d], n.145 (2015).

16   According to Nimmer, the service provider initially establishes entitlement to the

---

9 By "burden of proof," we refer to the burden of persuading the factfinder, sometimes called the burden of persuasion.

41

1   safe harbor by showing that it meets the statutory definition of an eligible service

2   provider (on whose website the allegedly infringing material was placed by a user),

3   and that it has taken the general precautionary steps against infringement that are

4   specified in the statute. The service provider could nonetheless be denied the safe

5   harbor if the plaintiff-rightsholder showed that the service provider had actual

6   knowledge, or red flag knowledge, of the infringement. The burden of proof with

7   respect to actual or red flag knowledge would be on the plaintiff.

8          Acknowledging that the burden lies on the defendant to establish the

9   affirmative defense, Nimmer explains,

10         It would seem that defendant may do so [establish entitlement to the
11         safe harbor] by demonstrating that it qualifies as a service provider
12         under the statutory definition, which has established a repeat infringer
13         policy and follows the requisite technical measures. *In terms of mental
14         state, the burden would then appear to shift back to plaintiff. To
15         disqualify defendant from the safe harbor, the copyright claimant
16         must show defendant's actual knowledge or a 'red flag' waving in its
17         face.* But defendant can still qualify for the safe harbor if, after
18         gaining the requisite mental state, it acted expeditiously to disable
19         access to the infringing content. As to that last matter [expeditious
20         take-down], the burden would seem to rest on defendant.

21

22   *Id.* (internal citations omitted)(emphasis added).[10]

10 *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006 (9th Cir. 2013),

1    We agree with Nimmer's proposed allocation of shifting burdens of proof.

2  Proper allocation of the burden of proof will necessarily have an important bearing

3  on determining entitlements to summary judgment. Following Nimmer's cogent

4  analysis, it appears that a defendant would, in the first instance, show entitlement

5  to the safe harbor defense by demonstrating its status as a service provider that

6  stores users' material on its system, that the allegedly infringing matter was placed

7  on its system by a user, and that it has performed precautionary, protective tasks

8  required by § 512 as conditions of eligibility, including that it adopted and

9  reasonably implemented a policy designed to exclude users who repeatedly

10  infringe, that it designated an agent for receipt of notices of infringement, and that

11  it accommodates standard technical measures used by copyright owners to detect

12  infringements.

13    On the issue of disqualifying knowledge, however, the burden falls on the

14  copyright owner to demonstrate that the service provider acquired knowledge of

---

cited and appeared to follow Nimmer's burden-shifting framework. *Id.* at 1107 n.11; *see also Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 115 (S.D.N.Y. 2013) (stating, on remand, that "the burden of showing that [defendant service provider] knew or was aware of the specific infringements of the works in suit cannot be shifted to [defendant] to disprove").

1    the infringement, or of facts and circumstances from which infringing activity was

2    obvious, and failed to promptly take down the infringing matter, thus forfeiting its

3    right to the safe harbor. The plaintiff is, of course, entitled to take discovery of the

4    service provider to enable it to make this showing.[11]

5        A copyright owner's mere showing that a video posted by a user on the

6    service provider's site includes substantially all of a recording of recognizable

7    copyrighted music, and that an employee of the service provider saw at least some

---

[11]Nimmer describes the allocation of burdens in slightly different terms in two separate passages. We agree with the description quoted above. A subsequent footnote in the Nimmer treatise, however, seems to impose a questionable prerequisite to the imposition of the burden on the plaintiff to show knowledge or red flag knowledge. According to this later footnote, "a service provider *who offers competent testimony that it lacked actual knowledge* shifts the burden of proof to the plaintiff to negate those claims." NIMMER, § 12B.04 n.211 (emphasis added) (internal citations omitted). We disagree that such evidence should be required of the service provider as a prerequisite to the imposition of the burden of proof on the plaintiff to prove the service provider's disqualification from the safe harbor by reason of its knowledge or red flag knowledge.

    While providing such a statement would not be difficult in some circumstances, as when all of the persons employed by the service provider while the videos were on its website remain in its employ, such a declaration may be impossible to make where there has been turnover in the service provider's personnel—especially if some former employees have died or cannot be located. If such a statement were required as a prerequisite to the imposition of the burden on the copyright owner with respect to disqualifying knowledge, service providers might be disqualified from the safe harbor for no reason other than inability to locate or communicate with former employees. We see no reason why the burden of proof should not fall on the plaintiff to show the service provider's knowledge or red flag knowledge without need for the service provider's prior formulaic disclaimer.

1    part of the user's material,[12] is insufficient to sustain the copyright owner's burden

2    of proving that the service provider had either actual or red flag knowledge of the

3    infringement. That is so for many reasons.

4          First, the employee's viewing might have been brief. The fact that an

5    employee viewed enough of a video to post a brief comment, add it to a channel

6    (such as *kitten videos*) or hit the "like" button, would not show that she had

7    ascertained that its audio track contains all or virtually all of a piece of music.

8          Second, the insufficiency of *some* viewing by a service provider's employee

9    to prove the viewer's awareness that a video contains all or virtually all of a song is

10   all the more true in contemplation of the many different business purposes for

11   which the employee might have viewed the video. The purpose of the viewing

12   might include application of technical elements of computer expertise,

13   classification by subject matter, sampling to detect inappropriate obscenity or

14   bigotry, and innumerable other objectives having nothing to do with recognition of

15   infringing music in the soundtrack. Furthermore, the fact that music is

---

12 While granting Vimeo summary judgment on videos with which Vimeo employees did not interact, the district court found sufficient interaction to deny summary judgment when employees "liked" or commented on videos, placed the videos on "channels," or "buried" them.

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    "recognizable" (which, in its dictionary definition of "capable of being

2    recognized"[13] would seem to apply to all music that is original and thus

3    distinguishable from other music), or even *famous* (which is perhaps what the

4    district court meant by "recognizable"), is insufficient to demonstrate that the

5    music was in fact recognized by a hypothetical ordinary individual who has no

6    specialized knowledge of the field of music. Some ordinary people know little or

7    nothing of music. Lovers of one style or category of music may have no familiarity

8    with other categories. For example, 60-year-olds, 40-year-olds, and 20-year-olds,

9    even those who are music lovers, may know and love entirely different bodies of

10   music, so that music intimately familiar to some may be entirely unfamiliar to

11   others.

12         Furthermore, employees of service providers cannot be assumed to have

13   expertise in the laws of copyright. Even assuming awareness that a user posting

14   contains copyrighted music, the service provider's employee cannot be expected to

15   know how to distinguish, for example, between infringements and parodies that

16   may qualify as fair use. Nor can every employee of a service provider be

_____

13 Webster's Third New Int'l Dictionary 1896 (1976).

46

1   automatically expected to know how likely or unlikely it may be that the user who

2   posted the material had authorization to use the copyrighted music. Even an

3   employee who was a copyright expert cannot be expected to know when use of a

4   copyrighted song has been licensed. Additionally, the service provider is under no

5   legal obligation to have its employees investigate to determine the answers to these

6   questions.

7       It is of course entirely possible that an employee of the service provider who

8   viewed a video did have expertise or knowledge with respect to the market for

9   music and the laws of copyright. The employee may well have known that the

10  work was infringing, or known facts that made this obvious. The copyright owner

11  is entitled to discovery in order to obtain the specific evidence it needs to sustain

12  its burden of showing that the service provider did in fact know of the infringement

13  or of facts that made infringement obvious. But the mere fact that a video contains

14  all or substantially all of a piece of recognizable, or even famous, copyrighted

15  music and was to some extent viewed (or even viewed in its entirety) by some

16  employee of a service provider would be insufficient (without more) to sustain the

17  copyright owner's burden of showing red flag knowledge.

1    Plaintiff argues that, under this interpretation of the standard for finding red

2    flag knowledge, red flag knowledge is so similar to actual knowledge of

3    infringement as to violate the rule of statutory interpretation that no portion of the

4    statute should be interpreted in a manner that renders it superfluous. This argument

5    has no merit. While the difference between actual knowledge of infringement

6    under § 512(c)(1)(A)(i) and red flag knowledge under § 512(c)(1)(A)(ii) may not

7    be vast, it is nonetheless a real difference. If the facts actually known by an

8    employee of the service provider make infringement obvious, the service provider

9    cannot escape liability through the mechanism of the safe harbor on the ground that

10   the person with knowledge of those facts never thought of the obvious significance

11   of what she knew in relation to infringement. Plaintiffs further argue that this

12   understanding of red flag knowledge reduces it to a very small category. Assuming

13   this is so, it is of no significance. The fact that Congress was unwilling to extend

14   the safe harbor to circumstances where the service provider did not subjectively

15   know that the posted material infringed, but did know facts that made infringement

16   objectively obvious, does not compel the conclusion that Congress expected this

17   extension to cover a large number of instances. That is especially so in view of the

1    fact that the purpose of § 512(c) was to give service providers immunity, in

2    exchange for augmenting the arsenal of copyright owners by creating the notice-

3    and-takedown mechanism.

4         In sum, a showing by plaintiffs of no more than that some employee of

5    Vimeo had some contact with a user-posted video that played all, or nearly all, of a

6    recognizable song is not sufficient to satisfy plaintiffs' burden of proof that Vimeo

7    forfeited the safe harbor by reason of red flag knowledge with respect to that video.

8    As it appears that the district court employed that inappropriate standard as the

9    basis for its denial of Vimeo's motion for summary judgment on numerous videos

10   conforming to that description, we vacate those rulings and remand for further

11   consideration. Vimeo is entitled to summary judgment on those videos as to the red

12   flag knowledge issue, unless plaintiffs can point to evidence sufficient to carry

13   their burden of proving that Vimeo personnel either knew the video was infringing

14   or knew facts making that conclusion obvious to an ordinary person who had no

15   specialized knowledge of music or the laws of copyright.

16

17

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1    **III. Willful Blindness**

2        Our final issue on this appeal involves Plaintiffs' contention that the district

3    court, in rejecting their claim of willful blindness, misapplied our teachings in

4    *Viacom*, which recognized that "the willful blindness doctrine may be applied, in

5    appropriate circumstances, to demonstrate knowledge or awareness of specific

6    instances of infringement under the DMCA." *Viacom*, 676 F.3d at 35. We disagree

7    with Plaintiffs' argument and see no reason to disturb the district court's ruling.

8        Plaintiffs essentially make three arguments. First, based on evidence that

9    Vimeo monitored videos for infringement of *visual* content but not for

10   infringement of *audio* content, they argue that they have demonstrated willful

11   blindness to infringement of music, which justifies liability under *Viacom*. Their

12   second argument is that Vimeo's awareness of facts suggesting a likelihood of

13   infringement gave rise to a duty to investigate further, and that Vimeo's failure to

14   do so showed willful blindness that justifies liability. Finally, they argue that,

15   having encouraged users to post infringing matter, Vimeo could not then close its

16   eyes to the resulting infringements without liability.

17

1    The first two arguments are easily disposed of. As we made clear in *Viacom*,

2    § 512(m) relieves the service provider of obligation to monitor for infringements

3    posted by users on its website. We see no reason why Vimeo's voluntary

4    undertaking to monitor videos for infringement of visual material should deprive it

5    of the statutory privilege not to monitor for infringement of music. Plaintiffs'

6    argument is refuted by § 512(m).

7    Their second argument, that awareness of facts suggesting a likelihood of

8    infringement gave rise to a duty to investigate further, does not fare better. Section

9    512(c) specifies the consequences of a service provider's knowledge of facts that

10   might show infringement. If the service provider knows of the infringement, or

11   learns of facts and circumstances that make infringement obvious, it must act

12   expeditiously to take down the infringing matter, or lose the protection of the safe

13   harbor. But we can see no reason to construe the statute as vitiating the protection

14   of § 512(m) and requiring investigation merely because the service provider learns

15   facts raising a *suspicion* of infringement (as opposed to facts making infringement

16   *obvious*). Protecting service providers from the expense of monitoring was an

17   important part of the compromise embodied in the safe harbor. Congress's

1   objective was to serve the public interest by encouraging Internet service providers

2   to make expensive investments in the expansion of the speed and capacity of the

3   Internet by relieving them of burdensome expenses and liabilities to copyright

4   owners, while granting to the latter compensating protections in the service

5   providers' takedown obligations. If service providers were compelled constantly to

6   take stock of all information their employees may have acquired that might suggest

7   the presence of infringements in user postings, and to undertake monitoring

8   investigations whenever some level of suspicion was surpassed, these obligations

9   would largely undo the value of § 512(m). We see no merit in this argument.

10      Plaintiffs' third argument may fare better in theory, but is not supported by

11   the facts of this case, at least as we understand them. In *Viacom*, we made clear that

12   actual and red flag knowledge under the DMCA ordinarily must relate to "specific

13   infringing material," *id.* at 30, and that, because willful blindness is a proxy for

14   knowledge, *id.* at 34-35, it too must relate to specific infringements. Plaintiffs

15   argue, however, that Vimeo, in order to expand its business, actively encouraged

16   users to post videos containing infringing material. They argue that,

17   notwithstanding the formulation in *Viacom*, a service provider cannot adopt a

1    general policy of urging or encouraging users to post infringing material and then

2    escape liability by hiding behind a disingenuous claim of ignorance of the users'

3    infringements.

4            We need not decide whether Plaintiffs' proposed gloss on *Viacom* is correct

5    as a matter of law.  Assuming that it is, Plaintiffs still cannot rely on such a theory

6    in this instance. The evidence cited to us by Plaintiffs, consisting of a handful of

7    sporadic instances (amongst the millions of posted videos) in which Vimeo

8    employees inappropriately encouraged users to post videos that infringed music

9    cannot support a finding of the sort of generalized encouragement of infringement

10    supposed by their legal theory. It therefore cannot suffice to justify stripping

11    Vimeo completely of the protection of § 512(m). Moreover, because that evidence

12    was not shown to relate to any of the videos at issue in this suit, it is insufficient to

13    justify a finding of red flag knowledge, under the principle of *Viacom*, as to those

14    specific videos. Thus, notwithstanding a few unrelated instances in which its

15    employees improperly encouraged specific infringements, Vimeo can still assert

16    the protection of § 512(m) for the present suit, and claim the benefit of the safe

17    harbor, in the absence of a showing by Plaintiffs of facts sufficient to demonstrate

1   that Vimeo, having actual or red flag knowledge of infringement in the videos that

2   are the subject of Plaintiffs' suit, failed to promptly take them down.

3
4                                   **CONCLUSION**

5
6        We conclude: (1) The safe harbor of § 512(c) of the DMCA does apply to

7   pre-1972 sound recordings, and therefore protects service providers against

8   liability for copyright infringement under state law with respect to pre-1972 sound

9   recordings, as well as under the federal copyright law for post-1972 recordings.

10   The district court's grant of partial summary judgment to Plaintiffs with respect to

11   Vimeo's entitlement to the safe harbor for infringements of pre-1972 recordings is

12   therefore vacated. (2) The various factual issues that arise in connection with a

13   service provider's claim of the safe harbor of § 512(c) are subject to shifting

14   burdens of proof, as described above. Because, on a defendant's claim of the safe

15   harbor of § 512(c), the burden of showing facts supporting a finding of red flag

16   knowledge shifts to the plaintiff, and the district court appears to have denied

17   Vimeo's motion for summary judgment as to a number of videos on this issue

18   based on a test that would improperly deny service providers access to the safe

19   harbor, we vacate the court's denial of Vimeo's motion for summary judgment on

14-1048/1049/1067/1068
Capitol Records, LLC v. Vimeo, LLC

1  that issue, and remand for reconsideration and further proceedings.

2  (3) We reject Plaintiffs' argument that the district court erred in its ruling in

3  Vimeo's favor as to the Plaintiffs' reliance on the doctrine of willful blindness.

4      The district court's rulings are accordingly affirmed in part and vacated in

5  part and the matter is remanded for further proceedings.

6

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit