UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, et al., | |
| Plaintiffs, | |
| v. | No. 09-CV-10101 (RA) |
| VIMEO, LLC d/b/a VIMEO.COM, et al., | |
| Defendants. | OPINION & ORDER |
| EMI BLACKWOOD MUSIC, INC, et al., | |
| Plaintiff, | |
| v. | No. 09-CV-10105 (RA) |
| VIMEO, LLC d/b/a VIMEO.COM, et al., | |
| Defendants. | |

RONNIE ABRAMS, United States District Judge:

Plaintiffs Capitol Records, LLC, Caroline Records, Inc., Virgin Records America, Inc.,

EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music, Inc., Colgems-EMI

Music, Inc., EMI Virgin Songs, Inc., EMI Gold Horizon Music Corp., EMI Unart Catalog Inc.,

Jobete Music Co., Inc., Stone Diamond Music Corporation, and EMI U Catalog, Inc.

(collectively, "Plaintiffs") bring these copyright infringement actions against Defendants Vimeo,

LLC and Connected Ventures, LLC (collectively, "Vimeo").  This Court previously granted in

part and denied in part the parties' cross-motions for summary judgment and certified several

questions to the Second Circuit Court of Appeals for an interlocutory appeal pursuant to

28 U.S.C. § 1292(b).  The Court of Appeals accepted that appeal and affirmed in part and

vacated in part this Court's decision.  *See Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 81 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017).  Now before the Court are the parties' post-remand cross-motions for summary judgment on the question of whether the safe-harbor provision of the Digital Millennium Copyright Act of 1998 ("DMCA") protects Vimeo from copyright liability.  For the reasons that follow, Plaintiffs' motion is denied and Vimeo's motion is granted in part and denied in part.

## BACKGROUND

The Court assumes familiarity with the factual background of this case, which has been recounted in the previous opinions of both this Court and the Second Circuit.  *See Capitol Records, LLC v. Vimeo*, *LLC*, 972 F. Supp. 2d 500, 504–07 (S.D.N.Y. 2013) ("*Vimeo I*"); *Capitol Records, LLC v. Vimeo*, *LLC*, 972 F. Supp. 2d 537, 542–43 (S.D.N.Y. 2013) ("*Vimeo II*"); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 82–86 (2d Cir. 2016) ("*Vimeo III*").  The Court here provides a brief overview of the procedural history that is relevant to the instant motions.

Defendants operate the website Vimeo.com, an internet platform that permits users to upload and share original videos.  Vimeo.com requires users to have participated in the creation of the videos that they upload.  Plaintiffs, record and music-publishing companies, initially brought this action against Defendants in 2009, alleging copyright infringement of musical recordings used in 199 videos that appeared on Vimeo's website.  In 2013, Vimeo moved for summary judgment, asserting entitlement to safe-harbor protection under the DMCA.  Plaintiffs cross-moved for partial summary judgment, seeking a ruling that Vimeo was ineligible for the safe harbor.

In September 2013, this Court granted in part and denied in part each party's motion. *Vimeo I*, 972 F. Supp. 2d 500.  As relevant here, the Court granted summary judgment in favor of Vimeo on 144 of the videos, on the basis that the lack of record evidence that Vimeo employees had viewed them precluded a finding that they had acquired any knowledge of their infringing content.  *Id.* at 523.  As to the remaining 55 videos, the Court held that triable issues of fact existed concerning whether Vimeo had acquired either actual or "red flag" knowledge of copyright infringement, thereby disqualifying Vimeo from the safe harbor.  *Id.*  The Court further held, with respect to 10 of the remaining 55 videos that had been uploaded by Vimeo employees, that there were triable issues of fact regarding whether the videos had been uploaded by employees acting as agents of Vimeo (which would disqualify Vimeo from the safe harbor) or in their personal capacities (which would not).  *Id.* at 519.

On Vimeo's motion for reconsideration, the Court granted summary judgment in favor of Vimeo on 17 additional videos.  *Vimeo II*, 972 F. Supp. 2d 537.  The Court concluded that there was insufficient evidence that Vimeo employees had watched 15 of the videos and that, with respect to two of the videos, the infringing activity—which consisted of playing a copyrighted song briefly in the background—was not "objectively obvious," so as to disqualify Vimeo from protection under the safe harbor.  *Id.* at 545–46 (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012)).  As to the remaining videos on which Vimeo sought reconsideration—which prominently featured recognizable songs by well-known artists in essentially unaltered form—the Court held that genuine issues of fact existed concerning whether Vimeo had red flag knowledge of the videos' infringing content.  *Id.* 546–49.  The Court granted Plaintiffs leave to file an amended complaint alleging 1,476 new instances of infringement and granted Vimeo's motion to certify two questions for interlocutory appeal.  As

relevant here, one of those certified questions was "[w]hether, under *Viacom Int'l, Inc. v. YouTube, Inc.*, a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish 'facts or circumstances' giving rise to 'red flag' knowledge of infringement." *Id.* at 556.

On appeal, the Second Circuit answered that question in the negative. Specifically, it held that "[a] copyright owner's mere showing that a video posted by a user on the service provider's site includes substantially all of a recording of recognizable copyrighted music, and that an employee of the service provider saw at least some part of the user's material, is insufficient to sustain the copyright owner's burden of proving that the service provider had either actual or red flag knowledge of the infringement." *Vimeo III*, 826 F.3d at 86. For videos where employee interaction with a well-known song was the sole indicator of red flag knowledge, the Court of Appeals held that "Vimeo is entitled to summary judgment . . . as to the red flag knowledge issue, unless plaintiffs can point to evidence sufficient to carry their burden of proving that Vimeo personnel either knew the video was infringing or knew facts making that conclusion obvious to an ordinary person who had no specialized knowledge of music or the laws of copyright." *Id.* at 98. The Second Circuit vacated this Court's partial denial of Vimeo's summary judgment motion and remanded for further consideration in light of its holding.

On remand, the parties renewed their cross-motions for summary judgment on the applicability of the DMCA safe harbor and submitted supplemental briefing on the effect of the Circuit's decision on the 307 videos that are now in dispute (the "Videos-in-Suit").[1]

---

[1] Following remand, Plaintiffs identified 307 videos in which there was some evidence of Vimeo employee interaction, such as comments or likes. *See* Dkt. 186 at 7.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).  Where both parties move for summary judgment, as Plaintiffs and Vimeo have done here, "each party's motion must be examined on its own merits, and . . . all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

Before the Court are the parties' cross-motions for summary judgment as to the issue of whether Vimeo employees had "red flag" knowledge that the Videos-in-Suit were infringing.

## I.  The Applicable Legal Standard on Remand

### A.  Defining Red Flag Knowledge

The DMCA creates a "compromise, which on the one hand, augments the protections available to copyright owners, and, on the other, insulates service providers from liability for infringements of which they are unaware . . . so as to make it commercially feasible to provide valuable Internet services to the public."  *Vimeo III*, 826 F.3d at 82.  On the one hand, the DMCA enhances copyright protection by establishing a "notice-and-takedown regime" that requires service providers to "'expeditiously . . . remove . . . material that is claimed to be infringing.'"  *Id.* at 83 (quoting 17 U.S.C. § 512(c)(1)(C)).  On the other hand, it "expressly

relieve[s] [internet service providers] of any obligation to monitor the postings of users to detect infringements as a condition of qualifying for the safe harbor," and immunizes them from copyright liability "if the service providers are unaware of the infringements."  *Id.* at 83.

At issue in this case is the scope of the safe harbor established by § 512(c), which shields qualifying internet service providers from liability for copyright infringement "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," if the service provider, among other things:

> (A)(i) does not have *actual knowledge* that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such knowledge, *is not aware of facts or circumstances from which infringing activity is apparent*; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material.

17 U.S.C. § 512(C)(1)(A)(i)–(iii) (emphases added).

In the event that infringing material has not been expeditiously removed from a site, the § 512(c) safe harbor applies only if the service provider has neither "actual knowledge" of the infringing material nor "aware[ness] of facts or circumstances from which infringing activity is apparent"—otherwise known as "red flag" knowledge.  *Id.*  "[T]he red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Viacom*, 676 F.3d at 31.  The *Vimeo III* court further held that "[t]he hypothetical 'reasonable person' to whom infringement must be obvious is an ordinary person—not endowed with specialized knowledge or expertise concerning music or the laws of copyright."  826 F.3d at 93–94.

Pursuant to *Vimeo III*, the burden of proving such knowledge or expertise falls on the plaintiff.  As entitlement to the safe harbor "is properly seen as an affirmative defense," the

defendant bears the burden of demonstrating that it meets the statutory definition of an eligible service provider. *Id.* at 94-95. Nevertheless, the Circuit has made clear that "the burden of proof more appropriately shifts to the plaintiff" on the question of whether the service provider should be "disqualified" from the safe harbor based on accusations of misconduct—for example, by reason of failing to act after acquiring actual or red flag knowledge. *Id.* at 94. In articulating this standard, the Circuit cited with approval "the proposed allocation of shifting burdens of proof" in the Nimmer copyright treatise. *Id.* at 94-95 (citing MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.04[A][1][d] (2015)).

Applying the above standard to the facts of this case, the *Vimeo III* court held that Plaintiffs could not meet their burden of proving that Vimeo had either actual or red flag knowledge of a particular instance of infringement merely by showing that "some employee of Vimeo had some contact with a user-posted video that played all, or nearly all, of a recognizable song." *Id.* at 97. This was so, the Court of Appeals held, for numerous reasons, including that the employee's viewing may have been brief or for a purpose unrelated to detecting infringement, and that even "famous" music may not be recognizable to a hypothetical ordinary individual with no specialized knowledge of the field. *Id.* at 96. The *Vimeo III* court further stated that employees of service providers "cannot be expected to know how to distinguish, for example, between infringements and parodies that may qualify as fair use" or "how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music." *Id.* at 97. Consequently, viewing a video that incorporates a song known by the viewer to be copyrighted would not in itself result in red flag knowledge. In the Circuit's view, "[e]ven an employee who was a copyright expert cannot be expected to know when the use of a copyrighted song has been licensed." *Id.* Although knowledge of fair-use and licensing

principles cannot automatically be imputed to a service-provider employee, the Court of Appeals noted that "[i]t is of course entirely possible" that a Vimeo employee viewing a video "did have expertise or knowledge with respect to the market for music and the laws of copyright," and that "[t]he employee may well have known that the work was infringing, or known facts that made this obvious." *Id.*

The Court of Appeals acknowledged that, in light of its narrow reading of red flag knowledge, "the difference between actual knowledge of infringement under § 512(c)(1)(A)(i) and red flag knowledge under § 512(c)(1)(A)(ii) may not be vast." *Id.* "Assuming this is so," that court concluded, "it is of no significance. The fact that Congress was unwilling to extend the safe harbor to circumstances where the service provider did not subjectively know that the posted material infringed, but did know facts that made infringement objectively obvious, does not compel the conclusion that Congress expected this extension to cover a large number of instances." *Id.* The Nimmer copyright treatise thus characterizes the *Vimeo III* decision as having "reduc[ed] red flags almost to the vanishing point." NIMMER ON COPYRIGHT § 12B.04[A][1][b][v][I] (2018).

**B.    The Burden of Proof on Facts Giving Rise to Red Flag Knowledge**

The parties agree that "[t]he burden of proof with respect to actual or red flag knowledge [is] on the plaintiff." *Vimeo III*, 826 F.3d at 95. Plaintiffs also acknowledge that they bear the burden of raising a triable issue of fact as to whether Vimeo employees possessed facts that would make it objectively obvious that the videos incorporated copyrighted music. They nonetheless dispute whether Plaintiffs must demonstrate that Vimeo employees were aware of facts that would demonstrate that the copyrighted music on user-generated videos was both

unlicensed and did not constitute "fair use" of such content.  *See* Pls. Memo at 18-19 (referring to licensing and fair use as "hypothetical affirmative defenses").

On this point, *Vimeo III* was clear.  Because the hypothetical person to whom infringement must be objectively obvious is someone "not endowed with specialized knowledge or expertise concerning music or the laws of copyright," *Vimeo III*, 826 F.3d at 93–94, a plaintiff seeking to surmount the safe harbor must adduce facts to demonstrate that the service-provider employee had a sufficient knowledge base to determine that a particular video obviously violated copyright law.  Among other things, therefore, Plaintiffs must adduce facts that the hypothetical ordinary individual "in fact recognized" the music contained in the video.  *Id.* at 96.

Mere "awareness that a user posting contains copyrighted music" is, however, insufficient for red flag knowledge, given the possibility that the user had authorization to use the copyrighted material or that it qualified as fair use.  *Id.* at 97.  Although the factual existence of a license or the applicability of fair use are generally treated as affirmative defenses, *see Bourne v. Walt Disney Co.*, 68 F.3d 621, 630–31 (2d Cir. 1995) (licensing); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (fair use), the Second Circuit held that the burden of proof is re-allocated in the context of the DMCA safe harbor.  Because "the service provider is under no legal obligation to have its employees investigate to determine the answers to these questions," *Vimeo III*, 826 F.3d at 98, the burden rests with Plaintiffs to show, through affirmative evidence, that the Vimeo employee who interacted with a specific video knew of facts sufficient to determine that the use of copyrighted music was neither authorized nor fair.

Decisions issued subsequent to *Vimeo III* have thus required the plaintiff to bear the burden of demonstrating that service-provider employees are able to distinguish infringing content from authorized uses.  In *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, the Second

Circuit held that a jury could reasonably conclude that the defendants had red flag knowledge about two categories of songs, "pre-2007 MP3s" and "Beatles songs."  844 F.3d 79, 93 (2d Cir. 2016).  The Circuit based its decision in large part on evidence that defendants knew that no licenses existed for these categories of songs.[2]  Evidence of defendants' actual knowledge that the Beatles had "never authorized their songs to be available digitally" and that "there had been no *legal* online distribution of Beatles tracks before 2010, other than one track within a video game" provided sufficient support for the conclusion that the defendants' mere awareness of a Beatles file on their site constituted red flag knowledge of infringement.  *Id.* at 93 (emphasis in original).  Judge Rakoff interpreted *Vimeo III* in a similar fashion in a copyright suit against the owners of the Huffington Post for hosting a self-published blog post that included a copyrighted photo bearing a New York Daily News credit.  *See Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 306 (S.D.N.Y. 2019).  Because plaintiff had not demonstrated that the Huffington Post employee who "screened the article" would be able to "distinguish between infringements and fair and authorized uses," even proof that she was aware of the photo credit would be insufficient evidence of red flag knowledge, according to the standard articulated in *Vimeo III.  Id.* at 301, 306-07.

In sum, to surmount the safe harbor on summary judgment, Plaintiffs must demonstrate that Vimeo employees possessed facts that would enable them to identify the presence of copyrighted material in each of the Videos-in-Suit.  They also bear the burden of demonstrating that Vimeo employees knew how to distinguish infringement from fair or authorized use, and that they were able to do so for each Video-in-Suit.

---

[2] The Court of Appeals did not address fair use in *MP3tunes, LLC.*  The infringing service in that case, however, simply hosted MP3 versions of copyrighted audio tracks.  As a result, the doctrine of fair use was plainly inapplicable.  *See Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 663 (2d Cir. 2018) (no fair use where defendant made identical copies of plaintiff's copyrighted sound recordings).

## II.      Plaintiffs' Evidence of Red Flag Knowledge

On remand, Plaintiffs have largely failed to satisfy this burden.  As an initial matter, Plaintiffs have failed to produce evidence to suggest that the Vimeo employees who viewed the Videos-in-Suit possessed "expertise with respect to … the laws of copyright," or with respect to the licensing practices of the artists whose music appears in the videos, that would allow them to detect copyright infringement.  *Vimeo III*, 826 F.3d at 97.  With respect to Videos-in-Suit uploaded by users that are unaffiliated with Vimeo, Plaintiffs have not demonstrated that any employee who viewed a Video-in-Suit possessed facts sufficient to determine whether the copyrighted material incorporated therein was either authorized or qualified as fair use.  As to Videos-in-Suit that were uploaded or partially created by Vimeo employees, however, the Court finds that the question whether those employees stored their content as "users" within the statutory definition or as employees acting within the scope of their employment precludes summary judgment in favor of Vimeo.

### A.      Plaintiffs' Evidence of Vimeo Employees' General Knowledge of Copyright Law and Licensing

Plaintiffs have not demonstrated that the Vimeo employees who interacted with the specific videos at issue possessed the knowledge, experience, and background to distinguish infringement from authorized or fair use.  The evidence, construed in the light most favorable to Plaintiffs, demonstrates only that some employees at the company were broadly familiar with the concept of copyright and that there was some general awareness within the company that copyright infringement was occurring on Vimeo.com.   Neither showing is sufficient to raise a triable issue of fact as to red flag knowledge, considering Plaintiffs' failure to impute this knowledge to the employees that screened the Videos-in-Suit.

Plaintiffs' evidence arguably suffices to establish that Vimeo executives possessed particularized knowledge of copyright law.  In their depositions, present and former Vimeo executives Moshe Koyfman, Dae Mellencamp, and Jonathan Marcus discuss copyright concepts such as licensing and music rights.  *See* Dkt. 187, Plaintiffs' Post-Remand Supplemental Statement of Undisputed Facts ("SSUF") ¶ 145.  For example, Vimeo co-founder Jacob Lodwick commented that "big media companies might dispute our use of copyrighted music in our videos even if we (i.e., sane people) consider it fair use."  Dkt. 88-1, Frackman Decl., Ex. 1 (Lodwick Dep.) at 52:22–53:2.  Former executive Marcus testified that he had conducted research on music licensing rates while at Vimeo.  SSUF ¶ 145.  Such testimony establishes that some Vimeo executives were familiar with the ways in which record companies collect royalties for commercial utilization of music.  That evidence sheds no light, however, on whether the employees who screened the Videos-in-Suit had similar knowledge.

Nor is there evidence that Vimeo employees were aware of the likelihood that Vimeo users lacked the requisite authorization to use the content.  Plaintiffs have adduced evidence that Vimeo employees and executives acknowledged that the company had not licensed rights to either sound recordings or musical compositions.  *See* SSUF ¶ 1.  But there is no evidence in the record that Vimeo employees knew whether users were authorized to incorporate the content they uploaded.  There is similarly no evidence that Vimeo employees were aware of the licensing practices of the artists themselves.  In this respect, Plaintiffs highlight the following blog post by Vimeo employee Blake Whitman:

> As many of you know, finding music for your videos can be somewhat . . . well, painful.  Licensing music on your own can be confusing and finding good free music can take forever.  Many of us here at Vimeo are video creators or filmmakers as well and we experience these frustrations on a regular basis.

SSUF ¶ 152.  The mere mention of licensing as a concept does not demonstrate any knowledge on Whitman's part of the likelihood that specific users did or did not have authorization for the music in their videos.  Although Plaintiffs maintain that Vimeo employees had no reason to believe "that random users, who never claimed to have a license, would have one," Pls. Memo at 18, the Circuit has made clear that Plaintiffs bear the burden of proving knowledge of licensing practices.  Their failure to adduce any evidence establishing that Vimeo "knew that major music labels generally had not [] authorized their music to be distributed in the format … available on [Vimeo]," *MP3tunes, LLC*, 844 F.3d at 92, indicates that they have not satisfied this burden.

Other pieces of evidence proffered by Plaintiffs demonstrate that some employees knew that some videos contained copyrighted material.  Vimeo employee Julia Quinn posted on her Vimeo account profile: "I had to take down all my videos that had copyrighted music on them 2/6/09. Sorry. :( ."  SSUF ¶ 40.  Whitman told a Vimeo user that the company's policy concerning the use of copyrighted music was "Don't ask, don't tell."  Dkt. 88-7, Frackman Decl., Ex. 4. (Whitman Dep.) at 233:10-234:18.  Community Team member Dalas Verdugo similarly told a user that the company "allow[ed]" the use of copyrighted music but would take a video down if it received a "legal takedown notice."  Dkt. 89-1, Frackman Decl., Ex. 4. (Vergudo Dep.) at 118:11-120:24.  None of these statements are probative of red flag knowledge under the standard articulated in *Vimeo III*.  As the Second Circuit reiterated in *MP3tunes, LLC*, "the DMCA does not impose 'an amorphous obligation to take commercially reasonable steps in response to a generalized awareness of infringement.'"  844 F.3d at 92 (quoting *Viacom*, 676 F.3d at 31).  Even if Vimeo did adopt a cavalier approach towards copyright infringement, that would not disqualify Vimeo from the safe harbor, because it does not demonstrate that it failed to act in the face of specific, "objectively obvious" instances of infringement.

13

None of this evidence, moreover, indicates whether employees were able to determine whether the incorporation of copyrighted music on a user-generated video could be considered fair use.  On that subject, Plaintiffs focus primarily on a company statement that "Vimeo moderators remove videos that constitute clear violations [of copyright] when they are brought to our attention. . . .  Examples include rips of movies, television shows, and music videos – or the unauthorized use of a popular song in the background of your video."  *See* SSUF ¶ 168. Construed in the light most favorable to Plaintiffs, this statement indicates that Vimeo employees may have been able to determine that the fair-use doctrine did not apply in the obvious case, *i.e.*, where the content purportedly generated by the user was a mere facsimile of copyrighted material.  The evidence does not demonstrate, however, whether a Vimeo employee could distinguish "between infringements and parodies that may qualify as fair use" in the broader context of user-generated videos in which copyrighted music is somehow incorporated.  *Vimeo III*, 826 F.3d at 97.  The same is true of the allegation that "[Vimeo employees] knew and were educated on possible means of detecting copyrighted music in videos (although Vimeo refused to implement those means)," Pls. Memo. at 17, which refers to copyright-detecting technology whose implementation was contemplated by the company.  Because of the fair-use doctrine, the mere use of unlicensed, copyrighted music in a video segment is insufficient on its own to establish a violation of law.  *See, e.g., Brown v. Netflix, Inc.*, No. 20-2007, 2021 WL 1976614 (2d Cir. May 18, 2021) (segment of music featured in documentary film was fair use).

At most, Plaintiffs' evidence permits an inference that some Vimeo employees may have been broadly familiar with concepts such as fair use.  Such evidence does not, on its own, permit the Court to infer that this knowledge armed employees with the ability to distinguish infringements from authorized or fair use with respect to any of the Videos-in-Suit.

**B.      Plaintiffs' Evidence of Vimeo Employee Interactions with Videos Uploaded by Unaffiliated Users**

Plaintiffs' failure to establish that Vimeo employees possessed, as a general matter, the "relevant knowledge and experience that informed the issue of red flag knowledge," Pls. Memo at 14, does not necessarily entitle Vimeo to summary judgment.   Plaintiffs argue that the nature of the interactions between Vimeo employees and the Videos-in-Suit raises a triable issue of fact as to whether those employees became aware of facts that made infringement "objectively obvious."  The Court is not persuaded that these interactions suffice to meet the stringent burden of proof required by *Vimeo III.*

Responding to the Second Circuit's ruling that the mere viewing of video that contains a well-known song does not suffice to establish red flag knowledge, Plaintiffs proffer the following categories of employee interaction with the Videos-in-Suit:  tagging the video with music credits, liking and commenting on videos, "whitelisting" or "burying" videos, placing videos on a Vimeo-moderated channel, and inducing the creation of certain types of videos. Relatedly, Plaintiffs emphasize that Vimeo employees watched certain infringing videos with the express purpose of determining their compliance or noncompliance with the website's terms of service.

These categories of evidence may well demonstrate that a Vimeo employee was aware of the content of a Video-in-Suit and that it was objectively obvious that such a video contained copyrighted music.   As explained above, however, proof that the employees identified the presence of copyrighted material is a necessary but insufficient condition of red flag knowledge. *See Vimeo III*, 826 F.3d at 96-97.  These modes of interaction with infringing videos say nothing about the employee's knowledge as to whether the use of such music was authorized or fair. They therefore do not suffice to show that Vimeo employees were aware of facts that would

make infringement "objectively obvious" under the standard set forth in *Vimeo III*—whether considered separately or in tandem.  The same deficiency applies to the other type of evidence proffered by Plaintiffs, that certain Videos-in-Suit were uploaded after Plaintiffs sent a cease-and-desist letter and filed the instant complaints.  The Court addresses each type of evidence in turn.

### 1.    Music Credits

Plaintiffs argue that the application of music credits and tags to the Videos-in-Suit is an indicator of red flag knowledge.  The Court agrees that such identification of the underlying music by a Vimeo employee permits the inference that that employee knew that the video contained copyrighted material.  In the case of the 300 Videos-in-Suit in which the names of artists and/or song titles are referenced in the title, description, tags or comments on the videos, *see* SSUF ¶ 61, the Court could reasonably infer that a Vimeo employee "recogni[zed] . . . infringing music in the soundtrack."  *Vimeo III*, 826 F.3d at 96.  But even assuming that Court would infer recognition in this context, such a showing would not meet the standard articulated in *Vimeo III* because "[a]wareness that a user posting contains copyrighted music" is insufficient proof of red flag knowledge.  *Id.* at 97.  Vimeo employees cannot be "automatically expected to know how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music."  *Id.*  Accordingly, this evidence, which Plaintiffs regard as "perhaps the most probative" in the record, Pls. Memo. at 6 n.4, does not suffice to create a triable issue of fact on red flag knowledge without an additional showing that Vimeo employees could distinguish authorized from unauthorized uses of copyrighted music.

### 2.      Likes, Duration, and Start Time

For similar reasons, evidence that employees "liked" videos or added them to Vimeo's promotional channels does not raise a triable issue of fact on red flag knowledge in this instance. Nor does evidence that a copyrighted song played at the beginning of a Video-in-Suit and/or through the entirety of the video. As explained above, proof that the screening employee possessed facts that would make it objectively obvious that a video contained copyrighted material does not, on its own, suffice to meet Plaintiff's burden of proof on summary judgment.

The evidence of employee interaction with Video 29 exemplifies this principle. Even if there was proof that a Vimeo employee watched the entirety of that video—which depicts Christina Aguilera performing "Genie in a Bottle" live at a concert in Kiev and was tagged as such—that showing does not on its own demonstrate knowledge of facts making infringement objectively obvious under *Vimeo III*'s strict standard. *See* Berkley Decl., Ex. C at 9, Video 29. This is so because knowledge of the likelihood that Christina Aguilera would authorize, for distribution on the internet, footage of a live performance from Ukraine cannot automatically be imputed to Vimeo employees. *See Vimeo III,* 826 F.3d at 97. Absent some evidence of Vimeo-employee knowledge on this subject—for example, that Christina Aguilera has not issued any licenses of her concert footage, or even that performing artists generally do not authorize distribution of their concerts—the Court cannot presume that this particular case of infringement would be objectively obvious to the Vimeo employee that watched this video. *Cf. MP3tunes, LLC,* 844 F.3d at 93 (citing evidence that employees knew that no Beatles songs had been licensed for distribution on the internet). As nothing in the record indicates that Vimeo employees possessed such knowledge about videos that they did not themselves create or upload,

17

no amount of employee interaction with this video can create a triable issue on red flag knowledge.

### 3.     Comments

Plaintiffs next set forth evidence of dozens of comments that were placed by Vimeo employees below videos with infringing content.  But again, none of these comments indicate employee awareness that a video contained unlicensed or otherwise infringing music. The majority of Vimeo-employee comments are basic compliments, for example, "great job!!," Berkley Decl., Ex. B, Video Ex. 3; "So much fun and very cool song selection . . . . ," *id.* Video Ex. 6-A; "Nice stuff, Ben!" *id.*, Video Ex. 48; "I'm REALLY impressed with this, it covers a whole new territory for lip dubbing; closer to an actual music video," *id.* Video Ex. 51; "mad skillz, yo!" *id.,* Video Ex. 236; and many others.

Other comments merely reflect the employee-viewer's identification of the song and artist.  For example, under a user's video which incorporates "Like Spinning Plates" by Radiohead as background music for a photo compilation, Vimeo employee Daniel Hayek commented, "That track works so well with this." Berkley Decl., Ex. C at 66, Video 189.  To reiterate, such a remark says nothing about Hayek's awareness whether the use of the song was authorized in this particular case, or how likely it was that a Radiohead song would be licensed for such use.

Nor do employee comments regarding users' desires to purchase the songs featured in videos.  For example, in response to a user's comment suggesting that, for lip dub videos,[3] Vimeo should post links for users "to buy the songs at itunes or the cd at amazon," Vimeo employee Jonathan Marcus wrote, "Good idea. I agree. Something were [sic] definitely thinking

---

[3] As this Court explained in *Vimeo I*, lip dub videos or "lip dubbing" were described on Vimeo's website as follows: "Lip Dubbing . . . Like a music video. Shoot yourself mouthing along to a song. Then sync it with a high quality copy of the song in an editing program." Dkt. 88-3, Frackman Decl., Ex. 2 (Klein Dep.) at 167:20–168:2; *id.*, Ex. 17.

about." Frackman Decl., Ex. C, Video 249A at 2. Yet no further evidence is adduced to demonstrate that Marcus knew that the use of "Overnight Celebrity" by Twista for a lip dub—the video below which he made this comment—was not authorized, or even unlikely to be authorized. Berkley Decl., Ex. C at 85, Video 249. In sum, the record is devoid of a single comment in which a Vimeo employee demonstrated awareness of facts that the music incorporated in the video was obviously infringing, as that standard was articulated in *Vimeo III*.

### 4. Whitelisting

Whitelisting—an action preventing users from flagging a video for review—indicates that a Vimeo employee screened a video for the specific purpose of determining whether it complied with Vimeo's Terms of Service. SSUF ¶¶ 89, 90; Def. SSUF ¶ 57; Def. Memo. at 18 n.13 (not disputing the purpose of whitelisting). Unlike the other video-viewing purposes mentioned by the Court of Appeals in *Vimeo III*—such as "classification by subject matter" or "sampling to detect inappropriate obscenity or bigotry"—whitelisting could, in theory, relate to "recognition of infringing music in the soundtrack." *Vimeo III*, 826 F.3d at 96. Vimeo's Terms of Service forbid users from uploading videos that infringe another's rights. *See* Dkt. 85, Supplemental Declaration of Michael A. Cheah, Nov. 16, 2012 ("Supp. Cheah Decl.") ¶ 11 & Exs. 6–10. Accordingly, a Vimeo employee tasked with assessing the compliance of a Video-in-Suit with those terms of service may well have considered the possibility of copyright infringement.

The parties dispute whether Vimeo staff made "determinations about potential infringement with respect to the music in any of the whitelisted Videos-in-suit." Dkt. 192, Pls. Counter. 56.1 ¶ 65. Yet even if whitelisting did involve such determinations, there is no evidence in the record that for any particular whitelisted video, a Vimeo employee "kn[ew] that

the work was infringing, or kn[ew] facts that made this obvious." *Vimeo III*, 826 F.3d at 97. There is no evidence that the whitelisting-review process involved any analysis of licensing or fair use. Nor have Plaintiffs adduced any evidence that a Vimeo employee whitelisted any specific Video-in-Suit with knowledge that the use of the incorporated music was unauthorized.

The only example Plaintiffs cite of a Vimeo employee whitelisting a video while aware that the uploader did not have rights to the underlying copyrighted music relates to a video not involved in this lawsuit. *See* Dkt. 203-2, Pls. Reply to Def. Counter. 56.1 ¶ 93 (not disputing that the referenced video is not a Video-in-Suit); Frackman Supp. Decl., Ex. R. For all other evidence of whitelisting, Plaintiffs do not indicate which employees whitelisted which videos, nor why a video was whitelisted or whether the employee knew facts that would make infringement objectively obvious. As an example, Plaintiffs have adduced evidence that the aforementioned Christina Aguilera concert video was whitelisted. *See* Dkt. 219-1, Post-Remand Third Supplemental Declaration of James D. Berkley, Ex. B at 15, Video 29. Although a finder of fact may infer that a Vimeo moderator watched the video for the purposes of determining compliance with Vimeo's Terms of Service, there is no evidence in the record that the review process revealed any facts to the moderator that would suggest that this specific video was unlicensed, or otherwise made it "objectively obvious" that it infringed a copyright. Absent such evidence, whitelisting does not suffice to create an issue of fact as to red flag knowledge.

### 5. Burying

"Burying" is broadly defined as de-emphasizing a video that is "not exemplary of 'Vimeoesque' content." Dkt. 88-4, Frackman Decl., Ex. 3 (Allen Dep.) at 183:16–184:6. The Court finds this practice less probative of red flag knowledge than whitelisting, as it does not even theoretically involve a review of whether the video complies with the Terms of Service.

And even if it did—as Plaintiffs note, one Vimeo employee acknowledged that burying occurs "when a video is okay by the guidelines" but should be de-publicized for other reasons, Pls. SSUF ¶ 101—there is no evidence in the record that this form of interaction with an infringing video led any employee to possess facts making infringement objectively obvious, in the manner required by *Vimeo III*.

### 6.     Channels & Employee Inducement

Similarly, none of the evidence that Vimeo promoted certain user-generated videos through the use of channels is relevant to red flag knowledge.  Plaintiffs' allegations demonstrate only that Vimeo employees were more familiar with the subject matter of certain videos, without indicating that they were able to identify that these videos were unlicensed or did not constitute fair use.  That a Vimeo employee selected the user-generated video "Artspin" for placement on Vimeo's "We Found These!" channel, for instance, does not signify that a Vimeo employee knew the video's audio track ("Plastic Beach" by Gorillaz) was not licensed to the user or that the video's incorporation of that track was not fair use.  *See* Berkley Decl., Ex. C at 69–70, Video 122.

Nor did Vimeo employees' exhortations of users to create lip dub videos—music videos in which users lip synch to well-known songs, SSUF ¶ 111—show that they knew that such videos were inherently infringing.  Videos on the "Lip Dub Stars" channel are videos generated by users that incorporate a variety of background audio tracks.  Unlike a rip of a music video or television show, it is not objectively obvious to an individual with no specialized knowledge of copyright that a lip dub video constitutes a "clear violation[]" of copyright, SSUF ¶ 168.  With this type of video, fair use is an open relevant question.  *See Downs*, 385 F. Supp. 3d at 306 (acknowledging "the fair use and licensing issues raised by the inclusion of a sound recording in

a video").  Even assuming Vimeo employees knew that some copyright infringement occurred on this channel, there is no evidence that the types of videos on these channels were by their very nature unauthorized or ineligible for fair use, let alone that Vimeo employees were aware of such facts.

### 7.   Timing of Interaction Vis-à-Vis the Lawsuit.

Next, Plaintiffs appear to argue that their cease-and-desist letters and complaints imparted red flag knowledge to Vimeo employees with respect to a subset of the Videos-in-Suit.  *See* Pls. SSUF ¶ 130 (identifying Vimeo employee's February 2010 "like" of a video that had been listed on the schedules of Plaintiff Capitol Records' complaint).  Plaintiffs have alleged only that these Videos-in-Suit, uploaded after Plaintiffs sent cease-and-desist letters and filed the complaint, "contained music by artists identified in the schedules."  Pls. SSUF ¶¶ 36, 38.  Under this view of DMCA liability, once Plaintiffs had identified Coldplay in their complaint as an artist whose music appeared unlawfully on Vimeo's website, red flag knowledge would be imputed to Vimeo with respect to all subsequently uploaded, user-generated videos containing music by Coldplay. That contention misconstrues the concept of red flag knowledge.  As one court in this district has put it, "past notices do not identify and locate other, and future, infringing activity."  *Wolk v. Kodak Imaging Network, Inc.*, No. 10 Civ. 4135 (RWS), 2011 WL 940056, at *5 (S.D.N.Y. Mar. 17, 2011); *see also Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 611 (9th Cir.) ("[E]ven if it were obvious to a reasonable person that some of the material on the site must be infringing, that is not enough to lose the safe harbor.  It must be obvious that the particular material that is the subject of the claim is infringing."), *cert. denied*, 139 S. Ct. 419 (2018).

The Court finds the reasoning in those cases to be persuasive and applicable to the instant situation.  The fact that an artist's copyright was previously infringed on Vimeo does not suffice

to indicate to an employee whether use of that artist's work in a subsequent video is authorized. The situation might differ if Plaintiffs had adduced evidence that Vimeo employees possessed so-called categorical knowledge about the licensing practices of particular artists. Had Plaintiffs' initial complaints indicated that Coldplay had not authorized any of its music for use on Vimeo or similar platforms, for example, then proof that a Vimeo employee recognized a Coldplay song on its platform may suffice to establish red flag knowledge. *See MP3tunes*, *LLC*, 844 F.3d at 93. Absent proof that Vimeo employees had such categorical knowledge, however, the timing of employee interactions with the Videos-in-Suit does not create a triable issue of fact on red flag knowledge.

### 8. Employee Involvement in the Creation of Videos (Short of Uploading)

Finally, Plaintiffs set forth evidence of three instances where Vimeo employees were involved in contributing to videos. The Court views employee involvement in the creation of the video as suggestive of knowledge that the users lacked authorization to incorporate the copyrighted music. This form of interaction with Videos-in-Suit is nevertheless distinct from an employee upload or employee maintenance of videos on Vimeo.com. Employee uploading of a video may disqualify Vimeo from the § 512(c)(1) safe harbor with respect to that video, which protects only against infringement of copyright by reason of the storage at the direction of a user. *See infra* Part III.C.

First, Plaintiffs note that Andrea Allen "contributed" to a Beatles "group project." Pls. SSUF ¶ 59. This allegation refers to Video-in-Suit No. 214, a lip dub video that incorporates, or parodies, the audio track "All Together Now" by the Beatles, uploaded by user PEIKA. Berkley Decl., Ex. C at 101–02. Allen commented numerous times under the video, including the following comment: "Great work! Thanks for letting me be a part of it. Group hug." Frackman

Supp. Decl., Ex. C, Video 214 at 6.  Unlike other comments by Vimeo employees that identified artists or complimented video quality, *see supra* Part III.B.3, this comment may be probative of red flag knowledge.  That Allen was "part of" the video's creation suggests that she was aware that neither the video creators nor the user-uploader were authorized by the Beatles to use their song.  Nonetheless, it is not clear from the nature of the video—a lip dub that seems to parody a Beatles music video—whether it would qualify as fair use.  *See supra* Part III.B.6.  As explained above, because Plaintiffs have adduced no evidence that Allen—or any other Vimeo employee, for that matter—could distinguish fair use from infringement in such a case, they have failed to raise a triable issue of fact as to Video 214.  *See supra* Part III.A.

Second, Plaintiffs allege that Vimeo employee Dalas Verdugo "signed up" to participate in a project where Vimeo users would create a series of videos containing the entirety of the Beatles' "Sgt. Pepper" album, and that he "commented" on at least one of the resulting videos. Pls. SSUF ¶ 58.  This allegation does not raise a triable issue of fact as to red flag knowledge. Verdugo merely commented on the "group project" page that he planned to contribute a lip dub video of "With A Little Help From My Friends," but later wrote, "I've been really busy/lazy and haven't gotten around to this yet, but I'm still planning on doing it."  Frackman Decl., Ex. 15 at 11, 31.  None of the Videos-in-Suit were created or uploaded by Verdugo as part of this project, and Verdugo's comments do not demonstrate that he knew other videos in this "group project" were unlicensed, or the likelihood that they were.

Third, Plaintiffs allege that Vimeo employee Blake Whitman, via his online alias "Bad Malone," was listed as one of the "referrers" for the infringing video "The Dark Side of Oz." Pls. SSUF ¶ 132; Berkley Decl., Ex. C at 85.  Not only do Plaintiffs fail to explain what "referring" means in this context, they also do not indicate how "referring" led this Vimeo employee to

know facts making infringement obvious.  Absent such information, the Court cannot infer that "referring" the video gave Whitman any additional insight into whether the video's creators or users were authorized to use the copyrighted music.  Plaintiffs list non-employee user Bryan Pugh as the video's sole uploader. *See* Berkley Decl., Ex. C at 85 (video uploaded by Bryan Pugh not marked as "employee upload").  This evidence does not therefore disqualify Vimeo from the DMCA safe harbor with respect to Video 176.

***

In sum, none of the evidence adduced by Plaintiffs on remand carries the high burden of raising a triable issue of fact as to whether Vimeo employees "either knew the video was infringing or knew facts making that conclusion obvious to an ordinary person who had no specialized knowledge of music or the laws of copyright." *Vimeo III*, 826 F.3d at 98.  Plaintiffs take issue with the steep threshold they must cross to demonstrate red flag knowledge, by arguing *inter alia*:  "Why . . . would [Vimeo] think that random users, who never claimed to have a license, would have one, let alone a license that would permit a user to sublicense music for dissemination on the internet?"  Pls. Memo. at 18.  With respect to fair use, Plaintiffs point out that "[n]o Vimeo Staff came forward to claim that he or she considered fair use . . . when viewing a video at issue, let alone that any facts led to the belief that a particular video was licensed or the use of music was fair use."  Pls. Reply at 9.

Although this Court found these arguments persuasive in the first instance, they are precluded by *Vimeo III* and by the Second Circuit's interpretation of the compromise embodied in the DMCA.  As explained above, Plaintiffs bear the burden of demonstrating that Vimeo employees were aware of the licensing practices that affect the music uploaded onto their site, and, where relevant, were able to distinguish between fair and infringing use.  The fact that the

record contains no evidence that Vimeo employees considered these issues when screening the Videos-in-Suit does not absolve Plaintiffs of this burden.  The Court of Appeals expressly stated that service-provider employees cannot "be automatically expected to know how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music."  *Vimeo III*, 826 F.3d at 97.  Plaintiffs have adduced no evidence, either in general or specific to the Videos-in-Suit, to suggest that Vimeo employees had such knowledge in this case. The same is true of fair use, a doctrine that is implicated by the nature of the infringing material here, *i.e.*, music incorporated into videos generated by the users themselves.

Because, pursuant to *Vimeo III*, a service provider cannot be presumed to know that content on its site is licensed or does not qualify as fair use, Plaintiff's lack of evidence in that respect is dispositive.  Vimeo is therefore entitled to summary judgment under the DMCA safe harbor as to all user-uploaded videos.

### C.  Employee-Uploaded Videos

The Court separately considers whether Vimeo is entitled to summary judgment on the set of videos Plaintiffs have identified as uploaded by Vimeo or Connected Ventures employees. In *Vimeo I*, this Court found that a triable issue of fact had been raised with respect to whether Vimeo employees who uploaded allegedly infringing videos were "storing their content as 'users' within the meaning of § 512(c) or as employees acting within the scope of their employment."  972 F. Supp. 2d at 519.  If the employees stored their videos as independent users, not on behalf of the company, then Vimeo would remain entitled to safe-harbor protection as the videos would have been stored "at the direction of a user" rather than the service provider. 17 U.S.C. § 512(c)(1); *see Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1161–62 (2d Cir. 1971) (affirming that one who promotes or induces "infringing acts"

infringement may be liable under the Copyright Act even without actual knowledge of infringement).  The Second Circuit did not address this issue on appeal.  *Vimeo III*, 826 F.3d at 86 n.6.

After this Court allowed Plaintiffs to amend their complaint to include additional instances of infringement, *Vimeo II*, 972 F. Supp. 2d at 549–50, Plaintiffs identified 26 videos that were uploaded to the Vimeo website by its employees.  *See* Pls. SSUF ¶ 29(a)–(z). The Court has already denied summary judgment to both parties on ten of these videos, *Vimeo I*, 972 F. Supp. 2d at 519, which correspond to the original set that Plaintiffs identified as uploaded by Vimeo employees.  *Compare* Plaintiffs' Original Statement of Undisputed Facts ¶ 63(a)–(j), *with* Pls. SSUF ¶ 29(a)–(z).  There are thus 16 additional allegations of employee-uploaded videos for the Court to consider.

As this Court held with respect to the first ten employee-uploaded videos, "[r]easonable minds could differ . . . as to the extent to which the videos at issue here were uploaded by Vimeo employees in their personal capacities as opposed to as agents of Vimeo." *Vimeo I*, 972 F. Supp. 2d at 519.  Each of these additional 16 videos were uploaded by individuals identified in the declaration of Katie McGregor—the head of Human Resources for Connected Ventures and prior head of Human Resources for Vimeo—as employees of either Vimeo or Connected Ventures.  Dkt. 84, McGregor Decl. ¶ 2(a)–(m).  The fact that in some cases the uploader may have only uploaded but not "maintained" the video does not resolve the dispute over whether the individual "stored" the video at the direction of Vimeo.  Nor does the fact that certain uploaders were Connected Venture employees, rather than Vimeo employees, resolve the issue of whether they had the authority to bind Vimeo, even after Vimeo's assets separated from Connected Ventures in July 2008.  *See* Dkt. 189, Def. Counter. 56.1 ¶ 29.  Neither party has sufficiently

briefed the question of whether this separation of assets in July 2008 affects whether a Connected Ventures employee could still have uploaded an infringing video to Vimeo's website "at the direction" of Vimeo, rather than as an independent user.  As there is a genuine dispute of material fact over whether they were uploaded by employees acting as Vimeo's agents, the Court denies Vimeo's summary judgment motion as to these videos.

## CONCLUSION

Applying the standard set forth in *Vimeo III,* and for the reasons stated above, Plaintiffs' motion must be denied in its entirety.  Vimeo's motion is denied as to the 26 videos which were uploaded or maintained by Vimeo or Connected Ventures employees, and granted as to the remaining 281 videos.  *See generally* Berkley Decl., Ex. C.

The parties shall submit a letter providing the Court with an update as to the status of this case and proposed next steps no later than June 18, 2021.

SO ORDERED.

Dated:      May 28, 2021
            New York, New York

                                         _____
                                         Ronnie Abrams
                                         United States District Judge

28